## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS
## EAST ST. LOUIS DIVISION

| | | |
|---|---|---|
| Midwest Trust Company as | ) | |
| Administrator of the Estate of | ) | |
| Mark Bull, Deceased, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 3:23-cv-01238-SMY |
| Vs. | ) | |
| | ) | |
| Sheriff Jeff C. Connor, County of Madison, | ) | |
| Illinois, John Does, Jane Does, and | ) | |
| Advanced Correctional Healthcare, Inc., | ) | |
| | ) | |
| Defendants. | ) | |

### AMENDED COMPLAINT

Plaintiff, Midwest Trust Company, as Administrator of the Estate of Mark Bull, Deceased ("Mark Bull," "Plaintiff," or "Decedent") through attorneys Ted Gianaris of Gianaris Trial Lawyers and Suvir Dhar of Dhar Legal Group, states as follow:

### GENERAL FACT ALLEGATIONS & PARTIES

1.    From June 14, 2022, to June 29, 2022, Mark Bull was detained as an inmate in the Madison County, Illinois jail. On information and belief Mr. Bull was detained in pretrial status.

2.    On June 28, 2022, while in custody Mr. Bull had a major medical emergency.  He was transferred by ambulance to Anderson Hospital.

3.    On June 29, 2022, Mr. Bull died in the ICU at Anderson Hospital from a perforated duodenal ulcer with peritonitis.

4.     On August 7, 2023, The Circuit Court of the Third Judicial Circuit, Madison County Illinois appointed Midwest Trust Company as the Independent Administrator of the estate of Mark T. Bull.

5.     On September 25, 2023, the Circuit Court of the Third Judicial Circuit, Madison County Illinois found and concluded that Matthew Bull and Coltyn Bull are, in fact Mark Bull's biological children and thus the proper legal heirs of Mark Bull and the only beneficiaries and next of kin of The Estate of Mark Bull.

6.     Defendant, Jeff C. Connor ("Sheriff"), is the Sheriff of Madison County, Illinois and employed by Madison County, Illinois.

7.     Defendant, County of Madison, Illinois ("Madison County"), is a County of the State of Illinois, a local governmental entity, acting herein by its agents, servants, and employees, and the operator of the Madison County, Illinois Jail.

8.     Defendant, Advanced Correctional Healthcare, Inc. ("ACH"), is an Illinois corporation based in Peoria, Illinois that provides healthcare services at the Madison County Jail on behalf of the Madison County Sheriff's Department.

9.     Before June 14, 2022, and from June 14, 2022, to June 29, 2022, while providing healthcare services at the Madison County Jail on behalf of the Madison County Sheriff's Department, ACH was a final policy maker for Madison County Jail.

10.     Before June 14, 2022, and from June 14, 2022, to June 29, 2022, while providing healthcare services at the Madison County Jail on behalf of the Madison County Sheriff's Department, ACH was acting under color of state law.

11.     Defendants, John Does and Jane Does, were Police or Law-Enforcement Officers, employed by the Sheriff, and/or Madison County, Illinois and working at the Madison County Jail before June 14, 2022, and between June 14, 2022, and June 29, 2022.

12.     Defendants, John Does and Jane Does, were healthcare providers employed by ACH and working at the Madison County Jail, and/or were working in conjunction with the Madison County Jail before June 14, 2022, and/or between June 14, 2022, and June 29, 2022.

13.     Between June 14, 2022, and June 29, 2022, Sheriff, or Madison County, by and through his/their/its employees and agents, owned, operated, and/or controlled the Madison County Jail ("Jail") and/or was/were responsible for the health, healthcare and wellbeing of Mr. Bull.

14.     Between June 14, 2022, and June 29, 2022, ACH by and through its employees and agents was responsible for the health, healthcare and wellbeing of Mr. Bull.

15.     On June 14, 2022, John Does and Jane Does, while acting under color of law, placed Mr. Bull into custody inside the Jail.

16.     Between June 14, 2022, and June 29, 2022, John Does and Jane Does, while acting under color of law, refused basic healthcare to Mark Bull.

17.     Danny Linhart was detained in the Jail with Mr. Bull and on June 6, 2022, he was interviewed by the Illinois State Police (See exhibit 1 as if fully stated).  Linhart stated the following:

-       LINHART stated he had known BULL his whole life.

-       LINHART stated he told every officer in the jail to help BULL.

-       LINHART stated jail staff just kept saying BULL was "dope sick."

-      LINHART stated BULL told every officer that he needed a wheelchair, a hospital, and a doctor.

-      LINHART stated jail staff gave BULL medication for withdrawals and he told staff he wasn't having withdrawals.

-      LINHART stated he heard BULL tell every officer that came through that he had tears in his stomach.

-      LINHART stated he was submitting a grievance for jail staff killing his friend.

-      LINHART stated BULL had a history of drug use.

-      LINHART stated BULL was in jail for over two weeks and there was no way BULL would have still been dope sick.

18.     On June 29, 2022, Danny Linhart filed a grievance (See exhibit 2 as if fully stated here). In the grievance, Linhart stated the following:

"On multiple occasions, between the dates 6/21/22 and 6/28/22 attempts were made by myself and detainee Mark T Bull# 52272 to inform facility staff entering cell block A North that detainee Mark T Bull# 52272 needed immediate medical attention due to severe stomach pains, vomiting, cold sweats, chest pains weakness and lack of energy. Detainee Mark T Bull requested outside medical attention and all request were ignored when medical issues were finally addressed, the severity of the issues were taken lightly and ultimately resulted in the death of detainee Mark T Bull."

19.     James Shimchick was detained in the Jail with Mr. Bull and on June 6, 2022, he was interviewed by the Illinois State Police (See exhibit 3 as if fully stated here). Shimchick stated the following:

-      SHIMCHICK stated BULL came to the jail approximately 2 weeks ago.

-        SHIMCHICK stated BULL was going through drug withdrawals when he initially arrived at the jail.

-        SHIMCHICK stated after about a week had passed BULL still hadn't gotten any better.

-        BULL started complaining about his stomach and stated he felt like a knife was inside him, while pointing to his liver area.

-        BULL told SHIMCHICK that a doctor told him (BULL) that long term use of opiates deteriorates the lining of your stomach.

-        SHIMCHICK stated he had known BULL since he was 5 years old and described him as a family friend.

-        SHIMCHICK stated he frequently notified jail staff about BULLS condition and jail staff just said BULL was going though withdrawals and there was nothing they could do for him.

-        SHIMCHICK stated they, SHIMCHICK and other inmates, helped BULL put in sick call requests on the tablets and they also filed grievances.

-        SHIMCHICK stated he helped BULL with one tablet request and one paper request.

-        SHIMCHICK stated BULL went to see the nurse and they gave him something for withdrawals.

-        SHIMCHICK stated BULL couldn't keep food down and he looked like a skeleton.

-        SHIMCHICK stated BULL withered away while he was in jail.

-        SHIMCHICK was told that BULL was vomiting and defecating blood. SHIMCHICK never witnessed it personally.

- SHIMCHICK stated BULL was getting out of bed when he got dizzy, fell, and hit his head.

- SHIMCHICK stated the next morning BULL told him to request a wheelchair and a doctor.

- SHIMCHICK stated he alerted Lt. Dover and filled out a paper sick call slip for BULL.

- SHIMCHICK stated there were grievances filed by Jonathan BEASLEY, BULL's cellmate.

- SHIMCHICK assumed BULL had Hepatitis-C because of his history with drug use and sharing needles.

- SHIMCHICK believed BULL would still be alive if he'd gotten to a hospital sooner.

- SHIMCHICK found out BULL was dead from BULL's sister.

- SHIMCHICK stated Danny LINHART, also incarcerated, was really close to BULL.

- SHIMCHICK believed BULL died as a result of medical negligence.

20.    On July 1, 2022, James Shimchick filed a grievance (See exhibit 4 as if fully stated here).  In the grievance Shimchick, stated the following:

"On multiple occasions, between the dates 6/21/22 and 6/28/22, attempts were made by myself and Detainee 'Mark T. Bull #52272 to inform security and medical staff entering Cell Block A-North that Detainee Mark T. Bull #52272 needed immediate medical attention due to severe stomach pains. vomiting, loss of appetite, cold sweats, weakness and lack of energy. Detainee Mark T. Bull #52272 requested outside medical attention and

all requests were either ignored or not taken seriously. When medical issues were finally addressed by security and medical staff, the severity of the issues were taken lightly and ultimately resulted in the death of Detainee Mark T. Bull #52272."

21.    Jonathan Beasley was detained in the Jail with Mr. Bull and on June 6, 2022, he was interviewed by the Illinois State Police (See exhibit 5 as if fully stated here).  Beasley stated the following:

- BEASLEY stated he was cell mates with BULL in cell 6A North. BULL slept in the top bunk and BEASLEY slept in the bottom bunk.

- BEASLEY stated he was cell mates with BULL for approximately a week, to a week and a half.

- BEASLEY initially thought BULL was "dope sick" but BULL wasn't getting any better.

- BEASLEY stated BULL was always sweating and had goosebumps. Additionally, he stated BULL was complaining about his stomach, coughing, vomiting and defecating all the time.

- BEASLEY told BULL he should have been getting better and ask him what was going on. BULL didn't tell BEASLEY about any health conditions.

- BEASLEY stated he'd seen guys come to jail that were dope sick and they usually pulled out of it within a week. BULL just wasn't getting any better.

- BEASLEY stated BULL told him that he kept messaging them (jail staff), saying he needed a doctor for his stomach.

- BULL told BEASLEY his stomach was bad and that he was in a bad way. He also told BEASLEY that he was dying.

- BEASLEY stated BULL was taken to the infirmary approximately 2 - 3 days ago.

- BEASLEY didn't know what BULL was treated for nor did BULL tell him what he was treated for when he came back to the cell.

- BEASLEY stated he notified jail staff about BULL's condition quite a few times.

- BEASLEY stated he never witnessed BULL take any drugs nor other illegal substances while incarcerated with BULL. BEASLEY stated he did not give BULL anything.

- BEASLEY stated BULL had a large cyst on the top of his head.

- BEASLEY stated he woke up one morning and saw BULL with a gash on his eye. BULL told BEASLEY he fell out of the bed. BEASLEY believed BULL hit his head on the toilet when he fell out of the bed. BEASLEY gave BULL a wad of tissue to put on his eye to stop the bleeding.

- BEASLEY stated he helped BULL submit a sick slip after he fell out of the bed.

- BEASLEY stated after BULL fell out of the bed and busted his eye, jail staff came to get him with a wheel chair. That's the last time he saw BULL.

- BEASLEY stated numerous people notified jail staff that BULL was sick and needed help.

- BEASLEY stated BULL would lay at night and breathe like he was in distress.

- BEASLEY stated he walked in the cell two days ago and saw BULL vomiting blood into the toilet.

22. While in jail, Mr. Bull complained to jail personnel of dizziness and headaches.

23. According to the Madison County Coroner's Office Case Report, while in jail Mr. Bull had been calling people he knew and telling them he was feeling ill, and the people Mr. Bull

had called had then, in turn, been calling Madison County jail on his behalf to request medical attention for him (See exhibit 6 as if fully stated here).

24.     While in jail, the jail personnel thought Mr. Bull was going through opioid withdrawals.

25.     While in jail, Mr. Bull had self-reported on an inmate form that he had "tears" in his stomach.

26.     While in jail, Mr. Bull could not walk, had dizziness when standing, fell and hit his head which required stitches.

27.     Between June 14, 2022, and June 29, 2022, Mr. Bull complained of severe stomach pain that was ignored.

28.     Sometime shortly after Mark Bull was placed into custody inside the Jail on June 14, 2022, and abruptly forced into opioid cessation, Mark Bull became "dope sick" and/or was in pain from an untreated duodenal ulcer and reported such to Jail staff and officers, John and Jane Does, employed by the Sheriff and Madison County, Illinois and/or ACH.

29.     In the alternative, sometime shortly after Mark Bull was placed into custody inside the Jail on June 14, 2022, and abruptly forced into opioid cessation, Mark Bull was in pain from an untreated duodenal ulcer and reported such to Jail staff and officers, John and Jane Does, employed by the Sheriff and Madison County, Illinois and/or ACH.

30.     According to the Bureau of Justice Assistance U.S. Department of Justice: Unaided and abrupt cessation of opioid use without drug substitution and step-down, referred to as "cold turkey," is a common and difficult process for substance users, and is associated with several withdrawal symptoms and complications (see exhibit 7 as if fully stated here).

31.     According to the Bureau of Justice Assistance U.S. Department of Justice: It is not uncommon for individuals to experience substance withdrawal at the time of entry into jail, when access to their drug of choice is abruptly stopped (see exhibit 7).

32.     In general, the Sheriff, Police or Law-Enforcement Officers and Jail staff or officers, John Does and Jane Does, employed by the Sheriff and Madison County, Illinois, and Madison County, Illinois were to provide necessary medical, psychological, and/or counseling services, housing, medications, care, and supervision to meet Mark Bull's safety needs, including those required to prevent serious and life-threatening health effects from abrupt opioid cessation and withdrawal symptoms.

33.     In the alternative, in general the Sheriff, Police or Law-Enforcement Officers and Jail staff or officers, John Does and Jane Does, employed by the Sheriff and Madison County, Illinois, and Madison County, Illinois were to provide necessary medical, psychological, and/or counseling services, housing, medications, care, and supervision to meet Mark Bull's safety needs, including those required to prevent serious and life-threatening health effects of an untreated duodenal ulcer.

34.     It is described in the medical literature and Defendants should have known that gastrointestinal ulcers and ulcerated strictures are secondary to opioid abuse (see exhibit 8 as if fully stated here).

35.     It is described in the medical literature and Defendants should have known that unaided and abrupt cessation of opioid use without drug substitution and step down or appropriate medical detoxification, referred to as cold turkey, can cause perforation of ulcers (see exhibit 9 as if fully stated here).

36.    Nonetheless, Advanced Correctional Healthcare, Inc. and its employees merely responded to Mark Bull's fears and concerns by telling him to "drink water" and that he would be "fine." They did not provide appropriate care.

37.    Nonetheless, the Sheriff, Jail staff and officers employed by the Sheriff and Madison County, Illinois, and/or Madison County, Illinois merely responded to Mark Bull's fears and concerns by telling him to "drink water" and that he would be "fine." They did not provide appropriate care.

38.    The Sheriff and Madison, County, Illinois employ or contract with physicians, ACH, or other professional medical-care providers, to examine and treat its inmates at the Jail, however none were appropriately called or utilized by the Sheriff, Jail staff or officers employed by the Sheriff and Madison County, Illinois in response to Mark Bull's illness and complaints.

39.    The Sheriff, Madison County, Illinois, ACH, and/or its employees and agents, including John and James Doe, refused to aid Mark Bull, and never contacted Mark Bull's primary care physician or family members.

40.    On June 28, 2022, and after nearly two weeks of painfully suffering from an abrupt and unaided opioid cessation without any medical attention or care or with improper medical attention or care, Mark Bull passed out and hit his head causing an injury that required stitches.

41.    In the alternative, then on June 28, 2022, and after nearly two weeks of painfully suffering from an untreated duodenal ulcer without any medical attention or care, Mark Bull passed out and hit his head causing an injury that required stitches.

42.    Sometime thereafter, Mark Bull was transferred to Anderson Hospital where he was determined to have suffered from a perforated duodenal ulcer.

43.     On June 29, 2022, Mark Bull died from the perforated duodenal ulcer, which was consciously disregarded and caused by the Sheriff, Jail staff or officers employed by the Sheriff and Madison County, Illinois, ACH, and Madison County, Illinois (collectively "Defendants").

44.     In the alternative, On June 29, 2022, Mark Bull died from the perforated duodenal ulcer caused by abrupt opioid cessation or cold turkey, which was consciously disregarded and caused by the Sheriff, Jail staff or officers employed by the Sheriff and Madison County, Illinois, ACH, and Madison County, Illinois (collectively "Defendants").

## COUNT I: 1983 CLAIM AGAINST DEFENDANTS

45.     Plaintiff incorporates the foregoing paragraphs as if fully stated here.

46.     Defendants had a duty to not violate Mark Bull's constitutional rights while holding him in custody; specifically, not to be deliberately indifferent to Mark Bull's health, safety, and welfare, and a further duty not to intentionally or recklessly refuse to comply with established policies and customs/practices of Defendants at the Jail and in their own profession.

47.     In violation of its duties, Defendants, with deliberate indifference, committed one or more of the following wrongful acts or omissions:

     a.  Failed to ensure Mark Bull received sufficient and proper medical attention, care, and/or withdrawal management at the Jail when they knew or should have known he was experiencing dangerous and painful opioid withdrawal symptoms and could suffer serious or life-threatening effects;

     b.  Failed to monitor and ignored Mark Bull's health condition after being made aware of such condition by Mark Bull and others;

     c.  Failed to appropriately notify, if at all, physicians or medical-care providers within a reasonable and timely manner that Mark Bull had complained of feeling "dope sick" and was suffering cold turkey withdrawals when Defendants knew or should have known of Mark Bull's struggles and addiction to opioids, including heroin;

     d.  Failed to employ, administer, or maintain a clinical management and/or monitoring/detox program for inmates, like Mark Bull, experiencing opioid withdrawal symptoms in order avert negative health effects and/or death;

e. Failed to maintain and/or administer proper medications for inmates, like Mark Bull, experiencing opioid withdrawal symptoms in order avert negative health effects and/or death;

f. Had a policy, or custom and practice, in which Jail physicians were not required to regularly examine and treat persons in the Jail with known serious or life-threatening conditions, such as opioid withdrawal, even though Defendants knew that these persons could or would suffer catastrophic injuries, including death, if not given proper treatment, including proper medication;

g. Had a policy, or custom and practice, in which the Jail's personnel, including law-enforcement officers, were not required to report inmates' verbal and/or written requests for medical attention to medical personnel, even though Defendants knew that persons in custody could or would suffer catastrophic injuries, including death, if they did not receive proper and immediate medical attention, including proper medication;

h. Failed to ensure Mark Bull received sufficient and proper medical attention, and care, for his painful duodenal ulcer that was made known to Defendants and Defendants should have known was a serious and life-threatening condition;

i. Failed to monitor and ignored Mark Bull's painful duodenal ulcer after being made aware of such condition by Mark Bull and others;

j. Failed to appropriately notify, if at all, physicians or medical-care providers within a reasonable and timely manner that Mark Bull had complained of painful duodenal ulcer and/or its related symptoms;

k. Knew Mark Bull was suffering cold-turkey withdrawals and choose to provide no assistance or inappropriate assistances specifically and deliberately to punish Mr. Bull; and/or

l. Had actual knowledge of Mark Bull's serious and life-threatening medical condition and choose to deliberately ignore it.

48.    The Illinois State Police investigated but did not appropriately and adequately investigate this death.

49.    As a proximate result of one or more of these wrongful acts or omissions, which were done with deliberate indifference, Mark Bull died on June 29, 2022, thus being deprived of rights and privileges guaranteed by the Fifth, Eight, and Fourteenth Amendments of the United States Constitution.

50.    Between the date Mark Bull was placed in the Jail and the date of his death, Mark Bull incurred substantial constitutional and non-economic damages, including pain, suffering,

humiliation, and emotional distress because of Defendants' wrongful acts and omissions and deliberate indifferences to his life and well-being.

51.     As a proximate result of Mark Bull's death, his estate has incurred funeral expenses. Plaintiffs make a claim against Defendants for reimbursement of these expenses.

52.     As a proximate result of Mark Bull's death, his children have suffered pecuniary losses allowed by law.

WHEREFORE, Plaintiff prays for judgment in its favor and against Defendants in an amount in excess of the jurisdictional minimum for this Court, plus punitive damages together with costs of suit and attorneys' fees.

## COUNT II: ADA VIOLATIONS AGAINST DEFENDANTS

53.     Plaintiff restates and realleges the above paragraphs as if fully stated herein.

54.     People addicted to prescription or illicit opioids have an opioid use disorder (OUD), which is a specific type of substance use disorder. OUD is "the maladaptive use of opioids, prescribed or illicit, resulting in two or more criteria that reflect impaired health or function over a 12-month period. OUD is scaled according to severity (mild/moderate/severe) and does not require physiological tolerance or dependence in order to be considered a substance use disorder."8 *See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* 541 (5th ed. APA, 2013) (Opioid Use Disorder), (See exhibit 10 as if fully stated here).

55.     The ADA prohibits denying health and drug rehabilitation services based on illegal drug use.

56.     People who are physically dependent on opioids experience acute withdrawal effects when they stop taking opioids and can suffer from protracted withdrawal symptoms. The

symptoms of acute withdrawal include increased pulse, vomiting, diarrhea, excessive sweating, bone and joint aches, anxiety, and irritability. Protracted withdrawal symptoms can last longer. These symptoms can include anxiety, depression, sleep disturbances, fatigue, dysphoria (i.e., feeling down or emotionally blunted), and irritability.

57.      Withdrawal alone is not a recognized form of treatment for OUD. Because OUD is often accompanied by changes to brain chemistry, there is a high likelihood of relapse after withdrawal if additional forms of treatment are not provided. Absent such treatment, people suffering from OUD will continue to crave opioids.

58.      The ADA protects people from discrimination on the basis of their disabilities.

59.      The ADA defines "disability" as a physical or mental impairment that substantially limits one or more major life activities. 42 U.S.C. § 12102(1)(A). People with OUD suffer from a physical or mental impairment that substantially limits one or more major life activities. 28 C.F.R. § 35.108(b)(2) (defining physical or mental impairment to include "drug addiction"). OUD substantially limits major life activities, including caring for oneself, learning, concentrating, thinking, and communicating. 42 U.S.C. § 12102(2)(A). OUD also limits the operation of major bodily functions, such as neurological and brain functions. 42 U.S.C. § 12102(2)(B). The determination whether an impairment substantially limits a major life activity is made without regard to the effect that ameliorating measures—including medication—may have on the impairment. 42 U.S.C. § 12102(4)(E)(i). Accordingly, people with OUD are individuals with a disability within the meaning of 42 U.S.C. § 12102 and 28 C.F.R. § 35.108 and are covered by the ADA's protections.

60.      The ADA provides that health and drug rehabilitation services cannot be denied based on a person having engaged in illegal drug use. 42 U.S.C. § 12210(c).

61.     Under the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

62.     On and before June 14, 2022, Mark Bull was an individual with disabilities as that term is defined in 42 U.S.C. § 12131(2) and 28 C.F.R. § 35.104 because he suffered from OUD, which is a mental and/or physical impairment that substantially limits one or more "major life activities," including, inter alia, caring for himself, eating, sleeping, learning, concentrating, thinking, communicating, working, and the operation of his major bodily functions, including immune systems and digestive, bowel, bladder, neurological, brain, and circulatory functions. *See* 42 U.S.C. §§ 12102(1-2).

63.     Defendants are public entities as that term is defined in 42 U.S.C. § 12131(1) and 28 C.F.R. § 35.104.

64.     Defendants provide medical services to individuals incarcerated at the Jail including, *inter alia*, medication services. *See Pa. Dep't of Corr. V. Yeskey*, 524 U.S. 206, 210 (1998) (concluding that "services, programs, or activities" under the ADA include medical services).

65.     Mark Bull met the essential eligibility requirements for the receipt of medical services - including access to medications - provided by Defendants to individuals incarcerated at the Jail.

66.     Even though Mark Bull was a qualified individual, Defendants denied medical services and treatment to Mark Bull on the basis of his qualified disability - OUD. *See* 42 U.S.C. § 12210(c) ("…an individual shall not be denied health services, or services provided in connection

with drug rehabilitation, on the basis of the current illegal use of drugs if the individual is otherwise entitled to such services.").

67.     Defendants provide medication services to individuals as necessary for other diseases and disorders but have a policy and practice of denying adequate medical services and treatment to individuals with an OUD and/or denied adequate medical services and treatment between June 14, 2022, and June 28, 2022, to Mark Bull, an individual with an OUD who needed medical services and treatment. This is a violation of the ADA.

68.     The Illinois State Police investigated but did not appropriately and adequately investigate this death.  (See exhibit 11 as if fully stated).

69.     As a direct and proximate result of Defendants' unlawful discrimination in violation of the ADA, Mark Bull incurred substantial constitutional and non-economic damages, including pain, suffering, humiliation, emotional distress and death.

70.     As a further proximate result of the wrongful death of Mark Bull, his estate has incurred funeral expenses. Plaintiffs make a claim against Defendants for reimbursement of these expenses.

71.     As a proximate result of Mark Bull's death, his children have suffered pecuniary losses allowed by law.

WHEREFORE, Plaintiff prays for judgment in its favor and against Defendants in an amount in excess of the jurisdictional minimum for this Court, together with costs of suit and attorneys' fees.

## COUNT III: SURVIVAL ACTION AGAINST DEFENDANTS - WILLFUL & WANTON

72.     Plaintiff restates and realleges the above paragraphs as if fully stated herein.

73.     This Count of Plaintiff's complaint is brought under the Illinois Survival Act (755 ILCS 5/27-6).

74.     Defendants had a duty to exercise ordinary care for Mark Bull's health and safety while holding him in custody, and a duty to provide to him (while holding him in custody) the most basic health care commensurate with a civilized society.

75.     In violation of these duties, Defendants committed one or more of the following willful & wanton acts or omissions:

      a.  Knowingly and deliberately failed to ensure Mark Bull received sufficient and proper medical attention, care, and/or withdrawal management at the Jail when they knew or should have known he was experiencing dangerous and painful opioid withdrawal symptoms and could suffer serious or life-threatening effects;

      b.  Knowingly and deliberately failed to monitor and ignored Mark Bull's health condition after being made aware of such condition by Mark Bull and others;

      c.  Knowingly and deliberately failed to appropriately notify, if at all, physicians or medical-care providers within a reasonable and timely manner that Mark Bull had complained of feeling "dope sick" and was suffering cold turkey withdrawals when Defendants knew or should have known of Mark Bull's struggles and addiction to opioids, including heroin;

      d.  Knowingly and deliberately failed to employ, administer, or maintain a clinical management and/or monitoring/detox program for inmates, like Mark Bull, experiencing opioid withdrawal symptoms in order avert negative health effects and/or death;

      e.  Knowingly and deliberately failed to maintain and/or administer proper medications for inmates, like Mark Bull, experiencing opioid withdrawal symptoms in order avert negative health effects and/or death;

      f.  Purposefully and with bad intent had a policy, or custom and practice, in which Jail medical providers were not required to regularly examine and treat persons in the Jail with known serious or life-threatening conditions, such as opioid withdrawal, even though Defendants knew that these persons would suffer catastrophic injuries, including death, if not given proper treatment, including proper medication;

      g.  Purposefully and with bad intent had a policy, or custom and practice, in which the Jail's personnel, including law-enforcement officers, were not required to report inmates' verbal and/or written requests for medical attention to medical personnel, even though Defendants knew that persons in custody would suffer catastrophic injuries, including death, if they did not receive proper and immediate medical attention, including proper medication;

h.  Knowingly and deliberately failed to ensure Mark Bull received sufficient and proper medical attention, and care, for his painful duodenal ulcer that was made known to Defendants and Defendants should have known was a serious and life-threatening condition;

i.  Knowingly and deliberately failed to monitor and ignored Mark Bull's painful duodenal ulcer after being made aware of such condition by Mark Bull and others;

j.  Knowingly and deliberately failed to appropriately notify, if at all, physicians or medical personnel within a reasonable and timely manner that Mark Bull had complained of painful duodenal ulcer and/or its related symptoms;

k.  Knew Mark Bull was suffering cold-turkey withdraws and choose to provide no needed assistance specifically and deliberately to punish Mr. Bull; and/or

l.  Had actual knowledge of Mark Bull's serious and life-threatening medical condition and choose to deliberately ignore it.

76.  The Illinois State Police investigated but did not appropriately and adequately investigate this death.

77.  As a proximate result of one or more of these willful & wanton acts or omissions, which were done with deliberate indifference, Mark Bull experienced conscious pain and suffering and substantial non-economic damages, including pain, suffering, humiliation, and emotional distress until his death on June 29, 2022.

WHEREFORE, Plaintiffs prays for judgment in its favor and against Defendants in an amount in excess of the jurisdictional minimum for this Court, plus punitive damages, together with costs of suit.

## COUNT IV: WRONGFUL DEATH AGAINST DEFENDANTS - WILLFUL & WANTON

78.  Plaintiffs restate and realleges the above paragraphs as if fully stated herein.

79.  This Count IV of Plaintiffs' Complaint is brought pursuant to the Illinois Wrongful Death Act (740 ILCS 180/1, *et seq*.).

80.  The Illinois State Police investigated but did not appropriately and adequately investigate this death.

81. As a proximate result of one or more of these willful & wanton acts or omissions, which were done with deliberate indifference, Mark Bull sustained injuries that caused or contributed to his death on June 29, 2022.

82. At the time of his death, decedent left surviving his next of kin, each of whom suffered injuries as a result of the decedent's death, including, grief, sorrow, loss of companionship and loss of society.

WHEREFORE, Plaintiff pray for judgment in their favor and against Defendants in an amount in excess of the jurisdictional minimum for this Court, plus punitive damages together with costs of suit.

## COUNT V: SURVIVAL ACTION AGAINST DEFENDANTS - NEGLIGENCE

83. Plaintiff restates and realleges the above paragraphs as if fully stated herein.

84. This Count of Plaintiff's complaint is brought under the Illinois Survival Act (755 ILCS 5/27-6).

85. Defendants had a duty to exercise ordinary care for Mark Bull's health and safety while holding him in custody, and a duty to provide to him (while holding him in custody) the most basic health care commensurate with a civilized society.

86. In violation of these duties, Defendants committed one or more of the following negligent acts or omissions:

    a. Failed to ensure Mark Bull received sufficient and proper medical attention, care, and/or withdrawal management at the Jail when they knew or should have known he was experiencing dangerous and painful opioid withdrawal symptoms and could suffer serious or life-threatening effects;

    b. Failed to monitor and ignored Mark Bull's health condition after being made aware of such condition by Mark Bull and others;

    c. Failed to appropriately notify, if at all, physicians or medical-care providers within a reasonable and timely manner that Mark Bull had complained of feeling "dope sick" and was suffering cold turkey withdrawals when

Defendants knew or should have known of Mark Bull's struggles and addiction to opioids, including heroin;

d.  Failed to employ, administer, or maintain a clinical management and/or monitoring/detox program for inmates, like Mark Bull, experiencing opioid withdrawal symptoms in order avert negative health effects and/or death;

e.  Failed to maintain and/or administer proper medications for inmates, like Mark Bull, experiencing opioid withdrawal symptoms in order avert negative health effects and/or death;

f.  Had a policy, or custom and practice, in which Jail medical personnel were not required to regularly examine and treat persons in the Jail with known serious or life-threatening conditions, such as opioid withdrawal, even though Defendants knew that these persons would suffer catastrophic injuries, including death, if not given proper treatment, including proper medication;

g.  Had a policy, or custom and practice, in which the Jail's personnel, including law-enforcement officers, were not required to report inmates' verbal and/or written requests for medical attention to medical personnel, even though Defendants knew that persons in custody would suffer catastrophic injuries, including death, if they did not receive proper and immediate medical attention, including proper medication;

h.  Failed to ensure Mark Bull received sufficient and proper medical attention, and care, for his painful duodenal ulcer that was made known to Defendants and Defendants should have known was a serious and life-threatening condition;

i.  Failed to monitor and ignored Mark Bull's painful duodenal ulcer after being made aware of such condition by Mark Bull and others;

j.  Failed to appropriately notify, if at all, physicians or medical personnel within a reasonable and timely manner that Mark Bull had complained of painful duodenal ulcer and/or its related symptoms.

87.  The Illinois State Police investigated but did not appropriately and adequately investigate this death.

88.  As a proximate result of one or more of these negligent acts or omissions, Mark Bull experienced conscious pain and suffering and substantial non-economic damages, including pain, suffering, humiliation, and emotional distress until his death on June 29, 2022.

WHEREFORE, Plaintiffs prays for judgment in its favor and against Defendants in an amount in excess of the jurisdictional minimum for this Court, together with costs of suit.

## COUNT VI: WRONGFUL DEATH AGAINST DEFENDANTS - NEGLIGENCE

89.  Plaintiffs restate and reallege the above paragraphs as if fully stated herein.

90.     This Count VI of Plaintiffs' Complaint is brought pursuant to the Illinois Wrongful Death Act (740 ILCS 180/1, *et seq*.).

91.     The Illinois State Police investigated but did not appropriately and adequately investigate this death.

92.     As a proximate result of one or more of these careless and negligent acts or omissions, Mark Bull sustained injuries that caused or contributed to his death on June 29, 2022.

93.     At the time of his death, decedent left surviving his next of kin, each of whom suffered injuries as a result of the decedent's death, including, grief, sorrow, loss of companionship and loss of society.

WHEREFORE, Plaintiffs prays for judgment in its favor and against Defendants, in an amount in excess of the jurisdictional minimum for this Court, together with costs of suit.

Respectfully Submitted,

**GIANARIS TRIAL LAWYERS**

By: ___*/s/ Ted Gianaris*_____

Ted Gianaris, IL #6237156
Joshua A. Edelson, IL #6326848
One Court Street
Alton, IL 62002
(618) 619-0010
(618) 259-2251 (Fax)
tgianaris@lawforpeople.com
jedelson@lawforpeople.com

**DHAR LEGAL GROUP, LLC**

By: /s/ Suvir Dhar_____
Suvir Dhar, IL #6304709
Dhar Legal Group, LLC
2822 N. Geyer Road
St. Louis, MO  63131
Suvir@dharlegalgroup.com
*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

The undersigned certifies that a true and correct copy of the foregoing was served via

Odyssey E-file Illinois on this 5th day of January 2024 upon all counsel of record.

<u>/s/ Ted Gianaris</u>