**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**
**EAST ST. LOUIS DIVISION**

| | | |
|---|---|---|
| Midwest Trust Company as | ) | |
| Administrator of the Estate of | ) | |
| Mark Bull, Deceased, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 3:23-cv-01238-SMY |
| Vs. | ) | |
| | ) | |
| Sheriff Jeff C. Connor, County of Madison, | ) | |
| Illinois, John Does, Jane Does, and | ) | |
| Advanced Correctional Healthcare, Inc., | ) | |
| | ) | |
| Defendants. | ) | |

# EXHIBIT 1 – LINHART STATMENT

# TO AMENDED COMPLAINT

# ILLINOIS STATE POLICE
# INVESTIGATIVE REPORT

| Case Number | Case Title | | | Report Type | | |
|---|---|---|---|---|---|---|
| 22-39766900034 | BULL, MARK T. | | | ☑ Individual  ☐ Location  ☐ Vehicle | | |
| Report Purpose | INTERVIEW OF DANNY LINHART | | | Report Date 08/30/2022 | | Activity Date 06/29/2022 |

| Lead Number | Drug Buys | ArrestWarrants | Search Warrants | Overhear Admin | Overhear Warrant |
|---|---|---|---|---|---|
| | | | | | |

| Reporting Agent | ID Number | Zone/Office |
|---|---|---|
| LOWERY, MICHAEL | 6592 | ISPZ6CL |

| Case Agent | Case Agent ID Number | Case Agent Zone/Office |
|---|---|---|
| LOWERY, MICHAEL | 6592 | ISPZ6CL |

| ALPR Used | APLR Location |
|---|---|
| ☐ Yes | |

## NARRATIVE

The purpose of this report is to document an interview conducted while investigating the in-custody death of Mark BULL.

The interview was conducted with:

DANNY G. LINHART



On June 6, 2022, Reporting Agent Michael Lowery and Special Agent Michael Hentze requested an interview with LINHART.   LINHART was read his Miranda Rights from a standardized form.   LINHART initialed and signed the form indicating he understood his rights.   A video statement checklist was completed as LINHART agreed to participate with a video recorded interview.  The interview started at 4:30 p.m., as LINHART stated the following:

- LINHART stated he had known BULL his whole life.

- LINHART stated he told every officer in the jail to help BULL.

- LINHART stated jail staff just kept saying BULL was "dope sick."

- LINHART stated BULL told every officer that he needed a wheelchair, a hospital, and a doctor.

- LINHART stated jail staff gave BULL medication for withdrawals and he told staff he wasn't having withdrawals.

- LINHART stated he heard BULL tell every officer that came through that he had tears in his stomach.

- LINHART stated he was submitting a grievance for jail staff killing his friend.

- LINHART stated BULL had a history of drug use.

- LINHART stated BULL was in jail for over two weeks and there was no way BULL would have still been dope sick.

| Approved By |
|---|
| Irwin, Travis   #6344 |

Disclaimer: This document contains neither recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

Exhibit 1

- LINHART heard BULL say he thought he was having a heart attack and he had tears in his stomach.

- LINHART stated BULL was close to James SHIMCHICK.

- LINHART heard BULL fall out of his bed and described it as being loud, like he hit the bars or the toilet. LINHART believed it was shortly after midnight.   Jail staff came to get him the next morning.

- LINHART stated BULL would barely eat and they (LINHART and SHIMCHICK) would cook for him.

- LINHART stated BULL was sick the day he arrived at jail.   He progressively got worse as time went by.

- LINHART stated sometimes BULL would be sweating so bad, it looked as if someone had dumped a 5-gallon bucket of water on him.

- LINHART stated BULL was vomiting blood and would be vomiting and defecating at the same time.   LINHART later stated BULL had a bowl full of blood that he had vomited.

- LINHART stated he never put in a sick call request for BULL; SHIMCHICK did.

- LINHART stated BULL told him the medicine that jail staff gave him made him worse.

- LINHART stated BULL went to see the nurse when he first got there and then again, a week later.

The interview concluded at 4:48 p.m.    LINHART was released back into the custody of jail staff.

The bullet statements contained in report are not verbatim and shall serve as a generalization of information provided by LINHART.   For an exact account of his statement, please review the DVD containing his recorded interview.

The original DVD, video statement checklist, and field notes will be submitted to the Illinois State Police Zone 6 Evidence Vault.   Copies of the documents are attached to this report for review.

| Approved By |
| --- |
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000002

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION**

Midwest Trust Company as )
Administrator of the Estate of )
Mark Bull, Deceased, )
　 )
             Plaintiffs, )
              )      No. 3:23-cv-01238-SMY
      Vs. )
              )
Sheriff Jeff C. Connor, County of Madison, )
Illinois, John Does, Jane Does, and )
Advanced Correctional Healthcare, Inc., )
              )
         Defendants. )

# EXHIBIT 2 – LINHART

# GRIEVANCE

# TO AMENDED COMPLAINT

22-39766900034
LOWERY, MICHAEL
D   6592
Page   2   Of   7

7/13/22, 10:09 AM                https://cc-snap.telmate.com/admin/grievances/documents/print_audit?grievance_ref=186950532&member_id=201870912

## Audit Grievance #186950532

Profile Photo:



Audit Photo:
Audit Photo

### Inmate Info

Name: DANNY LINHART
Submitted Date: 06/29/22 20:18
Submitted from Location/Room: A North Felony/A North Felony
Current Location/Room: A North Felony/A North Felony
Facility: Madison County Jail IL

### Form Info

Category: Medical
Form: Grievance-Medical

### Grievance Info

Status: CLOSED / Ungrievable by Valerie Bassett ❗
Facility Deadline: 07/13/22 23:59
Grievance Level: 1
Inmate can reply: No
❗ Appeal has been curtailed
Summary of Grievance:
Medical Negligence
Details of Grievance:

[Yes]

Attempted to resolve issue with all of the first shift guards and infirmary staff that enters cell block A North
between the dates 6/21/22 and 6/28/22. When attempts were not ignored, facility staffs responses were either
there's nothing we can do about it or file a griievance

Yes

On multiple occasions, between the dates 6/21/22 and 6/28/22 attempts were made by myself and detainee Mark
T Bull# 52272 to inform facility staff entering cell block A North that detainee Mark T Bull# 52272 needed
immediate medical attention due to severe stomach pains, vomiting, cold sweats, chest pains weakness and lack
of energy detainee Mark T Bull requested outside medical attention and all request were ignored when medical
issues were finally addressed , the severity of the issues were taken lightly and ultimately resulted in the death of
Detainee Mark T Bull

1/2

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000003

22-39766900034
LOWERY, MICHAEL
D  6592
Page   3  Of  7

7/13/22, 10:09 AM

I purpose that all detainee medical needs be taken seriously and given proper attention and care Detainee Mark T Bull and I were life long friends and I propose I be granted opportunity to grieve alongside our affected families and attend the funeral of Detainee Mark T Bull #52272 I propose disciplinary action be taken amongst facility medical staff

| Date/Time | User | Action | Source | Details |
|---|---|---|---|---|
| 07/01/22 07:17 | Valerie Bassett | Print | | Has been printed without notes by vlbassett@co.madison.il.us |
| 07/01/22 07:17 | Valerie Bassett | Viewed | | |
| 06/30/22 11:08 | DANNY LINHART | Viewed Staff Response | Tablet | |
| 06/30/22 07:02 | Valerie Bassett | Staff Response | | Every inmates medical needs are treated and taken seriously with out infirmary staff. I am not able to go into detail or discuss anyone's medical records/issues with other inmates. I also do not have the authority to grant a furlough. |
| 06/30/22 07:02 | Valerie Bassett | Changed Status | | From 'Open' to 'Closed / Ungrievable' |
| 06/30/22 06:58 | Valerie Bassett | Viewed | | |
| 06/29/22 20:53 | Craig Richert | Recategorization | | Changed Category and Form from 'Grievance/Grievance' to 'Medical/Grievance-Medical' |
| 06/29/22 20:53 | Craig Richert | Viewed | | |

2/2

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000004

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**
**EAST ST. LOUIS DIVISION**

Midwest Trust Company as      )
Administrator of the Estate of     )
Mark Bull, Deceased,         )
                          )
        Plaintiffs,     )
                          )     No. 3:23-cv-01238-SMY
      Vs.             )
                          )
Sheriff Jeff C. Connor, County of Madison, )
Illinois, John Does, Jane Does, and     )
Advanced Correctional Healthcare, Inc.,   )
                          )
        Defendants.    )

# EXHIBIT 3 – SHIMCHICK

# STATEMENT

# TO AMENDED COMPLAINT

22-39766900034
LOWERY, MICHAEL
D  6592
Page    1  Of  6

## ILLINOIS STATE POLICE
## INVESTIGATIVE REPORT

| Case Number | Case Title | | | | Report Type |
|---|---|---|---|---|---|
| **22-39766900034** | **BULL, MARK T.** | | | | ☑ Individual ☐ Location ☐ Vehicle |

| Report Purpose | | | | Report Date | Activity Date |
|---|---|---|---|---|---|
| **INTERVIEW OF JAMES SHIMCHICK** | | | | **08/30/2022** | **06/29/2022** |

| Lead Number | Drug Buys | ArrestWarrants | Search Warrants | Overhear Admin | Overhear Warrant |
|---|---|---|---|---|---|
| | | | | | |

| Reporting Agent | | D Number | Zone/Office |
|---|---|---|---|
| **LOWERY, MICHAEL** | | **6592** | **ISPZ6CL** |

| Case Agent | Case Agent ID Number | Case Agent Zone/Office |
|---|---|---|
| **LOWERY, MICHAEL** | **6592** | **ISPZ6CL** |

| ALPR Used | APLR Location |
|---|---|
| ☐ Yes | |

# NARRATIVE

The purpose of this report is to document an interview conducted while investigating the in-custody death of Mark BULL.

The interview was conducted with:

JAMES T. SHIMCHICK
M



On June 6, 2022, Reporting Agent Michael Lowery and Special Agent Michael Hentze requested an interview with SHIMCHICK.   SHIMCHICK was read his Miranda Rights from a standardized form.   SHIMCHICK initialed and signed the form indicating he understood his rights.   A video statement checklist was completed as SHIMCHICK agreed to participate with a video recorded interview.   The interview started at 3:59 p.m., as SHIMCHICK stated the following:

- SHIMCHICK stated BULL came to the jail approximately 2 weeks ago.

- SHIMCHICK stated BULL was going through drug withdrawals when he initially arrived at the jail.

- SHIMCHICK stated after about a week had passed BULL still hadn't gotten any better.

- BULL started complaining about his stomach and stated he felt like a knife was inside him, while pointing to his liver area.

- BULL told SHIMCHICK that a doctor told him (BULL) that long term use of opiates deteriorates the lining of your stomach.

- SHIMCHICK stated he had known BULL since he was 5 years old and described him as a family friend.

- SHIMCHICK stated he frequently notified jail staff about BULLS condition and jail staff just said BULL was going though withdrawals and there was nothing they could do for him.

- SHIMCHICK stated they, SHIMCHICK and other inmates, helped BULL put in sick call requests on the tablets and

| Approved By |
|---|
| **Irwin, Travis  #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

*Exhibit 3*

22-39766900034
LOWERY, MICHAEL
D   6592
Page    2  Of  6

they also filed grievances.

- SHIMCHICK stated he helped BULL with one tablet request and one paper request.

- SHIMCHICK stated BULL went to see the nurse and they gave him something for withdrawals.

- SHIMCHICK stated BULL couldn't keep food down and he looked like a skeleton.

- SHIMCHICK stated BULL withered away while he was in jail.

- SHIMCHICK was told that BULL was vomiting and defecating blood.   SHIMCHICK never witnessed it personally.

- SHIMCHICK stated BULL was getting out of bed when he got dizzy, fell, and hit his head.

- SHIMCHICK stated the next morning BULL told him to request a wheelchair and a doctor.

- SHIMCHICK stated he alerted Lt. Dover and filled out a paper sick call slip for BULL.

- SHIMCHICK stated there were grievances filed by Jonathan BEASLEY, BULL's cellmate.

- SHIMCHICK assumed BULL had Hepatitis-C because of his history with drug use and sharing needles.

- SHIMCHICK believed BULL would still be alive if he'd gotten to a hospital sooner.

- SHIMCHICK found out BULL was dead from BULL's sister.

- SHIMCHICK stated Danny LINHART, also incarcerated, was really close to BULL.

- SHIMCHICK believed BULL died as a result of medical negligence.

The interview concluded at 4:21 p.m.   SHIMCHICK was released back into the custody of jail staff.

The bullet statements contained in report are not verbatim and shall serve as a generalization of information provided by SHIMCHICK.   For an exact account of his statement, please review the DVD containing his recorded interview.

The original DVD, video statement checklist, and field notes will be submitted to the Illinois State Police Zone 6 Evidence Vault.   Copies of the documents are attached to this report for review.

| Approved By |
| --- |
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION**

| | | |
|---|---|---|
| Midwest Trust Company as | ) | |
| Administrator of the Estate of | ) | |
| Mark Bull, Deceased, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 3:23-cv-01238-SMY |
| Vs. | ) | |
| | ) | |
| Sheriff Jeff C. Connor, County of Madison, | ) | |
| Illinois, John Does, Jane Does, and | ) | |
| Advanced Correctional Healthcare, Inc., | ) | |
| | ) | |
| Defendants. | ) | |

# EXHIBIT 4 – SHIMCHICK

# GRIEVANCE

# TO AMENDED COMPLAINT

22-39766900034
LOWERY, MICHAEL
D   6592
Page   4   Of   7

7/13/22, 9:55 AM

## Audit Grievance #187207362

Profile Photo:



Audit Photo:
Audit Photo

### Inmate Info

Name: JAMES SHIMCHICK
Submitted Date: 07/01/22 09:46
Submitted from Location/Room: A North Felony/A North Felony
Current Location/Room: A North Felony/A North Felony
Facility: Madison County Jail IL

### Form Info

Category: Grievance
Form: Grievance

### Grievance Info

Status: CLOSED **by** Nicholas Bardelmeier
Facility Deadline: 07/16/22 23:59
Grievance Level: 1
Inmate can reply: No
Summary of Grievance:
Facility Operations
Details of Grievance:
**I have attempted to resolve this matter with jail staff prior to completing this form.:**

[Yes]

**If you attempted to resolve this issue who did you talk to, when did you talk to them, and what came from the conversation?:**

Attempted to resolve issue with all of the 1st Shift Guards and Infirmary Staff that entered Cell Block A-North between the dates 6/21/22 and 6/28/22. When attempts were not ignored, facility staff's responses were either there's nothing we can do about it or file a grievance.

**I affirm the information provided within this grievance is truthful. I understand that providing false or misleading information may result in criminal charges or progressive disciplinary action.:**

Yes

1/3

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

Exhibit 4

GTL-Bull,Mark-GeneralProduction-000007

22-39766900034
LOWERY, MICHAEL
D   6592
Page   5   Of   7

7/13/22, 9:55 AM

**Explain what matter you are grieving.** Provide specific dates, times, locations, and the names involved.:

On multiple occasions, between the dates 6/21/22 and 6/28/22, attempts were made by myself and Detainee Mark T. Bull #52272 to inform security and medical staff entering Cell Block A-North that Detainee Mark T. Bull #52272 needed immediate medical attention due to severe stomach pains, vomiting, loss of appetite, cold sweats, weakness and lack of energy. Detainee Mark T. Bull #52272 requested outside medical attention and all requests were either ignored or not taken seriously. When medical issues were finally addressed by security and medical staff, the severity of the issues were taken lightly and ultimately resulted in the death of Detainee Mark T. Bull #52272.

**More space if needed.:**

N/A

**What are you proposing as a resolution to this grievance?:**

I propose that all detainee medical needs be taken seriously and given proper attention and care.

Detainee Mark T. Bull #52272 and I were childhood friends and I propose I be granted the opportunity to grieve alongside our affected families and attend the funeral of Detainee Mark T. Bull #52272.

I propose disciplinary action be taken amongst facility medical staff.

I propose the families affected by the death of Detainee Mark T. Bull #52272 to receive adequate compensation and appropriate legal actions be take

I also propose that this grievance be categorized as a facility grievance as well as a medical grievance and I be provided a paper copy of this grievance.

| Date/Time | User | Action | Source | Details |
|---|---|---|---|---|
| 07/01/22 13:15 | JAMES SHIMCHICK | Viewed Staff Response | Tablet | |
| 07/01/22 11:55 | Nicholas Bardelmeier | Print | | Has been printed without notes by nabardelmeier@co.madison.il.us |
| 07/01/22 11:55 | Nicholas Bardelmeier | Staff Response | | A copy of this grievance will be printed and given to you shortly. In terms of a furlough, that is up to a judge. Jail Staff can not grant those, you need to speak with your attorney about getting a furlough. |
| 07/01/22 11:55 | Nicholas Bardelmeier | Changed Status | | From 'Open' to 'Closed' |
| 07/01/22 11:53 | Nicholas Bardelmeier | Print | | Has been printed without notes by nabardelmeier@co.madison.il.us |
| 07/01/22 11:53 | Nicholas Bardelmeier | Viewed | | |
| 07/01/22 10:13 | JAMES SHIMCHICK | Viewed Staff Response | Tablet | |
| 07/01/22 09:47 | JAMES SHIMCHICK | Viewed Staff Response | Tablet | |

2/3

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000008

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**
**EAST ST. LOUIS DIVISION**

| | | |
|---|---|---|
| Midwest Trust Company as | ) | |
| Administrator of the Estate of | ) | |
| Mark Bull, Deceased, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 3:23-cv-01238-SMY |
| Vs. | ) | |
| | ) | |
| Sheriff Jeff C. Connor, County of Madison, | ) | |
| Illinois, John Does, Jane Does, and | ) | |
| Advanced Correctional Healthcare, Inc., | ) | |
| | ) | |
| Defendants. | ) | |

# EXHIBIT 5 – BEASLEY

# STATEMENT

# TO AMENDED COMPLAINT

22-39766900034
LOWERY, MICHAEL
D  6592
Page    1  Of  6

## ILLINOIS STATE POLICE
## INVESTIGATIVE REPORT

| Case Number | Case Title | | | Report Type | | |
|---|---|---|---|---|---|---|
| **22-39766900034** | **BULL, MARK T.** | | | ☑ Individual ☐ Location ☐ Vehicle | | |
| Report Purpose  **INTERVIEW OF JONATHAN BEASLEY** | | | | Report Date  **08/30/2022** | | Activity Date  **06/29/2022** |
| Lead Number | Drug Buys | Arrest Warrants | Search Warrants | Overhear Admin | | Overhear Warrant |
| Reporting Agent  **LOWERY, MICHAEL** | | | | ID Number  **6592** | | Zone/Office  **ISPZ6CL** |
| Case Agent  **LOWERY, MICHAEL** | | | | Case Agent ID Number  **6592** | | Case Agent Zone/Office  **ISPZ6CL** |
| ALPR Used  ☐ Yes | APLR Location | | | | | |

## NARRATIVE

The purpose of this report is to document an interview conducted while investigating the in-custody death of Mark BULL.

The interview was conducted with:

JONATHAN M. BEASLEY



On June 6, 2022, Reporting Agent Michael Lowery and Special Agent Michael Hentze requested an interview with BEASLEY.   BEASLEY was read his Miranda Rights from a standardized form.   BEASLEY initialed and signed the form indicating he understood his rights.   A video statement checklist was completed as BEASLEY agreed to participate with a video recorded interview.   The interview started at 3:18 p.m., as BEASLEY stated the following:

- BEASLEY stated he was cell mates with BULL in cell 6A North.   BULL slept in the top bunk and BEASLEY slept in the bottom bunk.

- BEASLEY stated he was cell mates with BULL for approximately a week, to a week and a half.

- BEASLEY initially thought BULL was "dope sick" but BULL wasn't getting any better.

- BEASLEY stated BULL was always sweating and had goosebumps.   Additionally, he stated BULL was complaining about his stomach, coughing, vomiting and defecating all the time.

- BEASLEY told BULL he should have been getting better and ask him what was going on.   BULL didn't tell BEASLEY about any health conditions.

- BEASLEY stated he'd seen guys come to jail that were dope sick and they usually pulled out of it within a week. BULL just wasn't getting any better.

- BEASLEY stated BULL told him that he kept messaging them (jail staff), saying he needed a doctor for his stomach.

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

Exhibit 5

GTL-Bull,Mark-GeneralProduction-000009

22-39766900034
LOWERY, MICHAEL
D   6592
Page   2  Of  6

- BULL told BEASLEY his stomach was bad and that he was in a bad way.   He also told BEASLEY that he was dying.

- BEASLEY stated BULL was taken to the infirmary approximately 2 - 3 days ago.   BEASLEY didn't know what BULL was treated for nor did BULL tell him what he was treated for when he came back to the cell.

- BEASLEY stated he notified jail staff about BULL's condition quite a few times.

- BEASLEY stated he never witnessed BULL take any drugs nor other illegal substances while incarcerated with BULL.   BEASLEY stated he did not give BULL anything.

- BEASLEY stated BULL had a large cyst on the top of his head.

- BEASLEY stated he woke up one morning and saw BULL with a gash on his eye.   BULL told BEASLEY he fell out of the bed.   BEASLEY believed BULL hit his head on the toilet when he fell out of the bed.   BEASLEY gave BULL a wad of tissue to put on his eye to stop the bleeding.

- BEASLEY stated he helped BULL submit a sick slip after he fell out of the bed.

- BEASLEY stated after BULL fell out of the bed and busted his eye, jail staff came to get him with a wheel chair. That's the last time he saw BULL.

- BEASLEY stated numerous people notified jail staff that BULL was sick and needed help.

- BEASLEY stated BULL would lay at night and breathe like he was in distress.

- BEASLEY stated he walked in the cell two days ago and saw BULL vomiting blood into the toilet.

The interview concluded at 3:43 p.m.   BEASLEY was released back into the custody of jail staff.

The bullet statements contained in report are not verbatim and shall serve as a generalization of information provided by BEASLEY.   For an exact account of his statement, please review the DVD containing his recorded interview.

The original DVD, video statement checklist, and field notes will be submitted to the Illinois State Police Zone 6 Evidence Vault.   Copies of the documents are attached to this report for review.

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION**

| | | |
|---|---|---|
| Midwest Trust Company as | ) | |
| Administrator of the Estate of | ) | |
| Mark Bull, Deceased, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 3:23-cv-01238-SMY |
| Vs. | ) | |
| | ) | |
| Sheriff Jeff C. Connor, County of Madison, | ) | |
| Illinois, John Does, Jane Does, and | ) | |
| Advanced Correctional Healthcare, Inc., | ) | |
| | ) | |
| Defendants. | ) | |

# EXHIBIT 6 – MADISON COUNTY

# CORONER OFFICE CASE REPORT

# TO AMENDED COMPLAINT



# Case Report
### Mark Bull (2022-01524)
**Madison County Coroner's Office**
**618-692-7478**

## Case Administration

| | | | |
|---|---|---|---|
| County | Madison | Initial 911 call | 06/28/2022 10:52 |
| Case type | ME/C Case | Investigator notified | 06/29/2022 10:31 |
| Incident number | IL-8036-2022 | Investigator notified by | Anderson Hospital |
| Code | | Phone | 618-288-5711 |
| Hold | No | Scene arrival | 06/29/2022 11:19 |
| Restricted | No | Scene departure | 06/29/2022 13:45 |
| Pending adjudication | | Office arrival | |
| Disposition | Sent to Autopsy Facility | Office departure | |
| Facility | Madison County, IL | Departure location | |
| Disposition rationale | | Regular miles | |
| Disposition Authorized by | Shane Liley | Trans miles | |
| ETA to Facility | 06/29/2022 14:07 | Time spent | |
| Family notified of pending autopsy? | | Other information | |
| Autopsy authorization | | Autopsy results requested by: | |
| Autopsy authorization notes | | ME/C Approved for | |
| Signed by | Office of ME/C | Ready for release | |
| Signer | Stephen Nonn | Tox specimen sent | 2022-06-30 |
| Funeral/Crematorium | Marks Mortuary | Tox results received | 2022-08-03 |
| Funeral/Crematorium phone | 618-254-5544 | Turn around | 34 |

## Investigator

**Diondra Horner**
Madison County Coroner's Office
157 North Main StreetSuite 154
Edwardsville, Illinois 62025
Phone:618-692-7478
Fax:618-692-6042
dnhorner@co.madison.il.us

## Pathologist

**Kamal Sabharwal, MD**
Office of the Regional Medical Examiner
1650 Boone's Lick Road, Ste 120
St. Charles, Missouri 63301
Phone:636-949-1878
Fax:636-949-1847

## Body Tracking

| | | | |
|---|---|---|---|
| Name/Number on ID Tag | Mark Bull | Approximate height | |
| Seal number | | Approximate weight | |
| Case number | 2022-01524 | Storage location | |
| ME/C body bag provided | No | Locker number | |

### Tracking 1

| | | | |
|---|---|---|---|
| Event | Received from | Received by | Diondra Horner |
| Location | Scene | Released by | |
| Description | | Description | |
| Date | 06/29/2022 14:07 | Comment | |

### Tracking 2

| | | | |
|---|---|---|---|
| Event | Released to | Received by | Martin Marks |
| Location | Funeral home | Released by | Diondra Horner |
| Description | | Description | Marks Mortuary |
| Date | 06/30/2022 10:40 | Comment | |

Exhibit 6

## Decedent Identification

| | | | |
|---|---|---|---|
| **MDILog #** | 220629-586 | **Date of birth** | 07/25/1983 |
| **Case number** | 2022-01524 | **Date of death** | 06/29/2022  On |
| **Status** | Positive | **Time of death** | 09:58  Exact |
| **Method a** | Visual (Witness) | **Pronounced** | 06/29/2022 09:58 |
| **Method b** | | **Pronouncer type** | Nurse |
| **Last name** | Bull | **Pronouncer last name** | Haddix, RN |
| **First name** | Mark | **Pronouncer first name** | Sarah |
| **Middle name** | Travis | **Found deceased** | |
| **Suffix** | | **Found deceased by** | |
| **Alias** | | **Age** | 38 years 11 months 4 days |
| **Homeless** | No | **Drivers license** | |
| **Country** | United States | **Registered donor** | |
| **Address** | 92 Bonds Avenue | **SSN** | 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 |
| | East Alton, IL 62024 | **Birth country** | |
| **Township/Village** | Wood River Township | **Birth state international** | |
| **County** | Madison | **Marital status** | Single |
| **Inside city limits** | | **Pregnant** | |
| **Phone** | | **Student status** | |
| **Sex** | Male | **Employment status** | |
| **Race** | White | **Occupation** | |
| **Ethnicity** | | **Business/Industry** | |
| | | **Employer** | |
| | | **Education level** | |
| | | **Veteran status** | |
| | | **Athletic status** | |
| | | **Athletic description** | |

## Circumstances

| | | | |
|---|---|---|---|
| **Jurisdiction** | | **Medical treatments** | |
| **Scene investigated by** | Yes | | |
| **Law Enforcement** | | **Appropriate clothing** | |
| **Agency** | Illinois State Police | **Describe clothing** | |
| **Incident #** | | **Alerts to the pathologist** | |
| **Officer** | Mike Lowery | | |
| **Scene investigated by** | Yes | **Suspected behaviors** | |
| **ME/C** | | | |
| **Photos taken** | Yes | | |
| **Doctor present** | Yes | | |
| **Date investigated** | 06/29/2022 10:31 | | |
| **Reason for reporting** | Custody Death | | |
| **Related to intimate partner violence** | | | |
| **Decedent in custody** | Yes | | |
| **Police involved** | | | |
| **Decedent has minor child** | | | |
| **Drugs involved** | | | |
| **Evidence of alcohol** | | | |
| **Suspected suicide** | No | | |
| **Hospice** | No | | |
| **Indian reservation** | No | | |
| **Date LKA** | 06/29/2022  On | | |
| **Time LKA** | 09:57  Approximate | | |

### Case Brief (Non-identifiable data)

Decedent was an inmate at the Madison County Jail when he went in to cardiac arrest on 06/28/2022. He was subsequently admitted to Anderson Hospital where he was pronounced deceased the following day in the ICU. Perforated duodenal ulcer with peritonitis found at autopsy. Blood samples submitted are from the decedent's hospital admission. Urine and vitreous samples were collected at autopsy on 06/30/2022.

### Investigator Narrative

On Wednesday, June 29, 2022 at 10:31 AM; the reporting senior investigator, Diondra N. Horner, DSN 1479, was contacted via telephone by Charge Nurse Sarah Haddix, RN of Anderson Hospital in Maryville, IL. Haddix reported that a death had occurred within the hospital's Intensive Care Unit (ICU). Haddix identified the decedent as one:

Mark Travis Bull
White/Male; 38 yoa
DOB: 07/25/1983
92 Bonds Street
East Alton, IL 62024

whom she had pronounced deceased today at 9:58 AM. Haddix reported that the decedent was an inmate at:

Madison County, IL Jail
405 Randle Street
Edwardsville, IL 62025
(618) 692-6087

prior to his admission to the hospital. Haddix reported that the decedent was admitted to the hospital yesterday, Tuesday, June 28, 2022 through the emergency room (ER). Haddix reported that 9-1-1 was notified at 10:52 AM yesterday and that the decedent arrived to the ER at 11:30 AM yesterday. Haddix reported that the decedent was admitted to the ICU yesterday at 1:50 PM. Haddix reported that the decedent had arrived in the ER in cardiac arrest. She reported that the decedent had complained of abdominal pain and collapsed. Haddix reported that jail personnel then started cardiopulmonary resuscitation (CPR) and notified 9-1-1. Haddix reported that the decedent had been incarcerated at the Madison County Jail on Friday, June 17, 2022. Haddix reported that jail personnel thought that the decedent had been going through an opiate withdrawal. Haddix reported that the decedent had a medical history of Hepatitis C and that he had had a urinary tract infection (UTI) a couple of months ago. Haddix reported that the decedent had also self reported on an inmate form that he had "tears" in his stomach for which he took Prilosec. Haddix reported that the decedent also took Hydroxyzine. Haddix further reported that the decedent's last dose of Hydroxyzine was given yesterday and that the decedent took 25 mg. Haddix reported that the decedent couldn't walk yesterday and had dizziness when standing. Haddix reported that the decedent had fallen and hit his head on a toilet yesterday. Haddix reported that the decedent had a hematoma on the back left side of his head and lacerations above his right eye that had been stitched during his hospitalization. Haddix reported that a computed tomography (CT) scan performed in the ER yesterday showed a severe anoxic brain injury. Haddix reported that the decedent's first blood draw was at 12:48 PM yesterday. She reported, however, that his first toxicology screen was at 5:30 PM yesterday and was positive for benzodiazepines at that time. Haddix reported that the decedent had been administered Versed, a benzodiazepine, prior to the toxicology screen as medical personnel had had trouble ventilating the decedent. Haddix reported that there was no primary care physician listed for the decedent. The reporting senior investigator advised that she would be responding from the Edwardsville, IL area to investigate further.

The reporting senior investigator arrived on scene at 11:19 AM and met with Carrie Kuchta, RN. Kuchta reported that the decedent was incarcerated at the Madison County Jail for an unknown reason. She further reported that jail personnel thought that the decedent had been in withdrawal from opiates. Kuchta reported that the decedent had complained of dizziness and headache. She reported that the decedent had fallen and hit his head in his cell. Kuchta reported that the decedent later collapsed in front of the nurse within the jail infirmary.

The reporting senior investigator met further with Haddix who reported that a chest X-ray and head CT had been performed within the ER yesterday. She reported that a renal ultrasound and abdominal X-ray had also been performed. Haddix reported that the abdominal X-ray showed possible ileus. Haddix reported that the decedent was terminally weaned today. She reported that the decedent did not take a breath after the intubation tube had been removed. Haddix reported that a sick call to the jail was placed at 9:29 AM yesterday.

The reporting senior investigator was directed to ICU Room 9 where she briefly viewed the decedent before meeting with the family within a private room. The reporting senior investigator met with the decedent's sister:

Angie M. Roberts
DOB: 02/05/1985
92 Bonds Avenue
East Alton, IL 62024
cellular telephone: (618) 631-0466

and brother-in-law:

Chad R. Fleming
DOB: 03/26/1979
92 Bonds Avenue
East Alton, IL 62024
cellular telephone: (618) 631-0466

Roberts and Fleming were concerned about the decedent's property as they had just recently received a call from "Lt. Sarhage" with the Madison County Jail with information regarding the decedent's belongings. Roberts reported that she had contacted the Madison County Jail regarding the decedent's truck keys, which are unaccounted for. Roberts reported that the Madison County Jail had sent glasses, a hat, a belt, a cell phone, shoes, rings, and shorts with the decedent to the hospital with the decedent according to "Lt. Sarhage". Roberts reported that the decedent was arrested in Alton, IL by the Alton, IL Police Department on Tuesday, June 14, 2022. Roberts reported that the decedent was arrested with his girlfriend "Ashley" who is currently in the Madison County Jail. Roberts reported that the decedent was moved to the Madison County Jail from the Alton Police Department Jail on Friday. Roberts reported that the decedent was an addict and would use heroin. Fleming reported that the decedent would also use meth. Roberts reported that the decedent kept putting off having surgery on his arm. She reported that he had a great deal of pain in his arm, which she felt he treated with heroin. Roberts reported that

she was told that the decedent had a stomach issue but that the decedent had never complained of a stomach issue at home. Roberts reported that the decedent had a cyst at the crown on his head and would normally wear a hat to cover it. Fleming reported that the decedent was charged with possession with intent to deliver methamphetamine when he was arrested by the Alton Police Department on June 14, 2022. Roberts and Fleming reported that the decedent had prior criminal charges against him for which had been going to court, but there were no other charges filed against him on June 14, 2022. Roberts reported that she had spoken to the decedent last on Monday, June 27, 2022. Roberts reported that she had spoken with the decedent via telephone while he was incarcerated at the Madison County Jail and that the decedent was without complaint at that time. She reported that they had spoken about their mother (MCCO #2021-02567 Judy M. Bull) who had died in November of 2021 and whose death the reporting senior investigator investigated. Roberts and Fleming reported that since then, the decedent had apparently been calling people he knew and telling them he was feeling ill. Roberts and Fleming reported that the people that the decedent had called had then, in turn, been calling the Madison County Jail on the decedent's behalf to request medical attention for him. Fleming advised that the decedent would not normally complain, so he must have been hurting bad. Roberts reported that jail personnel said there was nothing they could do and told the decedent to drink more water and put in a sick call slip. Fleming reported that Dr. Zohair Karmally told them that the decedent hit his head on a toilet in his cell and later went in to cardiac arrest in front of the nurse. Roberts reported that Dr. Karmally explained that he did not know what had caused the decedent to go into cardiac arrest. Fleming reported that the decedent had a bruised ear on one side of his head and a cut that required stitches on the other side of his head. Fleming reported that the decedent's tongue was also bruised. Roberts reported that the decedent had had a seizure while hospitalized. Fleming asked about the camera footage at the Madison County Jail. Fleming advised that he has been incarcerated that the Madison County Jail and is aware that the cameras do not cover the interior of the cells. Fleming was concerned that another inmate may have harmed the decedent while he was incarcerated.

The reporting senior investigator advised Roberts and Fleming that Chief Investigator Shane P. Liley, DSN 879 had assisted the reporting senior investigator in the investigation by notifying the Illinois State Police (ISP) Zone 6 Investigation Division of the death. The reporting senior investigator further advised that a special agent would be assigned to the case to investigate and that the Coroner's Office would be performing an autopsy examination in order to establish the decedent's cause and manner of death. The family understood and requested that Marks Mortuary of Wood River, IL arrange for the decedent's disposition. Roberts and Fleming departed the hospital.

The reporting senior investigator further observed the decedent and utilized her department issued Cannon digital camera to photograph the process beginning at 12:07 PM. The decedent was a white male in supine position in a hospital bed. His head rested on pillows. His head hair appeared dark brown in color and was worn short. There was a deformity to the back left side of the head within the hair. The decedent's eyes were closed. Irides appeared blue in color. There were two small lacerations above the right eyebrow. The laceration closest to the eyebrow had three stitches while the second, smaller laceration did not have any stitches. There appeared to be a well-healed scar above the left eyebrow. The decedent wore a dark brown beard and mustache. The decedent was nude and covered with a white sheet. Numerous medical interventions were in place including a peripherally inserted central catheter (PICC) line, other intravenous lines, cardiac fast patches and leads, a Foley catheter, and a blood pressure cuff. The back of the decedent's left hand had a piece of cotton taped to it. There was a bandage around the decedent's right antecubital region. Bandages were noted on the decedent's shoulders, knees, and on the tops of his feet. Haddix reported that these bandages were placed in order to prevent the breakdown of skin as the decedent had been placed in a prone position for a period of time. The decedent had tattoos throughout his body. Rigor mortis was fixed in the jaw but allowed for manipulation of the extremities. Lividity would blanch with pressure. Please see Forensic Pathologist Dr. Kamal Sabharwal's autopsy report for further information.

The decedent's personal effects were located within a bag in a locked closet within the decedent's ICU room. The bag contained a red t-shirt, camouflage shorts, boxer briefs, two socks, two gray tennis shoes, one black "Adidas" hat, one cellular telephone with case with a skull pattern, one white metal chain necklace, one white metal ring with three clear stones, one white metal wristwatch, one pair of sunglasses, one brown belt, and loose papers. The reporting senior investigator took custody of these items. The reporting senior investigator also took custody of a framed picture located within the room per the family's request.

At 12:32 PM, the decedent underwent full body X-rays. The X-ray images were obtained by Radiology Technicians Allison Albertsen and Whitney Leech and Student Joshua Phillips.

ISP Special Agent Travis Irwin arrived on scene as the X-rays were being performed. The reporting senior investigator briefed Special Agent Irwin on the circumstances surrounding the death as known to her. He identified the case agent as Mike Lowrey.

The reporting senior investigator met with Haddix further. Haddix reported that the decedent's lactate level was high. She reported that the decedent's preliminary blood culture results showed no growth and that the urine culture is still pending. Haddix reported that the decedent's leukocyte esterase was negative. She reported that his white blood cell count was normal. Haddix reported that the decedent was negative for COVID-19.

The reporting senior investigator made telephone contact with Funeral Director Martin Marks of Marks Mortuary at 1:06 PM and requested transport to the Madison County Morgue in Wood River, IL.

Following the X-rays, the reporting senior investigator sealed the body within a cadaver pouch at 1:09 PM using U-line seal number 3777690. The body was then secured within the hospital's morgue while awaiting the arrival of the transportation unit. The reporting senior investigator responded to the hospital's laboratory department and at 1:26 PM presented Lisa Manley with a subpoena for all samples that had been obtained from the decedent during his admission. Manley complied with this request. The reporting senior investigator then responded to the hospital's radiology department and at 1:34 PM took custody of two compact disc (CD) copies of the previously obtained X-ray images. One CD copy will be retained within this case file and the other will be submitted to Dr. Sabharwal. The reporting senior investigator responded back to the hospital's morgue and met with Marks who removed the decedent to his transportation vehicle. It should be noted that the reporting senior investigator maintained custody of the decedent's personal effects. With nothing further, the reporting senior investigator departed the hospital and responded with the body to the Madison County Morgue where the body was logged in at 2:07 PM. The reporting senior investigator would photograph the decedent's personal effects prior to securing them with the body. This case is pending autopsy with Dr. Sabharwal.

GTL-Bull,Mark-GeneralProduction-000014

Were witness accounts of event consistent?

## Postmortem Observations

| | |
|---|---|
| **Date of exam by MDI** | **Non-therapeutic needle marks** |
| **Approximate height** | **Injury to bowel** |
| **Approximate weight** | **Samples collected by** |
| **Body location** | **investigator** |
| **Body temperature** | **Samples collected** |
| **Outside temperature** | **Suspected manner of death** Unknown |
| **Thermostat setting** | **Suspected cause of death** |
| **Thermostat reading** | Unknown/Other |
| **Room temperature** | |
| **Rigor** | **Suspected COD/Circumstance** |
| **Lividity a** | |
| **Lividity b** | |
| **Decomposition** | |
| **Position discovered** | |

### External injury and descriptions



**Description**

## Secondary Party: Roberts, Angie

| | | | | |
|---|---|---|---|---|
| **Last name** | Roberts | | **Relationship** | Sibling |
| **First name** | Angie | | **Referred to PF** | |
| **Middle name** | M. | | | **Type** |
| **Maiden name** | | | Next of kin | |
| **Date of birth** | **Age years** | **Age months** | | |

| | |
|---|---|
| **Mobile phone** | 618-631-0466 |
| **Email address** | angmarie980@gmail.com |
| **Notes** | |

07/19/2022 at 10:26 AM spoke with Angie several times and further advised her on the process going forward including pending toxicological testing and the pending autopsy report. Advised Angie about the DC including a temporary DC. Further contacted ISP Special Agent Lowrey with her information as she advised that he had not yet contacted her.--DNH1479

08/05/2022 at 9:00 AM attempted to call Angie's regarding the decedent's tox. results. Had trouble connecting first time and second time rang to full voicemail box.--DNH1479

08/05/2022 at 1:39 PM called and left Angie a VM. Attempting to contact her with the tox. results.--DNH1479

08/05/2022 at 2:00 PM Angie called back and I advised her of tox. results.--DNH1479

09/07/2022 at 4:32 PM called Angie and advised that the autopsy report is complete and advised her on the cause of death. Further advised that I have requested the police report and learned that it will not be available for approximately two weeks. I advised Angie that I would complete the DC upon receipt and advise her on when the DC would be completed.--DNH1479

09/26/2022 at 2:17 PM called Angie and advised that the DC would be completed same day. Angie requested that I email her a FOIA form and I complied.--DNH1479

## Addresses

### Address 1

| | |
|---|---|
| **Category** | |
| **Address** | 92 Bonds Avenue |
| | East Alton, IL 62024 |
| **Phone 1** | 618-515-0614 |
| **Phone 2** | |
| **Time at address** | |

### Next of Kin

| | | | |
|---|---|---|---|
| **Notified** | Yes, Kin at Scene | **Claimed the body** | Yes |
| **Notifying agency** | | | |
| **Date/Time notified** | | | |
| **Notified by** | | | |

## Location

| | | | |
|---|---|---|---|
| **Description** | | **Type** | Scene, Location of death |
| **Address type** | | | |
| **Address** | 6800 Illinois 162 | **Location other** | |
| | Maryville, IL 62062 | | |
| **County** | Madison | | |
| **Notes** | | | |

### Scene Location Details

| | | | |
|---|---|---|---|
| **Scene investigated** | | **Details** | |
| **Police agency** | Illinois State Police | | |
| **Police incident #** | | | |
| **Officer** | Mike Lowery | | |

### Location of Death Details

| | |
|---|---|
| **Location of death** | Hospital |
| **Description** | Anderson Hospital (ICU)-Maryville, IL |

GTL-Bull,Mark-GeneralProduction-000016

## Location

| | | | |
|---|---|---|---|
| **Description** | | **Type** | |
| **Address type** | | Final disposition | |
| **Address** | 633 East Lorena Avenue | **Location other** | |
| | Wood River, IL 62095 | | |
| **County** | Madison | | |
| **Notes** | | | |

## Final Disposition Details

| | |
|---|---|
| **Removed by** | Martin Marks |
| **Date of removal** | 06/30/2022 10:40 |
| **Funeral/Crematorium** | Marks Mortuary |
| **Funeral/Crematorium phone** | 618-254-5544 |
| **Funeral license number** | |
| **Cemetery** | |
| **Plot number** | |
| **Cemetery city** | |
| **Cemetery state** | |

## Property/Evidence Log

| | | |
|---|---|---|
| **Name:** Mark T. Bull | **Date of Birth:** 07/25/1983 | **Date of Death:** 06/29/2022 |
| **Case number:** 2022-01524 | **Date of Examination:** | **Pathologist:** Kamal Sabharwal, MD |
| **County of Death:** Madison | | |

| Describe items recovered | | Origin | Status | DNR | Item # |
|---|---|---|---|---|---|
| T-Shirt | red t-shirt | Scene | Released | | |
| **Released by:** Diondra Horner (06/30/2022 10:40) | | | | | |
| **Released to:** Martin Marks (06/30/2022 10:40) | | | | | |
| Hat | black "Adidas" hat | Scene | Released | | |
| **Released by:** Diondra Horner (06/30/2022 10:40) | | | | | |
| **Released to:** Martin Marks (06/30/2022 10:40) | | | | | |
| Eye Glasses | sunglasses | Scene | Released | | |
| **Released by:** Diondra Horner (06/30/2022 10:40) | | | | | |
| **Released to:** Martin Marks (06/30/2022 10:40) | | | | | |
| Shorts | camouflage shorts | Scene | Released | | |
| **Released by:** Diondra Horner (06/30/2022 10:40) | | | | | |
| **Released to:** Martin Marks (06/30/2022 10:40) | | | | | |
| Belt | brown belt | Scene | Released | | |
| **Released by:** Diondra Horner (06/30/2022 10:40) | | | | | |
| **Released to:** Martin Marks (06/30/2022 10:40) | | | | | |
| Underwear | black, white, and blue boxer briefs | Scene | Released | | |
| **Released by:** Diondra Horner (06/30/2022 10:40) | | | | | |
| **Released to:** Martin Marks (06/30/2022 10:40) | | | | | |
| Socks | two gray, white, and blue socks | Scene | Released | | |
| **Released by:** Diondra Horner (06/30/2022 10:40) | | | | | |
| **Released to:** Martin Marks (06/30/2022 10:40) | | | | | |
| Footwear | two gray tennis shoes | Scene | Released | | |
| **Released by:** Diondra Horner (06/30/2022 10:40) | | | | | |
| **Released to:** Martin Marks (06/30/2022 10:40) | | | | | |
| Jewelry | white metal wrist watch | Scene | Released | | |

GTL-Bull,Mark-GeneralProduction-000017

| Describe items recovered | | Origin | Status | DNR | Item # |
|---|---|---|---|---|---|
| **Released by:** Diondra Horner (06/30/2022 10:40)<br>**Released to:** Martin Marks (06/30/2022 10:40) | | | | | |
| Jewelry | white metal chain necklace | Scene | Released | | |
| **Released by:** Diondra Horner (06/30/2022 10:40)<br>**Released to:** Martin Marks (06/30/2022 10:40) | | | | | |
| Jewelry | white metal ring with three clear stones | Scene | Released | | |
| **Released by:** Diondra Horner (06/30/2022 10:40)<br>**Released to:** Martin Marks (06/30/2022 10:40) | | | | | |
| Cell Phone | black cell phone with skull pattern case | Scene | Released | | |
| **Released by:** Diondra Horner (06/30/2022 10:40)<br>**Released to:** Martin Marks (06/30/2022 10:40) | | | | | |
| Fingerprints | two sets of decedent's ink rolled fingerprints | Autopsy | Held | | |
| DNA Card | two DNA cards with decedent's DNA | Autopsy | Held | | |
| Other | decedent's full body X-rays | Scene | Held | | |
| Other | decedent's hospital specimens | Scene | Held | | |
| Other | framed photo | Scene | Released | | |
| **Released by:** Diondra Horner (06/30/2022 10:40)<br>**Released to:** Martin Marks (06/30/2022 10:40) | | | | | |
| Other | loose papers | Scene | Released | | |
| **Released by:** Diondra Horner (06/30/2022 10:40)<br>**Released to:** Martin Marks (06/30/2022 10:40) | | | | | |
| Other | NMS tox. kit | Autopsy | Held | | |
| Other | U-line seal number 3777690 | Autopsy | Held | | |

## Medical History

### Information Sources
None indicated

### Vaccinations
None indicated

### Diseases/Disorders
None indicated

### Cancer
None indicated

### Cardiac/Cardiovascular
None indicated

### GI/GU
None indicated

### Hepatic
Hepatitis C

### Neurological
None indicated

### Psychiatric Illness
None indicated

GTL-Bull,Mark-GeneralProduction-000018

## Tobacco Use / Smoking

**Use** None indicated
**Type** None indicated
**Describe (include daily use):**

## Alcohol Use

None indicated
**Drinks per day**

## Drug Use

Heavy
**Drug description** heroin, methamphetamine

## Drug and Alcohol Treatment

None indicated

## Health Care Providers

| | |
|---|---|
| **Name** | **Name** |
| **Address** | **Address** |
| **Phone number** | **Phone number** |
| **Fax number** | **Fax number** |
| **Date last seen** | **Date last seen** |

## Medical history notes

# Autopsy

## Body Bag Information

**Seal number**
**Name/Number on ID Tag**   Mark Bull
**Notes**

## Autopsy

| | | | |
|---|---|---|---|
| **Autopsy procedure** | Full | **Autopsy case number** | |
| **Exam date** | | **X-Rays** | |
| **Autopsy Assistant** | | **CT scan** | |
| **Attending** | | **Photos** | |
| **Findings availability** | Yes | **Histology** | |
| **Tobacco use** | Unknown | **Toxicology** | |
| **Autopsy report signed** | | **Specimens drawn** | |
| **Persons in attendance** | | **Cardiovascular consult** | |
| | | **Neuropathologic consult** | |
| | | **Remains** | Human |

**Preliminary findings**
On Thursday, June 30, 2022 at approximately 8:00 AM; the reporting senior investigator, Diondra N. Horner, DSN 1479, was present at the Madison County Morgue in Wood River, IL for the autopsy examination of Mark Travis Bull. Also present was Special Agent Mike Hentze and Crime Scene Investigator Skylar Marlow of the Illinois State Police (ISP). Forensic pathologist Dr. Kamal Sabharwal conducted the examination with pathologist's assistant Allyson Hoxsey assisting. The body was received in a cadaver pouch sealed with U-line seal number 3777690, which Hoxsey broke at the start of the autopsy and the reporting senior investigator seized. During the course of the examination, Dr. Sabharwal would find the decedent had a perforated duodenal ulcer with peritonitis. Routine samples were taken for microscopic and toxicological study. The toxicology samples will be delivered to NMS Labs in Horsham, PA at a later date. A final cause of death will not be issued until all results have been evaluated. Two DNA cards with the decedent's DNA were collected during the autopsy and will be maintained by this office. At 9:50 AM, the reporting senior investigator obtained two sets of the decedent's ink rolled fingerprints to be maintained within this case file. Following the examination, the body was placed back in secured refrigeration pending release to the funeral home of choice.

## Cause/Manner of Death

**Death certificate number**
**COD/Circumstances**          GI Tract Disease
**COD description**
**Immediate cause**                                                                 Interval (Onset to Death)
a.   Perforated Duodenal Ulcer with Peritonitis
**Due to (or as a consequence of)**
b.
**Due to (or as a consequence of)**
c.
**Due to (or as a consequence of)**
d.
**Other significant conditions**

**Manner of death**          **Describe How Injury Occurred**
Natural

**Natural cause**

## Body Identification

| **Status** | **Type** | **Method A** | **Method B** |
|---|---|---|---|
| **Investigator** | Positive | Visual (Witness) | None |
| **Pathologist** | | | |
| **Method notes** | | | |

## Other Body Information

| | | | |
|---|---|---|---|
| **Body Weights/Length** | | **Observations** | |
| **Body length** | inches | **Rigor** | |
| **Body weight** | lbs | **Lividity a** | |
| **Body Has:** | | **Lividity b** | |
| **Gallbladder** | | **Body temperature** | |
| **Appendix** | | **Organ Weights** | |
| **Uterus** | | **Heart** | |
| **Head Description** | | **Right lung** | |
| **Hair color** | | **Left lung** | |
| **Other hair color** | | **Liver** | |
| **Facial hair** | | **Spleen** | |
| **Right eye color** | | **Right kidney** | |
| **Left eye color** | | **Left kidney** | |
| **Dental description** | | **Brain** | |
| **Stomach Contents** | | **Thymus** | |
| **Description** | | **Pericardial** | |
| **Volume** | | **Right pleural** | |
| **Fractures** | | **Left pleural** | |
| | | **Peritoneal** | |
| **Autopsy notes** | | **Urine** | |

## Toxicology

## Collected Specimens

GTL-Bull,Mark-GeneralProduction-000020

**Collected by**

**Collected on**

| Specimen/Tissue | Container | # of tubes | Received from | Taken from | Storage Location |
|---|---|---|---|---|---|

## Tracking Specimens

| Specimen # | Released by | Received by | Date | # of tubes | Status | Note |
|---|---|---|---|---|---|---|

## Results

| Specimen/Tissues & Fluids | Container | Received from | Taken from | Date obtained |
|---|---|---|---|---|
| Hospital | | | | 2022-06-28 |

| **Test** | **Analyte name** | **Conc.** | **Units** | **Date disposed** | ☐ **Contributed to death** |
|---|---|---|---|---|---|
| Analysis by High Performance Liquid Chromatography/Time of Flight-Mass Spectrometry (LC/TOF-MS) | Lidocaine | Presump Pos | mcg/mL | | |

| Specimen/Tissues & Fluids | Container | Received from | Taken from | Date obtained |
|---|---|---|---|---|
| Hospital | | | | 2022-06-28 |

| **Test** | **Analyte name** | **Conc.** | **Units** | **Date disposed** | ☐ **Contributed to death** |
|---|---|---|---|---|---|
| Analysis by High Performance Liquid Chromatography/Time of Flight-Mass Spectrometry (LC/TOF-MS) | Naloxone | Presump Pos | ng/mL | | |

| Specimen/Tissues & Fluids | Container | Received from | Taken from | Date obtained |
|---|---|---|---|---|
| Hospital | | | | 2022-06-28 |

| **Test** | **Analyte name** | **Conc.** | **Units** | **Date disposed** | ☐ **Contributed to death** |
|---|---|---|---|---|---|
| Analysis by High Performance Liquid Chromatography/ Tandem Mass Spectrometry (LC-MS/MS) | Midazolam | 31 | ng/mL | | |

| Specimen/Tissues & Fluids | Container | Received from | Taken from | Date obtained |
|---|---|---|---|---|
| Vitreous | | | | |

| **Test** | **Analyte name** | **Conc.** | **Units** | **Date disposed** | ☐ **Contributed to death** |
|---|---|---|---|---|---|
| Analysis by Colorimetry (C) | Creatinine (Vitreous Fluid) | 1.22 | mg/dL | | |

| Specimen/Tissues & Fluids | Container | Received from | Taken from | Date obtained |
|---|---|---|---|---|
| Vitreous | | | | |

| **Test** | **Analyte name** | **Conc.** | **Units** | **Date disposed** | ☐ **Contributed to death** |
|---|---|---|---|---|---|
| Analysis by Chemistry Analyzer | Sodium (Vitreous Fluid) | 133 | mmol/L | | |

| Specimen/Tissues & Fluids | Container | Received from | Taken from | Date obtained |
|---|---|---|---|---|
| Vitreous | | | | |

| **Test** | **Analyte name** | **Conc.** | **Units** | **Date disposed** | ☐ **Contributed to death** |
|---|---|---|---|---|---|
| Analysis by Chemistry Analyzer | Potassium (Vitreous Fluid) | 9.32 | mmol/L | | |

| Specimen/Tissues & Fluids | Container | Received from | Taken from | Date obtained |
|---|---|---|---|---|
| Vitreous | | | | |

GTL-Bull,Mark-GeneralProduction-000021

| Test | Analyte name | Conc. | Units | Date disposed | | |
|---|---|---|---|---|---|---|
| Analysis by Chemistry Analyzer | Chloride (Vitreous Fluid) | 102 | mmol/L | | ☐ Contributed to death | |

| Specimen/Tissues & Fluids | Container | Received from | Taken from | Date obtained | |
|---|---|---|---|---|---|
| Vitreous | | | | | |
| Test | Analyte name | Conc. | Units | Date disposed | |
| Analysis by Chemistry Analyzer | Glucose (Vitreous Fluid) | 12.8 | mg/dL | | ☐ Contributed to death |

| Specimen/Tissues & Fluids | Container | Received from | Taken from | Date obtained | |
|---|---|---|---|---|---|
| Vitreous | | | | | |
| Test | Analyte name | Conc. | Units | Date disposed | |
| Analysis by Chemistry Analyzer | Urea Nitrogen (Vitreous Fluid) | 41.9 | mg/dL | | ☐ Contributed to death |

| Specimen/Tissues & Fluids | Container | Received from | Taken from | Date obtained | |
|---|---|---|---|---|---|
| Not Given | | | | | |
| Test | Analyte name | Conc. | Units | Date disposed | |
| Analysis by Enzyme Immunoassay (EIA) | Benzodiazepines | Presump Pos | ng/mL | | ☐ Contributed to death |

| Specimen/Tissues & Fluids | Container | Received from | Taken from | Date obtained | |
|---|---|---|---|---|---|
| Not Given | | | | | |
| Test | Analyte name | Conc. | Units | Date disposed | |
| Analysis by Enzyme Immunoassay (EIA) | Fentanyl / Metabolite | Presump Pos | ng/mL | | ☐ Contributed to death |

**Toxicologist**
**Notes**

## Body Details

### Physical Characteristics

- ☐ **Amputations**
- ☐ **Deformities**
- ☐ **Scars and marks**
- ☐ **Tattoos**
- ☐ **Piercings**
- ☐ **Medical implants**
- ☐ **Foreign objects**
- ☐ **Skeletal findings**
- ☐ **Organ absent**
- ☐ **Prior surgery**
- ☐ **Artificial parts/aids**

**Body Parts Inventory**

☐ **All parts recovered**                                          **Body condition**

☐ **Head not recovered**                                          **Decomposition scale**

☐ **Torso not recovered**

☐ **One or more limbs not recovered**

☐ **One or both hands not recovered**

GTL-Bull,Mark-GeneralProduction-000023

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**
**EAST ST. LOUIS DIVISION**

| | | |
|---|---|---|
| Midwest Trust Company as | ) | |
| Administrator of the Estate of | ) | |
| Mark Bull, Deceased, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 3:23-cv-01238-SMY |
| Vs. | ) | |
| | ) | |
| Sheriff Jeff C. Connor, County of Madison, | ) | |
| Illinois, John Does, Jane Does, and | ) | |
| Advanced Correctional Healthcare, Inc., | ) | |
| | ) | |
| Defendants. | ) | |

# EXHIBIT 7– MANAGING SUBSTANCE

# WITHDREWAL IN JAIL

# TO AMENDED COMPLAINT

BUREAU OF JUSTICE ASSISTANCE

# MANAGING SUBSTANCE WITHDRAWAL IN JAILS: A LEGAL BRIEF

A disproportionate number of people in jails have substance use disorders (SUDs).[1] Incarceration provides a valuable opportunity for identifying SUD and addressing withdrawal.* Within the first few hours and days of detainment, individuals who have suddenly stopped using alcohol, opioids, or other drugs may experience withdrawal symptoms, particularly when they have used the substances heavily or long-term. Without its identification and timely subsequent medical attention, withdrawal can lead to serious injury or death.

Deaths from withdrawal are preventable, and jail administrators have a pressing responsibility to establish and implement withdrawal policy and protocols that will save lives and ensure legal compliance. This brief describes the scope of the challenge, provides an overview of constitutional rights and key legislation related to substance use withdrawal, and outlines steps for creating a comprehensive response to SUD.

## Scope of the Challenge

Among sentenced individuals in jail, 63 percent have an SUD, compared to 5 percent of adults who are not incarcerated.[3] From 2000 to 2019, the number of local jail inmates who died from all causes increased 33 percent; the number who died from drug/alcohol intoxication during the same period increased 397 percent.[4] Among women

---

* As noted in the Substance Abuse and Mental Health Services Administration's *Use of Medication-Assisted Treatment for Opioid Use Disorder in Criminal Justice Settings* (2019), medically supported withdrawal (also referred to as medical detoxification) is "designed to alleviate acute physiological effects of opioids or other substances while minimizing withdrawal discomfort, cravings, and other symptoms."

When Kelly Coltrain was booked for unpaid traffic violations in 2017, she told jail staff that she was drug dependent and had a history of seizures. Her request to go to the hospital for help with withdrawal symptoms was denied. She was placed in a cell that required 30-minute checks, but these checks rarely occurred. For the next 3 days, she was observed (by video camera) vomiting, sleeping often, and eating little. On her third night in jail, she started convulsing; then, all movement ceased. For at least the next 4 hours, no deputies or medical staff came to the cell to determine why she was still. Kelly's family filed a wrongful death suit, which was settled in 2019 for $2 million plus 4 years of federal district court monitoring of the jail during implementation of new policies and procedures to ensure proper care of inmates at risk of withdrawal.[2]

incarcerated in local jails, the average annual mortality rate due to drug/alcohol intoxication was nearly twice that of their male counterparts.[5] The median length of stay in jail before death from alcohol or drug intoxication was just 1 day,[6] indicating that individuals on short stays, including those who are detained in pretrial status, are equally at risk.

It is not uncommon for individuals to experience substance withdrawal at the time of entry into jail, when access to their drug of choice is abruptly stopped. Estimates within specific regions vary widely, from 17 percent of people entering New York City jails being in acute opioid withdrawal[7] to a record 81 percent of people entering a Pennsylvania county jail needing detoxification services—half of them for opioid use disorders.[8]

This project was supported by Grant No. 2019-AR-BX-K061 to Advocates for Human Potential, Inc. awarded by the Bureau of Justice Assistance, a component of the Office of Justice Programs, which also includes the Bureau of Justice Statistics, the National Institute of Justice, the Office of Juvenile Justice and Delinquency Prevention, the Office for Victims of Crime, and the Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking. Advocates for Human Potential, Inc. was supported by the Addiction and Public Policy Initiative of the O'Neill Institute for National and Global Health Law at Georgetown University Law Center. This project was developed in partnership with the National Institute of Corrections, an agency within the Department of Justice's Federal Bureau of Prisons.

  

Exhibit 7

February 2022
https://bja.ojp.gov

Failing to manage withdrawal symptoms can lead to serious health complications, including anxiety, depression, seizures, vomiting, dehydration, hypernatremia (elevated blood sodium level), heart problems, hallucinations, tremors, and death.[9,10,11] Moreover, problematic substance use is a key factor contributing to suicide, and stimulant withdrawal is associated with suicidal ideas or attempts.[12,13] The U.S. Food and Drug Administration (FDA) issued a safety announcement in early 2019 advising on the risk of suicide among individuals addicted to opioid pain medications whose medication is abruptly discontinued.[14] From 2000 to 2019, suicide was the leading cause of death among jail inmates.[15]

Of note, deaths associated with alcohol or drug withdrawal are usually listed as "illness" or "other" in reporting to the Bureau of Justice Statistics' Mortality in Correctional Institutions* because no category specifies drug or alcohol withdrawal.[16] However, a study of deaths in U.S. jails revealed that alcohol was involved in 76 percent of withdrawal-related deaths, confirming longstanding research findings of the lethality of alcohol withdrawal.[17] Opioids were the drug most often involved in the other withdrawal deaths studied.[18]

The study also indicated that "physical and mental health comorbidity likely increases the risk of death from opioid withdrawal (e.g., acute cardiac stress or acute suicidal ideation)."[19] When compared to the general population, people who are incarcerated have higher rates of the following:

- Chronic health conditions (e.g., hypertension, diabetes, myocardial infarction, asthma, and arthritis).[20]
- Infectious diseases (e.g., COVID-19, human immunodeficiency virus [HIV], hepatitis, sexually transmitted infection, and tuberculosis).[21,22]
- Behavioral health conditions (e.g., three times as many people in jail have a serious mental illness as compared to those in the general community).[23]

In addition to the complexities generated by comorbidities,[24] recent trends in drug use and composition make effective withdrawal management even more difficult. More cases of overdose deaths involving co-occurring use of opioids with other depressants (benzodiazepines or alcohol) or with stimulants (methamphetamine or cocaine) are being reported.[25,26] There has also been a sharp rise in the use of fentanyl, which is an extremely potent synthetic opioid that is easily mixed with other drugs such as heroin and cocaine. Other synthetic drugs also are associated with

severe withdrawal symptoms. For example, withdrawal from the "club drug" gamma hydroxybutyrate (GHB) is associated with rapid heart rate, hallucinations, elevated blood pressure, and seizures.[27] With little information currently available on rapidly evolving synthetic substances, jail administrators and staff may not recognize the symptoms of withdrawal.[28]

## Importance of Withdrawal Management in Jails

Jail administrators, public health officials, and other stakeholders recognize that jails have become the default health care system for individuals with complex behavioral health and chronic medical conditions.[29,30,31] Yet, among sentenced jail inmates with SUD, less than 20 percent participated in any form of drug treatment, and only 1 percent received detoxification services.[32]

A special report on core competencies and jail leadership states, "Jails are guided by Constitutional mandates and case law, and thus, can be a focus for litigation for liability lawsuits and civil rights claims."[33] Jails that do not offer withdrawal-related medical care face the risk of legal liability under both federal and state laws, as well as adverse health outcomes for those in custody.[34,35] In *Access to Medications for Opioid Use Disorder in U.S. Jails and Prisons*, the O'Neill Institute for National and Global Health Law at Georgetown University Law Center notes lawsuits involving deaths due to improperly managed withdrawal.[36]

Litigation stemming from inadequate medical care increases costs to local governments and jails through large financial settlements or judgments, attorneys' fees, court-enforced remediation, time, and resource use. In October 2018, a wrongful death lawsuit associated with drug withdrawal was settled for $4.75 million against a Pennsylvania county for a death in its jail.[37] In December of that same year, a $10 million judgment was ordered against a major for-profit medical provider for a death in an Oregon county jail.[38]

# Legal Claims and Liability Pertaining to Withdrawal Management

Counties, jail administrators, and jail staff have faced civil lawsuits seeking monetary awards and other relief for failure to provide withdrawal management services. Some civil lawsuits have claimed violations of civil rights granted under the U.S. Constitution and federal laws. Other lawsuits have been based on state tort law, which covers noncriminal harms. Individuals may also face criminal liability under state law for egregious violations.

---

* Formerly known as Deaths in Custody Reporting Program.

GTL-Bull,Mark-GeneralProduction-000025

## Federal Civil Rights Claims

Individuals who are incarcerated may file claims in federal court alleging violations of their rights under the U.S. Constitution. The 8th Amendment prohibits "cruel and unusual punishments"[39] and is applicable to states through the Due Process Clause of the Fourteenth Amendment.[40] Equal or greater protections are afforded under the due process clauses of the 14th and 5th Amendments to individuals detained in pretrial status, who comprise large portions of the jail population.[41] Statutes provide for legal actions to enforce these constitutional rights, including the following:

- The **Civil Rights Act of 1871** enforces the 14th Amendment through the imposition of civil and criminal liability for violations of constitutionally protected rights. Under 42 U.S.C. § 1983, individuals have the right to sue state and local officials and governments acting under color of state law for civil rights violations.[42]

- The **Civil Rights of Institutionalized Persons Act (CRIPA) of 1980** also facilitates enforcement of the 14th Amendment. The Department of Justice may file a federal court action under CRIPA to address a pattern or practice of constitutional rights violations.[43,44]

Another law, the **Americans with Disabilities Act (ADA) of 1990**, protects people with disabilities from discrimination.* This protection is specifically extended to individuals with disabilities in jails, detention and correctional facilities, and community correctional facilities.[45] Individuals are generally not protected by ADA against discrimination on the basis of illegal drug use, but the law does prohibit denying health and drug rehabilitation services on the basis of illegal drug use.[46]

The legal standard for whether failure to provide adequate medical treatment violates an individual's rights depends on (a) whether the individual is detained in pretrial status or incarcerated after conviction and (b) which federal court of appeals has jurisdiction.

For individuals who have been convicted and are serving a sentence in jail or prison, the standard for constitutional violation was defined by the U.S. Supreme Court in *Estelle v. Gamble, 429 U.S. 97* (1976). The Court established "deliberate indifference to serious medical need," which incorporates a subjective standard showing

the defendant's state of mind.[47] A county, correctional facility, and staff can face liability under the standard established in *Estelle v. Gamble* if they knew of and consciously disregarded an excessive risk to an incarcerated person's health and safety.[48] The plaintiff must show that the responsible party was readily able to recognize the risk, acknowledged the risk, and failed to take reasonable measures to abate the harm.[49] The governmental body retains liability even if it contracts for and relies on outside medical care services.[50]

For individuals detained in pretrial status, the U.S. Supreme Court has not ruled on whether the "deliberate indifference" standard applies to inadequate medical care claims. Therefore, the 12 U.S. Courts of Appeals (just below the U.S. Supreme Court) must make their own rulings.

Most of the 12 circuits have applied the "deliberate indifference" test to medical claims of individuals detained in pretrial status.[51] However, some courts have found that a 2015 U.S. Supreme Court decision requires a different standard that is easier for plaintiffs to meet. The United States Court of Appeals for the Ninth Circuit, for example, held in *Gordon v. County of Orange, 888 F. 3d 1118* (9th Cir. 2018) that prior case law[52] requires an objective standard for determining whether failure to provide adequate medical treatment violates the due process rights of an individual detained in pretrial status. The *Gordon* case involved an individual who died in pretrial detention while withdrawing from heroin. The Ninth Circuit's objective standard is whether the defendant took reasonable measures to address the risk of serious harm.[53]

In most cases, public officials, such as sheriffs, cannot be held personally liable for their conduct when performing their duties, because they are covered by the doctrine of qualified immunity. In other words, their employer could be ordered to pay damages, but the public officials would not be ordered to pay those damages from their own funds. However, if they have violated a statutory or constitutional right that was clearly established at the time of the challenged conduct, they may be personally liable for a civil rights violation.[54] In such cases, the Monell doctrine may shield the county or jail from liability, because a local government entity can be liable only if the conduct in question was in keeping with official policy or a "persistent and widespread" practice.[55]

---

* Section 504 of the Rehabilitation Act provides similar protections as ADA.

GTL-Bull,Mark-GeneralProduction-000026

## State Tort Liability

Medical providers, jail administrators, and staff may be liable for the death or injury of a person who is incarcerated based on state tort law claims, including wrongful death, medical malpractice, and/or intentional infliction of emotional distress.[56] A family member or dependent may also bring a cause of action for wrongful death against a jail or other relevant parties and seek damages for losses caused by the death of the individual while incarcerated.[57] Medical malpractice claims can be brought for injuries resulting from a deviation from the appropriate standard of care, which is the same standard of care that applies to people who are not incarcerated.[58]

# Preparing a Comprehensive and Proactive Response

Increasing and changing patterns of drug use demand that jails be prepared to provide immediate, lifesaving screening and requisite interventions to anticipate and prevent a medical crisis—a standard for all individuals entering custody. When a length of stay allows and circumstances dictate, withdrawal management should extend beyond addressing acute symptoms to include a continuum of interventions, such as medication-assisted treatment (MAT) with its inherent clinical/social supports and transition planning, to initiate and maintain long-term recovery upon reentry.

In the past 5 years, considerable litigation has been brought against jails and prisons (local, state, and federal) for failing to provide opioid use disorder treatment medications.[59] *Smith v. Aroostook County*, *Pesce v. Coppinger*, and other lawsuits have challenged the failure to initiate—and maintain—MAT, which is in violation of ADA and the Rehabilitation Act.[60,61] These decisions have had ripple effects. New Hampshire and Maryland have passed laws to implement treatment programs in correctional settings, and Connecticut has included funding in the state budget to expand jail-based MAT programs.[62,63,64] Chapter 208, Section 78 of Massachusetts' General Laws requires that all FDA-approved forms of MAT be provided to state detainees or prisoners at relevant state facilities.[65]

Failure to comply with legislation and precedent set by case law can leave jails, corrections staff, and medical staff open to public scrutiny and potential litigation. Minimally, jails should designate a compliance officer or other staff member to remain up to date on changes in laws and policy. Further, a more comprehensive and proactive approach involves facility-wide engagement in the following steps.[66]

## 1. Establish withdrawal management policy to comport with legal, regulatory, and clinical standards.

**Case in Point:** In 2014, Lindsay Kronberger died from severe electrolyte imbalance due to opiate withdrawal while in custody at Snohomish County Jail (Washington). Her family sued the county and several jail staff. The court denied the county's motion for summary judgment, holding that the existence of or adherence to a policy for treating incarcerated persons undergoing opioid withdrawal was a genuine issue of material fact.[67] Subsequently, the case was settled for $1 million.

To be effective, policies must be available to and understood by all staff at the correctional facility and by third-party medical providers. In addition to being aligned with legal, regulatory, and clinical standards, site-specific policies will facilitate uniform application of protocols. Periodic (e.g., annual) review of the withdrawal management policy by both jail and medical directors will ensure that the policy is current. This review also helps eliminate conflicts between correctional policies and health policies.

In establishing both policy and protocols, a comprehensive approach for supporting SUD recovery is encouraged. For instance, it is important to consider how screening for withdrawal potential at intake and assessment of potential withdrawal severity will interface with the length of the jail stay, continuation or initiation of MAT, and continuity of care upon release.

GTL-Bull,Mark-GeneralProduction-000027

## 2. Create withdrawal management protocols and maintain fidelity in implementing them.

**Case in Point:** In 2016, Lisa Ostler exhibited profound physical distress and pleaded for medical attention from the time of her intake into the Salt Lake County Jail (Utah) until 3.5 days later, when she was found unresponsive and not breathing in her cell. Shortly after, she was pronounced dead at the hospital.[68] Ostler's family filed a wrongful death suit against Salt Lake County administrators, jailers, and medical personnel. Among many other findings, *The Expert Opinion Report In The Matter of Lisa Ostler v. Salt Lake City County Jail Staff* noted a failure "to perform required withdrawal protocol assessments for many inmates," as well as a "widespread cultural, customary, and accepted practice. . . to ignore health complaints and symptoms exhibited by inmates undergoing drug withdrawal."[69] The county settled for nearly $1 million.

Jails seeking to establish or update their protocols on withdrawal management can start the process by familiarizing themselves with general best practices such as those suggested in the American Society of Addiction Medicine's *Clinical Practice Guideline on Alcohol Withdrawal Management*, the Federal Bureau of Prisons' *Medically Supervised Withdrawal for Inmates with Substance Use Disorders Clinical Guidance*, or the Substance Abuse and Mental Health Services Administration's *TIP 63: Medications for Opioid Use Disorder for Healthcare and Addiction Professionals, Policymakers, Patients, and Families*. Of note, no comprehensive clinical guidelines specific to jail settings have yet been published, but jails that lay the groundwork now will be better prepared to recognize and address withdrawal and align their practices with such guidelines when they become available.

The more detailed the protocol, the less room for interpretation or confusion. Minimally, the protocol defines who does what by when and how. For example, who (medical director, nurse, corrections officer) decides when an individual's presenting symptoms warrant a trip to the hospital for additional medical support and based on what criteria? Documented processes for informing and training staff when a policy or protocol is revised will help ensure compliance.

## 3. Ensure proper staffing and resources are in place to implement policies and protocols.

**Case in Point:** Cynthia Mixon died 2.5 days after entering the Wilkinson County Jail (Georgia), during which time she was denied prescribed medications, including oxycodone. The cause of death was ruled as hypertensive cardiovascular disease, but the plaintiff's medical expert indicated that her symptoms (nausea, diarrhea, and fever) were consistent with acute benzodiazepine withdrawal. A lawsuit filed by Mixon's family alleged that, per jail policy, the on-duty jailer was authorized to decide whether emergency medical attention was warranted, yet said jailer was not provided with adequate medication training to make this decision.[70] The county settled the suit for $420,000.

Cases against correctional facilities related to improper staffing have involved failure to properly hire and train staff to tend to medical needs[71] and releasing individuals in withdrawal into the general jail population without appropriate monitoring.[72] The following actions can help facilities establish staffing and resources appropriate for safe and effective withdrawal management:

- **Designate a responsible health authority** to arrange and coordinate all aspects of health services and ensure the proper standard of care for all incarcerated individuals.

- **Ensure adequate medical staff coverage** to provide assessment and treatment planning services. Clinical support can be accomplished through any combination of on-site health staff, remote coverage, telemedicine services, and/or transfer to facilities that can provide a higher level of care.

- **Clarify roles and responsibilities** so staff understand the limits of their roles. Staff members who do not have adequate training, supplies, or equipment for the job must follow protocols for contacting staff members with the relevant role or expertise.

- **Proactively address staff vacancies** (temporary or permanent, short- or long-term) to avoid disruption or diminishment of health care services.

- **Review contracts with medical and behavioral health services** for withdrawal management practices. In cases where correctional health care is provided by a third party, counties and jail administrators are responsible for ensuring independent contractors meet the established standards of care delivery.[73]

GTL-Bull,Mark-GeneralProduction-000028

## 4. Train staff to ensure their understanding of and readiness to implement policy and protocol.

**Case in Point:** During his detention at the Jefferson County Jail (Oregon), James Wippel reported not feeling well, vomited, and defecated blood. He died 2 days later from a perforated ulcer. Three corrections deputies were charged with criminally negligent homicide for failing to secure medical treatment.[74] Explaining her belief that Wippel's symptoms were typical of withdrawal, one deputy told investigators, "I'm not familiar with heroin, or how people detox, other than what I'd seen in the movies."[75]

Staff training is essential to providing consistent, appropriate, and adequate health care to people who are incarcerated. Both correctional and health care staff should receive (and be issued certificates upon completion of) training on withdrawal management policy and protocol during onboarding and through regular (annual) training sessions. Announcements at roll calls, staff emails, and signage throughout the facility are informal ways to incorporate training into daily work life. Cross-training of medical and correctional staff can improve communication between groups.

In addition to site-specific policy and protocol, suggested training topics include:

- Signs and symptoms of withdrawal, which is particularly important when individuals provide inaccurate information about their recent substance use.

- The science of addiction as a disease, to clarify the impact substances have on the brain and what the recovery process entails.

- Stigma, which may help staff understand why people are reluctant to disclose recent substance use or a diagnosed SUD.

- Implicit bias, to raise awareness about unconscious thought patterns that affect attitudes and actions toward different groups.

## 5. Engage in continuous quality improvement and implement corrective action in a timely manner.

**Case in Point:** After investigating a string of seven suicides by persons experiencing opioid withdrawal at the Cumberland County Jail (New Jersey), the U.S. Department of Justice warned the jail that its procedures for managing withdrawal were inadequate and violated the 8th and 14th Amendments. Among its findings were that the jail had a written continuous quality improvement (CQI) plan, but that it had not been followed to improve withdrawal management in response to inmate suicides.[76]

Specific to withdrawal management, CQI is a process for evaluating access to care, the intake process, adverse events, need for emergency care, deaths, and other internal and external factors affecting the medical care of confined persons with SUD.[77] CQI often involves regular review of data (e.g., number of individuals screened for SUD upon intake and in initial detention, with the percent who screen positive; number of individuals receiving withdrawal services, by type of substance), incidents, and quality improvement goals to identify where updates or additional training sessions are needed for medical and correctional staff. The following activities are inherent to a robust CQI process for achieving better outcomes:

- ***Assign the responsibility of gathering and monitoring data*** to a person who is appropriately trained on gathering and monitoring data for quality improvement purposes.

- **Regularly conduct and document meetings** of the correctional administrator, the responsible health authority, and other members of the medical, dental, behavioral health, and correctional staff, as appropriate.[78]

- ***Gather statistical reports of health services*** at least monthly to monitor and discuss trends in the delivery of health care.[79]

- ***Maintain medical records*** (using electronic health records when possible) separate from jail confinement records.

- In contracts with third-party providers, ***specify software, data-gathering tools, and system management tools***, as well as any reporting or information needed for monitoring compliance and quality processes.

GTL-Bull,Mark-GeneralProduction-000029

- **Draft a codebook** for the processes in which the health care provider identifies the data elements, categories, codes for each data element, and data location in the computer.[80]

An established corrective action plan enables timely responses to problems and corrections to errors resulting from noncompliance or underperformance.[81] For example, jails/counties that contract with a third-party health care provider should specify the corrective action that will occur when metrics and standards are not met in the request for proposal (RFP) and contract. The jail/county should also specify in the contract the conditions under which it may terminate the contract or negate any contract extension clauses if the provider fails to correct errors. A study of 81 RFPs for contracted jail health care services found that less than one-third specified performance requirements and penalties for failing to uphold the requirements specified in the RFP.[82]

# Conclusion

Perhaps at no other time has the need for withdrawal management policy and protocols in jails been more critical. The COVID-19 pandemic has prompted initiation or increased use of substances, particularly by racial/ethnic minorities—a population disproportionally represented in jails.[83,84] The percent of individuals in local jails who die from alcohol/drug intoxication continues to grow, and legislation, such as Massachusetts' Chapter 208, Section 78 noted above, is demanding greater attention to the health of individuals with SUDs in jails. Jail administrators, medical and correctional staff, public health officials, and other stakeholders must be prepared to carry out the law.

**For More Information**

- The *ASAM National Practice Guideline for the Treatment of Opioid Use Disorder - 2020 Focused Update* (2020), from the American Society of Addiction Medicine at https://www.asam.org/Quality-Science/quality/2020-national-practice-guideline.

- *Medically Supervised Withdrawal for Inmates with Substance Use Disorders: Federal Bureau of Prisons Clinical Guidance* (2020), from the Federal Bureau of Prisons at https://www.bop.gov/resources/pdfs/medically_supervised_withdrawal_cg.pdf.

- *TIP 63: Medications for Opioid Use Disorder for Healthcare and Addiction Professionals, Policymakers, Patients, and Families* (2021), from the Substance Abuse and Mental Health Services Administration at https://store.samhsa.gov/product/TIP-63-Medications-for-Opioid-Use-Disorder-Full-Document/PEP20-02-01-006.

- *Fact Sheet: Drug Addiction and Federal Disability Rights Laws* (2018), from the U.S. Department of Health and Human Services, Office for Civil Rights at https://www.hhs.gov/sites/default/files/drug-addiction-aand-federal-disability-rights-laws-fact-sheet.pdf.

- *Medication-Assisted Treatment for Opioid Use Disorder in Jails and Prisons: A Planning & Implementation Toolkit* (2020), from the National Council for Behavioral Health and Vital Strategies at https://www.thenationalcouncil.org/wp-content/uploads/2020/09/MAT_in_Jails_Prisons_Toolkit_Final_12_Feb_20.pdf?daf=375ateTbd56.

- *Use of Medication-Assisted Treatment for Opioid Use Disorder in Criminal Justice Settings* (2019), from the Substance Abuse and Mental Health Services Administration at https://store.samhsa.gov/product/Use-of-Medication-Assisted-Treatment-for-Opioid-Use-Disorder-in-Criminal-Justice-Settings/PEP19-MATUSECJS.

- *Jail-Based Medication-Assisted Treatment: Promising Practices, Guidelines, and Resources for the Field* (2018), from the National Sheriffs' Association and the National Commission on Correctional Health Care at https://www.sheriffs.org/publications/Jail-Based-MAT-PPG.pdf.

GTL-Bull,Mark-GeneralProduction-000030

# Endnotes

1. Bronson, Jennifer, Jessica Stroop, Stephanie Zimmer, and Marcus Berzofsky, Revised 2020, *Drug Use, Dependence, and Abuse Among State Prisoners and Jail Confined Persons, 2007–2009*, Washington, DC: U.S. Department of Justice, Bureau of Justice Statistics, retrieved March 26, 2021 from https://bjs.ojp.gov/content/pub/pdf/dudaspji0709.pdf.

2. *Coltrain et al. v. Mineral County et al.*, United States District Court District of Nevada 3:18-cv-00420-LRH-CLB.

3. See note 1, Bronson et al., *Drug Use, Dependence, and Abuse Among State Prisoners and Jail Confined Persons, 2007–2009*, p. 1.

4. E. Ann Carson, 2021, "Mortality in Local Jails, 2000-2019 - Statistical Tables," *Bureau of Justice Statistics Statistical Tables*, Washington, DC: U.S. Department of Justice, Bureau of Justice Statistics, retrieved December 17, 2021 from https://bjs.ojp.gov/content/pub/pdf/mlj0019st.pdf.

5. Ibid, p. 17.

6. Ibid, p. 18.

7. The City of New York Office of the Mayor, n.d., *Healing NYC: Preventing Overdoses, Saving Lives*, New York City: The City of New York Office of the Mayor, retrieved March 19, 2021 from https://www1.nyc.gov/assets/home/downloads/pdf/reports/2017/HealingNYC-Report.pdf.

8. Rich Cholodofsky, 2019, "Westmoreland Inmates Reach Record Detox Level in February," *Tribune-Review*, March 18, retrieved March 19, 2021 from https://triblive.com/local/westmoreland/westmoreland-inmates-reach-record-detox-level-in-february/.

9. American Psychiatric Association, 2013, *Diagnostic and Statistical Manual of Mental Disorders (DSM–5)*, Washington, DC: American Psychiatric Association.

10. Darke, Shane, Sarah Larney, and Michael Farrell, 2017, "Yes, People Can Die from Opiate Withdrawal," *Addiction* 112(2), 199–200, retrieved March 26, 2021 from https://doi.org/10.1111/add.13512.

11. American Society of Addiction Medicine, 2020, *The ASAM Clinical Practice Guideline on Alcohol Withdrawal Management*, Rockville, MD: American Society of Addiction Medicine, retrieved March 19, 2021 from https://www.asam.org/Quality-Science/quality/guideline-on-alcohol-withdrawal-management.

12. Centers for Disease Control and Prevention, 2015, *Suicide Rising Across the U.S.*, Atlanta, GA: Centers for Disease Control and Prevention, retrieved March 23, 2021 from https://www.cdc.gov/vitalsigns/suicide/infographic.html#graphic3.

13. Center for Substance Abuse Treatment, 2006, *Detoxification and Substance Abuse Treatment*, Treatment Improvement Protocol (TIP) Series, No. 45, HHS Publication No. (SMA) 15-4131, Rockville, MD: Substance Abuse and Mental Health Services Administration, retrieved March 19, 2021 from https://store.samhsa.gov/sites/default/files/d7/priv/sma15-4131.pdf.

14. U.S. Food and Drug Administration, 2019, *FDA identifies harm reported from sudden discontinuation of opioid pain medicines and requires label changes to guide prescribers on gradual, individualized tapering*, White Oak, MD: U.S. Food and Drug Administration, retrieved March 26, 2021 from https://www.fda.gov/drugs/drug-safety-and-availability/fda-identifies-harm-reported-sudden-discontinuation-opioid-pain-medicines-and-requires-label-changes.

15. See note 4 above, Carson, "Mortality in Local Jails, 2000-2019 - Statistical Tables," p. 8.

16. Fiscella, Kevin, Margaret Noonan, Susan H. Leonard, Subrina Farah, Mechelle Sanders, Sarah E. Wakeman, and Jukka Savolainen, April 2020, "Drug- and Alcohol-Associated Deaths in U.S. Jails," *Journal of Correctional Health Care* 26(2): 183–193, retrieved March 19, 2021 from http://doi.org/10.1177/1078345820917356.

17. Ibid, p. 188.

18. Ibid, p. 183.

19. Ibid, p. 190.

20. Binswanger, Ingrid A., Patrick M. Krueger, and J.F. Steiner, 2009, "Prevalence of Chronic Medical Conditions Among Jail and Prison Inmates in the USA Compared with the General Population," *Journal of Epidemiology and Community Health* 63, retrieved March 19, 2021 from https://doi.org/10.1136/jech.2009.090662.

21. Jiménez, Monik, Tori Cowger, Lisa Simon, Maya Behn, Nicole Cassarino, and Mary Bassett, 2020, "Epidemiology of COVID-19 Among Incarcerated Individuals and Staff in Massachusetts Jails and Prisons," *JAMA Network Open* 3(8), retrieved December 16, 2021 from https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2769617.

22. Flanigan, Timothy, Nicklos Zaller, Lynn Taylor, Curt Beckwith, Landon Kuester, Josiah Rich, and Charles Carpenter, 2009, "HIV and Infectious Disease Care in Jails and Prisons: Breaking Down the Walls with the Help of Academic Medicine, *Transactions of the American Clinical and Climatological Association* 120, retrieved March 19, 2021 from https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2744543/.

23. Substance Abuse and Mental Health Services Administration, 2017, *Guidelines for Successful Transition of People with Mental or Substance Use Disorders from Jail and Prison: Implementation Guide*, (SMA) 16-4998, Rockville, MD: Substance Abuse and Mental Health Services Administration, retrieved March 19, 2021 from https://store.samhsa.gov/product/Guidelines-for-Successful-Transition-of-People-with-Mental-or-Substance-Use-Disorders-from-Jail-and-Prison-Implementation-Guide/SMA16-4998.

GTL-Bull,Mark-GeneralProduction-000031

24. See note 13, Center for Substance Abuse Treatment, *Detoxification and Substance Abuse Treatment,* Treatment Improvement Protocol (TIP) Series, No. 45.

25. The Pew Charitable Trusts, 2020, *Opioid Overdose Crisis Compounded by Polysubstance Use*, retrieved March 19, 2021 from https://www.pewtrusts.org/en/research-and-analysis/fact-sheets/2020/10/opioid-overdose-crisis-compounded-by-polysubstance-use.

26. Nora Volkow, 2020, *Rising Stimulant Deaths Show that We Face More than Just an Opioid Crisis*, North Bethesda: MD: National Institute on Drug Abuse, retrieved March 19, 2021 from https://www.drugabuse.gov/about-nida/noras-blog/2020/11/rising-stimulant-deaths-show-we-face-more-than-just-opioid-crisis.

27. Busardò, Francesco, and Alan Jones, 2015, "GHB Pharmacology and Toxicology: Acute Intoxication, Concentrations in Blood and Urine in Forensic Cases and Treatment of the Withdrawal Syndrome," *Current Neuropharmacology* 13(1), 47–70, retrieved March 23, 2021 from https://doi.org/10.2174/157015 9X13666141210215423.

28. Jones, Christopher, Emily Einstein, and Wilson Compton, 2018, "Changes in Synthetic Opioid Involvement in Drug Overdose Deaths in the United States, 2010-2016," *JAMA* 319(17), 1819–1821, retrieved March 23, 2021 from https://doi.org/10.1001/jama.2018.2844.

29. Rachel Dissell, 2019, "Ohio jails accept role as state's busiest opioid detox centers," *The Plain Dealer*, January 11, 2021, retrieved March 15, 2021 from https://www.cleveland.com/metro/2017/10/ohio_jails_accept_role_as_states_busiest_opioid_detox_centers.html.

30. Huh, Kil, Alexander Boucher, Frances McGaffey, Matt McKillop, and Maria Schiff, 2018, *Jails: Inadvertent Health Care Providers*, The Pew Charitable Trusts, retrieved March 26, 2021 from https://www.pewtrusts.org/-/media/assets/2018/01/sfh_jails_inadvertent_health_care_providers.pdf.

31. Eric Westervelt, 2019, "County Jails Struggle With a New Role as America's Prime Centers for Opioid Detox," *NPR*, April 24, retrieved March 26, 2021 from https://www.npr.org/2019/04/24/716398909/county-jails-struggle-with-a-new-role-as-americas-prime-centers-for-opioid-detox.

32. See note 1, Bronson, et al., *Drug Use, Dependence, and Abuse Among State Prisoners and Jail Confined Persons, 2007–2009*, p. 13.

33. Susan W. McCampbell, 2019, "Core Competencies and Jail Leadership: Reduce Jail-related Liability Risks," *American Jails*, retrieved March 26, 2021 from http://www.cipp.org/uploads/3/7/5/7/37578255/21_reduce_jail-rel...%5b3525%5d.pdf.

34. See *Smith v. Aroostook Cnty.*, 376 F. Supp. 3d 146 (D. Me. 2019), aff'd, 922 F.3d 41 (1st Cir. 2019); *Kortlever et al. v. Whatcom Cnty.*, No. 2:18CV00823, Order (W.D. Wash. July 9, 2019); *Gohranson v. Snohomish Cnty.*, No. C16-1124RSL, U.S. Dist. LEXIS 193494 (W.D. Wash. Nov. 13, 2018); *Pesce v. Coppinger*, 355 F. Supp. 3d 35 (D. Mass. 2018); *Smith v. Fitzpatrick*, No. 1:2018cv00288, Order (D. Me. Oct. 1, 2018); *Moyer v. Lebanon Cnty.*, No. 3:16-CV-01424, 2017 U.S. Dist. LEXIS 213261, (M.D. Pa., Dec. 28, 2017), adopted by *Moyer v. Lebanon Cnty.*, No. 3:16-CV-01424, 2018 U.S. Dist. LEXIS 8126 (M.D. Pa., Jan. 18, 2018); *Estate of Moffitt v. Minor*, No. 15-CV-00071-WYD-MJW, U.S. Dist. LEXIS 222865 (D. Colo. Sept. 28, 2017); *Hernandez v. Cnty. of Monterey*, 110 F. Supp. 3d 929 (N.D. Ca. 2015); *Brummett v. Cnty. of San Diego*, No. 12-CV-1428-LAB (BGS), U.S. Dist. LEXIS 42991 (S.D. Cal. Mar. 25, 2013); *Estate of Johnson v. Miller*, No. 2:11-CV-00067, U.S. Dist. LEXIS 95322 (S.D. Ohio Aug. 25, 2011).

35. Legal Action Center, 2021, *Cases Involving Discrimination Based on Treatment with Medication for Opioid Use Disorder (MOUD)*, retrieved March 26, 2021 from https://www.lac.org/assets/files/Cases-involving-denial-of-access-to-MOUD.pdf.

36. Weizman, Shelly, Joanna Perez, Isaac Manoff, Melissa Baney, and Taleed El-Sabawi, 2021, *National Snapshot: Access to Medications for Opioid Use Disorder in U.S. Jails and Prisons*, O'Neill Institute for National and Global Health Law at Georgetown University Law Center, retrieved September 3, 2021 from https://oneill.law.georgetown.edu/wp-content/uploads/2021/07/National-Snapshot-Access-to-Medications-for-Opioid-Use-Disorder-in-U.S.-Jails-and-Prisons.pdf.

37. Center on Media, Crime and Justice at the John Jay College of Criminal Justice, 2018, "Pennsylvania County to Pay $4.75M in Inmate Death," *Crime and Justice News*, October 25, retrieved September 9, 2021 from https://thecrimereport.org/2018/10/25/pennsylvania-county-to-pay-4-75m-in-inmate-death/.

38. *Pitkin and Pitkin v. Corizon Health, Inc. et al*, United States District Court for the District of Oregon, Civ. No. 3:16-cv-02235-AA.

39. U.S. Const. amend. VIII.

40. *Wilson v. Seiter*, 501 U.S. 294, 296-97.

41. *Kingsley v. Hendrickson*, 576 U.S 389, 390 (2015) (holding that to make an excessive force claim, pretrial detainees must only prove excessive force under an objective analysis instead of under the objective and subjective analyses required for incarcerated individuals to make the same claim); *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) (holding that a pretrial detainee's right to medical care under the 14th Amendment is "at least as great" as an incarcerated person's right to medical care under the 8th Amendment).

42. Edward C. Dawson, 2018, "Replacing Monell Liability with Qualified Immunity for Municipal Defendants in 42 U.S.C. § 1983 Litigation," *University of Cincinnati Law Review* 86(2), retrieved March 17, 2021 from https://scholarship.law.uc.edu/uclr/vol86/iss2/2.

43. *Wilson*, 501 U.S. at 296-97 (1991).

44. The United States Department of Justice, 2020, *Rights of Persons Confined to Jails and Prisons*, Washington, DC: The United States Department of Justice, retrieved March 26, 2021 from https://www.justice.gov/crt/rights-persons-confined-jails-and-prisons.

45. 28 C.F.R. § 35.152.

46. 42 U.S.C. § 12210(c). This is an evolving area of law. *See Kortlever*, No. 2:18CV00823, Complaint, (W.D. Wash. June 6, 2018), ¶ 29.

47. *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976).

48. *Farmer v. Brennan*, 511 U.S. 825, 836-840 (1994).

49. Ibid. at 836-840, 848.

50. *King*, 680 F.3d 1013, 1020 (7th Cir. 2012).

51. Struve, C.T., March 2013, "The Conditions of Pretrial Detention," 161 *U. Pa. L. Rev.* 1009, 1027.

52. *Kingsley*, 576 U.S. 389.

53. *Gordon*, 888 F.3d 1118 (9th Cir. 2018).

54. *Davis v. Wessel*, 792 F.3d 793, 803 (7th Cir. 2015) (citing *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. (2015).

55. *Connick v. Thompson*, 563 U.S. 51 (2011) (citing *Monell v. Dep't. of Social Services of City of New York*, 436 U.S. 658, 694 (1978).

56. *See Becker v. Newman*, 646 Fed. Appx. 788 (11th Cir. 2016); *Moyer*, 2017 U.S. Dist. LEXIS 213261; *Estate of Johnson*, U.S. Dist. LEXIS 95322.

57. Schap, David, Victor A. Matheson, and David I. Rosenbaum, 2016, "Wrongful Death: Who Recovers What, Where, and How," *Journal of Legal Economics* 22(2), retrieved April 14, 2021 from https://jle.aaefe.org/jle-volume22.html?dir=desc&order=name.

58. *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976).

59. See note 35, Legal Action Center, *Cases Involving Discrimination Based on Treatment with Medication for Opioid Use Disorder (MOUD)*.

60. *Aroostook Cnty.*, 376 F. Supp. 3d at 149.

61. American Civil Liberties Union of Massachusetts, 2018, *Pesce v. Coppinger*, retrieved April 14, 2021 from https://www.aclum.org/en/cases/pesce-v-coppinger.

62. Staff Report, 2020, "New law mandates medication assisted treatment in jails," *New Hampshire Union Leader*, August 5, retrieved March 25, 2021 from https://www.unionleader.com/news/health/new-law-mandates-medication-assisted-treatment-in-jails/article_bbb2728a-9a25-530e-bdf7-306de5f5b9b1.html.

63. Teddy Rosenbluth, 2020, "New law requires opioid treatment in county jails," *Concord Monitor*, August 6, retrieved March 25, 2021 from https://www.concordmonitor.com/Opioid-Treatment-New-Hampshire-Prisons-35593754.

64. Lisa Backus, 2019, "Funding to Help CT Prisons Improve Opioid Addiction Treatment Program," *The Middletown Press*, July 3, retrieved March 25, 2021 from https://www.middletownpress.com/middletown/article/Funding-to-help-CT-prisons-improve-opioid-14069347.php.

65. The 192nd General Court of the Commonwealth of Massachusetts, 2018, Chapter 208: An Act for Prevention and Access to Appropriate Care and Treatment of Addiction, at Section 78, retrieved April 9, 2021 from https://malegislature.gov/Laws/SessionLaws/Acts/2018/Chapter208.

66. Lauren McMenemy, 2019, "What Is Legal Compliance?," *Diligent Insights*, May 6, retrieved March 26, 2021 from https://insights.diligent.com/legal-compliance/steps-evaluating-legal-compliance.

67. *Gohranson*, U.S. Dist. LEXIS 193494 at 3.

68. Suzanne Ward, 2019, *Expert Opinion Report in The Matter of: Lisa Ostler v. Salt Lake City County Jail Staff*, retrieved March 26, 2021 from https://rockyanderson.org/wp-content/uploads/2020/03/expert-report-of-suzanne-l-ward-rn-ms-lnc.pdf.

69. Ibid.

70. *Brooks v. Wilkinson County, Georgia et al.*, United States District Court for the Middle District of Georgia, Macon Division Case 5:17-cv-00033-TES.

71. *Estate of Johnson*, U.S. Dist. LEXIS 95322, at 7, 11.

72. See *Brummett*, U.S. Dist. LEXIS 42991, at 12-13.

73. See *Aroostook*, 376 F. Supp. 3d 146; *King v. Kramer*, 680 F.3d 1013, 1020 (7th Cir. 2012); *Pesce*, 355 F. Supp. 3d 35; *Hernandez*, 110 F. Supp. 3d 929.

74. Clackamas County, 2018, *Jefferson County Corrections Deputies Acquitted of Criminally Negligent Homicide*, December 13, retrieved September 9, 2021 from https://www.clackamas.us/news/2018-12-13/jefferson-county-corrections-deputies-acquitted-of-criminally-negligent-homicide.

75. Conrad Wilson, 2018, "Jefferson County Death Raises Questions of Accountability," Oregon Public Broadcasting, December 30, retrieved March 26, 2021 from https://www.opb.org/news/article/jefferson-county-jail-death-questions-accountability-james-whippel-case/.

GTL-Bull,Mark-GeneralProduction-000033

76. U.S. Department of Justice, Civil Rights Division, and U.S. Attorney's Office, District of New Jersey, 2021, *Investigation of the Cumberland County Jail (Bridgeton, New Jersey)*, retrieved April 1, 2021 from https://www.justice.gov/opa/press-release/file/1354646/download.

77. National Commission on Correctional Health Care, 2010, *Continuous Quality Improvement*, Chicago, IL: National Commission on Correctional Health Care, retrieved March 26, 2021 from https://www.ncchc.org/spotlight-on-the-standards-24-1.

78. National Commission on Correctional Health Care, 2018, *Standards for Health Services in Jails*, Chicago, IL: National Commission on Correctional Health Care, p. 8.

79. Ibid.

80. Gail Elias, 2007, *How to Collect and Analyze Data: A Manual for Sheriffs and Jail Administrators*, Washington, DC: U.S. Department of Justice, National Institute of Corrections, retrieved March 26, 2021 from https://s3.amazonaws.com/static.nicic.gov/Library/021826.pdf.

81. John Spacey, 2018, "3 Examples of a Corrective Action Plan," *Simplicable*, January 4, retrieved March 26, 2021 from https://simplicable.com/new/corrective-action-plan.

82. See note 30, Huh et al., *Jails: Inadvertent Health Care Providers*.

83. Czeisler, Mark É., Rashon I. Lane, Emiko Petrosky, Joshua F. Wiley, Aleta Christensen, Rashid Njai, Matthew D. Weaver, Rebecca Robbins, Elise R. Facer-Childs, Laura K. Barger, Charles A. Czeisler, Mark E. Howard, and Shantha M.W. Rajaratnam, 2020, "Mental Health, Substance Use, and Suicidal Ideation During the COVID-19 Pandemic - United States, June 24-30, 2020," *Morbidity and Mortality Weekly Report* 69(32), Atlanta, GA: Centers for Disease Control and Prevention, retrieved May 20, 2021 from https://doi.org/10.15585/mmwr.mm6932a1

84. Zhen Zeng, 2020, *Jail Inmates in 2018*, Bulletin, Washington, DC: U.S. Department of Justice, Bureau of Justice Statistics, NCJ 253044, retrieved May 20, 2021 from https://www.bjs.gov/content/pub/pdf/ji18.pdf.

### About BJA

The Bureau of Justice Assistance (BJA) helps to make American communities safer by strengthening the nation's criminal justice system. BJA's grants, training and technical assistance, and policy development services provide government jurisdictions (state, local, tribal, and territorial) and public and private organizations with the cutting edge tools and best practices they need to support law enforcement, reduce violent and drug-related crime, and combat victimization.

To learn more about BJA, visit https://bja.ojp.gov, or follow us on Facebook (www.facebook.com/DOJBJA) and Twitter (@DOJBJA). BJA is part of the Department of Justice's Office of Justice Programs.

NCJ 304066

GTL-Bull,Mark-GeneralProduction-000034

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**
**EAST ST. LOUIS DIVISION**

| | | |
|---|---|---|
| Midwest Trust Company as | ) | |
| Administrator of the Estate of | ) | |
| Mark Bull, Deceased, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 3:23-cv-01238-SMY |
| Vs. | ) | |
| | ) | |
| Sheriff Jeff C. Connor, County of Madison, | ) | |
| Illinois, John Does, Jane Does, and | ) | |
| Advanced Correctional Healthcare, Inc., | ) | |
| | ) | |
| Defendants. | ) | |

# EXHIBIT 8– CLINICAL PROFILE AND

# OUTCOMES OF OPIOID ABUSE

# TO AMENDED COMPLAINT

## ORIGINAL ARTICLE

**INTESTINAL RESEARCH**

pISSN 1598-9100 • eISSN 2288-1956
https://doi.org/10.5217/ir.2019.00104
Intest Res 2020;18(2):238-244

# Clinical profile and outcomes of opioid abuse gastroenteropathy: an underdiagnosed disease entity

Ramit Mahajan[1], Yogesh Gupta[1], Arshdeep Singh[1], Pulkit Dhiman[1], Vandana Midha[2], Chandan Kakkar[3], Vikram Narang[4], Varun Mehta[1], Kavita Saggar[3], Ajit Sood[1]

*Departments of [1]Gastroenterology, [2]Internal Medicine, [3]Radiodiagnosis, and [4]Pathology, Dayanand Medical College and Hospital, Ludhiana, India*

**Background/Aims:** Opioid-induced bowel dysfunction includes nausea, vomiting, constipation and abdominal distension. We describe patients presenting with gastrointestinal (GI) ulcers and ulcerated strictures secondary to opioid abuse, an entity not well described in literature. **Methods:** This retrospective observational study included patients with opioid abuse gastroenteropathy presenting to Dayanand Medical College and Hospital, Ludhiana, India between January 2013 and December 2018. Opioid abuse gastroenteropathy was defined as gastric or small bowel ulcers and ulcerated strictures in patients abusing opioids, where all other possible etiologies of GI ulcers/strictures were excluded. Clinical, biochemical, endoscopic, radiological and histological parameters as well as response to treatment were assessed. **Results:** During the study period, 20 patients (mean age, $38.5 \pm 14.2$ years; 100% males) were diagnosed to have opioid induced GI ulcers and/or ulcerated strictures. The mean duration of opioid consumption was $6.2 \pm 3.4$ years. The mean duration of symptoms at presentation was $222.1 \pm 392.3$ days. Thirteen patients (65%) had gastroduodenal involvement, 6 (30%) had a jejunoileal disease and 1 (5%) had an ileocecal stricture. Two patients (10%) presented with upper GI bleeding, 11 (55%) had features of gastric outlet obstruction and 7 (35%) presented with small bowel obstruction. Abdominal pain and iron deficiency anemia were the most common presentations. Only 1 patient (5%) responded to proton pump inhibitors, 3 (15%) had a lasting response to endoscopic balloon dilatation, while all other (80%) required surgical intervention. **Conclusions:** Opioid abuse gastroenteropathy presents as ulcers and ulcerated strictures which respond poorly to medical management and endoscopic balloon dilatation. A majority of these cases need surgical intervention. **(Intest Res 2020;18:238-244)**

**Key Words:** Opium; Opioid abuse gastroenteropathy; Ulcer; Stricture; Intestinal obstruction

## INTRODUCTION

Gastrointestinal (GI) ulcers and ulcerated strictures are a common cause of overt or obscure GI blood loss and intestinal obstruction. The commonest identified causes of these ulcers/strictures are peptic, NSAIDs, corrosive, CD, neoplasms, tuberculosis, Behçet's disease, postsurgical and idiopathic.[1,2] An increasing number of patients presenting with unexplained anemia and/or gastric or small bowel obstruction due to idiopathic ulcers and strictures have been diagnosed in our center lately. These patients have a negative workup for common infective and inflammatory causes and deny history of NSAID intake. However, it was observed that some of these patients had been taking significant amounts of opium in various forms. Opium has been hypothesized to cause ulcero-constrictive disease of small bowel by decreasing intestinal motility, increasing resting muscle tone, increased inflammation and ischemia of small bowel.[3] We hereby report the clinical profile and outcomes of such opioid induced gastric and small bowel ulcers and strictures.

**Received** August 23, 2019. **Revised** October 29, 2019.
**Accepted** November 3, 2019.
**Correspondence to** Dr. Ajit Sood, Department of Gastroenterology, Dayanand Medical College and Hospital, Tagore Nagar, Ludhiana 141001, India. Tel: +91-981-5400718, Fax: +91-161-2302620, E-mail: ajitsood10@gmail.com

© Copyright 2020. Korean Association for the Study of Intestinal Diseases. All rights reserved.
This is an Open Access article distributed under the terms of the Creative Commons Attribution Non-Commercial License (https://creativecommons.org/licenses/by-nc/4.0/) which permits unrestricted non-commercial use, distribution, and reproduction in any medium, provided the original work is properly cited.

Exhibit 8

GTL-Bull,Mark-GeneralProduction-000035

# INTESTINAL RESEARCH

https://doi.org/10.5217/ir.2019.00104 • Intest Res 2020;18(2):238-244

## METHODS

This was a retrospective observational study conducted between January 2013 to December 2018 at Dayanand Medical College and Hospital, a tertiary care hospital in Ludhiana, Punjab, India. The study population included all patients who had gastric or small intestinal ulcers and/or strictures, history of opioid abuse and negative evaluation for other causes. Patients were excluded if they had ulcers/strictures due to peptic causes (including *Helicobacter pylori* induced ulcers), history of NSAIDs or corrosive intake, biopsy proven CD or tuberculosis, Behçet's disease, neoplasms and postsurgical strictures.

Hospital records of all patients who met the inclusion criteria were reviewed for history, physical examination, radiologi-

**Table 1.** Clinical Profile and Outcomes of Opioid Gastroenteropathy

| Demographic | Value |
|---|---|
| Age (yr) | 38.5 ± 14.2 |
| Sex | |
|   Male | 20 (100) |
|   Female | 0 |
| Opioid use | |
|   Opioid used | |
|     Dextropropoxyphene | 7 (35) |
|     Tramadol | 1 (5) |
|     Loperamide | 5 (25) |
|     Codeine | 2 (10) |
|     Dextropropoxyphene+tramadol | 1 (5) |
|     Dextropropoxyphene+opium husk | 2 (10) |
|     Tramadol+opium husk | 2 (10) |
|   Duration of opioid consumption (yr) | 6.2 ± 3.4 |
| Co-addictions | |
|   Alcohol | 13 (65) |
|   Tobacco | 4 (20) |
| Clinical presentation | |
|   Duration of symptoms at presentation (day) | 222.1 ± 392.3 |
|   Abdominal pain | 20 (100) |
|   Vomiting | 18 (90) |
|   Weight loss | 15 (75) |
|   Fatigue | 20 (100) |
|   Anorexia | 13 (65) |
|   GI bleeding | 2 (10) |

(*Continued to the next*)

**Table 1.** Continued

| Demographic | Value |
|---|---|
| Laboratory investigations | |
|   Hemoglobin (g/dL) | 6.8 ± 2.3 |
|   Albumin (g/dL) | 2.3 ± 0.5 |
|   Transferrin saturation (%) | 11.2 ± 3.7 |
|   Ferritin (ng/mL) | 23.1 ± 10.8 |
| Concomittent Infection | |
|   HCV | 6 (30) |
|   HBV | 0 |
|   HIV | 0 |
| CT abdomen | |
|   Gastroduodenal involvement | 13 (65) |
|   Jejunoileal involvement | 6 (30) |
|   Ileocecal involvement | 1 (5) |
|   Colonic involvement | 0 |
| Endoscopic/colonoscopic/enteroscopic findings | |
|   Ulcers | |
|     Esophageal | 0 |
|     Gastroduodenal | 2 (10) |
|     Jejunoileal | 0 |
|     Colonic | 0 |
|   Ulcerated strictures | |
|     Esophageal | 0 |
|     Gastroduodenal | 11 (55) |
|     Jejunoileal | 6 (30) |
|     Ileocecal junction | 1 (5) |
|     Colonic | 0 |
| Treatment | |
|   Proton pump inhibitors | 20 (100) |
|     Improvement in symptoms | 1 (5) |
|   Treatment for bleeding ulcers | |
|     Endoscopic hemoclipping | 1 (5) |
|     Radioembolization | 1 (5) |
|   Balloon dilatation | 10 (50) |
|     Total no. of dilatations | 14 |
|       No. of patients needing 1 session of dilatation | 7 |
|       No. of patients needing 2 sessions of dilatation | 2 |
|       No. of patients needing 3 sessions of dilatation | 1 |
|     Balloon dilatation successful | 3 (15) |
|   Surgery | |
|     Gastroduodenal disease (gastrojejunostomy) | 6/13 (46) |
|     Jejunoileal disease (resection anastomosis) | 6/6 (100) |
|     Ileocecal disease (resection anastomosis) | 1/1 (100) |

Values are presented as mean ± SD, number (%), or number/number (%).

GTL-Bull,Mark-GeneralProduction-000036

**Ramit Mahajan, et al.  •  Clinical profile and outcomes of opioid abuse gastroenteropathy**          **INTESTINAL RESEARCH**

cal and endoscopic evaluation. A particular attention was given to demographics, the duration and type of opium consumed, clinical presentation at the time of diagnosis, hematological and biochemical parameters, radiological findings (site and nature of disease), endoscopic/surgical findings and histology (endoscopic/surgical biopsies, where available). Follow-up of patients by a hospital visit or telephone was attempted for all patients and missing data, if any was completed.

### 1. Statistical Analysis

All analyses were performed using SPSS version 21.0 software (IBM Corp., Armonk, NY, USA). Quantitative data were expressed as mean ± SD and proportionate data in percentages.

### 2. Ethical Consideration

The study was approved by the Institutional Review Board of Dayanand Medical College and Hospital (IRB No. 2020-456) and performed in accordance with the principles of the Declaration of Helsinki. This study is a retrospective study using medical record review and so informed consent was waived.

## RESULTS

A total of 20 patients (mean age, 38.5 ± 14.2 years; 100% males) fulfilled the inclusion criteria (Table 1). The mean duration of opioid consumption was 6.2 ± 3.4 years. The commonly abused opioids were dextropropoxyphene (n = 10, 50%), loperamide (n = 5, 25%), tramadol (n = 4, 8%), and opium husk (n = 2, 10%).

Five patients consumed opioids in more than one form (dextropropoxyphene with tramadol [n = 1], dextropropoxyphene with opium husk [n = 2], and tramadol with opium husk [n = 2]).

The mean duration of symptoms at presentation was 222.1 ± 392.3 days. Thirteen patients (65%) had gastroduodenal involvement, 6 (30%) had jejunoileal disease, 1 (5%) had ileocecal involvement and none had colonic involvement. Among those with gastroduodenal involvement, 2 presented with upper GI bleeding, while 11 presented with features of gastric outlet obstruction. All 7 patients with ileal (jejunoileal/ileocecal) disease presented with features of small bowel obstruction. The most common presenting complaints were abdominal pain (n = 20, 100%), fatigue (n = 20, 100%), vomiting (n = 18, 90%), weight loss (n = 15, 75%; mean weight loss 12.8 ± 8.4 kg), and anorexia (n = 13, 65%). All 20 patients (100%) had iron deficiency anemia (mean hemoglobin, 6.8 ± 2.3 g/dL; ferritin, 23.1 ± 10.8 ng/mL) and hypoalbuminemia (2.3 ± 0.5 g/dL).

CT enterography was done in all patients with ulcerated strictures and it showed multiple, short segment strictures with mildly thick and variably enhancing walls. Proximal to these strictures, either the stomach or the small bowel was dilated (Fig. 1). No significant peri-enteric changes were seen. Two patients with GI bleeding had thickened duodenal walls. Esophagogastroduodenoscopy showed Forrest IB duodenal ulcers in both these patients. One of these could be managed with endotherapy (hemoclipping), while the other one required angioembolization of gastroduodenal artery.

Eleven patients (55%) had pyloric or proximal duodenal ul-



**Fig. 1.** CT findings in a patient with opioid abuse gastroenteropathy. (A) Contrast-enhanced CT image showing dilated stomach secondary to narrowing and wall thickening in the D2 segment of duodenum (white arrow) in a 28-year-old patient with a history of long-term opioid abuse who presented with gastric outlet obstruction. (B) The same patient had another stricture at the junction of the D3-D4 segment (black dashed arrow) with upstream duodenal dilatation. S, stomach; D, duodenal.

GTL-Bull,Mark-GeneralProduction-000037

**INTESTINAL RESEARCH**    https://doi.org/10.5217/ir.2019.00104 • Intest Res 2020;18(2):238-244

**Fig. 2.** Endoscopic images of patients with opioid gastroenteropathy showing ulcerated pyloric strictures (A, B); ulcerated small bowel stricture (C); and ileocecal stricture (D).

cerated strictures and presented with gastric outlet obstruction (Fig. 2A and B). Proton pump inhibitors were given to all the patients, but were not effective as sole therapy. Eight of these patients (72.7%) underwent endoscopic balloon dilatation (total 12 sessions, 1 session in 5 patients, 2 sessions in 2 patients and 3 sessions in 1 patient), however, only 3 of these (27.27%) had lasting symptomatic relief. Six patients (3 after failed balloon dilatation and 3 who opted for surgery over endoscopic balloon dilatation) underwent surgery (gastrojejunostomy) for the relief of symptoms.

For patients with jejunoileal strictures, the disease site could be reached by antegrade double-balloon enteroscopy in 4 patients (Fig. 2C), and 1 patient had an ileocecal stricture which was diagnosed by colonoscopy (Fig. 2D). Balloon dilatation was also attempted in one patient each with proximal jejunal stricture and ileocecal stricture, but failed to provide a lasting relief. All the patients with ileal involvement hence finally underwent resection of the diseased segment and end to end anastomosis. Histopathological examination of these strictures revealed reactive changes of the epithelium with minimal activity (Fig. 3). Lamina propria had mild degree of chronic inflammatory infiltrate comprised of lymphocytes, plasma cells and few eosinophils. Submucosal regions showed variable degree of fibrosis. No granulomas, necrosis, evidence of ischemic changes, or vascular changes were evident.

Thirteen patients (65%) required blood transfusions and 10 (50%) were given parenteral iron. All patients were counselled for de-addiction. Sixteen patients (80%) came for follow-up,



**Fig. 3.** Histopathological findings in opioid abuse gastroenteropathy. Histopathological examination showed reactive changes of the epithelium with minimal activity, mild degree of chronic inflammatory infiltrate comprised of lymphocytes, plasma cells and few eosinophils in lamina propria and variable degree of submucosal fibrosis (H&E, ×400).

however only 7 patients (35%) adhered to the same. Sustained improvement (>6 months follow-up) in hemoglobin and albumin was noted in 4 out of 18 (22.2%) patients after de-addiction and medical/surgical management.

## DISCUSSION

Opioids are the third most commonly abused drugs in India, after alcohol and tobacco.[4,5] Though GI dysmotility has been described with chronic opioid abuse, GI ulcers/strictures have not been described, except in one series of 6 cases.[3] We also propose the term "opioid abuse gastroenteropathy" (akin to NSAID enteropathy) for the ulcers and ulcerated strictures due to opioid abuse, where all other causes have been ruled out. Our patients with opioid abuse gastroenteropathy presented with either gastric outlet or small bowel obstruction. All of them had chronic iron deficiency anemia (secondary to GI blood loss and/or due to bacterial overgrowth due to small bowel strictures), presenting as fatigue and dyspnea on exertion. The main differentials to be considered in such patients are peptic strictures due to *H. pylori* or NSAIDs, tuberculosis and CD, in addition to post corrosive and postoperative stric-

GTL-Bull,Mark-GeneralProduction-000038

tures. We observed that opioid abuse most commonly resulted in gastroduodenal, followed by jejunoileal/ileocecal involvement. Patients with tuberculosis and CD, on the other hand, rarely present with isolated gastroduodenal disease. The commonly involved sites in these diseases are terminal ileum and ileocecal valve, both of which were spared in a majority of patients with opioid enteropathy (19/20, 95%).[6] NSAIDs may present with ulcers and diaphragm like strictures at the same sites as opioids, however, a detailed history can differentiate between the two. Radiologically, CT or magnetic resonance (MR) enterography can help ascertain the site of disease, and detect extraluminal findings, if any that may aid in diagnosis. For example, mural thickening with stratification, comb sign (vascular engorgement of mesentery) and mesenteric fibrofatty proliferation are features which favor CD, while mural thickening with ileocecal involvement, lymphadenopathy with hypodense centers and peripheral enhancement suggesting caseation are suggestive of tuberculosis. Multiphase imaging during CT and MR enterography in NSAID strictures reveal multiple, short segment strictures with minimal enhancement or wall thickening.[7] CT enterography was done in all our patients with opioid enteropathy to ascertain the extent of disease and also to rule out other etiologies of these strictures. We observed that strictures in opioid abusers were similar to NSAID strictures in being multiple, short-segment with minimal wall thickness and variable contrast enhancement. While proton pump inhibitors remain the mainstay of treatment in NSAID induced gastric and duodenal ulcers (except chronic ones which undergo repair with deposition of collagenous scars), these are not helpful in treatment of opioid induced gastroduodenal ulcers and ulcerated strictures. Patients with opioid strictures who failed medical management were subjected to endoscopic balloon dilatation. Of the 10 patients who underwent the same (1 or multiple sessions), only 3 (30%) had a lasting response. Six of the 7 patients who failed balloon dilatation required surgery (gastrojejunostomy). All 7 patients with ileal disease were also subjected to surgery.

Patients with opioid enteropathy showed prominent submucosal changes with reactive changes of the epithelium and mild degree of chronic inflammatory infiltrate (comprised of lymphocytes, plasma cells and few eosinophils) in the lamina propria. This is in contrast to CD where histological evaluation shows transmural inflammation with lymphoid aggregation, infrequent small granulomas which are poorly organized; and tuberculosis where caseation necrosis, large confluent multiple granulomas, with a disproportionate submucosal inflam-

mation are seen.[6]

Opioids have been one of the earliest groups of medications used for pain. Chronic opioid use has been increasing worldwide over the past few years, either as prescriptions for cancer and non-cancer pain in Western countries like the USA and Canada,[8] or as substance of abuse in Asian countries.[9] In countries like India, restrained use of natural opioids in the form of raw opium or poppy husk is socially accepted in many (especially rural) areas. Raw opium and opioids have been used off label for relief of pain after heavy work, for alleviating anxiety, sedation, control of diarrhea, and in patients with impending stroke. More recently, illicit opioids have replaced raw opium, especially in young males.[5,10] This explains why opioid abuse gastroenteropathy was seen only in young males in our study.

Chronic opioid abuse can negatively affect central nervous system and also the GI system where opioid receptors are present in abundance. This results in inhibition of gastric emptying, increase in sphincter tone, changes in motor patterns, and blockage of peristalsis.[11] Short acting opioids have also been demonstrated to cause a hyperadrenergic state due to opioid withdrawal, which results in increase in blood pressure and heart rate and reduces subendocardial perfusion.[12-14] Opium use has also been shown to be associated with high rates of myocardial fibrosis, perivascular fibrosis, interstitial fibrosis and severe coronary artery disease.[15-17] The pathogenesis of opioid abuse gastroenteropathy can therefore be hypothesized to be due to a combination of (1) a reduction in motility, which results in stasis and prolonged exposure to gastric acid/intestinal contents and (2) intestinal ischemia secondary to the hyperadrenergic and pro-inflammatory state secondary to opioid abuse.

In our experience, opioid abuse gastroenteropathy is a difficult to treat entity. It presents with severe anemia and hypoproteinemia, does not respond to proton pump inhibitors, has a poor response to endoscopic balloon dilatation and most of the patients finally require either a surgical drainage (gastrojejunostomy in gastroduodenal disease) or resection anastomosis (small bowel strictures). In addition, opium deaddiction in itself is challenging.[18] Most of the people with opioid abuse gastroenteropathy have been abusing opioids for several years ($6.2 \pm 3.4$ years in our study) and they require a long term combined psychosocial and pharmacological approach for treatment.

To conclude, all patients who have been abusing opium should be evaluated for opioid abuse gastroenteropathy, as

GTL-Bull,Mark-GeneralProduction-000039

**INTESTINAL RESEARCH**                **https://doi.org/10.5217/ir.2019.00104** • Intest Res 2020;18(2):238-244

this entity usually presents late, at a stage when medical or endoscopic management usually fails. Early detection of these lesions may prevent formation of resilient strictures and subsequent surgical intervention.

## FINANCIAL SUPPORT

The authors received no financial support for the research, authorship, and/or publication of this article.

## CONFLICT OF INTEREST

No potential conflict of interest relevant to this article was reported.

## AUTHOR CONTRIBUTION

Conception and design: Mahajan R, Midha V, Sood A. Collection of data: Mahajan R, Singh A, Dhiman P, Sood A. Analysis and interpretation of the data: Mahajan R, Gupta Y, Singh A, Dhiman P, Midha V, Mehta V, Sood A. Drafting of the article: Mahajan R, Gupta Y, Singh A, Midha V, Kakkar C, Narang V, Saggar K, Sood A. Critical revision of the article for important intellectual content: all authors. Final approval of the article: all authors.

## ORCID

Mahajan R          https://orcid.org/0000-0001-6726-6151
Singh A            https://orcid.org/0000-0001-7163-0454
Dhiman P           https://orcid.org/0000-0002-4549-2518
Midha V            https://orcid.org/0000-0003-0192-3969
Kakkar C           https://orcid.org/0000-0002-1051-3876
Narang V           https://orcid.org/0000-0002-8115-5439
Mehta V            https://orcid.org/0000-0002-8867-9526
Saggar K           https://orcid.org/0000-0002-9428-140X
Sood A             https://orcid.org/0000-0001-6961-6389

## REFERENCES

1. Khullar SK, DiSario JA. Gastric outlet obstruction. Gastrointest Endosc Clin N Am 1996;6:585-603.
2. Gill RS, Kaffes AJ. Small bowel stricture characterization and outcomes of dilatation by double-balloon enteroscopy: a single-centre experience. Therap Adv Gastroenterol 2014;7:108-114.
3. Joshi A, Falodia S, Kumar N, Solanki RL. Small intestine strictures in opium addicts: an unrecognized cause of intestinal obstruction. Indian J Gastroenterol 2018;37:169-173.
4. Mohan D, Sundaram KR, Sharma HK. A study of drug abuse in rural areas of Punjab (India). Drug Alcohol Depend 1986;17:57-66.
5. Chaturvedi HK, Mahanta J, Bajpai RC, Pandey A. Correlates of opium use: retrospective analysis of a survey of tribal communities in Arunachal Pradesh, India. BMC Public Health 2013;13:325.
6. Pulimood AB, Amarapurkar DN, Ghoshal U, et al. Differentiation of Crohn's disease from intestinal tuberculosis in India in 2010. World J Gastroenterol 2011;17:433-443.
7. Frye JM, Hansel SL, Dolan SG, et al. NSAID enteropathy: appearance at CT and MR enterography in the age of multi-modality imaging and treatment. Abdom Imaging 2015;40:1011-1025.
8. Berterame S, Erthal J, Thomas J, et al. Use of and barriers to access to opioid analgesics: a worldwide, regional, and national study. Lancet 2016;387:1644-1656.
9. Ray R, Kattimani S, Sharma HK. Opium abuse and its management: global scenario. WHO Web site. https://www.who.int/substance_abuse/activities/opium_abuse_and_its_management.pdf. Accessed August 1, 2019.
10. Farhat S, Hussain SS, Rather YH, Hussain SK. Sociodemographic profile and pattern of opioid abuse among patients presenting to a de-addiction centre in tertiary care hospital of Kashmir. J Basic Clin Pharm 2015;6:94-97.
11. Khansari M, Sohrabi M, Zamani F. The useage of opioids and their adverse effects in gastrointestinal practice: a review. Middle East J Dig Dis 2013;5:5-16.
12. Charney DS, Redmond DE Jr, Galloway MP, et al. Naltrexone precipitated opiate withdrawal in methadone addicted human subjects: evidence for noradrenergic hyperactivity. Life Sci 1984;35:1263-1272.
13. Reece AS, Hulse GK. Impact of lifetime opioid exposure on arterial stiffness and vascular age: cross-sectional and longitudinal studies in men and women. BMJ Open 2014;4:e004521.
14. Darke S, Duflou J, Torok M. The comparative toxicology and major organ pathology of fatal methadone and heroin toxicity cases. Drug Alcohol Depend 2010;106:1-6.
15. Ebdali RT, Tabaee SS, Tabaei S. Cardiovascular complications and related risk factors underlying opium consumption. J Cell Physiol 2019;234:8487-8495.
16. Masoudkabir F, Sarrafzadegan N, Eisenberg MJ. Effects of opium consumption on cardiometabolic diseases. Nat Rev Cardiol 2013;10:733-740.
17. Purohit P, Nebhinani N, Sharma P. Evaluation of antioxidant status, high sensitivity C-reactive protein, and insulin resis-

GTL-Bull,Mark-GeneralProduction-000040

tance in male chronic opiate users without comorbidities. Indian J Psychol Med 2017;39:299-305.

18. Ambekar A, Murthy P, Basu D, Rao GP, Mohan A. Challenges in the scale-up of opioid substitution treatment in India. Indian J Psychiatry 2017;59:6-9.

GTL-Bull,Mark-GeneralProduction-000041

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**
**EAST ST. LOUIS DIVISION**

Midwest Trust Company as      )
Administrator of the Estate of     )
Mark Bull, Deceased,          )
                                )
            Plaintiffs,     )
                                )     No. 3:23-cv-01238-SMY
      Vs.                )
                                )
Sheriff Jeff C. Connor, County of Madison, )
Illinois, John Does, Jane Does, and    )
Advanced Correctional Healthcare, Inc.,  )
                                )
            Defendants.    )

# EXHIBIT 9 – PERFORATION OF

# PEPTIC ULCER

# TO AMENDED COMPLAINT

Surg Today (2010) 40:836–839
DOI 10.1007/s00595-009-4147-x



© Springer 2010

## Original Article

# Perforation of Peptic Ulcer Following Abrupt Cessation of Long-term Opiate Use

Mahdi Kahrom[1] and Hadi Kahrom[2]

[1] Department of General Surgery and [2] Division of Toxicology, Department of Internal Medicine, Imam Reza Hospital, Mashhad University of Medical Sciences, Mashhad 91959-77178, Iran

**Abstract**

*Purpose.* Unaided and abrupt cessation of opiate use without drug substitution and step-down, referred to as "cold turkey," is a common and difficult process for substance users, and is associated with several withdrawal symptoms and complications. This report presents a preliminary series of patients treated at an urban public hospital with acute perforation of peptic ulcers following abrupt cessation of long-term opiate use, a phenomenon that has not been previously described in the literature.

*Methods.* Thirty-five patients with acute gastroduodenal perforation and a history of opiate addiction with a recent and abrupt cessation of opiate use were admitted between February 2004 and October 2008. This study evaluated the demographics, antecedent drug use, substance use characteristics, previous medical or surgical treatment of peptic ulcer disease, and surgical findings.

*Results.* The mean age was 32.3 years (range, 21–41 years) and the patients were overwhelmingly male (94%). The most frequent agent in single opiate users was opium (62.9%) followed by heroin (22.9%). The time interval between opiate cessation and perforation onset was 2–65 days (mean, 6.1 days). All patients underwent an immediate exploratory laparotomy, and the majority of perforations were found to be in the postpyloric area (94%) with mean size of $4.3 \times 5.1$ mm. Two patients (6%) had perforations in the lesser curvature of the stomach.

*Conclusion.* All of the perforations occurred following sudden self-cessation without step-down or classic maintenance therapy, and this may prove the importance of supervised medical detoxification with special attention to gastroprotective agents such as antacid drugs.

**Key words** Peptic ulcer perforation · Opiate · Cessation · Abstinence · Cold turkey

## Introduction

A perforation is a severe complication of peptic ulcer disease and is associated with an in-hospital mortality rate of 5%–25%.[1] Smoking and the use of nonsteroidal anti-inflammatory drugs (NSAIDs) seem to be risk factors of major importance for ulcer perforation.[1] Furthermore, the use of "crack" cocaine and tramadol has been reported as a cause of perforation among users.[2,3] Although *Helicobacter pylori* infection is a known cause of peptic ulcers, ulcer perforation seems to differ from an uncomplicated ulcer with regard to the importance of *H. pylori* infection.[4]

The chronological relationship between sudden, self-managed opiate cessation and gastroduodenal perforation suggested that this phenomenon is a novel cause of perforation. Although the exact causal relation between abrupt opiate cessation and a subsequent juxtapyloric perforation has not been defined, this surgical service in an urban public hospital now treats significant numbers of male addicts with such perforations. The series of patients described herein comprise the first report of perforated peptic ulcers associated with sudden and self-managed opiate cessation.

## Patients and Methods

This study reviewed all hospital admissions for peptic ulcer perforation from February 2004 to October 2008.

Reprint requests to: M. Kahrom
Received: March 31, 2009 / Accepted: August 6, 2009

Exhibit 9

GTL-Bull,Mark-GeneralProduction-000042

Thirty-five patients with a first-time diagnosis of non-malignant, nontraumatic gastroduodenal perforation, and with history of recent and sudden opiate cessation, were identified. The patients provided information including the demographics, antecedent drug use, substance use characteristics and interventions received, previous medical or surgical treatment of peptic ulcer disease, and surgical findings. Additional data were obtained from the patients' logs maintained in the Department of Surgery.

## Results

Thirty-five patients with gastroduodenal perforation and history of opiate addiction with recent and sudden substance abstinence were admitted between February 2004 and October 2008. The diagnosis of perforation was based on a combination of careful history taking, physical examination, marked leukocytosis, and free air under the diaphragm on an upright chest radiograph.

The mean age was 32.3 years (range, 21–41 years) and the sample was overwhelmingly male (94%). All 35 patients were addicts with a history of long-term opiate use of more than 6 months. The most frequent agent in single opiate users was opium (62.9%) followed by heroin (22.9%). A combination of opium and heroin was used in 5 patients (14.2%). The most common route of use was inhalation (74.3%), followed by ingestion (40.0%), and injection (8.6%). About 22.9% of cases had used opiates through more than one route ($n = 8$), with inhalation to be a common feature in all of the cases. Six had a prior history of presumed ulcer disease in the upper gastrointestinal tract, which was docu-

mented endoscopically in two patients. All patients had a recent history of making an attempt at self-managed sudden opiate cessation without the classical methods of gradual tapering detoxification and supervision in registered centers. The time interval between opiate cessation and the onset of perforation was 2–65 days (mean, 6.1 days), and is plotted in Fig. 1. All patients presented with overt peritonitis, while 29 patients (83%) presented with free air under the diaphragm on an upright chest X-ray. The time interval between the perforation (as suggested by the characteristic acute onset of sharp epigastric pain) and patients' admission ranged from 10 h to 7 days (mean, 1.9 days). The demographic characteristics of the patients are summarized in Table 1.

All patients underwent an immediate exploratory laparotomy, and the majority of the perforations were found to be in the first portion of the duodenum or postpyloric area (94%), with a mean size of $4.3 \times 5.1$ mm. Two patients (6%) had perforations in the lesser curvature of the stomach. All of the patients underwent a Roscoe–Graham omentopexy with closure of the perforated ulcer with a viable omental patch, and three received a vagotomy plus drainage, since they had a prior history of ulcer disease and only modest peritoni-



**Fig. 1.** Bar chart showing the distribution of the time intervals between opiate cessation and perforation onset (number of patients versus day)

**Table 1.** Characteristics of 35 patients with a first-time hospitalization for perforated peptic ulcer (PPU) following abrupt opiate cessation

| All patients | Number | % |
|---|---|---|
| Gender | | |
| Male | 33 | 94 |
| Female | 2 | 6 |
| Type of substance used | | |
| Opium[a] | 22 | 62.9 |
| Heroin | 8 | 22.9 |
| Combination of both | 5 | 14.2 |
| Duration of substance use | | |
| <12 months | 5 | 14.2 |
| 1–4 years | 11 | 31.4 |
| 5–10 years | 12 | 34.3 |
| 11+ years | 7 | 20.0 |
| Route of substance use | | |
| Inhalation | 26 | 74.3 |
| Ingestion | 14 | 40.0 |
| Injection | 3 | 8.6 |
| Cigarette smoking | 35 | 100 |
| History of peptic ulcer disease | | |
| Documented (endoscopically) | 2 | 5.7 |
| Nondocumented | 4 | 11.4 |
| History of antacid use | 10 | 28.6 |
| History of NSAID use | | |
| Previously | 4 | 11.4 |
| During abstinence | 3 | 8.6 |
| Chronic alcohol abuse | 8 | 22.9 |

NSAID, nonsteroidal anti-inflammatory drug
[a] Seven users of "Shireh," an opium derivative, are included in this category

GTL-Bull,Mark-GeneralProduction-000043

tis at the time of the laparotomy. There were no perioperative deaths. A complicated course, such as the need for a reoperation, renal failure, intra-abdominal abscesses, and delayed discharge occurred in 9 patients (25.7%). The mean time interval between the perforation and the patients' admission was significantly longer in those with a complicated course (3.6 versus 1.3 days). The average length of the hospital stay was 9.1 days (range, 6–62 days), reflecting a policy of the mandatory presence of a nasogastric tube and nil-by-mouth status for 4–5 days after omental patch closure of a perforated gastroduodenal ulcer.

## Discussion

This report presents a preliminary series of 35 patients treated during the past 4 years for acute gastroduodenal perforation, chronologically associated with sudden opiate abstinence. Although the exact pathophysiology of gastroduodenal perforations after abrupt opiate cessation is not known, it appears to be a novel and important etiology for this condition with regard to the global epidemic of opiate addiction. How exactly opioids are involved in mucosal ulceration or protection and the mechanisms underlying these actions are yet to be defined.

Studies with opioid agonists in various models of gastric mucosal damage have produced contradictory findings: morphine partly inhibited[5,6] and partly exacerbated[7,8] experimentally induced mucosal damage. The different results may be explained by differences in the doses employed, different routes of administration, and differences in times of administration.[9] Another possible explanation of these contradictory findings is that opiate agonists, as well as endogenous opioids, have different effects on gastric secretion when administered centrally or peripherally. Previous studies have suggested that centrally administered endogenous opioids inhibit gastric acid secretion, but peripheral administration of these compounds enhanced acid secretions and can potentiate gastric erosion.[10]

In fact, morphine has been reported to exert protection against certain inflammatory models, such as carrageenan edema and ethanol-induced gastric damage through the μ receptors and stimulation of the endogenous nitric oxide production.[9,11,12] Furthermore, mucus plays a significant role in the defensive mechanism in the gastric mucosa,[13,14] and morphine could partially reverse the depletion of the mucus-stained cell layer induced by stress. Interestingly, morphine treatment, when administered after ulceration, markedly increases the healing process in stressed animals. Morphine promotes lesion repair by stimulating cell proliferation in the gastric tissue, and also increases the amount of mucus secretion in the gastric mucosa that would strengthen the healing process in the stomach by providing a physical barrier and a stable unstirred layer between the apical surfaces of the epithelial cells and the lumen.[15] All these actions of morphine and perhaps other opioids can reduce the aggressive action of acid on the epithelium and at the ulcer site to provide a better environment for wound repair,[13,14] and could explain in part why abrupt opiate cessation without classic and protective maintenance therapy may lead to gastroduodenal perforation by making the mucosa vulnerable to the harmful effects of acid and pepsin.

The self-administration of NSAIDs for the alleviation of pain during abstinence is another well-documented and important risk factor for ulcer perforation, and was observed in three patients in our series. It is interesting to note that all of the perforations in the current series occurred following self-help opiate cessation without step-down or classic maintenance therapy, and this may prove the importance of supervised medical detoxification with special attention to the administration of appropriate gastroprotective agents such as antacid drugs. Methadone and buprenorphine, using flexible dosing regimens, are both recommended as options for maintenance therapy in the management of opioid dependence. Evidence suggests that methadone maintenance therapy is more effective at maintaining patients in treatment than buprenorphine maintenance therapy. Levo-α-acetyl methadol and dihydrocodeine are used in some countries for detoxification and substitution maintenance therapy; however, controlled studies of the effectiveness of these preparations for substitution treatment are yet to be undertaken.

Most patients who suddenly stop taking opiates experience the physical stress of withdrawal symptoms, which may be another mechanism leading to gastroduodenal perforation. Homeostasis is commonly perturbed by stress. Stress activates the hypothalamus, causing central adrenergic discharge and stimulation of the autonomic sympathetic system. The pathological basis for the development of stress-induced gastric ulceration and erosion has been postulated to be multifactorial and includes increased gastric acid secretion, the inhibition of gastric mucosal prostaglandin synthesis, disruption of the mucosal barrier, reduction of gastric mucosal blood flow, inhibition of gastric mucus and bicarbonate secretion, increased gastric motility, vagal hyperactivity, mast cell degranulation, and the free radical-generating system.[16]

Routine agents used in abstinence-based medical detoxification have some degrees of gastroprotection. Clonodine is found to exert protective effects on the gastric mucosa by reducing gastric acid secretion, increasing the mucosal blood flow, and subsequently decreasing sympathetic outflow and central vagal activ-

ity due to central and peripheral α2-adrenoceptor stimulation.[17] Anticholinergic drugs may have the same effects by reducing acid secretion due to blockage of vagal output.

The time interval between perforation and treatment is one of the most important prognostic factors for a perforated peptic ulcer,[1,18] and was notable in the current series. Self-medication and the use of analgesics during abstinence may contribute to an increased surgical delay since such drugs mask the symptoms of perforation, while enhancing the probability of overlooking the weaker, initial symptoms of perforation. In addition, the fact that many patients expect gastrointestinal symptoms and pain to be associated with abstinence syndrome is another reason for a delay in hospital admission for such individuals.

In conclusion, opiate addiction requires medically supervised detoxification to avoid the withdrawal symptoms associated with each particular opiate. Some opiates cause a strong physical dependence, therefore opiate detoxification runs the risk of serious complications if the use of the opiate is stopped abruptly with zero medication, namely with the patient "going cold turkey." Associated withdrawal symptoms may include seizure, heart irregularities, diarrhea, vomiting, insomnia, sneezing, running nose, watery eyes, depression, suicidal ideations, high anxiety, muscle and bone pain, and cold flushes with goose bumps resembling a "cold turkey," which thus is the reason for the use of this term.

"Cold turkey" is a common and difficult process among substance users with its special withdrawal symptoms and complications, but this is the first report of acute gastroduodenal perforations associated with unaided and sudden self-cessation. This novel phenomenon could have significant implications in the clinical setting by promoting a promising component of future preventive efforts in gastroprotection with medically supervised opiate detoxification. The use of proton-pump inhibitors and H2 blockers is one method for preventing stress ulceration during abstinence; however, precisely to what degree such prophylaxis is beneficial to such individuals remains to be established.

## References

1. Svanes C. Trends in perforated peptic ulcer: incidence, etiology, treatment, and prognosis. World J Surg 2000;24:277–83.
2. Tørring ML, Riis A, Christensen S, Thomsen RW, Jepsen P, Søndergaard J, et al. Perforated peptic ulcer and short-term mortality among tramadol users. Br J Clin Pharmacol 2008;65:565–72.
3. Sharma R, Organ CH Jr, Hirvela ER, Henderson VJ. Clinical observation of the temporal association between crack cocaine and duodenal ulcer perforation. Am J Surg 1997;174:629–32.
4. Reinbach DH, Cruickshank G, McColl KEL. Acute perforated duodenal ulcer is not associated with Helicobacter pylori infection. Gut 1993;34:1344.
5. Gyires K. Morphine inhibits the ethanol-induced gastric damage in rats. Arch Int Pharmacodyn Ther 1990;306:170–81.
6. Tazi-Saad K, Chariot J, Vatier J, Del Tacca M, Rozé C. Antisecretory and anti-ulcer effects of morphine in rats after gastric mucosal aggression. Eur J Pharmacol 1991;192:271–7.
7. Gyires K, Fürst S, Farczádi E, Márton A. Morphine potentiates the gastroulcerogenic effect of indometacin in rats. Pharmacology 1985;30:25–31.
8. Parmar NS, Tariq M, Ageel AM. Studies on the possible mechanism of morphine-induced potentiation of the gastroulcerogenic effect of indomethacin in rats. Arch Int Pharmacodyn Ther 1987;289:149–60.
9. Gyires, K. The role of endogenous nitric oxide in the gastroprotective action of morphine. Eur. J. Pharmacol 1994;255:33–7.
10. Morley JE, Levine AS, Silvis SE. Endogenous opiates and stress ulceration. Life Sci 1982;31:693–9.
11. Gyires K. Are all "cytoprotective" drugs gastroprotective? Acta Physiol Hung 1992;80:247–55.
12. Bhounsule SA, D'Souza RS, Dhume VG. Gastric cytoprotective effect of morphine is probably not mediated via mA-receptors. Arch Int Pharmacodyn Ther 1994;328:99–105.
13. Allen A, Carrol NJH. Adherent and soluble mucus in the stomach and duodenum. Dig Dis Sci 1985;30:55–62.
14. Allen A, Hutton DA, Leonard AJ, Pearson JP, Sellers LA. The role of mucus in the protection of the gastroduodenal mucosa. Scand J Gastroenterol 1986;21:71–7.
15. Cho CH, Wu KK, Wu S, Wong TM, So WH, Liu ES, et al. Morphine as a drug for stress ulcer prevention and healing in the stomach. Eur J Pharmacol 2003;460:177–82.
16. Aase S. Disturbances in the balance between aggressive and protective factors in the gastric and duodenal mucosa. Scand J Gastroenterol 1989;24:17–23.
17. Gyires K, Müllner K, Fürst S, Rónai AZ. Alpha-2 adrenergic and opioid receptor-mediated gastroprotection. J Physiol (Paris) 2000;94:117–21.
18. Wakayama T, Ishizaki Y, Mitsusada M, Takahashi S, Wada T, Fukushima Y, et al. Risk factors influencing the short-term results of gastroduodenal perforation. Surg Today 1994;24:681–7.

GTL-Bull,Mark-GeneralProduction-000045

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION**

| | | |
|---|---|---|
| Midwest Trust Company as | ) | |
| Administrator of the Estate of | ) | |
| Mark Bull, Deceased, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 3:23-cv-01238-SMY |
| Vs. | ) | |
| | ) | |
| Sheriff Jeff C. Connor, County of Madison, | ) | |
| Illinois, John Does, Jane Does, and | ) | |
| Advanced Correctional Healthcare, Inc., | ) | |
| | ) | |
| Defendants. | ) | |

# EXHIBIT 10 – DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS

# TO AMENDED COMPLAINT

# Medication-Assisted Treatment of Opioid Use Disorder

Review of the Evidence and Future Directions

Connery, Hilary Smith MD, PhD

Author Information

## Abstract

### Learning Objective

After participating in this activity, learners should be better able to: Evaluate the rationale for and current evidence supporting medication-assisted treatment of opioid use disorder.

Medication-assisted treatment of opioid use disorder with physiological dependence at least doubles rates of opioid-abstinence outcomes in randomized, controlled trials comparing psychosocial treatment of opioid use disorder with medication versus with placebo or no medication. This article reviews the current evidence for medication-assisted treatment of opioid use disorder and also presents clinical practice imperatives for preventing opioid overdose and the transmission of infectious disease. The evidence strongly supports the use of agonist therapies to reduce opioid use and to retain patients in treatment, with methadone maintenance remaining the gold standard of care. Combined buprenorphine/naloxone, however, also demonstrates significant efficacy and favorable safety and tolerability in multiple populations, including youth and prescription opioid–dependent individuals, as does buprenorphine monotherapy in pregnant women. The evidence for antagonist therapies is weak. Oral naltrexone demonstrates poor adherence and increased mortality rates, although the early evidence

Exhibit 10

GTL-Bull,Mark-GeneralProduction-000046

looks more favorable for extended-release naltrexone, which has the advantages that it is not subject to misuse or diversion and that it does not present a risk of overdose on its own. Two perspectives—individualized treatment and population management—are presented for selecting among the three available Food and Drug Administration–approved maintenance therapies for opioid use disorder. The currently unmet challenges in treating opioid use disorder are discussed, as are the directions for future research.

Opioid use disorder (OUD) is defined by the *Diagnostic and Statistical Manual of Mental Disorders* (fifth edition)[1] as the maladaptive use of opioids, prescribed or illicit, resulting in two or more criteria that reflect impaired health or function over a 12-month period. OUD is scaled according to severity (mild/moderate/severe) and does not require physiological tolerance or dependence in order to be considered a substance use disorder. Text Box 1 summarizes core criteria and provides a mnemonic to assist clinical diagnosis and teaching.

---

**Text Box 1**
**DSM-5 Criteria for Opioid Use Disorder OUD Presented in the Author's Mnemonic**

Long Time Craving Control ⇒ TRASHeD ⇒ Withdrawn
  **Long**er use or larger amounts used than intended
  **Time** spent obtaining opioids, using, or recovering from use
  **Craving** opioids
  Failed attempts to **control** or cut back opioid use
  Opioid **tolerance**
  **Role** failure due to opioid use
  **Activities** reduced because of recurrent opioid use
  **Social** problems resulting from recurrent opioid use
  **Health** problems resulting from recurrent opioid use
  **Dangerous** opioid use: use despite risk of physical hazard
  Opioid **withdrawal** syndrome

In the above mnemonic, the satisfaction of two or more criteria in a 12-month period defines opioid use disorder. Criteria are listed in order of severity, progressing from milder criteria to those criteria that most impair function or cause distress. Severity scaling is determined by the number of criteria that are met and may be remembered by *"5 or 4 is a moderate score"* (2–3 = mild; ≥6 = severe).

---

In the United States, rates of prescription opioid analgesic misuse rose exponentially in the preceding decade,[2] as has the treatment received for both heroin use disorder and opioid analgesic use disorder.[3] Among persons aged 12 years and older, self-reported lifetime misuse of heroin and opioid analgesics is estimated at nearly 2% and 14% of the population,

respectively.[3]

Effective treatment of OUD has been identified as a national priority to reduce the rates and societal costs of individual disability associated with OUD, the infectious disease burden associated with intravenous opioid use (especially hepatitis C [HCV] and HIV transmission), and escalating rates of accidental opioid overdose deaths and pediatric opioid ingestions.[2,4–8] Prior reviews of medication-assisted treatment (MAT) of OUD provide useful guidance to clinicians,[9–12] yet algorithms for selecting medication treatment require continuous updating to remain current with the emerging evidence. The goal of this review is to succinctly provide this clinical update and to highlight unresolved challenges in treating OUD.

## METHODS

All randomized, controlled trials (RCTs) with English abstracts on medical management of OUD were searched using PubMed mesh terms [opioid dependence OR opioid addiction] AND medication, yielding 502 abstracts. These articles were screened for inclusion as contributing to the evidence on MAT for OUD. The resulting set of references was supplemented, based on an examination of abstracts, to include relevant case reports, reviews, meta-analyses, and clinical trials. Finally, the Provider's Clinical Support System for Medication-Assisted Treatment website (www.pcssmat.org), which contains current practice training and educational support for opioid MAT, was reviewed to identify elements of expert consensus beyond the current evidence.

## RESULTS: OVERVIEW OF MAT FOR OUD

### Mu-Opioid Receptor Targeted Stabilization of OUD

The Food and Drug Administration (FDA) has approved three medications for preventing opioid relapse and for stabilization/maintenance treatment of

OUD: buprenorphine, naltrexone, and methadone. All three are ligands that bind to central mu-opioid receptors as the molecular target for their therapeutic activity, yet they differ significantly in their respective intrinsic activities at the mu-opioid receptor, their pharmacokinetic and pharmacodynamic properties (with effects on efficacy and toxicity), and the mechanisms by which they confer relapse-prevention protection to treated individuals (Table 1).

| Comparison of FDA-Approved Medications to Treat Opioid Use Disorder with Physiological Opioid Dependence | | | |
|---|---|---|---|
| Medication | MOR intrinsic activity / MOR binding | Differential pharmacology affecting MOR activation at therapeutic dose | Mechanism of relapse prevention |
| Buprenorphine | Partial agonist / High affinity / $K_i^a = 0.2$ nM | Slow MOR dissociation allows thrice-weekly sublingual dosing and possibility of high-dose weekly formulations[4,8,10] / Highest known MOR affinity makes rescue from overdose by naloxone less effective;[6] rapid precipitation of withdrawal if full agonists present | Reduces opioid craving, withdrawal, and stress reactivity / Competitively blocks or reduces the reinforcing effects of other opioids |
| Methadone | Full agonist / High affinity / $K_i^a = 3.4$ nM | Long terminal half-life (up to 120 hours) with delayed steady-state efficacy poses increased MOR toxicity risk during induction phase[11] / Multiple drug-drug interactions pose both opioid toxicity and withdrawal risks during treatment[12] | Reduces opioid craving, withdrawal, and stress reactivity / Reduces the reinforcing effects of other opioids |
| Naltrexone ER | Antagonist / High affinity / $K_i^b = 0.26$–0.34 nM | Lack of MOR agonism associated with delayed stabilization of opioid craving[13] / Safety concern based on rodent data demonstrating chronic naltrexone exposure increases respiratory-depression risk upon opioid agonist reexposure[14] | Competitively blocks reinforcing effects of opioid agonists / Reductions in craving are psychologically mediated (reduced anticipatory expectancies) |

<sup>a</sup> Equilibrium dissociation constant for the test compound and relative values are from Volpe et al. (2011).[4]
<sup>b</sup> Equilibrium dissociation constant is from Yuan et al. (2013).[5]
MOR, mu-opioid receptor; ER, extended release; nM, nanomoles.

Table 1:

Comparison of FDA-Approved Medications to Treat Opioid Use Disorder with Physiological Opioid Dependence

In selecting MAT, the first consideration is whether an individual has OUD with physiological dependence. All three medications are FDA approved based on RCTs demonstrating efficacy and safety in OUD with historical symptoms of physiological dependence (Table 2). The addition of agonist maintenance to relapse-prevention treatment at least doubles the probability, compared to relapse-prevention treatment alone, that an individual will achieve opioid abstinence during active treatment,[24–27] and the addition of antagonist maintenance nearly doubles opioid abstinence.[23] Oral naltrexone, although FDA approved to treat OUD, is excluded from consideration here due to poor adherence rates and significant opioid-overdose mortality following medication discontinuation in clinical studies of OUD treatment outcomes.[28–31] Attempts to pair oral naltrexone with psychosocial interventions aimed at improving compliance and retention in treatment have not yet demonstrated sustained positive results.[29,32] Naltrexone implant and buprenorphine implant are not yet FDA approved for OUD, and trials to date provide insufficient evidence of safety and efficacy.[33,34]

GTL-Bull,Mark-GeneralProduction-000049

| Opioid-Abstinence Rates with Medication Compared to Nonmedication[a] | | | |
|---|---|---|---|
| Medication[b] | Percentage opioid free on medication | Percentage opioid free on placebo/detoxification | Study |
| Naltrexone ER | 36 | 23 | Krupitsky et al. (2011)[23] |
| Buprenorphine/naloxone | 20–50 | 6 | Fudala et al. (2003)[34]  Weiss et al. (2011)[35c] |
| Buprenorphine/naloxone | 60 | 20 | Woody et al. (2008)[36,d] |
| Methadone | 60 | 30 | Mattick et al. (2009)[37] |

ER, extended release.
a The randomized, controlled clinical trials summarized here paired medication maintenance with evidence-based psychosocial treatments and opioid use will report data that were confirmed with urine toxicology. Clinical settings for treatment delivery may affect the rates of opioid use in the nonmedication control groups. The trials predominantly used adult opioid use disorder populations, with the majority being heroin dependent or having mixed dependence on heroin and prescription opioids.
b All medications are FDA approved.
c Population was prescription opioid-dependent patients.
d Population was youth aged 14–21 years.

Table 2:

Opioid–Abstinence Rates with Medication Compared to Nonmedication[a]

The evidence for efficacy both in reducing opioid use and retaining patients in care is strongest for agonist treatment; methadone maintenance remains the gold standard of care for OUD.[35] The evidence for antagonist treatment of OUD remains comparatively weak, given the mortality risk and poor adherence with oral naltrexone, plus the limited RCT evidence for extended-release naltrexone (naltrexone ER). The latter includes only a trial[23] with open-label extension[19] in a Russian population without access to agonist therapy and a small trial of employment contingency to improve naltrexone ER adherence in a US cohort.[36] Also in Russia, a small RCT of employment contingency to improve adherence used a different, non-FDA-approved formulation of naltrexone ER. Efficacy in reducing opioid use (60%–70% opioid-free urines) was similar to the two above trials cited, and the employment-contingency condition improved adherence but did not affect opioid use.[37] These studies do not adequately address either safety following medication discontinuation or efficacy compared to agonist therapy, and they pose problems for generalizability. A phase 4, multisite RCT comparing naltrexone ER to buprenorphine/naloxone maintenance is currently under way, with the expectation that results will resolve safety and efficacy questions regarding naltrexone ER as a treatment for OUD (NIDA Clinical Trials Network protocol 0051 [Principal Investigator: John Rotrosen/NewYork University School of Medicine]; ClinicalTrials.gov identifier NCT02032433).

## Unknown Aspects of Mu-Opioid Receptor Functional Activity in MAT

Although it is commonly accepted that the functional effects of MAT differ

according to their respective intrinsic activities at central mu-opioid receptors, this view is oversimplified. The many complexities of mu-opioid receptor ligand binding and biased agonism (e.g., "functional selectivity" according to mu-opioid receptor/effector coupling and intracellular environment, and agonist-induced receptor conformational changes with prolonged agonist exposure)[38–40] are only now being discovered, and may account for the clinical effects of these medications that remain poorly understood and that appear to vary widely among individuals. For example, little is known about why only certain individuals develop OUD following recurrent opioid exposure, although population studies in patients receiving opioid analgesics identify co-occurring substance use and mental illness as risk factors for developing OUD,[41] and a recent meta-analysis suggests that the rs1799971 polymorphism of the *OPRM1* gene may confer vulnerability to OUD following exposure to either heroin or prescription opioids.[42] Clinically, dosing needs in agonist maintenance therapies different significantly among individuals, and most patients do not develop tolerance to the relapse-prevention efficacy of buprenorphine or methadone maintenance. These observations suggest dynamic factors beyond ligand intrinsic activity at mu-opioid receptors. Whistler[43] has presented a helpful summary of the converging evidence that opioid agonists having both high efficacy and high propensity to produce mu-opioid receptor desensitization and endocytosis ("molecular trafficking") have lower liability for abuse and produce less tolerance than opioid agonists that induce comparatively little endocytosis. Examples of the former include endogenous opioid ligands and methadone, whereas the latter include morphine, codeine, buprenorphine,[44] and most commonly misused prescription opioids. Thus, endocytosis may help to explain the lack of tolerance observed for relapse-prevention efficacy with methadone maintenance but would not explain the same observation with buprenorphine maintenance.

Within methadone-maintained patients, pharmacogenomic studies identify variability in treatment response and pharmacokinetics associated with the variants of several genes (*OPRM1*, *ARRB2*, *KCNJ6*, *ABCB1*) and hepatic

CYP450 enzymes, suggesting layers of complexity in any given individual's treatment response.[45] For example, a recently published meta-analysis demonstrates that individuals homozygous for the CYP2B6*6 polymorphism are slow metabolizers of both the R- and S- enantiomers of methadone and therefore would be expected to have lower dosing requirements.[46] The utility of pharmacogenomic screening may be especially important in future clinical practice with methadone maintenance.

## Comparing MAT Tolerability and Convenience

RCTs examining methadone, buprenorphine, and extended-release naltrexone injection stabilization are all associated with acceptable adverse-effect profiles and with an acceptable level of patient tolerance.[23–27] Agonist treatment is associated most frequently with opioid-class effects such as dose-dependent sedation, constipation, sweating, neurocognitive impairment, and sexual dysfunction. Dose-dependent respiratory depression is an adverse effect mainly of methadone, a full mu-opioid agonist, whereas the partial-agonist properties of buprenorphine prevent dose-dependent respiratory depression greater than 50% reduction of baseline even at IV doses of 2 mcg/kg in opioid-naive healthy volunteers.[47] This "ceiling effect" on respiratory depression has obvious benefits for tolerability as well as for accidental or intentional overdose. Similarly, buprenorphine's partial-agonist properties have a protective "ceiling effect" that does not induce euphoria in opioid-tolerant individuals, whereas methadone-induced euphoria may be present in the early treatment of OUD but decreases with steady-state dosing stabilization.[48]

Naltrexone ER is associated most commonly with insomnia, site reactions to injection, clinically insignificant elevation of transaminases, hypertension, nasopharyngitis, and influenza.[19,23]

Patient convenience for dosing is least burdensome with monthly injections of naltrexone ER or monthly maintenance visits with office-based

buprenorphine/naloxone—both modeling typical outpatient treatment for severe chronic illness. Dosing is most burdensome with required observed daily dosing in opioid treatment programs prescribing methadone or buprenorphine maintenance in the early phases of recovery.

## Retention in Treatment After the Initiation of MAT

All three medications show improved retention in treatment compared to placebo or no medication.[24–27] Head-to-head comparisons are mainly available for buprenorphine versus methadone maintenance, with methadone demonstrating the highest rates of treatment retention in all studies,[35,49] including the treatment of pregnant women[50] and those with HIV.[51] One RCT conducted in Iran compared all three medications in a cohort of men dependent on intravenous buprenorphine and found that retention in treatment over a 24-week period was best with methadone followed by buprenorphine and then oral naltrexone, although it was noted that the available daily dose of buprenorphine (5 mg) was not an agonist dose equivalent to the study's daily dose of methadone (50 mg)—which likely contributed to poorer retention in the buprenorphine-treated group.[52]

## Impact on HIV Risk Behaviors

In HIV-infected populations, methadone and buprenorphine maintenance significantly reduce the use of illicit opioids and the risk of HIV transmission through the use of injection drugs, though their impact is less robust on sexual risk behaviors.[53–56] In a secondary analysis using a large national cohort from a safety RCT (comparing hepatic responses to 24 weeks methadone and buprenorphine maintenance for OUD),[57] an interesting gender difference emerged: sexual risk behaviors increased among men maintained on buprenorphine but decreased in methadone-maintained men, whereas women decreased risk with either buprenorphine or methadone maintenance.[51]

## Impact on Hepatitis C Risk Behaviors

Cumulative, lifetime HCV seroprevalence estimates among injection-drug users is up to 90%,[58] with high seroconversion rates attributable to both sharing syringes/needles and sharing drug preparation equipment (e.g., drug cookers and spoons, filtration cottons, vehicle fluids).[59,60] Two large, prospective cohort studies report the protective effect of methadone[61,62] and buprenorphine[62] maintenance, but not detoxification, in preventing HCV seroconversion among adult injection-drug users who are HCV negative at treatment entry.

## Impact on Preventing Opioid Overdose

Several risk factors for unintended opioid overdose have been identified. They include misuse of heroin and opioid analgesics, misuse of diverted buprenorphine and methadone, increases in opioid prescribing, having four or more prescribers or pharmacies filling opioid prescriptions, being prescribed doses equivalent to more than 100 mg morphine, opioid ingestion coupled with alcohol or the use of other sedatives/hypnotics (with synergistic effects on respiratory depression), receipt of public subsidy income providing access to drug purchase and binge drug use, suboptimal methadone-induction practices in relation to both pain management and addiction, opioid-analgesic switching, previous overdose history, loss of opioid tolerance among OUD due either to extended abstinence during incarceration or to treatment-related abstinence, and older age, with smoking status and co-occurring medical conditions likely contributing to fatalities.[2,63–71] Given that MAT reduces illicit opioid use, educates about OUD and accidental-overdose prevention, and may provide (where available) intranasal naloxone rescue kits to family and friends for use at the scene of an opioid overdose,[68,72] it is expected that MAT would be an important factor in preventing accidental opioid-overdose deaths occurring in those with OUD while they remain in active treatment. While data to date suggest that that is indeed the case for buprenorphine, methadone, and naltrexone

ER,[19,63] more data are required to judge the safety of MAT following treatment dropout and planned medication discontinuation, particularly for antagonist therapies for which the preclinical[20] and clinical[28,31,73] evidence indicates increased risk for respiratory depression upon opioid agonist reexposure.

## Safety Profile of MAT

Buprenorphine and methadone[57] and naltrexone ER[19,74] maintenance have favorable safety profiles, with HCV-infection being the most common predictor of mild-to-moderate increases in transaminases among adults, pregnant women,[75] and youth.[26,76] Methadone risk for QTc prolongation (associated with torsades de pointes, which has an estimated 10%–17% risk of sudden death due to cardiac arrhythmia[77]) is dose dependent, but screening baseline QTc intervals has not yet been shown to assist risk management during methadone maintenance.[78] Neither buprenorphine nor naltrexone is associated with QTc prolongation.

Drug-drug interactions are numerous with methadone, due to many cytochrome P450 isoenzymes involved in its hepatic metabolism (mainly CYP3A4, but also CYP1A2, CYP2B6, CYP2C8, CYP2C9, CYP2C19, and CYP2D6).[12,18] Metabolic inhibitors that increase methadone peak concentrations pose a risk for sedation and respiratory depression, bowel immotility, and QTc prolongation and cardiac arrhythmia; whereas metabolic potentiators that reduce methadone peak and trough concentrations pose a risk for opioid withdrawal and relapse to opioid use. Other substances and drugs having similar adverse effects (sedation, reduced bowel motility, QTc prolongation, and reductions in heart rate, blood pressure, and respiratory rate) may pose additive and synergistic effects, even if they do not alter methadone metabolism. Common examples include alcohol and benzodiazepines (sedation and reduced respiratory drive), antipsychotics, tricyclic antidepressants, and calcium channel blockers (QTc prolongation), and psychotropics with anticholinergic effects (constipation).

By comparison, buprenorphine and naltrexone have few drug–drug interactions and a benign side-effect profile. Owing to its partial-agonist properties, buprenorphine is not associated with a significant risk for respiratory depression;[47] however, in combination with sedatives/hypnotics (especially diazepam),[79–81] it poses a risk for sedation and reduced respiratory drive. Naltrexone has no risk for reduced respiratory drive, but attempts to "override" blockade with high-dose opioid use poses a risk for accidental-overdose death (see Vivitrol® package insert). Buprenorphine is metabolized primarily by CYP3A4 and has clinically significant drug-drug interactions with rifampin (reductions in buprenorphine concentrations pose a risk for opioid withdrawal, although this effect is not observed with rifabutin)[82] and atazanavir (increased buprenorphine concentration and sedation/cognitive impairment).[83] Buprenorphine has not had confirmed, clinically significant CYP3A4 or CYP2D6 interactions with other commonly prescribed psychotropics and medications, although infrequent case reports exist; definitive human studies are lacking.[18,84] Naltrexone is not metabolized by cytochrome P450 isoenzymes; instead, it has hepatic metabolism via dihydrodiol dehydrogenase to β-naltrexol, which is then conjugated for urinary excretion.[84] Its major drug interaction is blockade of opioid analgesic efficacy.

In pregnancy, naltrexone ER has no demonstrated safety, whereas both buprenorphine and methadone maintenance are safe and effective for maintaining maternal abstinence and retention in prenatal care,[85] and are safely recommended during breastfeeding.[86,87] Buprenorphine demonstrates less peak-dosing suppression of fetal heart rate, fetal heart rate reactivity, and biophysical profile scores, and generates a milder neonatal abstinence syndrome than methadone.[88,89] Early neonatal development appears within normal limits for infants exposed to buprenorphine or methadone in utero.[90] Longer-term neurodevelopmental safety is known for infants exposed in utero to methadone[91] and is being investigated for buprenorphine-exposed infants.

GTL-Bull,Mark-GeneralProduction-000056

# Ease of Induction and Comparison of Available MAT Formulary

The MAT formulary available in the United States for treating OUD is summarized in Table 3. Naltrexone ER is available only under a brand name, whereas buprenorphine monotherapy, buprenorphine/naloxone, and methadone are all available both generically and under brand names. Oral methadone concentrates are dose-equivalent, but the differences in formulations for buprenorphine/naloxone are not reliably dose-equivalent (see, e.g., the dosing differences with buccal film). Converting between these forms of buprenorphine/naloxone requires careful attention to dosing practices (food and smoking should be avoided 30 minutes before and after dosing, and dissolved medication should be held with saliva for a full 10 minutes to optimize mucosal absorption) and to patient response. General dosing ranges for both induction and for stabilization/maintenance treatment are also listed in Table 3.

| Opioid Use Disorder Formulary in the United States | | | |
|---|---|---|---|
| Available formulary | Dosage forms (mg) | Induction dosing (mg) | Recommended dosing range for stabilization/maintenance (mg) |
| **Methadone (HCl oral concentrate, per ml)** | | | |
| Generic | 5, 10 | 5–10 every 4 hours up to 40 in the first 24 hours | Gradual titration with close monitoring over 2 weeks to 60–120 daily; rapid metabolizers may require higher dosing |
| Methadose | 10 | | |
| Methadose sugar-free | 10 | | |
| Methadose HCL Intensol | 10 | | |
| **Buprenorphine + naloxone** | | | |
| *Sublingual tablet* | | | |
| Generic | 2/0.5, 8/2 | 2/0.5–4/1; repeat up to 16/4 in the first 24 hours | 4/1–24/6 daily |
| Zubsolv | 1.4/0.36, 5.7/1.4 | 1.4/0.36–2.8/0.72; repeat up to 11.4/2.8 in the first 24 hours | 2.8/0.72–17.1/4.2 daily |
| *Sublingual film* | | | |
| Suboxone Film | 2/0.5, 4/1, 8/2, 12/3 | 2/0.5–4/1; repeat up to 16/4 in the first 24 hours | 4/1–24/6 daily |
| *Buccal film* | | | |
| Bunavail | 2.1/0.3, 4.2/0.7, 6.3/1 | 2.1/0.3; repeat up to 8.4/1.4 in the first 24 hours | 2.1/0.3–12.6/2.1 daily |
| **Buprenorphine** | | | |
| Sublingual tablet (generic only) | 2, 8 | 2–4; up to 16 in the first 24 hours | 4–24 daily |
| **Naltrexone ER** | | | |
| Vivitrol | 380 | 380 IM following agonist clearance; oral naltrexone 50 mg daily may precede or supplement initial induction | 380 IM every 4 weeks; oral naltrexone may be added to supplement in weeks 3-4 as needed |
| ER, extended release. | | | |

Table 3:

Opioid Use Disorder Formulary in the United States

An advantage of methadone is that it can be started at any time during an overarching course of treatment. A disadvantage, however, is that it takes time to achieve a steady-state dose that is therapeutically effective in OUD, and this time period is one of high risk for treatment dropout and accidental overdose if titration is too rapid.[17,92] Buprenorphine requires the individual to be in mild-moderate opioid withdrawal prior to dosing, in order to avoid

precipitating severe opioid withdrawal (due to its partial-agonist activity), but relief is achieved within 24–72 hours of induction for both monotherapy and the naloxone-combined product. The partial-agonist "ceiling effect" protects against respiratory depression, thus rendering this medication safe for rapid induction. Buprenorphine monotherapy is recommended for observed induction and for stabilizing or maintaining pregnant women or those that may respond adversely to naloxone due to allergies or co-occurring medical conditions. The combination product is buprenorphine plus naloxone in a 4:1 ratio and was designed to prevent misuse and diversion of buprenorphine among injection drug users. Buprenorphine has good bioavailability via oral mucosal absorption, whereas naloxone does not. Taken sublingually, the naloxone component has poor bioavailability, but if crushed and injected, the naloxone component is readily available to exert opioid antagonist effects, thus reducing the risk of abuse in buprenorphine treatment. Buprenorphine/naloxone is consequently the formula of choice for inductions that are not fully observed and for routine maintenance, in order to reduce product diversion and misuse. Naltrexone ER has the most complicated induction profile because of the need to complete metabolism of opioid agonists prior to dosing (typically 7–14 days), thereby avoiding severe opioid withdrawal (due to its antagonist activity). Prolonged symptoms of opioid withdrawal during washout pose a high risk for treatment dropout and relapse. Attempts to abbreviate this period require more complex dosing algorithms as well as back-up options for environmental containment to prevent relapse to opioid use.[93]

## Risk for Diversion and Negative Public Health Impact

Buprenorphine (all formulations) and methadone are known to be diverted by patients and to be commonly used illicitly,[63,94,95] resulting in further opioid misuse and overdoses, in accidental pediatric exposures,[96] and in accidental or intentional adolescent exposures.[6] Since naltrexone ER has no known diversion value, it allows for the treatment of OUD without contributing to illicit opioid use.

GTL-Bull,Mark-GeneralProduction-000058

# DISCUSSION

## Factors to Consider in Selecting Treatment with MAT

MAT is recommended for adults presenting for clinical treatment of OUD with physiological dependence: it significantly augments treatment retention, reduces illicit opioid use, reduces the burden of opioid craving, and, in the case of agonist therapies, provides effective relief of the opioid withdrawal syndrome. Thus, MAT is a stabilizing addition to relapse-prevention counseling and mutual help groups (such as Narcotics Anonymous) in that it increases the effectiveness of those interventions. Longer-term, abstinence-based residential treatment without MAT shows limited effectiveness, especially among recently detoxified heroin users,[97,98] and loss of tolerance during this period of abstention poses an increased risk of fatal overdose if one relapses to opioid use upon discharge to home. Youth is a predictor of early dropout from psychosocial treatment of OUD,[99] whereas medication adherence and early opioid abstinence predict greater retention and treatment success among youth treated with buprenorphine/naloxone.[100] A 2005 Cochrane review noted that the available evidence was insufficient to support psychosocial treatment alone as effective for OUD.[101] The evidence remains insufficient, even to predict which individuals, if any, are likely to do well without MAT.

The selection of MAT can be viewed from two different perspectives: individualized treatment versus population management. An individualized treatment approach will consider many factors, in addition to the evidence base, to guide medical decisions. These factors include the following: the availability of, and patient's access to, MAT; the experience of the prescribing clinician; the clinical setting of treatment; patient and family preferences; occupational risks (see next paragraph); co-occurring medical and psychiatric illnesses; and the patient's motivation for opioid abstinence, capacity to adhere to recommended treatment, and legal status. If the risk for treatment dropout is high, the evidence regarding MAT and retention in

GTL-Bull,Mark-GeneralProduction-000059

treatment significantly favors a recommendation for agonist therapy; methadone maintenance demonstrates the highest patient retention rates in all studies comparing methadone to buprenorphine. A recommendation of methadone or buprenorphine/naloxone maintenance must also be balanced by a discussion with the patient (including informed consent) regarding both the difficulty of terminating agonist therapies (due to reexperiencing opioid withdrawal and craving) and the high rates of opioid relapse following the discontinuation of either buprenorphine[25,26] or methadone.[102,103] Unfortunately, no long-term studies have compared taper outcomes with buprenorphine versus methadone. Clinicians are encouraged to monitor taper trials closely for any evidence of patient destabilization or relapse risk that would require returning to higher-dose agonist treatment. The benefits of extended methadone or buprenorphine/naloxone maintenance delivered within an opioid treatment program (requiring daily medication monitoring during early recovery, and providing structured psychosocial interventions and integrated care options) are especially pronounced for populations with significant drug-related legal charges and drug-using social networks, for patients with co-occurring medical illness related to injection drug use, and for socially disadvantaged patients, who may receive, through the integrated structure of the program, the intensive social and medical services needed to support sustained recovery.

In some situations, the selection of MAT may reflect risk-benefit assessments unrelated to the medical factors as such. For instance, the performance of pilots, physicians, professional athletes, or those carrying firearms could be compromised and even be dangerous because of opioid agonist treatment's cognitive or sedative effects or its impact on reaction times.[104,105] No studies specific to these professions have been conducted for agonist therapy of OUD, however, so this concern is empirical rather than evidence based at this time. In such cases, antagonist therapy may be preferred for a motivated, treatment-seeking individual who desires to continue such employment, despite the comparatively weak evidence supporting antagonist versus agonist therapies. Similarly, an individual with

co-occurring OUD and alcohol use disorder might benefit most from antagonist therapy, given that the FDA has approved naltrexone ER as effective in preventing relapse to alcohol use.[106,107] In all such situations, these matters should be covered in a collaborative informed consent process, and clinicians should carefully document the discussion.

A population-management approach would consider the public health impact of OUD, along with the cost-effectiveness of the available treatment options, over patient preferences and individualized selection of MAT. Primary consideration would be given to preventing opioid diversion into the community, opioid overdose deaths, and the transmission of infectious diseases (in particular, hepatitis C and HIV) through the use of injection opioids. To optimize such decisions, all three MAT options for OUD would need to be available, and prescribers would need to be trained in the appropriate use of each one. Lack of prescriber familiarity and comfort with MAT, as well as limits imposed on prescribers by managed care (e.g., dosing limits, prior authorization reviews, and limits on toxicology), continue to be barriers to dissemination of MAT for OUD in clinical practice.[108] The availability of a regularly updated, evidence-based algorithm to assist in decision making would also contribute to the adoption of MAT in practice.[109]

An example of a simple, evidence-based algorithm for MAT selection—one designed to be flexible in relation to regional MAT availability—is outlined in Text Box 2. Failed treatment trials would result in the selection of an alternate MAT treatment or in the relocation of treatment itself—for example, from an office to a structured treatment setting with closer patient monitoring, such as an opioid treatment program, an integrated mental health care clinic, or a specialized integrated care clinic (following an integrated care model as is used for infectious diseases). In the United States, methadone maintenance must currently be delivered within a federally regulated opioid treatment program, but some evidence suggests, as a future option, that methadone maintenance can be effectively delivered within an office-based setting, especially for clinically stable patients who have achieved take-home

GTL-Bull,Mark-GeneralProduction-000061

doses.[110–112] The use and implementation of a MAT algorithm would reduce discrepancies in treatment based on regional variations, prescriber expertise, or access to specialty clinics. The main weakness of this approach, however, is that it could reduce the role of patient preferences in selecting MAT. This consideration is a serious one in framing an effective population-management approach since patient engagement in substance use treatment is essential for optimal outcomes. Service-utilization research and feedback from programs using this approach are much needed.



Text Box 2
Evidence-Based Medication-Assisted Treatment Selection Algorithm for Treating Opioid Use Disorder in Adults*

A. Threshold questions
  (1) Is the patient actively seeking abstinence from all illicit opioid use?
      YES: consider antagonist or agonist medication-assisted treatment (MAT)
      NO: consider agonist MAT to reduce risk of accidental opioid overdose death by maintaining opioid tolerance
  (2) Does the patient have significant co-occurring chronic pain?
      YES: consider agonist MAT to reduce pain-related opioid relapse
      NO: consider antagonist or agonist MAT
B. Exclusions to extended-release antagonist maintenance
      • pregnant or planning pregnancy
      • foreseeable need for opioid analgesia during treatment
      • recent opioid overdose or high risk for opioid overdose behavior
C. MAT treatment setting
  (1) office-based outpatient care
      • patients committed to abstaining from all substance use
      • no recent history of accidental or intentional substance overdose
      • no recent history of opioid diversion
  (2) structured care setting (e.g., opioid treatment program, integrated mental health care clinic)
      • recently stabilized sedative/hypnotic or alcohol use disorders
      • recent history of accidental or intentional substance overdose
      • patient is receiving agonist MAT and has recent history of opioid diversion

* This algorithm is flexible in that it includes local care options and is designed to replace opioid overdose deaths and opioid diversion. Failure of one MAT trial would prompt reconsideration of other available MAT options or the relocation of treatment from an office-based practice setting to a structured clinical setting with closer patient monitoring.

## MAT Selection in Adolescents

The buprenorphine/naloxone combination is FDA approved for adolescents aged 16 and older and has demonstrated safety and efficacy for youth with OUD.[26] As such, it is currently the treatment of choice. Nevertheless, concern about adolescent nonadherence and the misuse and diversion of buprenorphine/naloxone has generated some support for empirical treatment with naltrexone ER. Caution is advised, however, because evidence is lacking as to the safety and efficacy of naltrexone ER in this population. In the United States, methadone maintenance is not available for the treatment of adolescents.

## MAT Selection in Women of Childbearing Age

For women of childbearing age and those who are pregnant or planning pregnancy, careful discussion, along with informed consent, is required in selecting MAT. Although methadone maintenance is the current gold standard of clinical care during pregnancy, buprenorphine monotherapy (but

not buprenorphine/naloxone, though early evidence suggests that the combination warrants further study)[113] is a potential alternative based on studies comparing the safety and efficacy of these treatments during pregnancy.[85] Postpartum breastfeeding mothers may be switched from buprenorphine monotherapy to combination buprenorphine/naloxone maintenance in order to prevent diversion, especially since naloxone is poorly absorbed sublingually and is unlikely to be absorbed by suckling infants.[114]

## Lack of Clinical Studies for Using MAT in Nondependent OUD

No research has examined MAT in nondependent OUD, and even case reports are lacking on this topic. Such off-label use, which would require appropriate informed consent and risk–management consultation, should not be considered without careful deliberation and documentation of medical decision making. Theoretically, OUD without any history of physiological dependence would favor antagonist treatment in most cases, as maintenance on agonist therapy will induce physiological opioid dependence. In most cases, this risk would not be perceived to outweigh benefit except in the presence of an imminent risk of death by opioid overdose. Such situations include recurrent or recent near–fatal overdoses with opioids or a recent intentional opioid overdose in an impulsive individual returning to an outpatient setting. In these examples, the preserved or augmented opioid tolerance provided by agonist treatment might be considered protective against future toxic opioid use, in which case buprenorphine/naloxone would be favored over methadone because of its lower risk of opioid toxicity and fewer drug–drug interactions. Another example may be the patient with a co-occurring pain syndrome who requires intermittent opioid analgesia, satisfies criteria for OUD without physiological dependence, but misuses opioid analgesics. In this example, low–dose buprenorphine/naloxone maintenance in a divided–dosing regimen could potentially enable pain treatment and circumvent opioid misuse; indeed,

studies of OUD with physiological dependence show buprenorphine/naloxone to provide a benefit in mild-to-moderate pain syndromes.[25,115] Note, however, that the above comments reflect theoretical considerations only; evidence for efficacy and safety is lacking for all three medications in relation to nondependent OUD.

## Need for Development of Non-opioid Therapies to Ameliorate Acute and Protracted Opioid Withdrawal Syndromes

Opioid withdrawal is commonly misrepresented as a "flu-like" syndrome due to the constellation of physical symptoms characterizing acute hyperadrenergic rebound, along with malaise and gastrointestinal distress. This concept of opioid withdrawal is incomplete, however, in that it ignores the severe affective and cognitive distress (including treatment-resistant anxiety, dysphoria/depression, severe opioid craving, and loss of self-efficacy) that persists up to 30 days in untreated OUD abstinence[116,117] and that contributes to opioid relapse and treatment dropout, even among young OUD patients with relatively brief histories of dependence.[118]

Potential non-opioid treatments to stabilize opioid withdrawal and opioid craving may be developed through an understanding of how neurobiological circuitry interacts with opioid pathways.[119] Such treatments would be expected to relieve symptoms, improve retention in care, ease induction, and possibly increase the options for managing OUD during pregnancy. A small pilot RCT (n = 24) of buprenorphine detoxification with and without gabapentin, a GABAergic anticonvulsant, demonstrated better short-term opioid-use outcomes with gabapentin,[120] but two RCTs assessing the use of memantine, a glutamatergic antagonist, as an adjunct to naltrexone ER induction and stabilization[121] or to oral naltrexone[122] had negative results. Further research on novel pharmacotherapies to ease opioid withdrawal are warranted.[123,124]

GTL-Bull,Mark-GeneralProduction-000064

Clinicians are encouraged to educate patients about opioid withdrawal and its presenting a risk for opioid relapse and for dropping out of treatment. A collaborative plan should be developed, in advance, for managing opioid withdrawal. For example, informed consent with agonist therapies should include a discussion both of opioid withdrawal as presenting a risk for relapse and of the future inevitability of experiencing opioid withdrawal when discontinuing agonist treatment or if doses are missed. Collaborative treatment plans that include aggressive pharmacological management of symptom relief and options for safe containment in higher levels of care (such as partial or residential treatment programs) would be expected to improve retention in care and, more generally, the patient's understanding of how to avoid relapse to opioid use.

## Declaration of interest

The author reports no conflicts of interest. The author alone is responsible for the content and writing of this article.

# REFERENCES

1. American Psychiatric Association. Diagnostic and statistical manual of mental disorders. 5th ed. Arlington, VA: APA, 2013.
2. Centers for Disease Control and Prevention. Vital signs: overdoses of prescription opioid pain relievers—United States, 1999–2008. MMWR Morb Mortal Wkly Rep 2011: 60: 1487–92.
3. Substance Abuse and Mental Health Services Administration. Results from the 2012 National Survey on Drug Use and Health: summary of national findings. Rockville, MD: SAMHSA, 2013.
http://www.samhsa.gov/data/sites/default/files/NSDUHnationalfindingresults2012/NSDUHnationalfindingresults2012/NSDUHresults2012.pdf

**Keywords:**

buprenorphine; medication-assisted treatment; methadone; naltrexone;

GTL-Bull,Mark-GeneralProduction-000065

opioid use disorder

© 2015 President and Fellows of Harvard College

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**
**EAST ST. LOUIS DIVISION**

| | | |
|---|---|---|
| Midwest Trust Company as | ) | |
| Administrator of the Estate of | ) | |
| Mark Bull, Deceased, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 3:23-cv-01238-SMY |
| Vs. | ) | |
| | ) | |
| Sheriff Jeff C. Connor, County of Madison, | ) | |
| Illinois, John Does, Jane Does, and | ) | |
| Advanced Correctional Healthcare, Inc., | ) | |
| | ) | |
| Defendants. | ) | |

# EXHIBIT 11 – ISP REPORT

# TO AMENDED COMPLAINT

22-39766900034
LOWERY, MICHAEL
ID  6592
Page   1  Of  2

## ILLINOIS STATE POLICE
## CASE INITIATION AND ACTION

| SUMMARY |
|---|

**CASE INITIATION:**

| Case Number | Case Title | CAD Number |
|---|---|---|
| 22-39766900034 | BULL, MARK T. | Z62200000236 |

| Keyword | Other Keyword |
|---|---|
| OFFICER INVOLVED DEATH, OTHER | IN-CUSTODY DEATH |

| Report Purpose | CASE SUBMITTED TO MADISON COUNTY SA OFFICE FOR REVIEW |
|---|---|

| Case Agency | Case Agent | ID Number | Zone/Office |
|---|---|---|---|
| ISP ZONE 6 INVESTIGATIONS - COLLINSVILLE | LOWERY, MICHAEL | 6592 | ISPZ6CL |

| Date of Incident | Day of Incident | Time of Incident | Reported Date | Crime Victim Notified Of Opening |
|---|---|---|---|---|
| 06/29/2022 | WEDNESDAY | 09:58 | 06/29/2022 | Yes [ ] No [✓] |

| Initiated By ISP | Requesting Agency | Requesting Officer |
|---|---|---|
| Yes [ ] No [✓] | MADISON COUNTY SHERIFF'S DEPARTMENT | CAPTAIN KRIS THARP |

| Complaint By Public | Complaint Last Name | Complaint First Name | Complaint Middle Name | Complaint Phone Number |
|---|---|---|---|---|
| Yes [ ] No [✓] | | | | |

| Character of Case |
|---|
| DEATH - NON-CRIMINAL, COUNTY POLICE IN ILLINOIS |

| Crime Code |
|---|
| 6954 - DEATH - NON-CRIMINAL |

| Crime Code |
|---|
| 6002 - COUNTY POLICE IN ILLINOIS |

| LOCATION |
|---|

| Location Description |
|---|
| MADISON COUNTY SHERIFF'S DEPARTMENT |

| Latitude | Longitude |
|---|---|
| 38.8121628 | -89.959443 |

| Address |
|---|
| 405 RANDLE ST |

| City | State | Zip Code | County |
|---|---|---|---|
| EDWARDSVILLE | IL | 62025 | MADISON |

| NARRATIVE |
|---|

On June 28, 2022, Mark T. Bull (MW-7/25/1983), an inmate at Madison County Jail, was reported to be ill by fellow inmates.   Correctional Officers transported BULL to the infirmary where he suffered a medical emergency.  Edwardsville Fire Department responded and transported BULL to Anderson Hospital where he was pronounced dead on June 29, 2022; at approximately 9:58 a.m.   The Illinois State Police Major Crimes Unit was requested to investigate the in-custody death.

Exhibit 11

GTL-Bull,Mark-GeneralProduction-000067

22-39766900034
LOWERY, MICHAEL
ID  6592
Page   2  Of  2

| INDIVIDUAL 1 | |
|---|---|
| Type<br>**SUBJECT** | Last Name<br>**BULL** |
| First Name<br>**MARK** | Middle Name<br>**TRAVIS** |
| AKA/Maiden | |

| Sex<br>**MALE** | Race<br>**WHITE - W** | | DOB<br>**07/25/1983** | SSN | |
|---|---|---|---|---|---|
| Street<br>**92 BONDS STREET** | City<br>**EAST ALTON** | | | State<br>**IL** | Zip Code<br>**62024** |

| CASE ACTION | |
|---|---|
| Case Action Date<br>**9/22/2022** | Case Action Narrative<br>**CASE SUBMITTED TO MADISON COUNTY SA OFFICE FOR REVIEW** |

| EVIDENCE HELD |
|---|
| Evidence Being Held  ☐ Yes  ☐ No   Narrative |

| OFFICER | | | |
|---|---|---|---|
| Agent<br>**LOWERY, MICHAEL** | ID Number<br>**6592** | Zone/Office<br>**ISPZ6CL** | Agent Date<br>**06/30/2022** |
| Supervisor<br>**IRWIN T** | | ID Number<br>**6344** | |
| Final Approval Given by Supervisor<br>**IRWIN, TRAVIS   #6344** | | | Supervisor Date<br>**10/04/2022** |
| SupervisorsNotes | | | |

GTL-Bull,Mark-GeneralProduction-000068

22-39766900034
HATLEY, THOMAS
D  5961
Page   1  Of  3

## ILLINOIS STATE POLICE
### INVESTIGATIVE REPORT

| Case Number 22-39766900034 | Case Title BULL, MARK T. | | | Report Type ☐ Individual ☐ Location ☐ Vehicle | |
|---|---|---|---|---|---|
| Report Purpose **RECEIPT AND TRANSFER OF EXHIBITS #1 - #3 TO THE ZONE 6 EVIDENCE VAULT.** | | | | Report Date 07/06/2022 | Activity Date 07/06/2022 |
| Lead Number | Drug Buys | ArrestWarrants | Search Warrants | Overhear Admin | Overhear Warrant |
| Reporting Agent **HATLEY, THOMAS** | | | | D Number 5961 | Zone/Office ISPZ6LF |
| Case Agent **LOWERY, MICHAEL** | | | | Case Agent ID Number 6592 | Case Agent Zone/Office ISPZ6CL |
| ALPR Used ☐ Yes | APLR Location | | | | |

## NARRATIVE

On 07/06/2022, at approximately 9:00 a.m., I, Special Agent Thomas M. Hatley #5961, received exhibit(s) #1 - #3 from Trooper Skylar Marlow #6710.

Attached is an evidence manifest documenting the receipt and description of the above mentioned exhibit(s) (attachment #1).

I then secured the above mentioned exhibit(s) in the Zone 6 Evidence Vault.

| Approved By **Irwin, Travis   #6344** |
|---|

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000069

22-39766900034
HATLEY, THOMAS
D   5961
Page   2  Of  3



Illinois State Police
Division of Forensic Services
Crime Scene Services Command
Crime Scene Region 5

| DFS Case #: | DFS22-023387 |
|---|---|
| Agency: | Illinois State Police, Zone 6 - General Criminal |
| Agency Case #: | 22-39766900034 |
| Scene #: | 1 |
| Analyst: | CSI Skylar Marlow |

## Evidence Manifest

### Case Information

| | |
|---|---|
| **Primary Agency:** | Illinois State Police, Zone 6 - General Criminal - 22-39766900034 |
| **Secondary Agency:** | |
| **Investigating CSI:** | CSI Skylar Marlow (#6710) |
| **Primary Agency Officer:** | Special Agent Michael Lowery (#6592) |
| **Offense:** | Death Investigation |
| **Offense Date:** | Jun 28, 2022 9:45 AM |
| **Victim:** | Mark Bull |
| **Suspect:** | |

### Evidence Information

Item # 1
Envelope (Sealed) containing Swab of Suspected Blood -- Quantity: 1; Source: Jail Cell; One set of swabs from a red blood-like
substance collected from jail cell door.  -- Location Found: Scene

| Date/Time | Released By | Signature | Released To | Signature |
|---|---|---|---|---|
| Jul 6, 2022 9:21 AM | CSI Marlow (#6710) | | S/A Hatley (#5961) | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Date of Report: Jul 6, 2022

Page 1 of 1

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains neither recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000070

22-39766900034
HATLEY, THOMAS
D   5961
Page   3  Of  3



Illinois State Police
Division of Forensic Services
Crime Scene Services Command
Crime Scene Region 5

| DFS Case #: | DFS22-023387 |
|---|---|
| Agency: | Illinois State Police, Zone 6 - General Criminal |
| Agency Case #: | 22-39766900034 |
| Scene #: | 2 |
| Analyst: | CSI Skylar Marlow |

**Evidence Manifest**

## Case Information

| | |
|---|---|
| **Primary Agency:** | Illinois State Police, Zone 6 - General Criminal - 22-39766900034 |
| **Secondary Agency:** | |
| **Investigating CSI:** | CSI Skylar Marlow (#6710) |
| **Primary Agency Officer:** | Special Agent Michael Lowery (#6592) |
| **Offense:** | Death Investigation |
| **Offense Date:** | Jun 28, 2022 9:45 AM |
| **Victim:** | Mark Bull |
| **Suspect:** | |

## Evidence Information

Item# 2
Envelope (Sealed) containing Postmortem Kit -- Quantity: 1; Subject: Mark Bull; Sexual Assault Evidence: Not Collected; Clothing: Not Collected; Palmprints: Separate Exhibit ; Fingerprints: Separate Exhibit; Fingernail Specimens: Collected; Buccal Swabs: Collected; Blood Card: Collected; Pulled Pubic Hairs: Collected; Combed Head Hairs: Collected; Pulled Head Hairs: Collected; No sexual assault kit collected per conversation with Pathologist and Investigators on scene. No clothing on or with victim.  -- Location Found: Morgue

Item# 3
Envelope (Sealed) containing Known Fingerprints/Tenprints -- Quantity: 1; Finger and palm prints collected from victim during autopsy.  -- Location Found: Morgue

| Date/Time | Released By | Signature | Released To | |
|---|---|---|---|---|
| Jul 6, 2022 9:22 AM | CSI Marlow (#6710) | | S/A Hatley (#5961) | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Date of Report: Jul 6, 2022

Page 1 of 1

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei ther recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000071

## ILLINOIS STATE POLICE
## INVESTIGATIVE REPORT

| Case Number | Case Title | | | Report Type |
|---|---|---|---|---|
| **22-39766900034** | **BULL, MARK T.** | | | ☑Individual ☐Location ☐Vehicle |

| Report Purpose | | | Report Date | Activity Date |
|---|---|---|---|---|
| **INITIAL CALLOUT** | | | **08/29/2022** | **06/29/2022** |

| Lead Number | Drug Buys | ArrestWarrants | Search Warrants | Overhear Admin | Overhear Warrant |
|---|---|---|---|---|---|
| | | | | | |

| Reporting Agent | D Number | Zone/Office |
|---|---|---|
| **LOWERY, MICHAEL** | **6592** | **ISPZ6CL** |

| Case Agent | Case Agent ID Number | Case Agent Zone/Office |
|---|---|---|
| **LOWERY, MICHAEL** | **6592** | **ISPZ6CL** |

| ALPR Used | APLR Location |
|---|---|
| ☐ Yes | |

## NARRATIVE

On June 28, 2022, Mark T. Bull (MW-7/25/1983), an inmate at Madison County Jail, was reported to be ill by fellow inmates.   Correctional Officers transported BULL to the infirmary where he suffered a medical emergency.  Edwardsville Fire Department responded and transported BULL to Anderson Hospital where he was pronounced dead on June 29, 2022; at approximately 9:58 a.m.   The Illinois State Police Major Crimes Unit was requested to investigate the in-custody death.

On June 29, 2022 Reporting Agent (R/A) Michael Lowery and Special Agent Michael Hentze responded to the Madison County Jail.   Upon arriving at the jail, investigators met with Jail Administrator, Captain Kris Tharp.  Capt. Tharp provided preliminary case details to investigators.

Responding investigators conducted video recorded interviews with James T. SHIMCHICK (M⬛⬛⬛), Danny G. LINHART (M⬛-⬛⬛), and Jonathan M. BEASLEY (M⬛⬛⬛).   BEASLEY was identified as BULL's cell mate.

Illinois State Police Crime Scene Investigator  Marlow Skylar responded to process the cell where BULL was housed prior to being taken to the hospital.

R/A inquired about death notification and was told death notification had already been made to Angie M. Roberts, BULL's sister.   Mrs. Roberts' phone number was provided as ⬛⬛⬛.   No other information was provided for Mrs. Roberts.

Deputy Coroner Diondra Horner was assigned to BULL's case.

The investigation continues.

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D  6592
Page   2  Of  4

# Initial Callout Notes

## 22-39766900034

Arrived 10 days prior drug sick 6/17/22

VIC: MARK BULL , 7/25/1983   MW   Anderson Hosp
                                    11:30 AM  6/28
TOC: 6/28/22 @ 9:45 AM              Today 958 AM 6/29
                                    Not able speak
MEDICAL TREATMENT •

TRAINING Records  •

SURVEILLANCE  •         • Grievances ? Need

RADIO TRAFFIC  ☒ •

POLICY (MEDICAL)  •

⊬ JAIL CALLS   NEED

INTERVIEWS:

⊀ SICK REQUESTS  NEED

✳ LACERATION ON HEAD

FALL WITNESSED ?

VIDEO RETENTION ? 30 DAYS


CORONER:   SHANE LILEY

CSI: SKYLAR MARLER

SICK , AED NO SHOCK ADVISED, AMBU BAG,

DEPUTY CORONER: DIONRDA HORNER

SHIMCHICK, JAMES NOTIFIED


CELL MATE: BEASLEY, JOHNATHAN


SISTER: Angie M. Roberts

↳ DEATH NOTIFICATION MADE

#6592
ML

Approved By
Irwin, Travis   #6344

Disclaimer: This document contains neither recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D   6592
Page   3  Of  4

06/29/22   MADISON   COUNTY   JAIL

CAPTAIN   KRIS   THARP   #307

(618) 296 - 4832   OFFICE

███████████   CELL   ████████   PERSONAL

IN - CUSTODY   DEATH

MARK   T.   BULL   07/25/1983

HAS   BEEN   HERE   FOR   10   DAYS   METH   WITHDRAWLS

TOC:   06/29/22   9:45 AM

LACERATION   ON   HEAD

CSI? 1ST   AUTOPSY?   DEONDRA HUNTER   SHANE   LILEY   TOMORROW / FRIDAY   6/29/22
ANDERSON   HOSPITAL - STABLE   11:30

PHOTOS   TAKEN

30 DAY   VIDEO   RETENTION

BEASLEY   WAS   HIS   CELL MATE

JAIL   CALLS

SISTER - ANGIE M.   ROBONS   ████████

MH 6464

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains neither recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D  6592
Page   4  Of  4

# INDIVIDUAL

| Last Name | First Name | Middle Name |
|---|---|---|
| **BULL** | **MARK** | **TRAVIS** |

| AKA/Maiden |
|---|
| |

| Sex | Race | | DOB | SSN |
|---|---|---|---|---|
| **MALE** | **WHITE - W** | | **07/25/1983** | |

| Drivers License Number | Home Telephone | Cell Telephone |
|---|---|---|
| | | |

| Street |
|---|
| **92 BONDS STREET** |

| City | State | Zip Code | How Long | Personal History |
|---|---|---|---|---|
| **EAST ALTON** | **IL** | **62024** | | ☐ |

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000075

22-39766900034
LOWERY, MICHAEL
D   6592
Page   1  Of  7

## ILLINOIS STATE POLICE
## INVESTIGATIVE REPORT

| Case Number | Case Title | | | Report Type | |
|---|---|---|---|---|---|
| 22-39766900034 | BULL, MARK T. | | | ☑ Individual   ☐ Location   ☐ Vehicle | |

| Report Purpose | | | | Report Date | Activity Date |
|---|---|---|---|---|---|
| INTERVIEW OF DANNY LINHART | | | | 08/30/2022 | 06/29/2022 |

| Lead Number | Drug Buys | ArrestWarrants | Search Warrants | Overhear Admin | Overhear Warrant |
|---|---|---|---|---|---|
| | | | | | |

| Reporting Agent | ID Number | Zone/Office |
|---|---|---|
| LOWERY, MICHAEL | 6592 | ISPZ6CL |

| Case Agent | Case Agent ID Number | Case Agent Zone/Office |
|---|---|---|
| LOWERY, MICHAEL | 6592 | ISPZ6CL |

| ALPR Used | APLR Location |
|---|---|
| ☐ Yes | |

## NARRATIVE

The purpose of this report is to document an interview conducted while investigating the in-custody death of Mark BULL.

The interview was conducted with:

DANNY G. LINHART



On June 6, 2022, Reporting Agent Michael Lowery and Special Agent Michael Hentze requested an interview with LINHART.   LINHART was read his Miranda Rights from a standardized form.   LINHART initialed and signed the form indicating he understood his rights.   A video statement checklist was completed as LINHART agreed to participate with a video recorded interview.   The interview started at 4:30 p.m., as LINHART stated the following:

- LINHART stated he had known BULL his whole life.

- LINHART stated he told every officer in the jail to help BULL.

- LINHART stated jail staff just kept saying BULL was "dope sick."

- LINHART stated BULL told every officer that he needed a wheelchair, a hospital, and a doctor.

- LINHART stated jail staff gave BULL medication for withdrawals and he told staff he wasn't having withdrawals.

- LINHART stated he heard BULL tell every officer that came through that he had tears in his stomach.

- LINHART stated he was submitting a grievance for jail staff killing his friend.

- LINHART stated BULL had a history of drug use.

- LINHART stated BULL was in jail for over two weeks and there was no way BULL would have still been dope sick.

| Approved By |
|---|
| Irwin, Travis   #6344 |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D  6592
Page  2  Of  7

- LINHART heard BULL say he thought he was having a heart attack and he had tears in his stomach.

- LINHART stated BULL was close to James SHIMCHICK.

- LINHART heard BULL fall out of his bed and described it as being loud, like he hit the bars or the toilet. LINHART believed it was shortly after midnight.   Jail staff came to get him the next morning.

- LINHART stated BULL would barely eat and they (LINHART and SHIMCHICK) would cook for him.

- LINHART stated BULL was sick the day he arrived at jail.   He progressively got worse as time went by.

- LINHART stated sometimes BULL would be sweating so bad, it looked as if someone had dumped a 5-gallon bucket of water on him.

- LINHART stated BULL was vomiting blood and would be vomiting and defecating at the same time.   LINHART later stated BULL had a bowl full of blood that he had vomited.

- LINHART stated he never put in a sick call request for BULL; SHIMCHICK did.

- LINHART stated BULL told him the medicine that jail staff gave him made him worse.

- LINHART stated BULL went to see the nurse when he first got there and then again, a week later.

The interview concluded at 4:48 p.m.    LINHART was released back into the custody of jail staff.

The bullet statements contained in report are not verbatim and shall serve as a generalization of information provided by LINHART.   For an exact account of his statement, please review the DVD containing his recorded interview.

The original DVD, video statement checklist, and field notes will be submitted to the Illinois State Police Zone 6 Evidence Vault.   Copies of the documents are attached to this report for review.

| Approved By |
| --- |
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D  6592
Page   3  Of  7

## Video Statement Checklist

Case #: 22-39766900034

Name: DANNY G. LINHART          Date: 6/29/22

Alias: _____ DOB ____ Age: 39    Start Time: 4:30 ☐A.M. ☒P.M.

Address: _____      End Time: 4:48 ☐A.M. ☒P.M.

City: ____ State ____ Zip Co ____ 'hone: _____

Email: _____   Soc. Med. (FB, Snap, Insta) _____

**Pre-video Preparation**
☑ Setup and Check Equipment to Ensure Functioning Properly

**II.   Introduction & Preliminary Issues**
☑ State Time & Location of Interview
☑ Introduce All Individuals Present
☑ Miranda Rights:  Confirmation of Prior Admonishments & Comprehension
☑ Confirm Prior Questioning / Written Statement, if any (Time, Location & Duration)
☑ Confirm Consent to Video Recorded Statement

**III.   Suspect Background & Comprehension Information**
☑ Age & D.O.B.
☑ Address:  Where, How Long & With Whom
☑ Current Phone Number
☐ Email Account and/or Social Media Account Usernames
☑ Educational Background:  Level of Completion & Schools
☑ Confirm Ability to Read, Write & Understand English Language
☑ Employment / Military History / SSI / Driver's License
☑ Confirm Not Under the Influence of Alcohol / Drugs / Medication
☑ History of Mental Illness / Treatment
☑ Any Special Needs (Glasses, Contacts, Hearing aids, Medication (for purposes of interview)

**IV.   Custodial/Non-Custodial Treatment**
☑ Review Suspect/Witness time in Custody or in Police Presence
☑ Discuss Any Injuries Suffered by Suspect (pre-existing, Apprehensions, Self-Inflicted)
☑ Confirm No Physical Abuse / Coercion
☑ Confirm No Threats or Promises of Leniency
☑ Confirm Biological Needs Met (Food, Drink, Sleep, Bathroom)

**V.   Statement**
☑ Confirmation of Voluntary Interview
☐ Confirm Statement (Verbal or Written)
☐ Confirm Any Consents given by Suspect (Searches, Blood, Etc.)
☐ Have Suspect Identify Important Evidence
☐ Obtain Reverse Identification through Photographs
☐ Suspect Demonstration / Reenactment
☐ Suspect Opportunity for an Additions / Corrections
☐ Confirm Continuous Running of Tape & State Closing Time of Statement

**VI.   Final Preparations**
☐ Finalize DVD Recording of Interview
☐ Review Video DVD for Audio / Visual Clarity
☐ Make Copies & Secure Original as Evidence

S/A MICHAEL LOWERY #6592
Interviewing Agent/Officer Name and DSN

S/A MICHAEL HENTZE #6404
Assisting Agent/Officer Name and DSN

Approved By
Irwin, Travis  #6344

Disclaimer: This document contains neither recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D  6592
Page   4  Of  7

- TOLD STAFF TEARS IN STOMACH
- BULL STATED needed wheelchair, DOCTOR, & HOSPITAL. Thought the was having heart attack
- HAD to cook FOR BULL
- WAS SICK SINCE DAY ONE
- SWEATING, BLOODIN VOMIT,
- EVER PUT SICK SLIP IN FOR HIM?
- EVER WITNESS BULL VOMITING?

22-39766900034
FIELD NOTES
ML #6592

| Approved By |
| Irwin, Travis   #6344 |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D  6592
Page   5  Of  7

06/28/22   4:30 pm - 4:48 pm

DANNY G. LINHART

TORN
STOMACH LINING / CHEST PAIN

FENTANYL

2 WEEKS - NOT DOPE SICK

WHEELCHAIR / DR. / HOSPITAL

HEART ATTACK

• TALK ABOUT INJ.? WHAT INJ.?

VOMIT BLOOD         OUT BOTH ENDS

SEEN BY MEDICAL  2 X

MH 6401

| Approved By |
| --- |
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D  6592
Page   6  Of  7

## MIRANDA RIGHTS FORM

1. You have the right to remain silent. You do not have to talk to us.  DGL

2. If you do talk to us, everything that you say can be used against you in court.  DGL

3. You have the right to talk to a lawyer before you talk to us. The lawyer can be with you before we ask you questions. The lawyer can be with you during the whole time we ask you questions.  DGL

4. If you do not have money for a lawyer, one can be given to you for free.  DGL

5. You can stop answering questions any time you want.  DGL

Date: 6-29-22      Signature: ▆▆▆▆▆▆

Date: 6/29/22      Witness: S/A ▆▆▆▆▆ #6592

Approved By
Irwin, Travis  #6344

Disclaimer: This document contains neither recommendations nor conclusions of the Illinois State Police. It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000081

22-39766900034
LOWERY, MICHAEL
D   6592
Page   7  Of  7

## INDIVIDUAL

| Last Name | First Name | Middle Name |
|---|---|---|
| BULL | MARK | TRAVIS |

| AKA/Maiden |
|---|
| |

| Sex | Race | | DOB | SSN |
|---|---|---|---|---|
| MALE | WHITE - W | | 07/25/1983 | |

| Drivers License Number | Home Telephone | Cell Telephone |
|---|---|---|
| | | |

| Street |
|---|
| 92 BONDS STREET |

| City | State | Zip Code | How Long | Personal History |
|---|---|---|---|---|
| EAST ALTON | IL | 62024 | | |

## INDIVIDUAL

| Last Name | First Name | Middle Name |
|---|---|---|
| LINHART | DANNY | G |

| AKA/Maiden |
|---|
| |

| Sex | Race | | DOB | SSN |
|---|---|---|---|---|
| MALE | | | | |

| Drivers License Number | Home Telephone | Cell Telephone |
|---|---|---|
| | | |

| Street |
|---|
| |

| City | State | Zip Code | How Long | Personal History |
|---|---|---|---|---|
| | | | | |

| Approved By |
|---|
| Irwin, Travis   #6344 |

Disclaimer: This document contains neither recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000082

### ILLINOIS STATE POLICE
### INVESTIGATIVE REPORT

| Case Number | Case Title | | | Report Type | | | |
|---|---|---|---|---|---|---|---|
| **22-39766900034** | **BULL, MARK T.** | | | ✓ Individual | Location | | Vehicle |
| Report Purpose  **FILED GRIEVANCES** | | | | Report Date  **08/30/2022** | | Activity Date  **06/29/2022** | |
| Lead Number | Drug Buys | ArrestWarrants | Search Warrants | Overhear Admin | | Overhear Warrant | |
| Reporting Agent  **LOWERY, MICHAEL** | | | | D Number  **6592** | | Zone/Office  **ISPZ6CL** | |
| Case Agent  **LOWERY, MICHAEL** | | | | Case Agent ID Number  **6592** | | Case Agent Zone/Office  **ISPZ6CL** | |
| ALPR Used  ☐ Yes | APLR Location | | | | | | |

## NARRATIVE

The purpose of this report is to document the receipt of grievances filed by inmates incarcerated at the Madison County Jail.

On July 13, 2022, Reporting Agent (R/A) Michael Lowery received digital files containing grievances related to the death of Mark BULL, while in custody at the Madison County Jail.   The grievances were submitted by Danny Linhart and James Shimchick.   The .pdf files are attached to this report for review.

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000083

22-39766900034
LOWERY, MICHAEL
D   6592
Page   2   Of   7

7/13/22, 10:09 AM          https://cc-snap.telmate.com/admin/grievances/documents/print_audf?grievance_ref=186950532&member_id=201870912

## Audit Grievance #186950532

Profile Photo:



Audit Photo:
Audit Photo

### Inmate Info

Name: DANNY LINHART
Submitted Date: 06/29/22 20:18
Submitted from Location/Room: A North Felony/A North Felony
Current Location/Room: A North Felony/A North Felony
Facility: Madison County Jail IL

### Form Info

Category: Medical
Form: Grievance-Medical

### Grievance Info

Status: CLOSED / Ungrievable by Valerie Bassett ❗
Facility Deadline: 07/13/22 23:59
Grievance Level: 1
Inmate can reply: No
❗ Appeal has been curtailed
Summary of Grievance:
Medical Negligence
Details of Grievance:

[Yes]

Attempted to resolve issue with all of the first shift guards and infirmary staff that enters cell block A North between the dates 6/21/22 and 6/28/22. When attempts were not ignored, facility staffs responses were either there's nothing we can do about it or file a griievance

Yes

On multiple occasions, between the dates 6/21/22 and 6/28/22 attempts were made by myself and detainee Mark T Bull# 52272 to inform facility staff entering cell block A North that detainee Mark T Bull# 52272 needed immediate medical attention due to severe stomach pains, vomiting, cold sweats, chest pains weakness and lack of energy detainee Mark T Bull requested outside medical attention and all request were ignored when medical issues were finally addressed , the severity of the issues were taken lightly and ultimately resulted in the death of Detainee Mark T Bull

1/2

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains neither recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000084

22-39766900034
LOWERY, MICHAEL
D 6592
Page 3 Of 7

7/13/22, 10:09 AM

I purpose that all detainee medical needs be taken seriously and given proper attention and care Detainee Mark T Bull and I were life long friends and I propose I be granted opportunity to grieve alongside our affected families and attend the funeral of Detainee Mark T Bull #52272 I propose disciplinary action be taken amongst facility medical staff

| Date/Time | User | Action | Source | Details |
|---|---|---|---|---|
| 07/01/22 07:17 | Valerie Bassett | Print | | Has been printed without notes by vlbassett@co.madison.il.us |
| 07/01/22 07:17 | Valerie Bassett | Viewed | | |
| 06/30/22 11:08 | DANNY LINHART | Viewed Staff Response | Tablet | |
| 06/30/22 07:02 | Valerie Bassett | Staff Response | | Every inmates medical needs are treated and taken seriously with out infirmary staff. I am not able to go into detail or discuss anyone's medical records/issues with other inmates. I also do not have the authority to grant a furlough. |
| 06/30/22 07:02 | Valerie Bassett | Changed Status | | From 'Open' to 'Closed / Ungrievable' |
| 06/30/22 06:58 | Valerie Bassett | Viewed | | |
| 06/29/22 20:53 | Craig Richert | Recategorization | | Changed Category and Form from 'Grievance/Grievance' to 'Medical/Grievance-Medical' |
| 06/29/22 20:53 | Craig Richert | Viewed | | |

2/2

Approved By
**Irwin, Travis  #6344**
Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000085

22-39766900034
LOWERY, MICHAEL
D  6592
Page   4  Of  7

7/13/22, 9:55 AM

## Audit Grievance #187207362

Profile Photo:



Audit Photo:
Audit Photo

### Inmate Info

Name: JAMES SHIMCHICK
Submitted Date: 07/01/22 09:46
Submitted from Location/Room: A North Felony/A North Felony
Current Location/Room: A North Felony/A North Felony
Facility: Madison County Jail IL

### Form Info

Category: Grievance
Form: Grievance

### Grievance Info

Status: CLOSED **by** Nicholas Bardelmeier
Facility Deadline: 07/16/22 23:59
Grievance Level: 1
Inmate can reply: No
Summary of Grievance:
Facility Operations
Details of Grievance:
**I have attempted to resolve this matter with jail staff prior to completing this form.:**

[Yes]

**If you attempted to resolve this issue who did you talk to, when did you talk to them, and what came from the conversation?:**

Attempted to resolve issue with all of the 1st Shift Guards and Infirmary Staff that entered Cell Block A-North between the dates 6/21/22 and 6/28/22. When attempts were not ignored, facility staff's responses were either there's nothing we can do about it or file a grievance.

**I affirm the information provided within this grievance is truthful. I understand that providing false or misleading information may result in criminal charges or progressive disciplinary action.:**

Yes

1/3

---

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000086

22-39766900034
LOWERY, MICHAEL
D   6592
Page   5   Of   7

7/13/22, 9:55 AM

**Explain what matter you are grieving. P**rovide specific dates, times, locations, and the names involved.:

On multiple occasions, between the dates 6/21/22 and 6/28/22, attempts were made by myself and Detainee Mark T. Bull #52272 to inform security and medical staff entering Cell Block A-North that Detainee Mark T. Bull #52272 needed immediate medical attention due to severe stomach pains, vomiting, loss of appetite, cold sweats, weakness and lack of energy. Detainee Mark T. Bull #52272 requested outside medical attention and all requests were either ignored or not taken seriously. When medical issues were finally addressed by security and medical staff, the severity of the issues were taken lightly and ultimately resulted in the death of Detainee Mark T. Bull #52272.

**More space if needed.:**

N/A

**What are you proposing as a resolution to this grievance?:**

I propose that all detainee medical needs be taken seriously and given proper attention and care.

Detainee Mark T. Bull #52272 and I were childhood friends and I propose I be granted the opportunity to grieve alongside our affected families and attend the funeral of Detainee Mark T. Bull #52272.

I propose disciplinary action be taken amongst facility medical staff.

I propose the families affected by the death of Detainee Mark T. Bull #52272 to receive adequate compensation and appropriate legal actions be take

I also propose that this grievance be categorized as a facility grievance as well as a medical grievance and I be provided a paper copy of this grievance.

| Date/Time | User | Action | Source | Details |
|---|---|---|---|---|
| 07/01/22 13:15 | JAMES SHIMCHICK | Viewed Staff Response | Tablet | |
| 07/01/22 11:55 | Nicholas Bardelmeier | Print | | Has been printed without notes by nabardelmeier@co.madison.il.us |
| 07/01/22 11:55 | Nicholas Bardelmeier | Staff Response | | A copy of this grievance will be printed and given to you shortly. In terms of a furlough, that is up to a judge. Jail Staff can not grant those, you need to speak with your attorney about getting a furlough. |
| 07/01/22 11:55 | Nicholas Bardelmeier | Changed Status | | From 'Open' to 'Closed' |
| 07/01/22 11:53 | Nicholas Bardelmeier | Print | | Has been printed without notes by nabardelmeier@co.madison.il.us |
| 07/01/22 11:53 | Nicholas Bardelmeier | Viewed | | |
| 07/01/22 10:13 | JAMES SHIMCHICK | Viewed Staff Response | Tablet | |
| 07/01/22 09:47 | JAMES SHIMCHICK | Viewed Staff Response | Tablet | |

2/3

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains neither recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000087

22-39766900034
LOWERY, MICHAEL
D   6592
Page   6  Of  7

7/13/22, 9:55 AM

| Date/Time | ser | Action | Source | Details |
|-----------|-----|--------|--------|---------|
| 07/01/22 | JAMES | Submitted Tablet | Facility Operations | |
| 09:46 | SHIMCHICK | New | | |



3/3

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D  6592
Page   7  Of  7

## INDIVIDUAL

| Last Name | First Name | Middle Name |
|---|---|---|
| LINHART | DANNY | G |

AKA/Maiden

| Sex | Race | | DOB | SSN |
|---|---|---|---|---|
| MALE | | | | |

| Drivers License Number | Home Telephone | Cell Telephone |
|---|---|---|

Street

| City | State | Zip Code | How Long | Personal History |
|---|---|---|---|---|

## INDIVIDUAL

| Last Name | First Name | Middle Name |
|---|---|---|
| BULL | MARK | TRAVIS |

AKA/Maiden

| Sex | Race | DOB | SSN |
|---|---|---|---|
| MALE | WHITE - W | 07/25/1983 | |

| Drivers License Number | Home Telephone | Cell Telephone |
|---|---|---|

Street
92 BONDS STREET

| City | State | Zip Code | How Long | Personal History |
|---|---|---|---|---|
| EAST ALTON | IL | 62024 | | |

## INDIVIDUAL

| Last Name | First Name | Middle Name |
|---|---|---|
| SHIMCHICK | JAMES | T |

AKA/Maiden

| Sex | Race | DOB | SSN |
|---|---|---|---|
| MALE | | | |

| Drivers License Number | Home Telephone | Cell Telephone |
|---|---|---|

Street

| City | State | Zip Code | How Long | Personal History |
|---|---|---|---|---|

| Approved By |
|---|
| Irwin, Travis   #6344 |

Disclaimer: This document contains neither recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000089

22-39766900034
LOWERY, MICHAEL
D   6592
Page   1  Of  18

## ILLINOIS STATE POLICE
## INVESTIGATIVE REPORT

| Case Number | Case Title | | | Report Type | | |
|---|---|---|---|---|---|---|
| **22-39766900034** | **BULL, MARK T.** | | | ☑ Individual  ☐ Location  ☐ Vehicle | | |

| Report Purpose | | Report Date | Activity Date |
|---|---|---|---|
| **MADISON COUNTY JAIL POLICIES** | | **08/30/2022** | **06/29/2022** |

| Lead Number | Drug Buys | ArrestWarrants | Search Warrants | Overhear Admin | Overhear Warrant |
|---|---|---|---|---|---|

| Reporting Agent | D Number | Zone/Office |
|---|---|---|
| **LOWERY, MICHAEL** | **6592** | **ISPZ6CL** |

| Case Agent | Case Agent ID Number | Case Agent Zone/Office |
|---|---|---|
| **LOWERY, MICHAEL** | **6592** | **ISPZ6CL** |

| ALPR Used | APLR Location |
|---|---|
| ☐ Yes | |

## NARRATIVE

The purpose of this report is to document the receipt of Madison County Jail Policies related to the death investigation of Mark BULL.

Reporting Agent Michael Lowery received digital copies of policies related to the death investigation of Mark Bull.  The policies provided include:

• Duty Station Assignments
• Escorting Prisoners for Medical Treatment and Subsequent Admissions to the Hospital
• Inmate Safety Checks
• Nurse LPN RN Medical Screening
• Prisoner Intake For Information as it pertains to the Jail Infirmary and Booking Process
• Reporting In-Custody Deaths

The documents are attached to this report for review.

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000090

22-39766900034
LOWERY, MICHAEL
D  6592
Page    2  Of  18



**Policy**
**1043**

## Madison County Sheriff's Office
Madison County SO Custody Manual

# Duty Station Assignments

### 1043.1  PURPOSE AND SCOPE
The following duty stations will be established within the Madison County Jail to ensure that safety and security is maintained. This will also put a deputy in the immediate area when an emergency arises.

### 1043.2  POLICY
**Duty Station 1: Booking Office**

The Booking Clerks or Jail Deputy assigned to this area will be responsible for the booking process of in-coming prisoners and the discharging of prisoners. This area is also responsible for other duties in this office and should not be limited to the above.

**Duty Station 2: South Guard Office**

The deputies assigned to this area will be responsible for making 30 minutes personal observation rounds in cellblocks A-South, A-North, B-South, B-North, C-South, C-North, D-South, and D-North. Segregation unit #1, and Male Drunk Tank will also be an area of responsibility, but the monitoring of a prisoner may require a 15 or 30-minute personal observation round. The rounds will be noted on a Madison County Sheriff's Department Guard Tour Log. The rounds for the Drunk Tank will be noted on the Madison County Jail Drunk Tank sheet. Additional duties may be assigned by the shift commander and are not limited to the above.

**Duty Station 3: North Guard Office**

The deputy assigned to this area will be responsible for making 30 minutes personal observation rounds in cellblocks E-South, E-North, F-South, F-North, G-South, and G-North. Additional duties may be assigned and are not limited to the above.

**Duty Station 4: Male Dormitory Area / Special Housing Unit**

The officer assigned to this area will be responsible for making 30 minutes personal observation rounds in the male dormitory cellblock, segregation unit #2, segregation unit 3, and the Special Housing Unit. Segregation unit #4 may require 30 minutes or 15 minutes personal observation round. The rounds will be noted on the Madison County Sheriff's Department Guard Tour Log Sheet. The segregation rounds will be noted on the Madison County Jail Segregation Round Sheet. This deputy will also be responsible for ensuring that prisoner's personal property that is left at the jail is given to the appropriate person. Additional duties may be assigned and are not limited to the above.

**Duty Station 5: Female Booking Office**

The female deputy assigned to this area will be responsible for making 30-minute personal observation rounds in the Female Infirmary, cellblocks F-1, F-2, F-3 and F-4. The rounds will be noted on the Madison County Sheriff's Department Guard Tour Log Sheet. The female drunk tank and segregation unit #4 may require 15 or 30 minute personal observation round. This will be

Copyright Lexipol, LLC 2022/05/04, All Rights Reserved.
Published with permission by Madison County Sheriff's Office

| Approved By |
| --- |
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000091

22-39766900034
LOWERY, MICHAEL
D  6592
Page   3  Of  18

---

Madison County Sheriff's Office Policy Manual noted on a Madison County Jail Drunk Tank Sheet, or Madison County Jail Segregation Round Sheet. Additional duties may be assigned and are not limited to the above.

**Duty Station 6: Console Operator / Jail Technician**

The officers assigned to this area will be responsible for the security of the inner and outer perimeter of this facility. To assist the officer with these tasks, cameras have been mounted inside and outside this facility. The officer will monitor those areas by watching the cameras. It also will be the responsibility of this officer to ensure that individuals that are let into this facility are checked, prior to giving them access to this facility. This officer will make sure that all doors that are opened by them are secured. D-door, C-door, B-door, Sally Port, and the back gate should not be opened at the same time. These doors will be secured before the next door is opened. Additional duties may be assigned and are not limited to the above.

It will be the responsibility of the shift commander and supervisors to ensure that the mentioned duty stations will be manned at all times. It will be the responsibility of the shift commander and supervisors to ensure that all deputies are assigned a duty station, and that a rotating schedule be used daily. All personal observation rounds will be recorded by pushing a green button located in all cellblocks and segregation units.

---

Copyright Lexipol, LLC 2022/05/04. All Rights Reserved.
Published with permission by Madison County Sheriff's Office

Duty Station Assignments - 2

| Approved By |
| --- |
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000092

22-39766900034
LOWERY, MICHAEL
D   6592
Page    4  Of  18


Policy
**1004**

**Madison County Sheriff's Office**
Madison County SO Custody Manual

# Escorting Prisoners for Medical Treatment and Subsequent Admission to Hospital

**1004.1  PURPOSE AND SCOPE**
The purpose of this policy is to set procedures for both the Patrol and Jail Division with regards to the escorting of prisoners for medical treatment at any facility as well as the guarding of a prisoner should they subsequently be admitted for follow-up treatment.

**1004.2  POLICY**

(a)  Once it has been determined that a person taken into custody at the scene of a field arrest is in need of emergency medical treatment, arrangements will be made to transport the prisoner to the nearest medical facility. The mode of transportation will be determined due to the current circumstances and the most practical mode of transportation will be utilized to accomplish the transport.

(b)  Once a prisoner, under the custody of the Sheriff's Office, arrives within the environment of the medical facility, there will be no less than two (2) armed deputies guarding the prisoner the entire time. The transporting officer can be joined at the medical facility by either an area unit or a Jail deputy to satisfy the requirement of two (2) armed guards being present.

(c)  If practical prior to the arrival of the prisoner at the designated facility, the on-duty Patrol Watch Commander will make contact with hospital security (if so staffed) or a representative of the facility and provide them with the following:

   (a)  Charge the prisoner is being held for

   (b)  Nature of illness / injury

   (c)  Security concerns (escape risk, etc.)

   (d)  Mode of transportation

   (e)  ETA to the facility

(d)  If the prisoner is treated and released, they will be transported to the Madison County Jail for booking procedures and remanded to their custody.

**1004.3  ADMISSION OF PRISONER TO HOSPITAL**

(a)  Once it has been determined by hospital personnel that it will be necessary to admit the prisoner as a patient, the escorting deputies will establish contact with hospital security personnel if the hospital is so staffed.

(b)  Hospital staff will immediately be informed that the prisoner should be "blacked out" during admission procedures. If needed, security will assist in listing the prisoner under a "John Doe" for security reasons.

(c)  When guarding a prisoner at Gateway Regional Medical Center in Granite City, security may require that the deputies assigned to guard the prisoner read and sign a

Copyright Lexipol, LLC 2022/05/04. All Rights Reserved.
Published with permission by Madison County Sheriff's Office

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000093

22-39766900034
LOWERY, MICHAEL
D  6592
Page    5  Of  18

## Madison County Sheriff's Office
### Madison County SO Custody Manual

*Escorting Prisoners for Medical Treatment and Subsequent Admission to Hospital*

Forensic Guideline Booklet which explains emergency codes, evacuations and other safety directions. Each time a new deputy is assigned to the detail, they may be required to read and sign the book which should be maintained in close proximity to the room in which the prisoner is confined. If so requested, the deputy shall be required to read the instructions.

(d)     Reasonable efforts shall be made by one of the deputies to obtain a portable radio from security, if so staffed, to be kept in the room should they need to be contacted for any reason.

(e)     Deputies will ensure that the Patrol Watch Commander and Jail Superintendent knows theroom number in which the prisoner is being housed. Hospital Security will be notified as well to ensure they are certain of the fact that a prisoner and two armed deputies are present in the hospital.

(f)     The prisoner will remain in proper restraints the entire time unless medical personnel instruct the deputies to temporarily remove the restraints pursuant to a medical procedure. The prisoner will be allowed no phone calls or visitors without the permission of the Sheriff or Jail Superintendent.

### 1004.4  ASSIGNMENT OF PERSONNEL

(a)     If the hospital stay is for an extended period of time, ideally the guard detail will consist of one deputy from the Patrol Division and one deputy from the Jail Division unless other arrangements are made by the Jail Superintendent.

(b)     It will be the responsibility of the shift supervisors in each division to arrange / schedule the necessary personnel to cover the detail. This shall be accomplished with on-duty personnel if possible. If the detail requires an overtime assignment, it will be filled according to contract guidelines.

### 1004.5  RESPONSIBILITIES

(a)     Supervisors in both the Patrol and Jail Divisions will ensure their personnel adhere to this policy.

(b)     The Patrol Watch Commander and Jail Shift Supervisor shall coordinate efforts during an escort and subsequent admission ensuring this policy is followed. Each shall be responsible for keeping their Division Commander informed.

Copyright Lexipol, LLC 2022/05/04. All Rights Reserved.
Published with permission by Madison County Sheriff's Office

| Approved By |
| --- |
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000094

22-39766900034
LOWERY, MICHAEL

D   6592

Page    6   Of   18



**Policy**
**500**

**Madison County Sheriff's Office**
Madison County SO Custody Manual

# Inmate Safety Checks

**500.1  PURPOSE AND SCOPE**
The purpose of this policy is to establish a requirement for conducting visual safety checks at least every 30 minutes for all inmates, and for creating and maintaining a log to document all safety checks.

**500.2  POLICY**
It is the policy of the Madison County Sheriff's Office that all correctional staff shall conduct safety checks at least once every 30 minutes on all inmates, or more frequently as determined by inmate custody status and/or housing classification.

Safety checks shall be made through direct visual observation. Cameras and monitors may supplement the required visual observation safety checks but they shall not replace the need for direct visual observation. Safety checks will be clearly documented on permanent logs in accordance with the office Daily Activity Logs and Shift Reports Policy (20 Ill. Adm. Code 701.130(a); 20 Ill. Adm. Code 720.60(a)).

**500.3  SAFETY CHECKS**
The staff shall adhere to the following procedures when conducting safety checks:

  (a)  Safety checks shall be conducted at least every 30 minutes and more frequently if necessary.

  (b)  Safety checks shall be conducted on an irregular schedule (staggered) so that inmates cannot predict when the checks will occur.

  (c)  Safety checks shall be done by personal observation of the correctional officer and shall be sufficient to determine whether the inmate is experiencing any stress or trauma.

  (d)  Cameras and monitors may supplement the required visual observation safety checks but they shall not replace the need for direct visual observation.

  (e)  Safety checks will be clearly documented on permanent logs in accordance with the office Daily Activity Logs and Shift Reports Policy.

  (f)  Actual times of the checks and notations should be recorded on the daily activity logs.

  (g)  Log entries shall never be made in advance of the actual check. Log entries made in this manner do not represent factual information and are prohibited.

  (h)  Special management inmates shall be checked more frequently as detailed in the Special Management Inmates Policy (20 Ill. Adm. Code 701.140(c)).

  (i)  Restrained inmates shall be checked at least every 15 minutes (20 Ill. Adm. Code 720.60(a)).

Copyright Lexipol, LLC 2022/05/04. All Rights Reserved.
Published with permission by Madison County Sheriff's Office

Inmate Safety Checks - 1

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D  6592
Page  7  Of  18

 **Policy 1114**

**Madison County Sheriff's Office**
Madison County SO Custody Manual

# Nurse - LPN/RN Medical Screening

### 1114.1  PURPOSE
Information will be gathered on all inmates that are incarcerated at the Madison County Jail.  It shall be the responsibility of the medical staff to establish certain information pertaining to current or potential medical problems.

### 1114.2  PROCEDURE
Establish the following:

(a)  Age

(b)  Sex

(c)  Race

(d)  Drug or food allergies

(e)  Insurance carrier

(f)  Vital signs to be taken BP, Pulse and Weight If symptomatic take Temp. Respirations and Po2 level.

(g)  Substance abuse

    1.  Age started

    2.  How often used

    3.  Last date of use

    4.  Note symptoms of withdrawal

        (a)  Nausea

        (b)  Vomiting

        (c)  Diarrhea

        (d)  Abdominal cramps

        (e)  Chills

        (f)  Or any other recognizable symptoms.

(h)  History of illnesses

(i)  History of surgeries

(j)  Recent injuries

(k)  Currently taking medications on routine basis.

        (a)  Name of medication

        (b)  Dosage

        (c)  Number of times taken per day

Copyright Lexipol, LLC 2022/05/04. All Rights Reserved.
Published with permission by Madison County Sheriff's Office

Nurse - LPN/RN Medical Screening - 1

| Approved By |
| --- |
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D  6592
Page    8  Of  18

## Madison County Sheriff's Office
Madison County SO Custody Manual

*Nurse - LPN/RN Medical Screening*

    (d)   Name of Doctor prescribing and/or Pharmacy filled at

(l)   Diabetics

    (a)   How long a diabetic

    (b)   Name of medication

    (c)   Dosage

    (d)   Number of times per day taken

    (e)   Type of diet

    (f)   Date and results of last blood sugar (if known)

    (g)   Baseline blood sugar should be done at time of screening (before breakfast or 2 hours after eating if possible)

    (h)   Inmate's weight

(m)   Follow TB screening procedure and x-ray chest if necessary.

**1114.3  ATTACHMENTS**
See attachment: Nurses Medical Screening (A).pdf

Copyright Lexipol, LLC 2022/05/04. All Rights Reserved.
Published with permission by Madison County Sheriff's Office

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000097

22-39766900034
LOWERY, MICHAEL
D  6592
Page   9  Of  18

Madison County SO Custody Manual

# Attachments

Copyright Lexipol, LLC 2022/05/04, All Rights Reserved.
Published with permission by Madison County Sheriff's Office

Attachments - 3

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000098

22-39766900034
LOWERY, MICHAEL
D   6592
Page    10  Of   18

**Attachment**

Madison County SO Custody Manual

**Nurses Medical Screening (A).pdf**

Copyright Lexipol, LLC 2022/05/04, All Rights Reserved.
Published with permission by Madison County Sheriff's Office

Nurses Medical Screening (A).pdf - 4

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D   6592
Page   11  Of  18

### Madison County Sheriff's Office Medical Sheet

Have you been outside the country in the last 3 weeks?  NO / YES

If Yes, where:_____

Have you been in contact with anyone who has been ouside the country?  NO  /  YES

| NAME: | |
|---|---|
| NWS Booking #: | SSN: |
| Global Jacket #: | Old Perm# 88526 |

| Date: | AGE: | DOB: | SEX: Male | RACE: White |
|---|---|---|---|---|

| TEMP: | PULSE: | RESP: | BP: | WT: | PO2: |
|---|---|---|---|---|---|

| Glasses: Yes / No | Contacts: Yes / No | Dentures: Yes / No | |
|---|---|---|---|

**GENERAL MEDICAL CONDITION: GOOD    FAIR    POOR      INSURANCE:  Y  N  TYPE:**

**MEDICAL HISTORY:**    Long term medical conditions:   NO    DESCRIBE:

**SUBSTANCE ABUSE HISTORY:   DENIES,    DESCRIBE:**

**Mental Health History: DENIES,    DESCRIBE:**

**PRIMARY CARE PHYSICIAN:**

**CLINIC CARE:**

**SPECIALIST'S:**

**SURGICAL HISTORY:   NONE,    DESCRIBE:**

**ALLERGIES:   NONE,    LIST:**

Page 1 of 3

Form 04-08-15 jlt.

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000100

22-39766900034
LOWERY, MICHAEL
D   6592
Page   12  Of   18

| NAME: | | NWS Booking #:  2015-00002222 | |
|---|---|---|---|
| Global Jacket #: | Old Perm | SSN: | |

MEDICATIONS:   NONE,   LIST:

| LMP: | PREG: YES  NO  ? | GRAVA: | PARA: | AB: |
|---|---|---|---|---|

OB/GYN PROBLEMS / COMPLAINTS:

NURSE & DOCTOR NOTES:

Page **2** of **3**

Form 01-08-13.jfc

---

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000101

22-39766900034
LOWERY, MICHAEL
D   6592
Page   13 Of   18

| NAME: | | NWS Booking #:  2015-00002222 |
|---|---|---|
| Global Jacket #: | Old Perm# 88526   SSN: | |

## MADISON COUNTY JAIL-INFIRMARY
### INMATE TUBERCULOSIS SIGNS AND SYMPTOMS CHECK LIST

This assessment tool is used in place of a Mantoux Skin Test for those inmates who have a documented history of a positive Mantoux Skin Test or simply as a complementary screening tool to the Mantoux Skin Test for those who are a-symptomatic.

| | YES | NO |
|---|---|---|
| Smoker/How Much: | | |
| COUGH / Non-productive | | |
| COUGH / Productive> 3 weeks: | | |
| Night Sweats: | | |
| Weight, Loss: | | |
| Anorexia: | | |
| Fatigue: | | |
| Weakness: | | |
| Fever / Chills: | | |
| Hemoptysis: | | |
| Chest Pain> 15 Days: | | |
| Shortness of Breath: | | |

Inmate at this time does not show significant signs and symptoms indicating infectious Tuberculosis. Inmate is to be reassessed if symptoms develop.

LAST TEST AND / OR CHEST X-RAY

| DATE TESTED: | DATE READ: | SIZE IN mm: |
|---|---|---|
| DATE X-RAYED: | X-RAY RESULTS: | |
| NURSE: | | DATE: |
| NOTES: | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Form 05-08-15 JS

Page **3** of 3

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D   6592
Page   14  Of   18



**Policy**
**1115**

**Madison County Sheriff's Office**
Madison County SO Custody Manual

# Prisoner Intake Form Information as it Pertains to the Jail Infirmary and Booking Process

### 1115.1  PURPOSE
To establish the procedure by which we will address the medical and/or mental health issues of an inmate brought to the Madison County Jail by another municipality or by our own deputies.

### 1115.2  SCOPE
All Madison County Jail personnel and all infirmary staff

### 1115.3  PROCEDURE
The medical staff will be notified of any medical and/or mental health issues brought to the attention of the jail staff on the prisoner intake form. This will not negate the responsibility of the delivering agency to obtain medical and/or mental health care for their prisoner while in their custody. If the jail staff feels that the inmate should receive medical treatment before they take custody of the prisoner it will be the responsibility of the delivering officer to seek and obtain that treatment for his/her prisoner.

(a)  The jail staff will notify the infirmary staff immediately so that arrangements can be made to screen and start treatment on the inmate as soon as possible.

(b)  When discovered that the inmate has a serious medical and/or mental health issue they will be moved up in priority on the booking process. If there is a question as to the placement in priority and the infirmary staff is not on duty the shift supervisor will be notified and he/she will make the decision.

(c)  As soon as the information is made available to the infirmary staff either by the prisoner intake form or by interview with the inmate they will obtain any and all medical and/or mental health information from treating facilities that is pertinent to the inmates on going medical care.

Copyright Lexipol, LLC 2022/05/04, All Rights Reserved.
Published with permission by Madison County Sheriff's Office

Prisoner Intake Form Information as it Pertains
to the Jail Infirmary and Booking Process - 1

| Approved By |
| --- |
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D   6592
Page   15 Of   18



**Policy**
**513**

**Madison County Sheriff's Office**
Madison County SO Custody Manual

# Reporting In-Custody Deaths

### 513.1  PURPOSE AND SCOPE
This policy provides direction on how in-custody deaths shall be reported.

#### 513.1.1   DEFINITIONS
Definitions related to this policy include:

**In-custody death** - The death of any person, for whatever reason (natural, suicide, homicide, accident), who is in the process of being booked or is incarcerated at any facility of this office.

**Officer-involved death** - Any death of an individual that results directly from an action or directly from an intentional omission, including unreasonable delay involving a person in custody or intentional failure to seek medical attention when the need for treatment is apparent, of a law enforcement officer while the officer is on duty, or otherwise acting within the scope of his/her employment, or while the officer is off duty, but performing activities that are within the scope of his/her law enforcement duties (50 ILCS 727/1-5).

### 513.2  POLICY
It is the policy of this office to follow state and local guidelines for reporting in-custody deaths.

### 513.3  MANDATORY REPORTING
All in-custody deaths shall be reported as required.

If the decedent is a boarder for another agency, the Jail Administrator shall notify that agency so that agency will assume responsibility for the notification of the decedent's family.

Pursuant to Article 37 of the Vienna Convention on Consular Relations 1963, in the case of the death of a foreign national, telephonic notification to the appropriate consulate post should be made without unreasonable delay and confirmatory written notification shall be made within 72 hours of the death to the appropriate consulate post. The notification shall include the inmate's name, identification number, date and time of death, and the attending physician's name.

In the event that a juvenile dies while in custody, the Jail Administrator or the authorized designee shall notify the court of jurisdiction and ensure notification to the juvenile's parent or guardian.

A report shall also be submitted to the Illinois Department of Corrections, Jail and Detention Standards Unit.

#### 513.3.1   REPORTING OFFICER-INVOLVED DEATHS
The Jail Administrator is responsible for ensuring qualifying officer-involved deaths are reported to the Illinois State Police as provided in 50 ILCS 709/5-12 and 20 Ill. Adm. Code 1244.30.

The Chief of Detectives shall submit a written report to the Illinois Criminal Justice Information Authority, as required by the Reporting of Deaths in Custody Act, whenever there is an officer-involved death of an individual in custody or a death that may have been caused by a correctional

Copyright Lexipol, LLC 2022/05/04, All Rights Reserved.
Published with permission by Madison County Sheriff's Office

Reporting In-Custody Deaths - 1

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

## Madison County Sheriff's Office
Madison County SO Custody Manual

*Reporting In-Custody Deaths*

officer's use of force (730 ILCS 210/3-5). There shall be a good faith effort to include all known relevant facts and circumstances in the report, and the report shall be submitted within 30 days on the required standardized form (730 ILCS 210/3-5).

### 513.4  PROCEDURE
Upon determining that a death of any person has occurred while in the custody of this office, the Shift Commander is responsible for ensuring that the Sheriff and all appropriate investigative authorities, including the Coroner, are notified without delay and all written reports are completed.

The Shift Commander shall also promptly notify the Jail Administrator and make any other notifications required by policy or direction. The Jail Administrator shall observe all pertinent laws and allow appropriate investigating agencies full access to all facts surrounding the death.

The Office shall establish policies and procedures for the investigation of any in-custody death.

The decedent's personal belongings shall be disposed of in a responsible and legal manner. All property and records shall be retained according to established records retention schedules.

The individual designated by the decedent shall be notified of all pertinent information as required by law.

During an investigation, all inquiries regarding the death shall be referred to the Chief Deputy Sheriff. Correctional officer shall not make a public comment.

### 513.5  IN-CUSTODY DEATH REVIEW
The Sheriff is responsible for establishing a team of qualified staff to conduct an administrative review of every in-custody death. At a minimum, the review team should include the following:

(a)   Sheriff and/or the Jail Administrator

(b)   State's Attorney

(c)   State's Attorney

(d)   Investigative staff

(e)   Responsible Physician, qualified health care professionals, supervisors or other staff who are relevant to the incident

The in-custody death review should be conducted no later than 72 hours after the incident.

### 513.5.1  OFFICER-INVOLVED DEATH INVESTIGATIONS
The Jail Administrator should ensure that the county enters into appropriate intergovernmental agreements to provide for investigations of officer-involved deaths involving members of the Jail by appropriately trained outside investigators as required by the Police and Community Relations Improvement Act (50 ILCS 727/1-1 et seq.). The agreements should establish any compensation arrangement for participation in investigations and establish responsibilities for expeditiously providing a complete report to the State's Attorney and a public report if no charge or indictment is brought against the correctional officer.

Copyright Lexipol, LLC 2022/05/04. All Rights Reserved.
Published with permission by Madison County Sheriff's Office

Reporting In-Custody Deaths - 2

| Approved By | |
|---|---|
| **Irwin, Travis   #6344** | |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

## Madison County Sheriff's Office
### Madison County SO Custody Manual

*Reporting In-Custody Deaths*

**513.5.2  DEATHS RELATED TO USE OF FORCE**
An officer-involved death of an individual in custody or death that may have been caused by a correctional officer's use of force shall be investigated pursuant to the Reporting of Deaths in Custody Act (730 ILCS 210/3-5).

When a death has resulted from a correctional officer's use of force, or while in the custody of the office or the office correctional officer, notification to next of kin, family, or another emergency contact shall be made as soon as practicable. The information provided should include the facts surrounding the incident that are reasonably known to the member at that time and that are appropriate to provide under the circumstances given any pending investigations and in accordance with state and federal law (730 ILCS 210/3-5).

The Sheriff shall designate a correctional officer member as the Family Liaison Officer to handle ongoing communication with the decedent's family or next of kin. Responsibilities of this position include but are not limited to communicating investigation developments, practical support, and, if requested, arranging for a chaplain or suitable staff member to address matters related to faith (730 ILCS 210/3-5).

Copyright Lexipol, LLC 2022/05/04. All Rights Reserved.
Published with permission by Madison County Sheriff's Office

Reporting In-Custody Deaths - 3

| Approved By |
| --- |
| **Irwin, Travis   #6344** |

Disclaimer: This document contains neither recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D  6592
Page  18  Of  18

# INDIVIDUAL

| Last Name | First Name | Middle Name |
|---|---|---|
| **BULL** | **MARK** | **TRAVIS** |

| AKA/Maiden |
|---|
| |

| Sex | Race | | DOB | SSN |
|---|---|---|---|---|
| **MALE** | **WHITE - W** | | **07/25/1983** | |

| Drivers License Number | Home Telephone | Cell Telephone |
|---|---|---|
| | | |

| Street |
|---|
| **92 BONDS STREET** |

| City | State | Zip Code | How Long | Personal History |
|---|---|---|---|---|
| **EAST ALTON** | **IL** | **62024** | | ☐ |

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000107

22-39766900034
LOWERY, MICHAEL

D   6592

Page   1   Of   16

## ILLINOIS STATE POLICE
## INVESTIGATIVE REPORT

| Case Number | Case Title | | | Report Type | | | |
|---|---|---|---|---|---|---|---|
| **22-39766900034** | **BULL, MARK T.** | | | ☑ Individual | ☐ Location | ☐ Vehicle | |

| Report Purpose | **MARK BULL POSTMORTEM EXAMINATION AND TOXICOLGY REPORTS** | Report Date **08/30/2022** | Activity Date **08/24/2022** |
|---|---|---|---|

| Lead Number | Drug Buys | ArrestWarrants | Search Warrants | Overhear Admin | Overhear Warrant |
|---|---|---|---|---|---|

| Reporting Agent **LOWERY, MICHAEL** | ID Number **6592** | Zone/Office **ISPZ6CL** |
|---|---|---|

| Case Agent **LOWERY, MICHAEL** | Case Agent ID Number **6592** | Case Agent Zone/Office **ISPZ6CL** |
|---|---|---|

| ALPR Used ☐ Yes | APLR Location |
|---|---|

## NARRATIVE

On August 24, 2022, Reporting Agent Michael Lowery received an email from the Madison County Coroner's Officer.   The email contained Mark BULL's postmortem examination and toxicology reports.   The postmortem exam was conducted on June 30, 2022, by Forensic Pathologist Kamal Sabharwal M.D.   As indicated in the report, BULL's cause of death was listed as "Perforated Duodenal Ulcer with Peritonitis."   The reports are digitally attached for review.

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois
State Police.   It and its contents are not to be disseminated outside of your agency.

Kamal Sabharwal, Inc.
12794 Wynfield Pines Court
St. Louis, MO 63131

Name of Deceased: **MARK TRAVIS BULL**
Race: White
Sex: Male
Age: 38
Date of Birth: 07/25/1983
Date/Time of Pronounced Death: 06/29/2022 9:58 AM
Exam Type: Complete Autopsy (2022-28 IL Madison County/2022-1524)
Date/Time of Pathologist's Examination: 06/30/2022 8:10 AM
Referral Case: Madison County Coroner

## POSTMORTEM EXAMINATION

External Examination:  The unembalmed body is received without clothing.  The body is that of a well developed white male with an appearance consistent with the documented age of 38 years.  It measures approximately 70.5 inches in length and weighs approximately 190 pounds.  Livor mortis is fixed on the posterior aspect.  Rigor mortis is severe in the jaw, severe in the upper extremities, and severe in the lower extremities.  The right side of the forehead contains a 1 cm laceration and a 2.5 cm laceration.  The 2.5 cm laceration contains sutures.  The left side of the forehead contains a 3 cm well healed scar.  The left posterior aspect of the scalp contains a 4 x 3 x 1.5 cm subcutaneous cyst filled with thick tan/green material.  The hair is short and brown.  Facial hair is present in the form of a brown mustache and beard.  The irides are blue and free of focal lesions.  The pupils are round and symmetric measuring 6 mm bilaterally.   The sclerae and conjunctival surfaces are unremarkable.  The ears are unremarkable.  The left earlobe has been pierced twice.  The nose is unremarkable.  The lips are unremarkable.  The oral cavity contains a full complement of teeth.  The neck is symmetric and shows no external evidence of recent trauma.  The larynx and trachea are in the midline.  The thorax is symmetric and shows no evidence of recent trauma.  The right upper aspect of the chest contains a tattoo of a lizard.  The abdomen is flat and shows no evidence of recent trauma.  The back shows no evidence of recent trauma.  Bilaterally the upper extremities are normally formed and show no evidence of recent trauma.  The anterior aspect of the right forearm contains a tattoo of an unidentifiable word, the word "Caden", and what appears to be the Air Jordan symbol.  The lateral aspect of the left deltoid region contains tattoos of the words "LOVE" and "MOM".  The anterior aspect of the left forearm contains a tattoo of a female nurse with a syringe.  The anterior aspect of the left wrist contains a tattoo of the word "Bull" and the date "3/16/10".  The posterior aspect of the

Approved By
**Irwin, Travis  #6344**

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000109

22-39766900034
LOWERY, MICHAEL
D  6592
Page   3  Of  16

left forearm contains a tattoo of a demon and what appears to be an eight ball on fire. Bilaterally, the lower extremities are normally formed and show no evidence of recent trauma. The lateral aspect of the right calf region contains a tattoo of a cartoon character with a money bag and a gun. The lateral aspect of the left calf region contains a tattoo of a demon and playing cards. The genitalia are those of a normal adult circumcised male and show no evidence of recent trauma.

Evidence of Medical Intervention: Cardioversion pads are present on the chest. EKG leads are present on the chest and arms. The 2.5 cm laceration over the right side of the forehead contains sutures. An intravascular catheter is present in the right lateral aspect of the neck. The superior aspect of the right shoulder contains an adhesive pad. An intravascular catheter covered with a bandage is present in the right cubital fossa. An adhesive pad is present on superior aspect of the left shoulder. An intravascular catheter is present in the left cubital fossa. The posterior aspect of the left hand contains gauze with an underlying puncture mark. An intravascular catheter is present in the right inguinal region. Adhesive pads are present over the anterior aspects of the right and left knees and the dorsal aspects of the right and left feet. A Foley catheter attached to a container containing a small amount of urine is present in the urethra.

Injuries: The right side of the forehead contains a 1 cm laceration. The right side of the forehead also contains a 2.5 cm laceration containing sutures.

Fractures: No fractures are present.

Body Cavities: The body is opened by means of a Y-shaped incision revealing normal skeletal muscle and a panniculus adiposus measuring up to 1.5 cm in thickness. The chest plate is removed in the usual manner. The thoracic and abdominal organs show normal anatomic relationships. The mediastinum is in the midline. The right pleural cavity contains approximately 500 ml of yellow/brown clear fluid and is free of adhesions. The left pleural cavity contains approximately 900 ml of yellow/brown clear fluid and is free of adhesions. The pericardial sac is of normal thickness, contains a minimal amount of clear yellow fluid, and is free of adhesions. The bones of the rib cage and spine are unremarkable. The diaphragm is unremarkable except for purulent exudate covering the right and left abdominal surfaces. The peritoneal cavity contains approximately 1000 ml of tan purulent fluid. Large amounts of purulent exudate are present over the peritoneal surfaces of the abdomen and the visceral surfaces of the abdominal organs.

Neck Organs: The hyoid bone, larynx, trachea, and carina are intact and show normal anatomic relationships. The soft tissue of the neck is free of hemorrhage. The 20 gm thyroid gland is red-brown and of normal shape. Its cut surface is uniform and without focal lesions. Enlarged parathyroid glands are not identified.

Mediastinum: The great vessels have normal anatomic relationships and branching pattern. There is no evidence of mediastinal trauma or other abnormalities. No thymus is identified.

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000110

22-39766900034
LOWERY, MICHAEL
D  6592
Page   4  Of  16

Cardiovascular System:  The 400 gm heart is of normal shape and anatomic position without congenital malformation.  The epicardium is smooth, glistening, and free of focal lesions.  The amount of subepicardial fat is normal.  The myocardium is beefy red, of normal consistency, and free of focal lesions.  The right ventricular wall thickness is 0.5 cm.  The left ventricular wall thickness is 1.2 cm.  The atria and ventricles do not show significant dilatation.  The foramen ovale is closed.  The interventricular and interatrial septa are intact without communicating defects.  The endocardium is smooth, glistening, of normal thickness, and free of focal lesions and adherent thrombi.  The circumferences of the cardiac valves are as follows:  Tricuspid – 12 cm; Pulmonic – 7 cm; Mitral – 10 cm and Aortic – 7 cm.  The valve cusps are thin, pliable, and free of focal lesions and adherent thrombi; commissures are normal.  The chordae tendinae are thin, discrete, and of normal length.  The coronary ostea are patent.  The coronary arteries show minimal atherosclerosis.  Coronary artery luminal obstruction by atherosclerotic plaque is as follows:  Right Coronary Artery – less than 5%; Left Anterior Descending Coronary Artery – less than 5%; Circumflex Coronary Artery – less than 5%.  The coronary arteries are free of intraluminal thrombi.  The aorta shows mild atherosclerosis, normal elasticity, is intact, and is free of anomaly and adherent thrombi.  The carotid arteries, bilateral renal arteries, celiac trunk, and superior and inferior mesenteric arteries are probe patent and show no atherosclerosis.  The vena cava is patent and without abnormality.

Lungs:  The 650 gm right lung has three lobes.  The 600 gm left lung has two lobes.  Bilaterally the visceral pleura is smooth, glistening, of normal thickness, and free of focal lesions.  On sectioning, all five lobes have a similar congested and edematous appearance.  Focal parenchymal lesions are absent.  The pulmonary arterial tree and bronchial tree are patent and free of focal lesions.

Liver:  The 1400 gm liver has a smooth and glistening capsule which is covered with purulent exudate.  The cut surface is brown/yellow and free of focal parenchymal lesions.  There is no evidence of fibrosis.  The architecture is intact.  The portal venous, hepatic venous, hepatic arterial, and intrahepatic biliary trees are patent and free of focal lesions.

Biliary Tract:  The gallbladder contains tan/green mucoid bile that is freely expressed into the duodenum.  The gallbladder serosa is smooth, glistening, and covered with purulent exudate.  The gallbladder mucosa is tan/green and free of focal lesions.  The gallbladder wall is of normal thickness and is free of focal lesions.  Multiple green calculi measuring up to 0.4 cm in diameter are present.

Pancreas:  The 130 gm pancreas is tan and of normal shape and position.  Its cut surface shows normal lobulation without focal lesions.  The peripancreatic soft tissue is unremarkable.

Gastrointestinal Tract:  The esophagus has the normal contour.  The esophageal wall is of normal thickness and is free of focal lesions.  The esophageal mucosa is tan-

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000111

22-39766900034
LOWERY, MICHAEL
D   6592
Page    5  Of  16

white, intact, and free of focal lesions. The stomach contains a small amount of brown/tan liquid gastric material. The gastric serosa is smooth and covered with purulent exudate. The gastric wall is of normal thickness and is without focal lesions. The gastric mucosa shows a normal rugal pattern and is free of focal lesions. The small and large intestinal serosa are smooth and covered with purulent exudate. The small and large intestinal walls are of normal thickness. The proximal duodenum contains a 1.5 x 1 cm ulcer with a 0.2 cm perforation. The appendix is not identified and staples are present.

Spleen: The 130 gm spleen is normal in shape and position. Its capsule is smooth and covered with purulent exudate. The cut surface is brown and soft without focal lesions.

Lymphatic System: Mediastinal lymph nodes show mild anthracosis. No enlarged lymph nodes are identified.

Adrenals: The 10 gm right adrenal and 10 gm left adrenal are of normal shape and position. The cortices are yellow, of normal thickness, and free of focal lesions. The medulla are gray-tan, of normal thickness, and free of focal lesions.

Kidneys: The 200 gm right kidney and 180 gm left kidney are of normal shape and position. The capsules strip with relative ease revealing red-brown, smooth, subcapsular surfaces without focal lesions. Bilaterally the cut surfaces of the kidneys are similar. The cortex and medulla are well demarcated. The parenchyma is free of focal lesions. The calyces and pelves are patent and without focal lesions. Calculi are absent.

Bladder: The urinary bladder contains no urine and is free of gross lesions and calculi. A small amount of urine is present in the container attached to the Foley catheter in the urethra.

Cranial Cavity: The inner surface of the scalp shows no evidence of hematoma or other lesions. The calvarium is intact without fracture or other focal lesions. The cerebrospinal fluid released on removal of the calvarium is clear and colorless. The internal surface of the calvarium and base of the skull are free of focal lesions. The inner and outer dural surfaces are free of hematoma, organizing membranes, and other focal lesions. The sagittal sinus is patent. The brain weighs 1300 gm. There is no evidence of cingulate gyral, uncal or cerebellar tonsillar herniation. The brain has normal symmetry with the normal pattern of gyri and sulci. The leptomeninges are transparent. The subarachnoid space is free of hemorrhage and exudate. The vessels at the base of the brain show normal anatomic relationships and no atherosclerosis; saccular aneurysms are absent. The brainstem and cerebellum are unremarkable on external examination. Coronal sections of the cerebral hemispheres show intact cortical ribbon, central white matter, and basal ganglia. There are no focal parenchymal lesions. The ventricles are lined by smooth, glistening ependyma, and are of normal size. The choroid plexus is unremarkable. Serial sections of the brainstem and cerebellum show no parenchymal lesions. The Aqueduct of Sylvius and fourth ventricle are patent and lined by smooth, glistening ependyma.

| Approved By |
| Irwin, Travis   #6344 |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D  6592
Page   6  Of  16

Specimens Obtained:  Femoral blood, vitreous fluid, urine from the container attached to the Foley catheter in the urethra, liver, brain, and gastric contents are recovered for toxicology.  Vitreous fluid is also tested for electrolytes and glucose. Tissue sections are submitted for histology.  A blood card, fingernail scrapings from the right and left hands, head hair, pubic hair, and buccal swabs are recovered by Illinois CSI.

Kamal Sabharwal, M.D.
Forensic Pathologist

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D  6592
Page  7  Of  16

(Bull, Mark T.)       2022-28 IL Madison County/2022-1524
Referral – Madison

## MICROSCOPIC EXAMINATION

Heart – No significant pathologic alterations are noted.

Lung – Sections show bilateral intraalveolar neutrophil collections.

Trachea – No significant pathologic alterations are noted.

Liver – Increased amounts of mononuclear cells are present in portal areas.
Inflammatory cells with fibropurulent debris are present on the capsular surface.

Kidney – No significant pathologic alterations are noted.

Pancreas – No significant pathologic alterations are noted.

Spleen – No significant pathologic alterations are noted.

Digestive System – Cellular inflammatory reaction consisting of mixed inflammatory cells and fibropurulent debris is present on the surfaces of the small and large intestine and peritoneal surfaces.  A section of the duodenum shows the ulcer with perforation.

Endocrine System – No significant pathologic alterations are noted.

Brain – No significant pathologic alterations are noted.

Kamal Sabharwal, M.D.
Forensic Pathologist

Approved By
Irwin, Travis  #6344

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police. It and its contents are not to be disseminated outside of your agency.

(Bull, Mark T.)                    **2022-28 IL Madison County/2022-1524**
Referral – Madison

## PATHOLOGIC FINDINGS

I.      Perforated Duodenal Ulcer with Peritonitis
II.     Cardiovascular System
    A.  Heart, left ventricle, hypertrophy
    B.  Coronary arteries, minimal atherosclerosis
    C.  Aorta, mild atherosclerosis
III.    Respiratory System
    A.  Lungs, bilateral pneumonia
IV.     Hepatobiliary System
    A.  History of Hepatitis C
    B.  Gallbladder, calculi
V.      Integument and Soft Tissues
    A.  Forehead, right, laceration
VI.     Anoxic Brain Injury (clinical)
VII.    Possible Urinary Tract Infection (clinical)

Kamal Sabharwal, M.D.
Forensic Pathologist

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains neither recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D  6592
Page   9  Of  16

(Bull, Mark T.)　　　　2022-28 IL Madison County/2022-1524
Referral – Madison

**CAUSE OF DEATH SHEET**:

Cause of Death:  Perforated Duodenal Ulcer with Peritonitis

Kamal Sabharwal, M.D.
Forensic Pathologist

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains neither recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D  6592
Page   10  Of   16

## ATTACHMENTS

Attachment Description
**22-01524 Bull, Mark T. (ToxResults).pdf**

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000117

22-39766900034
LOWERY, MICHAEL

D  6592

Page  11 Of  16



**NMS Labs**
200 Welsh Road, Horsham, PA 19044-2208
Phone: (215) 657-4900 Fax: (215) 657-2972
e-mail: nms@nmslabs.com
Robert A. Middleberg, PhD, F-ABFT, DABCC-TC, Laboratory Director

**CONFIDENTIAL**

### Toxicology Report

**Report Issued**   08/03/2022 18:01

To:   **10591**
Madison County Coroner
Attn: Kelly Rogers
157 North Main Street, Ste 354
Edwardsville, IL  62025

| | |
|---|---|
| **Patient Name** | Bull, Mark T |
| **Patient ID** | 220629-586 |
| **Chain** | 220629-586 |
| **DOB** | 07/25/1983 |
| **Sex** | Male |
| **Workorder** | 22234283 |

Page 1 of 5

### Positive Findings:

| Analyte | Result | Units | Matrix Source |
|---|---|---|---|
| Lidocaine | Presump Pos | mcg/mL | 003 - Hospital Blood |
| Naloxone | Presump Pos | ng/mL | 003 - Hospital Blood |
| Midazolam | 31 | ng/mL | 003 - Hospital Blood |
| Creatinine (Vitreous Fluid) | 1.22 | mg/dL | 011 - Vitreous Fluid |
| Sodium (Vitreous Fluid) | 133 | mmol/L | 011 - Vitreous Fluid |
| Potassium (Vitreous Fluid) | 9.32 | mmol/L | 011 - Vitreous Fluid |
| Chloride (Vitreous Fluid) | 102 | mmol/L | 011 - Vitreous Fluid |
| Glucose (Vitreous Fluid) | 12.8 | mg/dL | 011 - Vitreous Fluid |
| Urea Nitrogen (Vitreous Fluid) | 41.9 | mg/dL | 011 - Vitreous Fluid |
| Benzodiazepines | Presump Pos | ng/mL | 012 - Urine |
| Fentanyl / Metabolite | Presump Pos | ng/mL | 012 - Urine |

See Detailed Findings section for additional information

Agency Case Number: 2022-01524

### Testing Requested:

| Test | Test Name |
|---|---|
| 0170FL | Alcohol Panel, Fluid |
| 1919FL | Electrolytes and Glucose Panel (Vitreous), Fluid (Forensic) |
| 8052B | Postmortem, Expanded, Blood (Forensic) |
| 8050U | Postmortem, Urine Screen Add-On (6-MAM Quantification only) (Forensic) |

### Specimens Received:

| ID | Tube/Container | Volume/ Mass | Collection Date/Time | Matrix Source | Labeled As |
|---|---|---|---|---|---|
| 001 | Lavender (Purple) Stopper Plastic Tube | 0.3 mL | 06/28/2022 12:44 | Hospital Blood | 220629-586 |
| 002 | Lavender (Purple) Stopper Plastic Tube | 0.2 mL | 06/28/2022 12:44 | Hospital Serum or Plasma | 220629-586 |
| 003 | Gray Stopper Plastic Tube | 3.5 mL | 06/28/2022 | Hospital Blood | 220629-586 |
| 004 | Lavender (Purple) Stopper Plastic Tube | 3 mL | 06/28/2022 | Hospital Blood | 220629-586 |
| 005 | Green Stopper Plastic Tube | 2 mL | 06/28/2022 | Hospital Serum or Plasma | 220629-586 |

NMS v.24.0

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL

D   6592
Page   12 Of   16

 **NMS** LABS

**CONFIDENTIAL**

| Workorder | 22234283 |
| Chain | 220629-586 |
| Patient ID | 220629-586 |

Page 2 of 5

| ID | Tube/Container | Volume/Mass | Collection Date/Time | Matrix Source | Labeled As |
|----|----------------|-------------|----------------------|---------------|-----------|
| 006 | Green Stopper Plastic Tube | 1.75 mL | 06/28/2022 | Hospital Serum or Plasma | 220629-586 |
| 007 | Lavender (Purple) Stopper Plastic Tube | 3.5 mL | 06/28/2022 | Hospital Blood | 220629-586 |
| 008 | Green Stopper Plastic Tube | 1.5 mL | 06/28/2022 | Hospital Serum or Plasma | 220629-586 |
| 009 | Parafilm (top sealed with Parafilm) | 0.5 mL | 06/28/2022 12:44 | Hospital Fluid | 220629-586 |
| 010 | Parafilm (top sealed with Parafilm) | 0.2 mL | 06/28/2022 12:44 | Hospital Fluid | 220629-586 |
| 011 | Red Stopper Glass Tube | 4 mL | Not Given | Vitreous Fluid | 220629-586 |
| 012 | White Cap Plastic Container | 12 mL | Not Given | Urine | 220629-586 |

003 TIME ON LABEL: 15:47

004 TIME ON LABEL: 15:47

005 TIME ON LABEL: 15:47

006 TIME ON LABEL: 15:47

007 TIME ON LABEL: 21:14

008 TIME ON LABEL: 21:14

009 YELLOW FLUID IN CUP; 0.1 mL OF RED FLUID IN BOTTOM OF TUBE

010 YELLOW FLUID IN CUP; ONLY GEL IN BOTTOM OF TUBE

011 DATE ON LABEL: 30 JUN 2022

012 DATE ON LABEL: 30 JUN 2022

All sample volumes/weights are approximations.
Specimens received on 07/01/2022.

**Detailed Findings:**

| Analysis and Comments | Result | Units | Rpt. Limit | Specimen Source | Analysis By |
|-----------------------|--------|-------|-----------|-----------------|-------------|
| Lidocaine | Presump Pos | mcg/mL | 0.20 | 003 - Hospital Blood | LC/TOF-MS |
| This test is an unconfirmed screen. Confirmation by a more definitive technique such as GC/MS is recommended. | | | | | |
| Naloxone | Presump Pos | ng/mL | 1.0 | 003 - Hospital Blood | LC/TOF-MS |
| This test is an unconfirmed screen. Confirmation by a more definitive technique such as GC/MS is recommended. | | | | | |
| Midazolam | 31 | ng/mL | 5.0 | 003 - Hospital Blood | LC-MS/MS |
| Creatinine (Vitreous Fluid) | 1.22 | mg/dL | 0.500 | 011 - Vitreous Fluid | Colorimetry |
| Sodium (Vitreous Fluid) | 133 | mmol/L | 50.0 | 011 - Vitreous Fluid | Chemistry Analyzer |
| Potassium (Vitreous Fluid) | 9.32 | mmol/L | 1.00 | 011 - Vitreous Fluid | Chemistry Analyzer |
| Chloride (Vitreous Fluid) | 102 | mmol/L | 50.0 | 011 - Vitreous Fluid | Chemistry Analyzer |
| Glucose (Vitreous Fluid) | 12.8 | mg/dL | 10.0 | 011 - Vitreous Fluid | Chemistry Analyzer |

NMS v.24.0

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL

D   6592
Page    13 Of  16



CONFIDENTIAL

| Workorder | 22234283 |
|---|---|
| Chain | 220629-586 |
| Patient ID | 220629-586 |

Page 3 of 5

### Detailed Findings:

| Analysis and Comments | Result | Units | Rpt. Limit | Specimen Source | Analysis By |
|---|---|---|---|---|---|
| Urea Nitrogen (Vitreous Fluid) | 41.9 | mg/dL | 2.00 | 011 - Vitreous Fluid | Chemistry Analyzer |
| Benzodiazepines | Presump Pos | ng/mL | 50 | 012 - Urine | EIA |
| This test is an unconfirmed screen. Confirmation by a more definitive technique such as GC/MS is recommended. | | | | | |
| Fentanyl / Metabolite | Presump Pos | ng/mL | 2.0 | 012 - Urine | EIA |
| This test is an unconfirmed screen. Confirmation by a more definitive technique such as GC/MS is recommended. | | | | | |

**Other than the above findings, examination of the specimen(s) submitted did not reveal any positive findings of toxicological significance by procedures outlined in the accompanying Analysis Summary.**

### Reference Comments:

1. Chloride (Vitreous Fluid) (Cl-) - Vitreous Fluid:

   Normal: 105 - 135 mmol/L

2. Creatinine (Vitreous Fluid) - Vitreous Fluid:

   Normal: 0.6 - 1.3 mg/dL

3. Glucose (Vitreous Fluid) (C6H12O6; D-glucose (biologically active); Dextrose; L-glucose) - Vitreous Fluid:

   Normal: <200 mg/dL

   Postmortem vitreous glucose concentrations >200 mg/dL are associated with hyperglycemia.

   Since postmortem vitreous glucose concentrations decline rapidly after death both in vivo and in vitro, care should be taken in the interpretation of results.  Stability of vitreous glucose for up to 30 days has been noted by NMS Labs when specimens are maintained frozen (-20C).

4. Midazolam (Versed®) - Hospital Blood:

   Midazolam is a short acting benzodiazepine (a DEA Schedule IV controlled analyte) with sedative/hypnotic properties and is a strong central nervous system depressant. It is used for preoperative sedation, as a sedative hypnotic and as an agent for the induction of anesthesia. It has significant abuse potential. Effects noted following use include sedation, somnolence (drowsiness or sleepiness), visual disturbances (diplopia or double vision), dysarthria (slurred speech), ataxia (shaky movements and unsteady gait), and intellectual impairment and coma may result. Oral doses of 10 mg given to 20 subjects produced average peak plasma concentrations for midazolam of 69 ng/mL in males and 53 ng/mL in females one hour post-dose. As a preoperative medication, intramuscular injection of midazolam at 0.13 mg/Kg body weight (9.1 mg/70 Kg body weight) produced peak plasma concentrations of 68 ng/mL. At high concentrations, confusion, impaired coordination, diminished reflexes, respiratory depression, apnea, hypotension, and coma may result.

5. Potassium (Vitreous Fluid) (K+) - Vitreous Fluid:

   Normal: <15 mmol/L
   Quantitative results for Potassium will be affected if performed on gray top tubes since these collection tubes contain potassium oxalate.

6. Sodium (Vitreous Fluid) (Na+) - Vitreous Fluid:

   Normal: 135 - 150 mmol/L
   Quantitative results for sodium will be affected if performed on gray top tubes since these collection tubes contain sodium fluoride.

7. Urea Nitrogen (Vitreous Fluid) (Carbamide; carbonyl diamide; carbonyldiamine) - Vitreous Fluid:

   Normal: 8 - 20 mg/dL

NMS v.24.0

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D   6592
Page   14 Of  16



**CONFIDENTIAL**

| | |
|---|---|
| Workorder | 22234283 |
| Chain | 220629-586 |
| Patient ID | 220629-586 |

Page 4 of 5

Unless alternate arrangements are made by you, the remainder of the submitted specimens will be discarded one (1) year from the date of this report; and generated data will be discarded five (5) years from the date the analyses were performed.

Workorder 22234283 was electronically
signed on 08/03/2022 16:19 by:

Chelsey N. Deisher, M.S.
Certifying Scientist

### Analysis Summary and Reporting Limits:

All of the following tests were performed for this case.  For each test, the compounds listed were included in the scope. The Reporting Limit listed for each compound represents the lowest concentration of the compound that will be reported as being positive.  If the compound is listed as None Detected, it is not present above the Reporting Limit.   Please refer to the Positive Findings section of the report for those compounds that were identified as being present.

Test 0170FL - Alcohol Panel, Fluid - Vitreous Fluid

-Analysis by Headspace Gas Chromatography (GC) for:

| Analyte | Rpt. Limit | Analyte | Rpt. Limit |
|---|---|---|---|
| Acetone | 5.0 mg/dL | Isopropanol | 5.0 mg/dL |
| Ethanol | 10 mg/dL | Methanol | 5.0 mg/dL |

Test 1919FL - Electrolytes and Glucose Panel (Vitreous), Fluid (Forensic) - Vitreous Fluid

-Analysis by Chemistry Analyzer for:

| Analyte | Rpt. Limit | Analyte | Rpt. Limit |
|---|---|---|---|
| Chloride (Vitreous Fluid) | 50.0 mmol/L | Sodium (Vitreous Fluid) | 50.0 mmol/L |
| Glucose (Vitreous Fluid) | 10.0 mg/dL | Urea Nitrogen (Vitreous Fluid) | 2.00 mg/dL |
| Potassium (Vitreous Fluid) | 1.00 mmol/L | | |

-Analysis by Colorimetry (C) for:

| Analyte | Rpt. Limit | Analyte | Rpt. Limit |
|---|---|---|---|
| Creatinine (Vitreous Fluid) | 0.500 mg/dL | | |

Test 50012B - Benzodiazepines Confirmation, Blood - Hospital Blood

-Analysis by High Performance Liquid Chromatography/ Tandem Mass Spectrometry (LC-MS/MS) for:

| Analyte | Rpt. Limit | Analyte | Rpt. Limit |
|---|---|---|---|
| 7-Amino Clonazepam | 5.0 ng/mL | Flurazepam | 2.0 ng/mL |
| Alpha-Hydroxyalprazolam | 5.0 ng/mL | Hydroxyethylflurazepam | 5.0 ng/mL |
| Alprazolam | 5.0 ng/mL | Hydroxytriazolam | 5.0 ng/mL |
| Chlordiazepoxide | 20 ng/mL | Lorazepam | 5.0 ng/mL |
| Clobazam | 20 ng/mL | Midazolam | 5.0 ng/mL |
| Clonazepam | 2.0 ng/mL | Nordiazepam | 20 ng/mL |
| Desalkylflurazepam | 5.0 ng/mL | Oxazepam | 20 ng/mL |
| Diazepam | 20 ng/mL | Temazepam | 20 ng/mL |
| Estazolam | 5.0 ng/mL | Triazolam | 2.0 ng/mL |

Test 8050U - Postmortem, Urine Screen Add-On (6-MAM Quantification only) (Forensic) - Urine

NMS v.24.0

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains neither recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D   6592
Page   15 Of   16

 **CONFIDENTIAL**

| | |
|---|---|
| Workorder | 22234283 |
| Chain | 220629-586 |
| Patient ID | 220629-586 |

**Page 5 of 5**

**Analysis Summary and Reporting Limits:**

-Analysis by Enzyme Immunoassay (EIA) for:

| Analyte | Rpt. Limit | Analyte | Rpt. Limit |
|---|---|---|---|
| Amphetamines | 500 ng/mL | Fentanyl / Metabolite | 2.0 ng/mL |
| Barbiturates | 0.30 mcg/mL | Methadone / Metabolite | 300 ng/mL |
| Benzodiazepines | 50 ng/mL | Opiates | 300 ng/mL |
| Cannabinoids | 50 ng/mL | Oxycodone / Oxymorphone | 100 ng/mL |
| Cocaine / Metabolites | 150 ng/mL | Phencyclidine | 25 ng/mL |

Test 8052B - Postmortem, Expanded, Blood (Forensic) - Hospital Blood

-Analysis by Enzyme-Linked Immunosorbent Assay (ELISA) for:

| Analyte | Rpt. Limit | Analyte | Rpt. Limit |
|---|---|---|---|
| Barbiturates | 0.040 mcg/mL | Gabapentin | 5.0 mcg/mL |
| Cannabinoids | 10 ng/mL | Salicylates | 120 mcg/mL |

-Analysis by Headspace Gas Chromatography (GC) for:

| Analyte | Rpt. Limit | Analyte | Rpt. Limit |
|---|---|---|---|
| Acetone | 5.0 mg/dL | Isopropanol | 5.0 mg/dL |
| Ethanol | 10 mg/dL | Methanol | 5.0 mg/dL |

-Analysis by High Performance Liquid Chromatography/Time of Flight-Mass Spectrometry (LC/TOF-MS) for: The following is a general list of analyte classes included in this screen. The detection of any specific analyte is concentration-dependent. Note, not all known analytes in each specified analyte class are included. Some specific analytes outside of these classes are also included. For a detailed list of all analytes and reporting limits included in this screen, please contact NMS Labs. Amphetamines, Anticonvulsants, Antidepressants, Antihistamines, Antipsychotic Agents, Benzodiazepines, CNS Stimulants, Cocaine and Metabolites, Hallucinogens, Hypnosedatives, Hypoglycemics, Muscle Relaxants, Non-Steroidal Anti-Inflammatory Agents, Opiates and Opioids.

NMS v.24.0

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D   6592
Page   16  Of   16

# INDIVIDUAL

| Last Name | First Name | Middle Name |
|---|---|---|
| **BULL** | **MARK** | **TRAVIS** |

| AKA/Maiden |
|---|
| |

| Sex | Race | | DOB | SSN |
|---|---|---|---|---|
| **MALE** | **WHITE - W** | | **07/25/1983** | |

| Drivers License Number | Home Telephone | Cell Telephone |
|---|---|---|
| | | |

| Street |
|---|
| **92 BONDS STREET** |

| City | State | Zip Code | How Long | Personal History |
|---|---|---|---|---|
| **EAST ALTON** | **IL** | **62024** | | ☐ |

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000123

## ILLINOIS STATE POLICE
## INVESTIGATIVE REPORT

| Case Number | Case Title | | | Report Type | |
|---|---|---|---|---|---|
| 22-39766900034 | BULL, MARK T. | | | ☑ Individual ☐ Location ☐ Vehicle | |

| Report Purpose | | Report Date | Activity Date |
|---|---|---|---|
| **MADISON COUNTY JAIL INCIDENT REPORT** | | **08/30/2022** | **06/29/2022** |

| Lead Number | Drug Buys | ArrestWarrants | Search Warrants | Overhear Admin | Overhear Warrant |
|---|---|---|---|---|---|
| | | | | | |

| Reporting Agent | ID Number | Zone/Office |
|---|---|---|
| **LOWERY, MICHAEL** | **6592** | **ISPZ6CL** |

| Case Agent | Case Agent ID Number | Case Agent Zone/Office |
|---|---|---|
| **LOWERY, MICHAEL** | **6592** | **ISPZ6CL** |

| ALPR Used | APLR Location |
|---|---|
| ☐ Yes | |

## NARRATIVE

Reporting Agent Michael Lowery received Madison County Jail's Incident Report related to Mark Bull.   The large file size exceeds the limit for being attached to this report.   The report will be copied to a DVD for review by the Madison County States Attorney's Office.

## INDIVIDUAL

| Last Name | First Name | Middle Name |
|---|---|---|
| **BULL** | **MARK** | **TRAVIS** |

| AKA/Maiden |
|---|
| |

| Sex | Race | | DOB | SSN |
|---|---|---|---|---|
| **MALE** | **WHITE - W** | | **07/25/1983** | |

| Drivers License Number | Home Telephone | Cell Telephone |
|---|---|---|
| | | |

| Street |
|---|
| **92 BONDS STREET** |

| City | State | Zip Code | How Long | Personal History |
|---|---|---|---|---|
| **EAST ALTON** | **IL** | **62024** | | ☐ |

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

## ILLINOIS STATE POLICE
## INVESTIGATIVE REPORT

| Case Number **22-39766900034** | Case Title **BULL, MARK T.** | | | Report Type ☑Individual ☐Location ☐Vehicle | |
|---|---|---|---|---|---|
| Report Purpose **INTERVIEW OF JONATHAN BEASLEY** | | | | Report Date **08/30/2022** | Activity Date **06/29/2022** |
| Lead Number | Drug Buys | ArrestWarrants | Search Warrants | Overhear Admin | Overhear Warrant |
| Reporting Agent **LOWERY, MICHAEL** | | | | D Number **6592** | Zone/Office **ISPZ6CL** |
| Case Agent **LOWERY, MICHAEL** | | | | Case Agent ID Number **6592** | Case Agent Zone/Office **ISPZ6CL** |
| ALPR Used ☐ Yes | APLR Location | | | | |

## NARRATIVE

The purpose of this report is to document an interview conducted while investigating the in-custody death of Mark BULL.

The interview was conducted with:

JONATHAN M. BEASLEY



On June 6, 2022, Reporting Agent Michael Lowery and Special Agent Michael Hentze requested an interview with BEASLEY.   BEASLEY was read his Miranda Rights from a standardized form.   BEASLEY initialed and signed the form indicating he understood his rights.   A video statement checklist was completed as BEASLEY agreed to participate with a video recorded interview.   The interview started at 3:18 p.m., as BEASLEY stated the following:

- BEASLEY stated he was cell mates with BULL in cell 6A North.   BULL slept in the top bunk and BEASLEY slept in the bottom bunk.

- BEASLEY stated he was cell mates with BULL for approximately a week, to a week and a half.

- BEASLEY initially thought BULL was "dope sick" but BULL wasn't getting any better.

- BEASLEY stated BULL was always sweating and had goosebumps.   Additionally, he stated BULL was complaining about his stomach, coughing, vomiting and defecating all the time.

- BEASLEY told BULL he should have been getting better and ask him what was going on.   BULL didn't tell BEASLEY about any health conditions.

- BEASLEY stated he'd seen guys come to jail that were dope sick and they usually pulled out of it within a week. BULL just wasn't getting any better.

- BEASLEY stated BULL told him that he kept messaging them (jail staff), saying he needed a doctor for his stomach.

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

- BULL told BEASLEY his stomach was bad and that he was in a bad way.   He also told BEASLEY that he was dying.

- BEASLEY stated BULL was taken to the infirmary approximately 2 - 3 days ago.   BEASLEY didn't know what BULL was treated for nor did BULL tell him what he was treated for when he came back to the cell.

- BEASLEY stated he notified jail staff about BULL's condition quite a few times.

- BEASLEY stated he never witnessed BULL take any drugs nor other illegal substances while incarcerated with BULL.   BEASLEY stated he did not give BULL anything.

- BEASLEY stated BULL had a large cyst on the top of his head.

- BEASLEY stated he woke up one morning and saw BULL with a gash on his eye.   BULL told BEASLEY he fell out of the bed.   BEASLEY believed BULL hit his head on the toilet when he fell out of the bed.   BEASLEY gave BULL a wad of tissue to put on his eye to stop the bleeding.

- BEASLEY stated he helped BULL submit a sick slip after he fell out of the bed.

- BEASLEY stated after BULL fell out of the bed and busted his eye, jail staff came to get him with a wheel chair. That's the last time he saw BULL.

- BEASLEY stated numerous people notified jail staff that BULL was sick and needed help.

- BEASLEY stated BULL would lay at night and breathe like he was in distress.

- BEASLEY stated he walked in the cell two days ago and saw BULL vomiting blood into the toilet.

The interview concluded at 3:43 p.m.    BEASLEY was released back into the custody of jail staff.

The bullet statements contained in report are not verbatim and shall serve as a generalization of information provided by BEASLEY.   For an exact account of his statement, please review the DVD containing his recorded interview.

The original DVD, video statement checklist, and field notes will be submitted to the Illinois State Police Zone 6 Evidence Vault.   Copies of the documents are attached to this report for review.

| Approved By |
| --- |
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D  6592
Page   3  Of  6

## Video Statement Checklist

Case #: 22-39766900034

Name: JONATHAN M. BEASLEY          Date: 6/29/2022

Alias: JON          DOB          Age: 48          Start Time: 3:18  ☐A.M. ☑P.M.

Address:          End Time: 3:43 ☐A.M. ☑P.M.

City          State          Zip Code          Phone:

Email:          Soc. Med. (FB, Snap, Insta)

**Pre-video Preparation**
☑ Setup and Check Equipment to Ensure Functioning Properly

**II.     Introduction & Preliminary Issues**
☑ State Time & Location of Interview
☑ Introduce All Individuals Present
☑ Miranda Rights:  Confirmation of Prior Admonishments & Comprehension
☑ Confirm Prior Questioning / Written Statement, if any (Time, Location & Duration)
☑ Confirm Consent to Video Recorded Statement

**III.    Suspect Background & Comprehension Information**
☑ Age & D.O.B.
☑ Address:  Where, How Long & With Whom
☑ Current Phone Number
☑ Email Account and/or Social Media Account Usernames
☑ Educational Background:  Level of Completion & Schools
☑ Confirm Ability to Read, Write & Understand English Language
☑ Employment / Military History / SSI / Driver's License  IL
☑ Confirm Not Under the Influence of Alcohol / Drugs / Medication
☑ History of Mental Illness / Treatment
☑ Any Special Needs (Glasses, Contacts, Hearing aids, Medication (for purposes of interview)

**IV.    Custodial/Non-Custodial Treatment**
☑ Review Suspect/Witness time in Custody or in Police Presence  PHONE
☑ Discuss Any Injuries Suffered by Suspect (pre-existing, Apprehensions, Self-Inflicted)
☑ Confirm No Physical Abuse / Coercion
☑ Confirm No Threats or Promises of Leniency
☑ Confirm Biological Needs Met (Food, Drink, Sleep, Bathroom)

**V.     Statement**
☑ Confirmation of Voluntary Interview
☐ Confirm Statement  (Verbal or Written)
☐ Confirm Any Consents given by Suspect (Searches, Blood, Etc.)
☐ Have Suspect Identify Important Evidence
☐ Obtain Reverse Identification through Photographs
☐ Suspect Demonstration / Reenactment
☐ Suspect Opportunity for an Additions / Corrections
☐ Confirm Continuous Running of Tape & State Closing Time of Statement

**VI.    Final Preparations**
☐ Finalize DVD Recording of Interview
☐ Review Video DVD for Audio / Visual Clarity
☐ Make Copies & Secure Original as Evidence

S/A          #6592
Interviewing Agent/Officer Name and DSN

S/A          #6164
Assisting Agent

---

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains neither recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000127

22-39766900034
LOWERY, MICHAEL
D   6592
Page    4   Of   6

## MIRANDA RIGHTS FORM

1. You have the right to remain silent.  You do not have to talk to us.  _____

2. If you do talk to us, everything that you say can be used against you in court.  _____

3. You have the right to talk to a lawyer before you talk to us. The lawyer can be with you before we ask you questions. The lawyer can be with you during the whole time we ask you questions.  _____

4. If you do not have money for a lawyer, one can be given to you for free.  _____

5. You can stop answering questions any time you want.  _____

Date: 6-29-22        Signature _____

Date: 6/29/22        Witness: S/A _____  #6592

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains neither recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000128

22-39766900034
LOWERY, MICHAEL
D  6592
Page   5  Of  6

06/29/22   3:18 PM - 3:43 PM
BEASLEY INT.
6 A NORTH
CELL MATE  1 - 1.5 WEEKS
GOOSE BUMPS   SWEAT    COMPLAIN  OF STOMACH
STOMACH  WAS  BAD  -  I'M  DYING
TOOK  HIM  FOR  VITALS   2-3 DAYS AGO
NOTIFIED  C/O's
- WHO ELSE NOTIFIED  C/O's
+ DRUGS IN HERE?
CAST ON HEAD
                        HIT HEAD ON WHAT?
- LACERATION on HEAD?  SICK CALL  YESTERDAY
    FELL  OUT  OF BUNK
    PUKING  BLOOD  2 DAYS AGO - HE NOTIFIED  C/O's
    DRANK  LOTS  OF WATER   TRIED TO EAT

MM 6464

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D   6592
Page   6  Of  6

## INDIVIDUAL

| Last Name | First Name | Middle Name |
|---|---|---|
| BULL | MARK | TRAVIS |

| AKA/Maiden |
|---|
| |

| Sex | Race | | DOB | SSN |
|---|---|---|---|---|
| MALE | WHITE - W | | 07/25/1983 | |

| Drivers License Number | Home Telephone | Cell Telephone |
|---|---|---|
| | | |

| Street |
|---|
| 92 BONDS STREET |

| City | State | Zip Code | How Long | Personal History |
|---|---|---|---|---|
| EAST ALTON | IL | 62024 | | ☐ |

## INDIVIDUAL

| Last Name | First Name | Middle Name |
|---|---|---|
| BEASLEY | JONATHAN | M |

| AKA/Maiden |
|---|
| |

| Sex | Race | | DOB | SSN |
|---|---|---|---|---|
| MALE | | | | |

| Drivers License Number | Home Telephone | Cell Telephone |
|---|---|---|
| | | |

| Street |
|---|
| |

| City | State | Zip Code | How Long | Personal History |
|---|---|---|---|---|
| | | | | ☐ |

| Approved By |
|---|
| Irwin, Travis   #6344 |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000130

22-39766900034
LOWERY, MICHAEL
D  6592
Page   1  Of  6

## ILLINOIS STATE POLICE
## INVESTIGATIVE REPORT

| Case Number | Case Title | | | | Report Type | | | |
|---|---|---|---|---|---|---|---|---|
| **22-39766900034** | **BULL, MARK T.** | | | | ☑ Individual | ☐ Location | ☐ Vehicle | |
| Report Purpose | **INTERVIEW OF JAMES SHIMCHICK** | | | | Report Date **08/30/2022** | | Activity Date **06/29/2022** | |
| Lead Number | Drug Buys | ArrestWarrants | | Search Warrants | | Overhear Admin | | Overhear Warrant |
| Reporting Agent **LOWERY, MICHAEL** | | | | | ID Number **6592** | | Zone/Office **ISPZ6CL** | |
| Case Agent **LOWERY, MICHAEL** | | | | | Case Agent ID Number **6592** | | Case Agent Zone/Office **ISPZ6CL** | |
| ALPR Used ☐ Yes | APLR Location | | | | | | | |

## NARRATIVE

The purpose of this report is to document an interview conducted while investigating the in-custody death of Mark BULL.

The interview was conducted with:

JAMES T. SHIMCHICK
M



On June 6, 2022, Reporting Agent Michael Lowery and Special Agent Michael Hentze requested an interview with SHIMCHICK.   SHIMCHICK was read his Miranda Rights from a standardized form.   SHIMCHICK initialed and signed the form indicating he understood his rights.   A video statement checklist was completed as SHIMCHICK agreed to participate with a video recorded interview.   The interview started at 3:59 p.m., as SHIMCHICK stated the following:

- SHIMCHICK stated BULL came to the jail approximately 2 weeks ago.

- SHIMCHICK stated BULL was going through drug withdrawals when he initially arrived at the jail.

- SHIMCHICK stated after about a week had passed BULL still hadn't gotten any better.

- BULL started complaining about his stomach and stated he felt like a knife was inside him, while pointing to his liver area.

- BULL told SHIMCHICK that a doctor told him (BULL) that long term use of opiates deteriorates the lining of your stomach.

- SHIMCHICK stated he had known BULL since he was 5 years old and described him as a family friend.

- SHIMCHICK stated he frequently notified jail staff about BULLS condition and jail staff just said BULL was going though withdrawals and there was nothing they could do for him.

- SHIMCHICK stated they, SHIMCHICK and other inmates, helped BULL put in sick call requests on the tablets and

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000131

22-39766900034
LOWERY, MICHAEL
D  6592
Page    2  Of  6

they also filed grievances.

- SHIMCHICK stated he helped BULL with one tablet request and one paper request.

- SHIMCHICK stated BULL went to see the nurse and they gave him something for withdrawals.

- SHIMCHICK stated BULL couldn't keep food down and he looked like a skeleton.

- SHIMCHICK stated BULL withered away while he was in jail.

- SHIMCHICK was told that BULL was vomiting and defecating blood.   SHIMCHICK never witnessed it personally.

- SHIMCHICK stated BULL was getting out of bed when he got dizzy, fell, and hit his head.

- SHIMCHICK stated the next morning BULL told him to request a wheelchair and a doctor.

- SHIMCHICK stated he alerted Lt. Dover and filled out a paper sick call slip for BULL.

- SHIMCHICK stated there were grievances filed by Jonathan BEASLEY, BULL's cellmate.

- SHIMCHICK assumed BULL had Hepatitis-C because of his history with drug use and sharing needles.

- SHIMCHICK believed BULL would still be alive if he'd gotten to a hospital sooner.

- SHIMCHICK found out BULL was dead from BULL's sister.

- SHIMCHICK stated Danny LINHART, also incarcerated, was really close to BULL.

- SHIMCHICK believed BULL died as a result of medical negligence.

The interview concluded at 4:21 p.m.    SHIMCHICK was released back into the custody of jail staff.

The bullet statements contained in report are not verbatim and shall serve as a generalization of information provided by SHIMCHICK.   For an exact account of his statement, please review the DVD containing his recorded interview.

The original DVD, video statement checklist, and field notes will be submitted to the Illinois State Police Zone 6 Evidence Vault.   Copies of the documents are attached to this report for review.

| Approved By |
| --- |
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D  6592
Page   3  Of  6

## Video Statement Checklist

Case #: 22-3976690034

Name: JAMES T.  SHIMCHICK

Date: 06/12/__

Alias: _____ DOB: _____ Age 31

Start Time: 3:57  ☐ A.M. ☒ P.M.

Address: _____

End Time: 4:21  ☐ A.M. ☒ P.M.

City: _____  State: ____  Zip Code: ____  Phone: ____

Email: _____  Soc. Med. (FB, Snap, Insta) _____

**I.      Pre-video Preparation**
☒  Setup and Check Equipment to Ensure Functioning Properly

**II.      Introduction & Preliminary Issues**
☒  State Time & Location of Interview
☒  Introduce All Individuals Present
☒  Miranda Rights:  Confirmation of Prior Admonishments & Comprehension
☒  Confirm Prior Questioning / Written Statement, if any (Time, Location & Duration)
☒  Confirm Consent to Video Recorded Statement

**III.     Suspect Background & Comprehension Information**
☒  Age & D.O.B.
☒  Address:  Where, How Long & With Whom  10 yrs  AUNT/UNCLE
☒  Current Phone Number
☒  Email Account and/or Social Media Account Usernames
☒  Educational Background: Level of Completion & Schools  Some College
☒  Confirm Ability to Read, Write & Understand English Language
☒  Employment / Military History / SSI / Driver's License
☒  Confirm Not Under the Influence of Alcohol / Drugs / Medication
☒  History of Mental Illness / Treatment
☒  Any Special Needs (Glasses, Contacts, Hearing aids, Medication (for purposes of interview)

**IV.     Custodial/Non-Custodial Treatment**
☒  Review Suspect/Witness time in Custody or in Police Presence
☒  Discuss Any Injuries Suffered by Suspect (pre-existing, Apprehensions, Self-Inflicted)
☒  Confirm No Physical Abuse / Coercion
☒  Confirm No Threats or Promises of Leniency
☒  Confirm Biological Needs Met (Food, Drink, Sleep, Bathroom)

**V.      Statement**
☐  Confirmation of Voluntary Interview
☐  Confirm Statement  (Verbal or Written)
☐  Confirm Any Consents given by Suspect (Searches, Blood, Etc.)
☐  Have Suspect Identify Important Evidence
☐  Obtain Reverse Identification through Photographs
☐  Suspect Demonstration / Reenactment
☐  Suspect Opportunity for an Additions / Corrections
☐  Confirm Continuous Running of Tape & State Closing Time of Statement

**VI.     Final Preparations**
☐  Finalize DVD Recording of Interview
☐  Review Video DVD for Audio / Visual Clarity
☐  Make Copies & Secure Original as Evidence

_Heame_
Interviewing Agent/Officer Name and DSN

_Lavery_
Assisting Agent/Officer Name and DSN

| Approved By |
| --- |
| **Irwin, Travis   #6344** |

Disclaimer: This document contains neither recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D  6592
Page   4  Of  6

2 WEEKS AGO OR SO

DRUG WITHDRAWALS

1 WEEK STOMACH PROBLEMS

INJURIES?

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000134

22-39766900034
LOWERY, MICHAEL
D   6592
Page   5   Of   6

1. You have the right to remain silent.  You do not have to talk to us. _____JS_____

2. If you do talk to us, everything that you say can be used against you in court. _____JS_____

3. You have the right to talk to a lawyer before you talk to us. The lawyer can be with you before we ask you questions. The lawyer can be with you during the whole time we ask you questions. _____JS_____

4. If you do not have money for a lawyer, one can be given to you for free. _____JS_____

5. You can stop answering questions any time you want. _____JS_____

Date: 6/29/22          Signature: _____

Date: 06/29/22        Witness: _____

Approved By
Irwin, Travis   #6344

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D  6592
Page   6  Of  6

## INDIVIDUAL

| Last Name | First Name | Middle Name |
|---|---|---|
| **BULL** | **MARK** | **TRAVIS** |

| AKA/Maiden |
|---|
| |

| Sex | Race | | DOB | SSN |
|---|---|---|---|---|
| **MALE** | **WHITE - W** | | **07/25/1983** | |

| Drivers License Number | Home Telephone | Cell Telephone |
|---|---|---|
| | | |

| Street |
|---|
| **92 BONDS STREET** |

| City | State | Zip Code | How Long | Personal History |
|---|---|---|---|---|
| **EAST ALTON** | **IL** | **62024** | | ☐ |

## INDIVIDUAL

| Last Name | First Name | Middle Name |
|---|---|---|
| **SHIMCHICK** | **JAMES** | **T** |

| AKA/Maiden |
|---|
| |

| Sex | Race | | DOB | SSN |
|---|---|---|---|---|
| **MALE** | | | | |

| Drivers License Number | Home Telephone | Cell Telephone |
|---|---|---|
| | | |

| Street |
|---|
| |

| City | State | Zip Code | How Long | Personal History |
|---|---|---|---|---|
| | | | | ☐ |

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000136

## ILLINOIS STATE POLICE
## INVESTIGATIVE REPORT

| Case Number | Case Title | | | | Report Type |
|---|---|---|---|---|---|
| **22-39766900034** | **BULL, MARK T.** | | | | ☑ Individual  ☐ Location  ☐ Vehicle |

| Report Purpose | | Report Date | Activity Date |
|---|---|---|---|
| **RECEIPT AND REVIEW OF MADISON COUNTY JAIL VIDEO SURVEILLANCE** | | 08/31/2022 | 06/29/2022 |

| Lead Number | Drug Buys | Arrest Warrants | Search Warrants | Overhear Admin | Overhear Warrant |
|---|---|---|---|---|---|
| | | | | | |

| Reporting Agent | D Number | Zone/Office |
|---|---|---|
| **LOWERY, MICHAEL** | **6592** | **ISPZ6CL** |

| Case Agent | Case Agent ID Number | Case Agent Zone/Office |
|---|---|---|
| **LOWERY, MICHAEL** | **6592** | **ISPZ6CL** |

| ALPR Used | APLR Location |
|---|---|
| ☐ Yes | |

## NARRATIVE

The purpose of this report is to document the receipt and review of video surveillance related to the in-custody death of Mark Bull.

Reporting Agent (R/A) Michael Lowery received video surveillance from Madison County Jail Administrator, Kris Tharp.   The video files were downloaded onto a temporary USB storage device and later transferred to a DVD.   R/A reviewed all supplied video clips and summarized the events as follows:

June 28, 2022
- 9:51:14 a.m.:   A shirtless inmate approached A North cell block door and grabbed a piece of paper left by an officer.
- 9:56:53 a.m.:   The same shirtless inmate returned to A North cell block door and placed a folded piece of paper in the hinged area of the door.
- 10:30:50 a.m.:   An officer retrieved the folded paper left at A North cell block door.
- 10:44:22 a.m.:   A wheelchair was rolled into A North cell block by an officer.
- 10:44:40 a.m.:   Mark Bull appeared to sit, unassisted, into the provided wheelchair.
- 10:45:08 a.m.:   Mark Bull was wheeled out of A North cell block, his body appeared to be straight and not in a typical seated position. His feet appeared to drag the floor and his head was leaned back over the backrest.
- 10:47:00 a.m.:   Mark Bull was wheeled into a room, outside of the cell block.
- 10:57:20 a.m.:   Edwardsville Fire/Ambulance crew parked at the sally port and entered the jail.
- 10:58:00 a.m.:   Personnel with Edwardsville Fire/Ambulance began entering the room with Mark Bull.
- 11:05:12 a.m.:   Mark Bull was removed from the room, placed on an awaiting stretcher, and wheeled outside the building.
- 11:18:25 a.m.:   The ambulance left the rear gate of the Madison County Jail.

The provided information is to be used as a summary only.   Please review the recorded video clips for a

| Approved By |
|---|
| **Irwin, Travis  #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D  6592
Page  2  Of  2

better understanding of events as they transpired.

The DVD containing recorded video clips will be submitted to the Illinois State Police Zone 6 Evidence Vault.

| INDIVIDUAL | | |
|---|---|---|
| Last Name **BULL** | First Name **MARK** | Middle Name **TRAVIS** |
| AKA/Maiden | | |

| Sex **MALE** | Race **WHITE - W** | | DOB **07/25/1983** | SSN | |
|---|---|---|---|---|---|
| Drivers License Number | Home Telephone | | | Cell Telephone | |
| Street **92 BONDS STREET** | | | | | |
| City **EAST ALTON** | | State **IL** | Zip Code **62024** | How Long | Personal History ☐ |

| Approved By **Irwin, Travis  #6344** |
|---|

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000138

22-39766900034
LOWERY, MICHAEL
D   6592
Page   1   Of   1

## ILLINOIS STATE POLICE
## INVESTIGATIVE REPORT

| Case Number | Case Title | | Report Type |
|---|---|---|---|
| 22-39766900034 | BULL, MARK T. | | ✓ Individual   Location   Vehicle |

| Report Purpose | | Report Date | Activity Date |
|---|---|---|---|
| EDWARDSVILLE FIRE DEPARTMENT PATIENT CARE RECORDS | | 08/31/2022 | 06/29/2022 |

| Lead Number | Drug Buys | ArrestWarrants | Search Warrants | Overhear Admin | Overhear Warrant |
|---|---|---|---|---|---|
| | | | | | |

| Reporting Agent | ID Number | Zone/Office |
|---|---|---|
| LOWERY, MICHAEL | 6592 | ISPZ6CL |

| Case Agent | Case Agent ID Number | Case Agent Zone/Office |
|---|---|---|
| LOWERY, MICHAEL | 6592 | ISPZ6CL |

| ALPR Used | APLR Location |
|---|---|
| ☐ Yes | |

## NARRATIVE

The purpose of this report is to document the receipt of patient care records received from Edwardsville Fire/Ambulance while investigating the in-custody death of Mark BULL.

On June 29, 2022, Reporting Agent Michael Lowery received BULL's patient care report from care provided on June 28, 2022.   The report provides Cardiac Arrest as a primary impression.   The report also documents BULL had no eye movement, no motor responses, and no verbal/vocal responses; on 3 different occasions.   Please review the attached patient care report for detailed information.

## ATTACHMENTS

Attachment Description
**Mark Bull Patient Care Report.pdf**

## INDIVIDUAL

| Last Name | First Name | Middle Name |
|---|---|---|
| BULL | MARK | TRAVIS |

| AKA/Maiden |
|---|
| |

| Sex | Race | | DOB | SSN |
|---|---|---|---|---|
| MALE | WHITE – W | | 07/25/1983 | |

| Drivers License Number | Home Telephone | Cell Telephone |
|---|---|---|
| | | |

| Street |
|---|
| 92 BONDS STREET |

| City | State | Zip Code | How Long | Personal History |
|---|---|---|---|---|
| EAST ALTON | IL | 62024 | | ☐ |

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

Patient Name: Bull, Mark T          Incident: 22-1886          V#: 0000341567



GTL-Bull,Mark-GeneralProduction-000140

Patient Name: Bull, Mark T          Incident 22-1886          V#: 0000341567



GTL-Bull,Mark-GeneralProduction-000142



GTL-Bull,Mark-GeneralProduction-000143

Patient Name: Bull, Mark T          Incident  22-1886          V#: 0000341567

GTL-Bull,Mark-GeneralProduction-000144

Vitals



GTL-Bull,Mark-GeneralProduction-000145

GTL-Bull,Mark-GeneralProduction-000146

GTL-Bull,Mark-GeneralProduction-000147

GTL-Bull,Mark-GeneralProduction-000148



GTL-Bull,Mark-GeneralProduction-000150



GTL-Bull,Mark-GeneralProduction-000151

GTL-Bull,Mark-GeneralProduction-000152

GTL-Bull,Mark-GeneralProduction-000153

22-39766900034
LOWERY, MICHAEL

D   6592

Page   1   Of   10

## ILLINOIS STATE POLICE
## INVESTIGATIVE REPORT

| Case Number | Case Title | | | Report Type | | | |
|---|---|---|---|---|---|---|---|
| **22-39766900034** | **BULL, MARK T.** | | | ☐ Individual | ☐ Location | ☐ Vehicle | |

| Report Purpose | | Report Date | Activity Date |
|---|---|---|---|
| **RECEIPT OF MARK BULL'S FILES FROM MADISON COUNTY JAIL** | | **08/31/2022** | **06/29/2022** |

| Lead Number | Drug Buys | ArrestWarrants | Search Warrants | Overhear Admin | Overhear Warrant |
|---|---|---|---|---|---|
| | | | | | |

| Reporting Agent | D Number | Zone/Office |
|---|---|---|
| **LOWERY, MICHAEL** | **6592** | **ISPZ6CL** |

| Case Agent | Case Agent ID Number | Case Agent Zone/Office |
|---|---|---|
| **LOWERY, MICHAEL** | **6592** | **ISPZ6CL** |

| ALPR Used | APLR Location |
|---|---|
| ☐ Yes | |

# NARRATIVE

The purpose of this report is to document the receipt of Mark Bull's records received from Madison County Jail.

Reporting Agent Michael Lowery received several documents related to Mark Bull's incarceration at the Madison County Jail.   The documents, which are attached to this report for review, are as follows:

- Mark Bull Booking Card
- Mark Bull Medical Health and Tuberculosis Screenings
- Mark Bull Sick Call and Grievance Requests
- Mark Bull Medication Administration Record

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D  6592
Page   2  Of  10

Admin: (618) 692-6087
Invest: (618) 692-0971
Patrol: (618) 692-4433

# Booking Card

## BULL, MARK TRAVIS



Madison County Sheriff's Office
Edwardsville, Illinois

**Print Date/Time:**   06/29/2022 12:11
**Login ID:**   kmtharp

**ORI Number:**   IL0600000

*2022-00002210*

| | | | |
|---|---|---|---|
| **Booking #:** 2022-0002210 | **Booking Date/Time:** 06/17/2022 19:24 | | |
| **Jacket #:** 42344 | **Inmate #:** 52272 | | |
| **Address:** 92 BONDS ST East Alton, IL 62024 | | | |

| | | | | | |
|---|---|---|---|---|---|
| **Phone #:** | **DOB:** 07/25/1983 | **Race:** White | |
| **SSN:** | **Age:** 38 | **Sex:** Male | |
| **Hair Color:** Brown | **Eyes:** Blue | **Height:** 5ft 11 in | |
| **Weight:** 150.0 | | | |

| | | | | |
|---|---|---|---|---|
| **Prisoner Type:** Felony | **Incarceration Reason:** Felony | | |
| **Facility:** | **Pod/Block:** | **Cell:** | **Bed:** |

**Charge:**

| | | | |
|---|---|---|---|
| State | 1935 | 720 ILCS 646/55(a)(1) | Possession Methamphetamine w/ Intent to Deliver: <5 grams |
| **Offense/Charge Date:** 06/17/2022 19:25 | **Warrant Number:** | **Court Date/Time:** | |
| **Case Tracking ORI:** | **Case Tracking #:** | **Docket Number:** 22-CF-1558 | |
| **Bond/Bail Set Type:** Deposit Bond | **Bond/Bail Set Date:** 06/17/2022 19:26 | **Bond/Bail Set Amt:** $100000.00/$10000.00 | |
| **Bond Posted By:** | **Bond Post Date:** 06/28/2022 14:10 | **Bond Post Amt:** $0.00 | |
| **Severest:** No | | | |

This certifies that all of the above information is correct.

Inmate Signature: _____

Booking Officer: _____

Date/Time: _____

### DISCHARGE INFORMATION

**Release Date/Time:** 06/28/2022 14:11       **Released By:** 516 - Pickerill
**Release Reason:** Recognizance Bond       **Released to ORI:**
**Released To:** PER JUDGE NAPP

Inmate Signature: _____

Booking Officer: _____

Discharge Officer: _____

Secondary Officer: _____

Date/Time: _____

Page: 1 of 1

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains neither recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D  6592
Page   3  Of  10

MEDICAL HISTORY AND HEALTH APPRAISAL

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains neither recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D  6592
Page  4  Of  10

# MEDICAL HISTORY AND HEALTH APPRAISAL



0217 Medical History and Health Appraisal                    Page 2 of 2

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains neither recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000157

22-39766900034
LOWERY, MICHAEL
D   6592
Page   5  Of  10

Tuberculosis Screening/Test



>5mm: HIV Positive, IV drug users with unknown HIV status, Close contact of
active case, Fibrotic Chest X-ray, persons on steroids and transplant
patients
>10mm: All others

If a stated or documented history of a positive PPD, obtain the following information

Date of the positive PPD:_____   Where was the test performed? _____

Were medications prescribed?  Yes  No    Name of medication(s)? _____

How long were medications taken? _____

_____

**Physician/Practitioner's order:**

0117 TB Screening                                                    Page 1 of 1

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains neither recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000158

22-3976900034
LOWERY, MICHAEL
D  6592
Page  6  Of  10

8/31/22, 10:05 AM

070622 GTL Command Search Results-Mark Bull (submitted requests 061722-until his release).PNG (1885×847)



Approved By
Irwin, Travis  #6344

Disclaimer: This document contains neither recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D   6592
Page   7  Of  10

**Request #185756802**

Profile Photo
Profile Photo

**Inmate Info**
Name: MARK BULL
Submitted Date: 06/23/22 12:50
Submitted from Location/Room: A North Felony/A North Felony
Current Location/Room: A North Felony/A North Felony
Facility: Madison County Jail IL

Audit Photo
Audit Photo

**Form Info**
Category: Others
Form: Sick Call-Infirmary

**Request Info**
Status: CLOSED by Denise Stanford
Facility Deadline: 06/24/22 23:59

**Summary of Request:**
I've got tares on my stomach liner and need the medicine for it

**Details of Request:**
To help you better serve your needs please tell us what you are reporting to our infirmary staff? What specifically is the issue today? Be detailed. One complaint per sick call slip.:
Be specific
Need to get medication for my stomach so I'm not in so much pain

How long has the issue you are reporting been going on?:
This information will help us better serve your needs.
Just started

Any known allergies? If the answer is yes, list the allergies:
This will help us better serve your needs.
No

What is your doctor's name and the location of his/her office?:
This will help us get the information we need to better serve your needs.
I went to Alton memorial to get meds last time dont remember the docs name

What pharmacy do you use and what city is it located in?:
This will help us get the information we need to better serve your needs.
Alton Washington walgreens

Any thoughts of self harm?:
If you are having thoughts of self harm, please explain.
No

I affirm that everything I have included in this request is truthful. I understand that providing false or misleading information could be detrimental for my medical welfare.:
Medical staff is not responsible for any consequence arising from a detainee providing false or misleading information.
Yes

*[handwritten:]* No meds since 4/4/22 and that was a 10 day supply of emepraten.

| DATE/TIME | USER | ACTION | DETAILS |
|---|---|---|---|
| 06/24/22 06:50 | Denise Stanford | Staff Response | You are on the Sick Call list |
| 06/24/22 08:59 | Denise Stanford | Changed Status | From 'Open' to 'Closed' |
| 06/23/22 12:50 | MARK BULL | Submitted New | I've got tares on my stomach liner and need the medicine for it |

*[handwritten notes at bottom, partially legible:]*
Walgreens in Alton on Washington
stomach pain. Alton Memorial Hospital this year
Sometime he maybe wasn't in the E.R.
Jerseyville Co. Jail last year he was in.
141/78  979, Resp 20, O2 sat 97  P 72   wt 147.6
*M2L 6-28-22*

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000160

22-39766900034
LOWERY, MICHAEL
D   6592
Page   8  Of  10

**Request #186573462**

Profile Photo:
Profile Photo

Inmate Info

Name: MARK BULL
Submitted Date: 05/28/22 09:29
Submitted from Location/Room: A North Felony/A North Felony
Current Location/Room: A North Felony/A North Felony
Facility: Madison County Jail IL

Audit Photo:
Audit Photo

Form Info

Category: Others
Form: Sick Call-Infirmary

Request Info

Status: OPEN
Facility Deadline: 06/29/22 23:59 (1d)

Summary of Request:

Want to see a Doctor

Details of Request:

To help us better serve your needs please tell us what you are reporting to our Infirmary staff? What specifically is the issue today? Be detailed. One complaint per sick call slip.:
Be specific
Stand up and bad breathing can't controls it and fall out my stomach liner is in bad shape

How long has the issue you are reporting been going on?:
This information will help us better serve your needs.
2Weeks

Any known allergies? If the answer is yes, list the allergies.:
This will help us better serve your needs.
No

What is your doctor's name and the location of his/her office?:
This will help us get the information we need to better serve your needs.
This will help us get the information we need to better serve your needs.

What pharmacy do you use and what city is it located in?:
This will help us get the information we need to better serve your needs.
This will help us get the information we need to better serve your needs.

Any thoughts of self harm?:
If you are having thoughts of self harm, please explain.
No

I affirm that everything I have included in this request is truthful. I understand that providing false or misleading information could be detrimental for my medical welfare.:
Medical staff is not responsible for any consequence arising from a detainee providing false or misleading information.
Yes

| DATE/TIME | USER | ACTION | | DETAILS |
|---|---|---|---|---|
| 05/28/22 09:29 | MARK BULL | Submitted | New | Want to see a Doctor |

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains neither recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000161

22-39766900034
LOWERY, MICHAEL
D   6592
Page   9   Of   10

## SICK CALL SLIP

NAME: Mark Bull                     DATE: 6/28/22

BLOCK: A-N   PERM #: 52272   DOB: 7/25/83

COMPLAINT: Can't walk, stomach pain severe, dizziness when standing, falling down (head injury), can't hold down food, vomiting. today

Need Doctor and wheelchair.

HOW LONG: Dizziness - 1 day   ALLERGIES: No   PHARMACY & CITY:
Stomach - 1 week

DISPOSITION AND INSTRUCTIONS: *(AREA BELOW FOR MEDICAL STAFF ONLY)*

DR./NURSE INITIALS:                     DATE:

**COST FOR ALL SLIPS NURSE VISIT $5.00/DR. VISIT $15.00/OFF-SITE DR. VISIT $25.00**

A CHARGE WILL BE MADE FOR ACTUAL VISIT. IF NURSE STATES THAT THIS IS A COMPLAINT OR MEMBER OF THIS IS COMPLAINT AS BELOW DR.

TYPE OF VISIT IS THE DECISION OF THE MEDICAL STAFF

Officer's Initials:                     Date:

DR                                      Date:

Created by B. Unfried

---

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.



Approved By
Irwin, Travis  #6344

Disclaimer: This document contains neither recommendations nor conclusions of the Illinois
State Police. It and its contents are not to be disseminated outside of your agency.

22-3076690034
LOWERY, MICHAEL
ID 6592
Page 10 Of 10

22-39766900034
LOWERY, MICHAEL
D   6592
Page   1  Of  4

## ILLINOIS STATE POLICE
## INVESTIGATIVE REPORT

| Case Number | Case Title | | | Report Type | | |
|---|---|---|---|---|---|---|
| 22-39766900034 | BULL, MARK T. | | | ☑ Individual  ☐ Location  ☐ Vehicle | | |
| Report Purpose **INTERVIEW WITH PARAMEDIC CHAD LANKFORD** | | | | Report Date **08/31/2022** | | Activity Date **08/31/2022** |
| Lead Number | Drug Buys | ArrestWarrants | Search Warrants | Overhear Admin | | Overhear Warrant |
| Reporting Agent **LOWERY, MICHAEL** | | | | ID Number **6592** | | Zone/Office **ISPZ6CL** |
| Case Agent **LOWERY, MICHAEL** | | | | Case Agent ID Number **6592** | | Case Agent Zone/Office **ISPZ6CL** |
| ALPR Used ☐ Yes | APLR Location | | | | | |

# NARRATIVE

The purpose of this report is to document a paramedic interview conducted while investigating the in-custody death of Mark Bull.

The interview was conducted with:

PARAMEDIC CHAD LANKFORD



On August 31, 2022, at approximately 10:50 a.m., Reporting Agent Michael Lowery contacted LANKFORD and conducted a phone interview.   During the interview LANKFORD stated the following:

- LANKFORD stated he was the primary patient caregiver for BULL; as a paramedic for Edwardsville Fire/Ambulance Service.

- LANKFORD stated when they arrived at Madison County Jail, officers were performing CPR on BULL.

- Responding EMT's/Paramedics assumed responsibility for BULL and began providing care.

- Responding first responders were able to re-establish a pulse on BULL.

- BULL never regained consciousness and remained non-verbal/non-vocal.

- BULL only had a sluggish pupil response when checked.

- BULL was intubated without the use of medication to keep him immobile.   Additionally, LANKFORD explained that BULL never reached a level of consciousness where he would have needed medication to keep him intubated.

- LANKFORD stated the only medication provided to BULL was to help get his blood pressure up.

The information provided in this report is not verbatim but accurately represents information provided by

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D   6592
Page   2  Of  4

LANKFORD.

The original notes taken during the phone conversation will be submitted to the Illinois State Police, Zone 6, Evidence Vault.

| Approved By |
| --- |
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000165

22-39766900034
LOWERY, MICHAEL
D  6592
Page   3  Of  4

22-39766900034
PHONE CONVERSATION

- PARAMEDIC & PRIMARY CAREGIVER
- WHEN AER AT JAIL STAFF CPR
- EMT'S TOOK OVER
- RE-ESTAB PULSE
- NEVER REGAIN CONSCIOUSNESS
- REMAIN NON VERBAL / VOCAL
- ONLY HAD SLUGGISH PUPIL RESPONSE
- WAS INTUBATED W/O MEDS. NEVER REACH LEVEL
  OF CONSC. THAT WOULD REQUIRE MEDS TO
  IMMOB
- ONLY MED ISSUED WAS TO GET BP UP


CHAD LANKFORD
EDWARDSVILLE FIRE/AMB
333 S. MAIN ST.
EDWARDSVILLE, IL
(618) 692-7541

August 31 @ 10:51 AM

Approved By
Irwin, Travis  #6344

Disclaimer: This document contains neither recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000166

22-39766900034
LOWERY, MICHAEL
D  6592
Page   4  Of  4

## INDIVIDUAL

| Last Name | First Name | Middle Name |
|---|---|---|
| **BULL** | **MARK** | **TRAVIS** |

| AKA/Maiden |
|---|
| |

| Sex | Race | | DOB | SSN |
|---|---|---|---|---|
| **MALE** | **WHITE - W** | | **07/25/1983** | |

| Drivers License Number | Home Telephone | Cell Telephone |
|---|---|---|
| | | |

| Street |
|---|
| **92 BONDS STREET** |

| City | State | Zip Code | How Long | Personal History |
|---|---|---|---|---|
| **EAST ALTON** | **IL** | **62024** | | ☐ |

## INDIVIDUAL

| Last Name | First Name | Middle Name |
|---|---|---|
| **LANKFORD** | **CHAD** | |

| AKA/Maiden |
|---|
| |

| Sex | Race | | DOB | SSN |
|---|---|---|---|---|
| **MALE** | | | | |

| Drivers License Number | Home Telephone | Cell Telephone |
|---|---|---|
| | | |

| Street |
|---|
| |

| City | State | Zip Code | How Long | Personal History |
|---|---|---|---|---|
| | | | | ☐ |

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000167

**ILLINOIS STATE POLICE**
**INVESTIGATIVE REPORT**

| Case Number | Case Title | | | Report Type | | |
|---|---|---|---|---|---|---|
| **22-39766900034** | **BULL, MARK T.** | | | ☑Individual  ☐Location  ☐Vehicle | | |

| Report Purpose | | Report Date | Activity Date |
|---|---|---|---|
| **CRIME SCENE REPORT: MADISON COUNTY JAIL** | | **09/22/2022** | **06/29/2022** |

| Lead Number | Drug Buys | ArrestWarrants | Search Warrants | Overhear Admin | Overhear Warrant |
|---|---|---|---|---|---|
| | | | | | |

| Reporting Agent | D Number | Zone/Office |
|---|---|---|
| **LOWERY, MICHAEL** | **6592** | **ISPZ6CL** |

| Case Agent | Case Agent ID Number | Case Agent Zone/Office |
|---|---|---|
| **LOWERY, MICHAEL** | **6592** | **ISPZ6CL** |

| ALPR Used | APLR Location |
|---|---|
| ☐ Yes | |

## NARRATIVE

The purpose of this report is to document the acquisition of a crime scene report and worksheet related to the in-custody death of Mark T. BULL.

Reporting Agent (R/A) Michael Lowery of the Illinois State Police Zone 6 Major Crimes Unit downloaded a crime scene report and worksheet submitted by the Illinois State Police Metro-East Forensic Science Laboratory.

On June 29th, 2022, Crime Scene Investigator (CSI) Skylar Marlow responded to the Madison County Jail located at 405 Randle Street, in Edwardsville, Illinois.   CSI Marlow photographed, measured and collected evidence from the crime scene. His findings are outlined in the attached crime scene report and crime scene worksheet.

ATTACHMENTS:

- Crime Scene Report

- Crime Scene Worksheet

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

**Illinois State Police**
Division of Forensic Services
Crime Scene Region 5
Metro East Forensic Science Laboratory
2220 West Main Street
Belleville, Illinois  62226

**CRIME SCENE REPORT**

| | | | |
|---|---|---|---|
| Michael  Lowery | | DFS Case #: | DFS22-023387 |
| Illinois State Police, Zone 6 - General Criminal | | Report #: | 1 |
| 1100 Eastport Plaza Dr. | | Report Date: | 07/06/2022 |
| Collinsville, IL 62234 | | | |

| | |
|---|---|
| Agency Case #: | 22-39766900034 |
| Offense: | Death Investigation |
| Victim(s): | Mark Bull |
| Suspect(s): | |

**Request:**

On 06/29/2022 02:30 PM, Crime Scene Investigator Skylar Marlow was requested by the Illinois State Police, Zone 6 - General Criminal to assist with a Death Investigation scene.

**Investigation:**

On 06/29/2022 03:00 PM, Crime Scene Investigator Skylar Marlow arrived at 405 Randle Street Edwardsville IL 62025. Crime scene photographs were taken at the scene. Crime scene measurements were collected for the completion of a crime scene sketch.

The following items of evidential value were collected, packaged, and marked from the scene as indicated on the evidence receipt.

| LAB ITEM# | DESCRIPTION |
|---|---|
| 1 | Envelope (Sealed) containing Swab of Suspected Blood: Source: Jail Cell; Quantity: 1; Additional Description-One set of swabs from a red blood-like substance collected from jail cell door. ; Location Found: Scene |

On 06/29/2022 04:27 PM, Crime Scene Investigator Skylar Marlow left the scene.

**Evidence Disposition:**

The following item(s) were returned to the agency: 1.

Page 1 of **2**

| |
|---|
| Approved By |
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

Crime Scene Investigator Skylar Marlow's notes, observations, images and detailed chain of custody of items will be included in the notes for this case.

The "Notes Packet" appendix of this report, available in Prelog, may contain low resolution scene images. If needed, full resolution images are available for download on the "CASE INFO" tab in Prelog.

Respectfully submitted,

Skylar Marlow
Crime Scene Investigator

Approved By: Joshua Easton

2 of 2

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police. It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000170



SM #671?



Illinois State Police
Division of Forensic Services
Crime Scene Services Command
Crime Scene Region 5

| DFS Case #: | DFS22-023387 |
|---|---|
| Agency: | Illinois State Police, Zone 6 - General Criminal |
| Agency Case #: | 22-39766900034 |
| Scene #: | 1 |
| Analyst: | CSI Skylar Marlow |

**Crime Scene Worksheet**

# CASE INFORMATION

**Case Number:** DFS22-023387
**Investigating Officer:** CSI Skylar Marlow
**Date Time Case Was Opened:** Jun 29 2022 14:30
**District:** Crime Scene Region 5
**Details Description:** In custody death Madison County Jail
**Details Offenses:**
- **Offense:** Death Investigation
  **Time Occurred Approximate:** Jun 28 2022 09:45

**Details Other Cases:**
- **Case Number:** 22-39766900034
  **Agency Name:** Illinois State Police, Zone 6 - General Criminal
  **Relationship To This Case:** Primary
  **Main Contact:** Special Agent Michael  Lowery

# SCENE INFORMATION

**Type:** Police Station
**Scene Number:** 1
**Date Time First Arrival:** Jun 29 2022 15:00
**Date Time Scene Released:** Jun 29 2022 16:27
**First Officer On Scene:** Special Agent Michael  Lowery
**Secured By Officer:** Special Agent Michael  Lowery
**How Was The Scene Secured:** Cell secured until CSI arrival.
**Was A Warrant Used:** No
**Was Consent Given To Enter:** No
**What Was The Legal Justification:** Madison County Jail.
**General Description Of The Scene:** The scene consisted of Cell 6 in housing A-North at the Madison County Jail in Edwardsville, Illinois.
**Weather Temp Humidity Clouds:** 85.8 F / 29.9 C; Humidity: 52.0%; clear sky
**Address Of The Scene:** 405 Randle Street, Edwardsville, IL 62025

# PEOPLE

**Related To Case:** Victim
**First Name:** Mark
**Middle Name:** T.
**Last Name:** Bull
**Sex:** Male
**Race:** White
**Ethnicity:** Not Hispanic or Latino
**Date Of Birth:** July 25, 1983

22-39766900034 # 0                                         DFS22-023387
Illinois State Police, Zone 6 - General Criminal            Page 2 of 13





Illinois State Police
Division of Forensic Services
Crime Scene Services Command
Crime Scene Region 5

| | |
|---|---|
| DFS Case #: | DFS22-023387 |
| Agency: | Illinois State Police, Zone 6 - General Criminal |
| Agency Case #: | 22-39766900034 |
| Scene #: | 1 |
| Analyst: | CSI Skylar Marlow |

### Crime Scene Worksheet

**Notes About This Person:** Deceased
**Addresses:**

# SCENE ACCESS

**Type:** Entry
**Accessed By:** CSI Skylar Marlow
**Area Of Access:** Scene
**Date Time Of Entry:** Jun 29 2022 15:00
**Purpose Of Access:** Crime Scene Processing
**Person Protective Equipment PPE Worn:** Nitrile Gloves
**Additional Description:** Final walk through completed with Agent on scene.
**Time Requested For Scene:** Jun 29 2022 14:30
**Requested By:** Special Agent Michael  Lowery
**Time Dispatched To Scene:** Jun 29 2022 14:30
**On Scene Officer:** Special Agent Michael  Lowery
**Briefed By:** Special Agent Michael  Lowery

# AREAS

**Name Of This Area:** Scene
**General Description Of The Area:** Jail Cell

# NOTES

**Type:** Scene Observation
**Details Note:** The scene consisted of Cell 6 in housing A-North at the Madison County Jail in Edwardsville, Illinois.

Illinois State Police Zone 6 requested SESC Region 5 assist with a Death Investigation scene.

Agents reported the victim was taken to the jails infirmary on 06/28/2022 at approximately 10:46AM with unknown medical issues. At 11:16AM, the victim was taken to Anderson Hospital by EMS. At 12:15AM, the Hospital reported the victim to be in stable condition. On 06/29/2022 at 9:58AM, the victim was pronounced deceased. The victim had been at the jail since 06/17/2022 and had made frequent trips to the infirmary for medical issues related to detoxication from methamphetamine and other drugs. The victim had a laceration above his eye which was reported to have occurred in the early morning of 06/28/2022 after falling out of his bed.

The jail cell was secured until CSI arrival.

The jail cell was photographed.

A red blood-like stain (RBLS) was observed on the door of the jail cell. This blood was reported to belong to the victim from the laceration on his head.

A set of swabs were collected from the RBLS.

Date of Report: Jul 4, 2022                                         Page 2 of 4

22-39766900034 # 0                                              DFS22-023387
Illinois State Police, Zone 6 - General Criminal                Page 3 of 13                                          SM #6710



Illinois State Police
Division of Forensic Services
Crime Scene Services Command
Crime Scene Region 5

| | |
|---|---|
| DFS Case #: | DFS22-023387 |
| Agency: | Illinois State Police, Zone 6 - General Criminal |
| Agency Case #: | 22-39766900034 |
| Scene #: | 1 |
| Analyst: | CSI Skylar Marlow |

## Crime Scene Worksheet

The scene was released after final walk through.

**Type:** Immediate Notification Report
**Details Note:** On 06/29/2022 at 2:30PM, CSI Marlow was requested to assist Illinois State Police Zone 6 with a Death Investigation Scene at the Madison County Jail in Edwardsville, Illinois.

Synopsis: Thirty-eight year old male perishes at local Hospital after medical complications while housed at the Madison County Jail.

At Approximately 3:00PM, CSI Marlow met with Special Agent Lowery of the Illinois State Police Zone 6. Special Agent Lowery relayed the victim was taken to the jails infirmary on 06/28/2022 at approximately 10:46AM with unknown medical issues. At 11:16AM the victim was taken to Anderson Hospital by EMS. At 12:15AM, the Hospital reported the victim to be in stable condition. On 06/29/2022 at 9:58AM, the victim was pronounced deceased. The victim had been at the jail since 06/17/2022 and had made frequent trips to the infirmary for medical issues related to detoxation from methamphetamine and other drugs.

An autopsy is planned and is yet to be scheduled. CSS will attend.

The investigation continues by Illinois State Police Zone 6, Madison County Coroner's Office and SESC.

## TECHNIQUES

**Type:** Bloodstain Pattern Analysis
**Performed By:** CSI Skylar Marlow
**Where Performed:** Scene
**More Specific Location:**
**Area Pattern Designation:** Jail Cell
**Location Of Area Pattern W Measure:** On jail cell door.
**Approximate Number Of Stains:** More than 5
**Size Of Stain S:** 2mm - 25mm
**Shape Of Stain S:** Irregular
**Distribution Of Stains:** Small Pool stain with small spatter stains near pool.
**Color:** Dark Red
**Degree Of Dryness:** Dry
**Appearance Of Stains:** Pool stain covering a 2' by 4' area with small spatter stains nearby.
**Additional Description:** A red blood-like stain on jail cell door.

## EVIDENCE

**Type:** Swab of Suspected Blood
**Evidence Number:** 1
**Details Bar Code:** e1   0S9mD
**Found Generated Where:** Scene
**Collected By:** CSI Skylar Marlow
**Date Time Collected:** Jun 29 2022 15:44
**Packaged In:** Envelope (Sealed)
**Source:** Jail Cell
**Quantity:** 1
**Additional Description:** One set of swabs from a red blood-like substance collected from jail cell door.

GTL-Bull,Mark-GeneralProduction-000173

22-39766900034 # 0
Illinois State Police, Zone 6 - General Criminal

DFS22-023387
Page 4 of 13



 Illinois State Police
Division of Forensic Services
Crime Scene Services Command
Crime Scene Region 5

| | |
|---|---|
| DFS Case #: | DFS22-023387 |
| Agency: | Illinois State Police, Zone 6 - General Criminal |
| Agency Case #: | 22-39766900034 |
| Scene #: | 1 |
| Analyst: | CSI Skylar Marlow |

**Crime Scene Worksheet**

## SCENE SKETCHES

**Sketcher:** CSI Skylar Marlow
**Area Sketched:** Scene
**Type Of Drawing:** Computer Generated
**Composition Description:** Scene
**:** Scene

## PHOTOS

**Photographer:** CSI Skylar Marlow
**Area Photographed:** Scene
**Reason For Photos:** Documentary
**Number Of Photos Taken:** 49
**Camera Used:** T6i
**What Was Photographed:** Scene
**:** Scene

22-39766900034 # 0
Illinois State Police, Zone 6 - General Criminal

DFS22-023387
Page 5 of 13





Illinois State Police
Division of Forensic Services
Crime Scene Services Command
Crime Scene Region 5

| DFS Case #: | DFS22-023387 |
|---|---|
| Agency: | Illinois State Police, Zone 6 - General Criminal |
| Agency Case #: | 22-39766900034 |
| Scene #: | 1 |
| Analyst: | CSI Skylar Marlow |

## Photo Sheet



IMG_2047 JPG



IMG_2048 JPG



IMG_2049 JPG



IMG_2050 JPG



IMG_2051 JPG



IMG_2052 JPG



IMG_2053 JPG



IMG_2054 JPG



IMG_2055 JPG

Date of Report: Jul 4, 2022

Page 1 of 6

SM #6716



Illinois State Police
Division of Forensic Services
Crime Scene Services Command
Crime Scene Region 5

| | |
|---|---|
| DFS Case #: | DFS22-023387 |
| Agency: | Illinois State Police, Zone 6 - General Criminal |
| Agency Case #: | 22-39766900034 |
| Scene #: | 1 |
| Analyst: | CSI Skylar Marlow |

## Photo Sheet


IMG_2056 JPG


IMG_2057 JPG


IMG_2058 JPG


IMG_2059 JPG


IMG_2060 JPG


IMG_2061 JPG


IMG_2062 JPG


IMG_2063 JPG


IMG_2064 JPG

22-39766900034 # 0
Illinois State Police, Zone 6 - General Criminal

DFS22-023387
Page 7 of 13

SM #6716



Illinois State Police
Division of Forensic Services
Crime Scene Services Command
Crime Scene Region 5

| DFS Case #: | DFS22-023387 |
| Agency: | Illinois State Police, Zone 6 - General Criminal |
| Agency Case #: | 22-39766900034 |
| Scene #: | 1 |
| Analyst: | CSI Skylar Marlow |

**Photo Sheet**


IMG_2065 JPG


IMG_2066 JPG


IMG_2067 JPG


IMG_2068 JPG


IMG_2069 JPG


IMG_2070 JPG


IMG_2071 JPG


IMG_2072 JPG


IMG_2073 JPG

GTL-Bull,Mark-GeneralProduction-000177

22-39766900034 # 0
Illinois State Police, Zone 6 - General Criminal

DFS22-023387
Page 8 of 13

SM #6716



Illinois State Police
Division of Forensic Services
Crime Scene Services Command
Crime Scene Region 5

| DFS Case #: | DFS22-023387 |
|---|---|
| Agency: | Illinois State Police, Zone 6 - General Criminal |
| Agency Case #: | 22-39766900034 |
| Scene #: | 1 |
| Analyst: | CSI Skylar Marlow |

## Photo Sheet



IMG_2074 JPG



IMG_2075 JPG



IMG_2076 JPG



IMG_2077 JPG



IMG_2078 JPG



IMG_2079 JPG



IMG_2080 JPG



IMG_2081 JPG



IMG_2082 JPG

Date of Report: Jul 4, 2022

Page 4 of 6

22-39766900034 # 0
Illinois State Police, Zone 6 - General Criminal

DFS22-023387
Page 9 of 13

SM #6716



Illinois State Police
Division of Forensic Services
Crime Scene Services Command
Crime Scene Region 5

| DFS Case #: | DFS22-023387 |
|---|---|
| Agency: | Illinois State Police, Zone 6 - General Criminal |
| Agency Case #: | 22-39766900034 |
| Scene #: | 1 |
| Analyst: | CSI Skylar Marlow |

## Photo Sheet



IMG_2083 JPG


IMG_2084 JPG


IMG_2085 JPG


IMG_2086 JPG


IMG_2087 JPG


IMG_2088 JPG


IMG_2089 JPG


IMG_2090 JPG


IMG_2091 JPG

Date of Report: Jul 4, 2022

Page 5 of 6

SM #6716



Illinois State Police
Division of Forensic Services
Crime Scene Services Command
Crime Scene Region 5

| | |
|---|---|
| DFS Case #: | DFS22-023387 |
| Agency: | Illinois State Police, Zone 6 - General Criminal |
| Agency Case #: | 22-39766900034 |
| Scene #: | 1 |
| Analyst: | CSI Skylar Marlow |

## Photo Sheet




IMG_2092.JPG



IMG_2093.JPG



IMG_2094.JPG



IMG_2095.JPG

SM #6710 



Illinois State Police
Division of Forensic Services
Crime Scene Services Command
Crime Scene Region 5

| DFS Case #: | DFS22-023387 |
|---|---|
| Agency: | Illinois State Police, Zone 6 - General Criminal |
| Agency Case #: | 22-39766900034 |
| Scene #: | 1 |
| Analyst: | CSI Skylar Marlow |

## Evidence Manifest

### Case Information

| | |
|---|---|
| **Primary Agency:** | Illinois State Police, Zone 6 - General Criminal - 22-39766900034 |
| **Secondary Agency:** | |
| **Investigating CSI:** | CSI Skylar Marlow (#6710) |
| **Primary Agency Officer:** | Special Agent Michael Lowery (#6592) |
| **Offense:** | Death Investigation |
| **Offense Date:** | Jun 28, 2022 9:45 AM |
| **Victim:** | Mark Bull |
| **Suspect:** | |

### Evidence Information

Item# 1
Envelope (Sealed) containing Swab of Suspected Blood -- Quantity: 1; Source: Jail Cell; One set of swabs from a red blood-like substance collected from jail cell door.  – Location Found: Scene

| Date/Time | Released By | Signature | Released To | Signature |
|---|---|---|---|---|
| Jul 6, 2022 9:21 AM | CSI Marlow (#6710) | | S/A Hatley (#5961) | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Date of Report: Jul 6, 2022

Page 1 of 1

GTL-Bull,Mark-GeneralProduction-000181

22-39766900034 # 0                                          DFS22-023387
Illinois State Police, Zone 6 - General Criminal            Page 12 of 13

SM #6710

| DATE | CASE NUMBER | PREPARED BY |
|------|-------------|-------------|
| 06/29/2022 | DFS22-023387 | CSI S. Marlow #6710 |

| LOCATION |
|----------|
| 405 Randle Street, Edwardsville, IL Madison County Jail |

**Housing A North - Cell 6**



Not To Scale

Page 1 of 1

GTL-Bull,Mark-GeneralProduction-000182

22-39766900034 # 0                                    DFS22-023387
Illinois State Police, Zone 6 - General Criminal        Page 13 of 13





**Illinois State Police**                                    **Chain of Custody**
**Division of Forensic Services**
                                                        **Lab Case #: DFS22-023387**
                                                        **Agency #:22-39766900034**

Item 1 (): One(1) sealed Envelope containing Swab of blood-like staining

**Item Chain of Custody**

| Date | Time | Container | Lab | Custody Of | Location / Person | Logged By |
|------|------|-----------|-----|------------|-------------------|-----------|
| 06/29/2022 | 4:20 pm | | | Crime Lab Personnel | Skylar Marlow | |
| 06/29/2022 | 4:21 pm | | | Crime Lab Personnel | Skylar Marlow | Skylar Marlow |
| 06/29/2022 | 4:44 pm | | | CSSC Vehicle Lock Box | 59945 | Skylar Marlow |
| | **Comments:** F-61 | | | | | |
| 06/30/2022 | 11:10 am | | | CSSC Secure Temp Storage Room | Metro East Forensic Science Laboratory | Skylar Marlow |
| 07/06/2022 | 9:29 am | | | Crime Lab Personnel | Skylar Marlow | Skylar Marlow |
| 07/06/2022 | 9:30 am | | | Personnel Transfer | Personnel Transfer (Non-Lab Use Only) | Skylar Marlow |

**Comments:** Items taken into custody at 9:15AM on 07/06/2022 by Crime Lab Personnel Skylar Marlow

GTL-Bull,Mark-GeneralProduction-000183

22-39766900034
LOWERY, MICHAEL
D  6592
Page   17  Of  17

# INDIVIDUAL

| Last Name | First Name | Middle Name |
|---|---|---|
| **BULL** | **MARK** | **TRAVIS** |

| AKA/Maiden |
|---|
| |

| Sex | Race | | DOB | SSN |
|---|---|---|---|---|
| **MALE** | **WHITE - W** | | **07/25/1983** | |

| Drivers License Number | Home Telephone | Cell Telephone |
|---|---|---|
| | | |

| Street |
|---|
| **92 BONDS STREET** |

| City | State | Zip Code | How Long | Personal History |
|---|---|---|---|---|
| **EAST ALTON** | **IL** | **62024** | | |

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains neither recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000184

**ILLINOIS STATE POLICE**
**INVESTIGATIVE REPORT**

| Case Number | Case Title | | | | Report Type | | |
|---|---|---|---|---|---|---|---|
| **22-39766900034** | **BULL, MARK T.** | | | | ☑ Individual | ☐ Location | ☐ Vehicle |

| Report Purpose | | Report Date | Activity Date |
|---|---|---|---|
| **CRIME SCENE REPORT: POSTMORTEM EXAMINATION** | | **09/22/2022** | **06/30/2022** |

| Lead Number | Drug Buys | ArrestWarrants | Search Warrants | Overhear Admin | Overhear Warrant |
|---|---|---|---|---|---|
| | | | | | |

| Reporting Agent | D Number | Zone/Office |
|---|---|---|
| **LOWERY, MICHAEL** | **6592** | **ISPZ6CL** |

| Case Agent | Case Agent ID Number | Case Agent Zone/Office |
|---|---|---|
| **LOWERY, MICHAEL** | **6592** | **ISPZ6CL** |

| ALPR Used | APLR Location |
|---|---|
| ☐ Yes | |

# NARRATIVE

The purpose of this report is to document the acquisition of a crime scene report and worksheet related to the in-custody death of Mark T. BULL.

Reporting Agent (R/A) Michael Lowery of the Illinois State Police Zone 6 Major Crimes Unit downloaded a crime scene report and worksheet submitted by the Illinois State Police Metro-East Forensic Science Laboratory.

On June 30th, 2022, Crime Scene Investigator (CSI) Skylar Marlow responded to 101 East Edwardsville Road, in Wood River, Illinois, to attend BULL's autopsy.  CSI Marlow took photographs and collected evidence from while in attendance at the autopsy. His findings are outlined in the attached crime scene report and crime scene worksheet.

ATTACHMENTS:

- Crime Scene Report

- Crime Scene Worksheet

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

**Illinois State Police**
Division of Forensic Services
Crime Scene Region 5
Metro East Forensic Science Laboratory
2220 West Main Street
Belleville, Illinois  62226

**CRIME SCENE REPORT**

| | | | |
|---|---|---|---|
| Michael  Lowery | | DFS Case #: | DFS22-023387 |
| Illinois State Police, Zone 6 - General Criminal | | Report #: | 2 |
| 1100 Eastport Plaza Dr. | | Report Date: | 07/06/2022 |
| Collinsville, IL 62234 | | | |

| | |
|---|---|
| Agency Case #: | 22-39766900034 |
| Offense: | Death Investigation |
| Victim(s): | Mark Bull |
| Suspect(s): | |

**Request:**

On 06/30/2022 07:30 AM, Crime Scene Investigator Skylar Marlow was requested by the Illinois State Police, Zone 6 - General Criminal to assist with a Death Investigation scene.

**Investigation:**

On 06/30/2022 08:00 AM, Crime Scene Investigator Skylar Marlow arrived at 101 East Edwardsville Road Wood River IL 62095. Crime scene photographs were taken at the scene.

The following items of evidential value were collected, packaged, and marked from the scene as indicated on the evidence receipt.

| **LAB ITEM#** | **DESCRIPTION** |
|---|---|
| 2 | Envelope (Sealed) containing Postmortem Kit: BloodCard: Collected;BuccalSwabs: Collected;Clothing: Not Collected;CombedHeadHairs: Collected;FingernailSpecimens: Collected;Fingerprints: Separate Exhibit;Palmprints: Separate Exhibit ;PulledHeadHairs: Collected;PulledPubicHairs: Collected;SexualAssaultEvidence: Not Collected; Quantity: 1; Additional Description-No sexual assault kit collected per conversation with Pathologist and Investigators on scene. No clothing on or with victim. ; Location Found: Morgue |
| 3 | Envelope (Sealed) containing Known Fingerprints/Tenprints: ; Quantity: 1; Additional Description-Finger and palm prints collected from victim during autopsy. ; Location Found: Morgue |

1 of 2

---

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D   6592
Page   3  Of   18

On 06/30/2022 10:10 AM, Crime Scene Investigator Skylar Marlow left the scene.

**Evidence Disposition:**

The following item(s) were returned to the agency: 2,3.

Crime Scene Investigator Skylar Marlow's notes, observations, images and detailed chain of custody of items will be included in the notes for this case.

The "Notes Packet" appendix of this report, available in Prelog, may contain low resolution scene images. If needed, full resolution images are available for download on the "CASE INFO" tab in Prelog.

Respectfully submitted,

Skylar Marlow
Crime Scene Investigator

Approved By: Joshua Easton

Page 2 of 2

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois
State Police. It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000187

22-39766900034
LOWERY, MICHAEL
D   6592
Page   4  Of  18

22-39766900034 # 0                                DFS22-023387
Illinois State Police, Zone 6 - General Criminal       Page 1 of 14





Illinois State Police
Division of Forensic Services
Crime Scene Services Command
Crime Scene Region 5

| | |
|---|---|
| DFS Case #: | DFS22-023387 |
| Agency: | Illinois State Police, Zone 6 - General Criminal |
| Agency Case #: | 22-39766900034 |
| Scene #: | 2 |
| Analyst: | CSI Skylar Marlow |

**Crime Scene Worksheet**

## CASE INFORMATION

**Case Number:** DFS22-023387
**Investigating Officer:** CSI Skylar Marlow
**Date Time Case Was Opened:** Jun 29 2022 14:30
**District:** Crime Scene Region 5
**Details Description:** In custody death Madison County Jail
**Details Offenses:**
- **Offense:** Death Investigation
  **Time Occurred Approximate:** Jun 28 2022 09:45

**Details Other Cases:**
- **Case Number:** 22-39766900034
  **Agency Name:** Illinois State Police, Zone 6 - General Criminal
  **Relationship To This Case: Primary**
  **Main Contact:** Special Agent Michael  Lowery

## SCENE INFORMATION

**Type:** Postmortem/Autopsy
**Scene Number:** 2
**Date Time First Arrival:** Jun 30 2022 08:00
**Date Time Scene Released:** Jun 30 2022 10:10
**First Officer On Scene:** Special Agent Michael  Hentze
**Secured By Officer:** Special Agent Michael  Hentze
**How Was The Scene Secured:** Victim secured in body bag with seal #3777690 at the Madison County Morgue..
**Was A Warrant Used:** No
**Was Consent Given To Enter:** No
**What Was The Legal Justification:** Autopsy
**General Description Of The Scene:** Madison County Morgue in Wood River, Illinois.
**Weather Temp Humidity Clouds:** 75.8 F / 24.3 C; Humidity: 66.0% clear sky
**Address Of The Scene:** 101 East Edwardsville Road, Wood River, IL 62095

## PEOPLE

**Related To Case:** Victim
**First Name:** Mark
**Middle Name:** T.
**Last Name:** Bull
**Sex:** Male
**Race:** White
**Ethnicity:** Not Hispanic or Latino
**Date Of Birth:** July 25, 1983
**Notes About This Person:** Deceased

Date of Report: Jul 4, 2022                                    Page 1 of 4

| Approved By |
|---|
| **Irwin, Travis    #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D   6592
Page   5  Of  18

22-39766900034 # 0
Illinois State Police, Zone 6 - General Criminal

DFS22-023387
Page 2 of 14

SM #6716



Illinois State Police
Division of Forensic Services
Crime Scene Services Command
Crime Scene Region 5

| | |
|---|---|
| DFS Case #: | DFS22-023387 |
| Agency: | Illinois State Police, Zone 6 - General Criminal |
| Agency Case #: | 22-39766900034 |
| Scene #: | 2 |
| Analyst: | CSI Skylar Marlow |

## Crime Scene Worksheet

Addresses:

## SCENE ACCESS

**Type:** Entry
**Accessed By:** CSI Skylar Marlow
**Area Of Access:** Morgue
**Date Time Of Entry:** Jun 30 2022 08:00
**Purpose Of Access:** Crime Scene Processing
**Person Protective Equipment PPE Worn:** Nitrile Gloves
**Additional Description:** Final walk through completed with Agent on scene.
**Time Requested For Scene:** Jun 30 2022 07:30
**Requested By:** Special Agent Michael  Hentze
**Time Dispatched To Scene:** Jun 30 2022 07:30
**On Scene Officer:** Special Agent Michael Hentze
**Briefed By:** Special Agent Michael  Hentze

## AREAS

**Name Of This Area:** Morgue
**General Description Of The Area:** Madison County

## NOTES

**Type:** Scene Observation
**Details Note:** The scene consisted of the Madison County Morgue in Wood River, Illinois.

Present for the autopsy included the following; Pathologist Dr. Sabharwal, Pathologist Assistant Allyson Hoxsey, Madison County Deputy Coroner Diondra Horner and Illinois State Police Zone 6 Special Agent M. Hentze.

No clothing collected due to victim arriving to morgue with no clothing.

No sexual assault kit collected per conversation with Pathologist and Investigators on scene.

See Pathologist report for further details.

The scene was released after final walk through.

## EVIDENCE

**Type:** Postmortem Kit
**Evidence Number:** 2
**Details Bar Code:** c1   0S9tc

Date of Report: Jul 4, 2022

Page 2 of 4

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034 # 0
Illinois State Police, Zone 6 - General Criminal

DFS22-023387
Page 3 of 14

SM #071



Illinois State Police
Division of Forensic Services
Crime Scene Services Command
Crime Scene Region 5

| | |
|---|---|
| DFS Case #: | DFS22-023387 |
| Agency: | Illinois State Police, Zone 6 - General Criminal |
| Agency Case #: | 22-39766900034 |
| Scene #: | 2 |
| Analyst: | CSI Skylar Marlow |

## Crime Scene Worksheet

**Found Generated Where:** Morgue
**Collected By:** CSI Skylar Marlow
**Date Time Collected:** Jun 30 2022 09:38
**Packaged In:** Envelope (Sealed)
**Subject:** Mark Bull
**Pulled Head Hairs:** Collected
**Combed Head Hairs:** Collected
**Pulled Pubic Hairs:** Collected
**Blood Card:** Collected
**Buccal Swabs:** Collected
**Fingernail Specimens:** Collected
**Fingerprints:** Separate Exhibit
**Palmprints:** Separate Exhibit
**Clothing:** Not Collected
**Sexual Assault Evidence:** Not Collected
**Quantity:** 1
**Additional Description:** No sexual assault kit collected per conversation with Pathologist and Investigators on scene. No clothing on or with victim.

**Type:** Known Fingerprints/Tenprints
**Evidence Number:** 3
**Details Bar Code:** c1  0S9tf
**Found Generated Where:** Morgue
**Collected By:** CSI Skylar Marlow
**Date Time Collected:** Jun 30 2022 09:45
**Packaged In:** Envelope (Sealed)
**Quantity:** 1
**Additional Description:** Finger and palm prints collected from victim during autopsy.

## BODIES

**Type Of Body:** Male - Adult
**Body Part Identity If Known:** Mark Bull
**Details Exams:**
- **Date Time Examined:** Jun 30 2022 08:00
  **Type Of Exam:** Post-Mortem
  **General Body Exam Description:** See Pathologist report for further details.

## PHOTOS

**Photographer:** CSI Skylar Marlow
**Area Photographed:** Morgue
**Reason For Photos:** Documentary
**Number Of Photos Taken:** 64
**Camera Used:** T6i
**What Was Photographed:** Scene

Date of Report: Jul 4, 2022

Page 3 of 4

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.



22-39766900034
LOWERY, MICHAEL
D  6592
Page  7  Of  18

22-39766900034 # 0
Illinois State Police, Zone 6 - General Criminal

DFS22-023387
Page 4 of 14

SM #6716

Illinois State Police
Division of Forensic Services
Crime Scene Services Command
Crime Scene Region 5

| DFS Case #: | DFS22-023387 |
| --- | --- |
| Agency: | Illinois State Police, Zone 6 - General Criminal |
| Agency Case #: | 22-39766900034 |
| Scene #: | 2 |
| Analyst: | CSI Skylar Marlow |

**Crime Scene Worksheet**

: Morgue

Date of Report: Jul 4,

Page 4 of 4

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D   6592
Page   8  Of  18

22-39766900034 # 0
Illinois State Police, Zone 6 - General Criminal

DFS22-023387
Page 5 of 14

SM #0710

| DFS Case #: | DFS22-023387 |
| Agency: | Illinois State Police, Zone 6 - General Criminal |
| Agency Case #: | 22-39766900034 |
| Scene #: | 2 |
| Analyst: | CSI Skylar Marlow |

**Illinois State Police**
Division of Forensic Services
Crime Scene Services Command
Crime Scene Region 5

**Photo Sheet**



Date of Report: Jul 4, 2022

Page 1 of 6

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains neither recommendations nor conclusions of the Illinois State Police. It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D  6592
Page   9  Of  18

22-39766900034 # 0
Illinois State Police, Zone 6 - General Criminal

DFS22-023387
Page 8 of 14

SM #0710



Illinois State Police
Division of Forensic Services
Crime Scene Services Command
Crime Scene Region 5

| DFS Case #: | DFS22-023387 |
| Agency: | Illinois State Police, Zone 6 - General Criminal |
| Agency Case #: | 22-39766900034 |
| Scene #: | 2 |
| Analyst: | CSI Skylar Marlow |

**Photo Sheet**

| IMG_3105.JPG | IMG_3106.JPG | IMG_3107.JPG |
| IMG_3108.JPG | IMG_3109.JPG | IMG_3110.JPG |
| IMG_3111.JPG | IMG_3112.JPG | IMG_3113.JPG |

Date of Report: Jul 4, 2022

Page 3 of 6

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains neither recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000193

22:39786900034 # 0
Illinois State Police, Zone 6 - General Criminal

DFS22-023387
Page 7 of 14

SM #0710

Illinois State Police
Division of Forensic Services
Crime Scene Services Command
Crime Scene Region 5

| DFS Case #: | DFS22-023387 |
| Agency: | Illinois State Police, Zone 6 - General Criminal |
| Agency Case #: | 22-39766900034 |
| Scene #: | 2 |
| Analyst: | CSI Skylar Marlow |

**Photo Sheet**



Date of Report: Jul 4, 2022

Page 3 of 8

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains neither recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D   6592
Page   11  Of  18

22.39786900034 # 0
Illinois State Police, Zone 6 - General Criminal

DFS22-023387
Page 8 of 14

SM #070

Illinois State Police
Division of Forensic Services
Crime Scene Services Command
Crime Scene Region 5

DFS Case #:     DFS22-023387
Agency:          Illinois State Police, Zone 6   General Criminal
Agency Case #: 22-39766900034
Scene #:         2
Analyst:          CSI Skylar Marlow

**Photo Sheet**



IMG_3129.JPG          IMG_3130.JPG          IMG_3131.JPG

Date of Report: Jul 4, 2022

Page 4 of 8

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains neither recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D   6592
Page   12 Of  18

22-39786900034 # 0
Illinois State Police, Zone 6 - General Criminal

DFS22-023387
Page 9 of 14

SM #0710

Illinois State Police
Division of Forensic Services
Crime Scene Services Command
Crime Scene Region 5

| DFS Case #: | DFS22-023387 |
| Agency: | Illinois State Police, Zone 6 - General Criminal |
| Agency Case #: | 22-39766900034 |
| Scene #: | 2 |
| Analyst: | CSI Skylar Marlow |

**Photo Sheet**



| IMG_2132.JPG | IMG_2133.JPG | IMG_2134.JPG |

Date of Report: Jul 4, 2022

Page 5 of 8

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains neither recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000196

22-39766900034
LOWERY, MICHAEL
D   6592
Page   13  Of   18

22-39766900034 # 0
Illinois State Police, Zone 6 - General Criminal

DFS22-023387
Page 16 of 14

SM #6710

| DFS Case #: | DFS22-023387 |
|---|---|
| Agency: | Illinois State Police, Zone 6 - General Criminal |
| Agency Case #: | 22-39766900034 |
| Scene #: | 2 |
| Analyst: | CSI Skylar Marlow |



IMG_2141.JPG          IMG_2142.JPG          IMG_2143.JPG

IMG_2144.JPG          IMG_2145.JPG          IMG_2146.JPG

IMG_2147.JPG          IMG_2148.JPG          IMG_2149.JPG

Date of Report: Jul 4, 2022                                Page 6 of 8

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains neither recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000197

22-39766900034 # 0
Illinois State Police, Zone 6 - General Criminal

DFS22-023387
Page 11 of 14

SM #0710



Illinois State Police
Division of Forensic Services
Crime Scene Services Command
Crime Scene Region 5

DFS Case #:     DFS22-023387
Agency:         Illinois State Police, Zone 6 - General Criminal
Agency Case #: 22-39766900034
Scene #:        2
Analyst:        CSI Skylar Marlow

**Photo Sheet**

| IMG_2150.JPG | IMG_2151.JPG | IMG_2152.JPG |
| IMG_2153.JPG | IMG_2154.JPG | IMG_2155.JPG |
| IMG_2156.JPG | IMG_2157.JPG | IMG_2158.JPG |

Date of Report: Jul 4, 2022

Page 7 of 8

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains neither recommendations nor conclusions of the Illinois State Police. It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000198

22-39766900034
LOWERY, MICHAEL
D  6592
Page  15 Of  18

22-39766900034 # 0
Illinois State Police, Zone 6 - General Criminal

DFS22-023387
Page 12 of 14

SM #0710



Illinois State Police
Division of Forensic Services
Crime Scene Services Command
Crime Scene Region 5

| DFS Case #: | DFS22-023387 |
| Agency: | Illinois State Police, Zone 6 - General Criminal |
| Agency Case #: | 22-39766900034 |
| Scene #: | 2 |
| Analyst: | CSI Skylar Marlow |

**Photo Sheet**

IMG_3159.JPG

Date of Report: Jul 4, 2022

Page 4 of 5

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains neither recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000199

22-39766900034
LOWERY, MICHAEL
D 6592
Page 16 Of 18

22-39766900034 # U
Illinois State Police, Zone 6 - General Criminal

DFS22-023387
Page 13 of 14

SM #0710



Illinois State Police
Division of Forensic Services
Crime Scene Services Command
Crime Scene Region 5

| | |
|---|---|
| DFS Case #: | DFS22-023387 |
| Agency: | Illinois State Police, Zone 6 - General Criminal |
| Agency Case #: | 22-39766900034 |
| Scene #: | 2 |
| Analyst: | CSI Skylar Marlow |

**Evidence Manifest**

### Case Information

| | |
|---|---|
| Primary Agency: | Illinois State Police, Zone 6 - General Criminal - 22-39766900034 |
| Secondary Agency: | |
| Investigating CSI: | CSI Skylar Marlow (#6710) |
| Primary Agency Officer: | Special Agent Michael Lowery (#6592) |
| Offense: | Death Investigation |
| Offense Date: | Jun 28, 2022 9:45 AM |
| Victim: | Mark Bull |
| Suspect: | |

### Evidence Information

Item# 2
Envelope (Sealed) containing Postmortem Kit -- Quantity: 1; Subject: Mark Bull; Sexual Assault Evidence: Not Collected; Clothing: Not Collected; Palmprints: Separate Exhibit ; Fingerprints: Separate Exhibit; Fingernail Specimens: Collected; Buccal Swabs: Collected; Blood Card: Collected; Pulled Pubic Hairs: Collected; Combed Head Hairs: Collected; Pulled Head Hairs: Collected; No sexual assault kit collected per conversation with Pathologist and Investigators on scene. No clothing on or with victim. -- Location Found: Morgue

Item# 3
Envelope (Sealed) containing Known Fingerprints/Tenprints -- Quantity: 1; Finger and palm prints collected from victim during autopsy. -- Location Found: Morgue

| Date/Time | Released By | Signature | Released To | Signature |
|---|---|---|---|---|
| Jul 6, 2022 9:22 AM | CSI Marlow (#6710) | | A Hadley (#5961) | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Date of Report: Jul 6, 2022

Page 1 of 1

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains neither recommendations nor conclusions of the Illinois State Police. It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000200

22-39766900034
LOWERY, MICHAEL

D   6592

Page   17  Of   18

22:39766900034 # 0                                          DFS22-023387
Illinois State Police, Zone 6 - General Criminal            Page 14 of 14

SM #6710



| Illinois State Police | Chain of Custody |
|---|---|
| **Division of Forensic Services** | Lab Case #: DFS22-023387 |
| | Agency #:22-39766900034 |

**Item 2 Q: One(1) sealed Envelope containing Autopsy/post mortem kit (standards, pubs**

**Item Chain of Custody**

| Date | Time | Container | Lab | Custody Of | Location / Person | Logged By |
|---|---|---|---|---|---|---|
| 06/30/2022 | 10:06 am | | | Crime Lab Personnel | Skylar Marlow | |
| 06/30/2022 | 10:07 am | | | Crime Lab Personnel | Skylar Marlow | Skylar Marlow |
| 06/30/2022 | 11:10 am | | | CSSC Secure Temp Storage Room | Metro East Forensic Science Laboratory | Skylar Marlow |
| 07/06/2022 | 9:29 am | | | Crime Lab Personnel | Skylar Marlow | Skylar Marlow |
| 07/06/2022 | 9:30 am | | | Personnel Transfer | Personnel Transfer (Non-Lab Use Only) | Skylar Marlow |

**Comments:** Items taken into custody at 9:15AM on 07/06/2022 by Crime Lab Personnel Skylar Marlow

**Item 3 Q: One(1) sealed Envelope containing Ten Print Cards**

**Item Chain of Custody**

| Date | Time | Container | 0' : | Custody Of | Location / Person | Logged By |
|---|---|---|---|---|---|---|
| 06/30/2022 | 10:06 am | | | Crime Lab Personnel | Skylar Marlow | |
| 06/30/2022 | 10:07 am | | | Crime Lab Personnel | Skylar Marlow | Skylar Marlow |
| 06/30/2022 | 11:10 am | | | CSSC Secure Temp Storage Room | Metro East Forensic Science Laboratory | Skylar Marlow |
| 07/06/2022 | 9:29 am | | | Crime Lab Personnel | Skylar Marlow | Skylar Marlow |
| 07/06/2022 | 9:30 am | | | Personnel Transfer | Personnel Transfer (Non-Lab Use Only) | Skylar Marlow |

**Comments:** Items taken into custody at 9:15AM on 07/06/2022 by Crime Lab Personnel Skylar Marlow

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000201

22-39766900034
LOWERY, MICHAEL
D  6592
Page   18  Of  18

# INDIVIDUAL

| Last Name | | First Name | | | Middle Name | |
|---|---|---|---|---|---|---|
| **BULL** | | **MARK** | | | **TRAVIS** | |

| AKA/Maiden |
|---|
| |

| Sex | Race | | | DOB | SSN | |
|---|---|---|---|---|---|---|
| **MALE** | **WHITE - W** | | | **07/25/1983** | | |

| Drivers License Number | | Home Telephone | | Cell Telephone | |
|---|---|---|---|---|---|
| | | | | | |

| Street | | | | | | |
|---|---|---|---|---|---|---|
| **92 BONDS STREET** | | | | | | |

| City | | State | Zip Code | How Long | Personal History |
|---|---|---|---|---|---|
| **EAST ALTON** | | **IL** | **62024** | | |

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000202

22-39766900034
LOWERY, MICHAEL
D   6592
Page   1   Of   1

## ILLINOIS STATE POLICE
## INVESTIGATIVE REPORT

| Case Number | Case Title | | Report Type | | |
|---|---|---|---|---|---|
| 22-39766900034 | BULL, MARK T. | | ☑ Individual | ☐ Location | ☐ Vehicle |

| Report Purpose | | Report Date | Activity Date |
|---|---|---|---|
| CRIME SCENE PHOTOS | | 09/22/2022 | 09/22/2022 |

| Lead Number | Drug Buys | ArrestWarrants | Search Warrants | Overhear Admin | Overhear Warrant |
|---|---|---|---|---|---|
| | | | | | |

| Reporting Agent | ID Number | Zone/Office |
|---|---|---|
| LOWERY, MICHAEL | 6592 | ISPZ6CL |

| Case Agent | Case Agent ID Number | Case Agent Zone/Office |
|---|---|---|
| LOWERY, MICHAEL | 6592 | ISPZ6CL |

| ALPR Used | APLR Location |
|---|---|
| ☐ Yes | |

## NARRATIVE

The purpose of this report is to document the receipt of crime scene photos related to the in-custody death of Mark BULL.

On September 22, 2022, Reporting Agent (R/A) Michael Lowery received crime scene photos from Crime Scene Investigator Skylar Marler. The photos were downloaded onto a temporary USB storage device and later transferred to a DVD.

The temporary USB storage device was erased and stored for later use.   The DVD will be submitted to the Illinois State Police, Zone 6, Evidence Vault.

## INDIVIDUAL

| Last Name | First Name | Middle Name |
|---|---|---|
| BULL | MARK | TRAVIS |

| AKA/Maiden |
|---|
| |

| Sex | Race | | DOB | SSN |
|---|---|---|---|---|
| MALE | WHITE - W | | 07/25/1983 | |

| Drivers License Number | Home Telephone | Cell Telephone |
|---|---|---|
| | | |

| Street |
|---|
| 92 BONDS STREET |

| City | State | Zip Code | How Long | Personal History |
|---|---|---|---|---|
| EAST ALTON | IL | 62024 | | ☐ |

| Approved By |
|---|
| Irwin, Travis   #6344 |

Disclaimer: This document contains neither recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000203

22-39766900034
LOWERY, MICHAEL
D   6592
Page   1   Of   9

## ILLINOIS STATE POLICE
## INVESTIGATIVE REPORT

| Case Number | Case Title | | Report Type | | |
|---|---|---|---|---|---|
| **22-39766900034** | **BULL, MARK T.** | | ☑ Individual  ☐ Location  ☐ Vehicle | | |
| Report Purpose | **MADISON COUNTY STATE'S ATTORNEY LETTER OF REVIEW** | | Report Date **06/06/2023** | | Activity Date **05/26/2023** |

| Lead Number | Drug Buys | ArrestWarrants | Search Warrants | Overhear Admin | Overhear Warrant |
|---|---|---|---|---|---|
| | | | | | |

| Reporting Agent | D Number | Zone/Office |
|---|---|---|
| **LOWERY, MICHAEL** | **6592** | **ISPZ6CL** |

| Case Agent | Case Agent ID Number | Case Agent Zone/Office |
|---|---|---|
| **LOWERY, MICHAEL** | **6592** | **ISPZ6CL** |

| ALPR Used | APLR Location |
|---|---|
| ☐ Yes | |

## NARRATIVE

The purpose of this report is to document the receipt of a letter from the Madison County State's Attorney's Office in reference to the in-custody death of Mark T. Bull.

On May 26, 2023 at approximately 3:40 p.m., Reporting Agent (R/A) Michael Lowery received a letter from the Madison County State's Attorney Office.  In the letter, Assistant State's Attorney Ryan Kemper provided the following conclusion:

There is no probable cause to believe that any Madison County Sheriff's Deputy exceeded the permissible use of force as provided under 720 ILCS 5/7-5; nor does the record reveal probable cause of official misconduct under 720 ILCS 5/33-3. I believe no further action or investigation is necessary at this time and my office will consider this review closed.

The letter is attached to this email for review.

On June 6, 2023, R/A notified Madison County Sheriff Department's Jail Administrator, Captain Kris Tharp, of the findings.

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000204

22-39766900034
LOWERY, MICHAEL
D  6592
Page   2  Of  9



**Office of the State's Attorney**
MADISON COUNTY, ILLINOIS

THOMAS A. HAINE
STATE'S ATTORNEY

**To: SA Lowery, Zone 6 Investigations**

**From: Ryan A. Kemper, Chief Warrant Officer**

**Re: SAO Review of ISP #22-39766900034; MCSO Report No. 2022-13407**

**Date: May 26, 2023**

Dear SA Lowery:

I have reviewed the reports and digital copies of evidence provided by the Illinois State Police regarding the death of Mark Bull ("Bull"), which occurred in the Madison County Jail on June 28, 2022, in Madison County, Illinois.

Specifically I have reviewed the following: Madison County Sheriff's Office Report No. 2022-13407; Illinois State Police Investigative Report No. 22-39766900034; Alton Police Report 22-13994; CSI Report DFS22-23387; Edwardsville Fire Department Report 22-1886; administrative jail grievances submitted by detainees Danny Linhart and James Shimchick after the incident; reports specific to the interviews of detainees Danny Linhart, James Shimchick and Jonathan Beasley; Medical Examiner Report No. 2022-28 IL; narrative reports regarding investigator review of video surveillance in the jail; booking card and a medical history health appraisal form for detainee Mark Bull; detainee grievance/request history for Mark Bull; medical requests from detainee Mark Bull; and a medication administration record for detainee Mark Bull.

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains neither recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000205

22-39766900034
LOWERY, MICHAEL
D   6592
Page    3   Of   9

**FACTUAL SUMMARY – JUNE 28, 2022 INCIDENT**

The following is a summary of the facts as they appear in the evidence presented to the State's Attorney's Office.  I have not included all facts, only those particularly relevant to this review.

A.   *Mark Bull's Arrest and Arrival at the County Jail*

On June 14, 2022, the Alton Police Department initiated an investigation into reports of possible drug trafficking of methamphetamine from Missouri into the State of Illinois.   Alton Police officers conducted a traffic stop of a white Ford Expedition, finding it occupied by a female driver, and front seat passenger, identified as Mark Bull.  A probable cause search of the vehicle revealed Bull to be in possession of approximately thirty (30) grams of methamphetamine, as well as various items of drug paraphernalia, found on the vehicle floorboard.  On June 16, 2022, Bull was charged in Cause No. 22-CF-1558 with one (1) count of Unlawful Possession of Methamphetamine with the Intent to Deliver (Class X).  Bond was set at $100,000 and, on June 17, 2022, Bull was remanded to the custody of the Madison County Sheriff pending trial.

On June 17, 2022, Bull was booked into the Madison County Jail.  On June 19, 2022, a medical history and health appraisal of Bull was taken by a jail nurse and signed by Bull.  In that appraisal, Bull's level of consciousness was found to be "alert" and his speech, behavior and mood were found to be normal.   When questioned about existing health issues, Bull made no reference to any gastrointestinal or cardiovascular issues at that time.  On June 21, 2022, that document was reviewed and signed by a medical practitioner.

B.   *Mark Bull's Jail Requests and Available Medical Records*

Bull submitted two grievances to jail staff during the period from June 17, 2022 to June 28, 2022.  On June 23, 2022, Bull submitted a sick call indicating that he had "tears" in his stomach and needed medicine for it.  The June 23 request further indicates that the pain in his stomach "just started."  The handwritten notes on the June 23 request seem to indicate that Bull met with someone on medical staff with regard to treatment.   The handwritten notes appear to indicate that medical staff, at a minimum, assessed Bull's blood pressure, weight and blood oxygen levels, and also took some medical history concerning Bull's prior treatment for a stomach issue at Alton Memorial Hospital.  Bull's medical administration record also indicates that he was started on a medication regimen on or about June 20, 2022, and prescribed something different on June 25, 2022, indicating that he had contact with medical staff during this period.  A cursory, lay search for information on the medications given to Bull suggests he was being treated by medical staff, in part, for gastrointestinal issues.

2

Approved By
**Irwin, Travis   #6344**
Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D   6592
Page    4   Of   9

On June 28, 2022, at approximately 9:29am, Bull submitted a second sick call indicating that he "want[ed] to see a doctor," that his breathing was bad, that "his stomach liner is in bad shape," and that his issue has been occurring for "2 weeks." It does not appear that medical staff had yet made any notations on this second request document.[1]

### C.   Statements from Deputies

Madison County Sheriff's Deputies ("Deputies") report that on June 28, 2022, at approximately 9:45am, shortly after Bull submitted his second sick call, detainee James Shimchick ("Shimchick") asked for a sick call slip for "the guy in cell three," later identified as Mark Bull. Shimchick reported that Bull was feeling pretty bad and might have fallen out of his bed that morning. Deputies report that they provided a sick slip to Shimchick and returned it to the infirmary at 10:33am. Deputies report that around 10:40am, a jail nurse asked to see Bull for assessment. At 10:42am, Deputies began to transport Bull to the infirmary for assessment, observing Bull to be perspiring and to have a cut to his forehead. Deputies provided a wheelchair for transportation and immediately took Bull to the infirmary.

At 10:46am, Bull arrived to the infirmary for treatment. Deputies observed that during transport to the infirmary Bull's breathing had become shallow, and he began to make gurgling sounds. It was determined to lower Bull to the floor and call for EMS. Deputies dispatched for EMS at 10:50am. At 10:53am, Bull became unresponsive and a jail nurse administered aid. EMS arrived on scene at 10:56am and took over Bull's care. At 11:05am, EMS loaded Bull into an ambulance for treatment.

### D.   Video Surveillance and EMTs

Video surveillance from the jail confirms that Deputies conveyed detainee Bull to the infirmary at 10:44am, with Bull in an upright position in the wheelchair. During transport, Bull appears to move into an atypical position, then showing signs of distress. The video does not show that Deputies made any forcible contact with Bull that might have contributed to his medical condition. EMS arrives and Bull is transported by stretcher to an ambulance at 11:05am. Edwardsville Fire Department EMS personnel ("EMS") reported conducting an assessment of Bull at the Madison County Jail at 10:58am, finding him to be unresponsive. EMS records indicate that Bull was taken to Anderson Hospital for treatment, arriving at 11:30am.

---

[1] Notably, a complete copy of Bull's medical history has not been included in this review. Based on the information available, it is clear that Bull's medical care was referred to medical professionals, who exercised independent professional judgment. The exercise of medical judgment is not relevant to this review.

3

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police. It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000207

22-39766900034
LOWERY, MICHAEL
D   6592
Page    5 Of 9

E.   *Statements from Other Detainees*

Detainee James Shimchick was interviewed and reported that he believed that Bull was going through drug withdrawals when he first entered the jail.  Shimchick stated that Bull had previously told him that he (Bull) was told by a doctor that Bull's long term use of opiates had deteriorated the lining of his stomach.  Shimchick stated that he notified jail staff about Bull's condition and that jail staff said Bull with going through withdrawals.  Shimchick stated that Bull did, in fact, see the nurse, and that medical staff gave him something for withdrawals.  He further stated that on June 28 as Bull was getting out of bed, he felt dizzy, fell, and hit his head.  Shimchick stated that Bull told him to request a wheelchair and a doctor.  Shimchick stated that he filled out a paper sick call slip for Bull.

Detainee Danny Linhart ("Linhart") was interviewed and reported that he repeatedly asked jail officers to help Bull during his period of detention, but they told him that Bull was "dope sick."  Linhart believed that jail staff gave Bull medication for withdrawals, but Bull told staff that he was not having withdrawals.  Linhart heard Bull tell jail staff that he had "tears in his stomach."  Linhart opined that Bull was in custody for two weeks and would not still have been having withdrawals at that point.  Linhart stated that Bull told him that the medication that medical staff gave to him was making it worse.

Detainee Jonathan Beasley ("Beasley") was interviewed and reported that he initially thought Bull was "dope sick," but stated that Bull was not getting better over time.  Beasley believed that guys who are "dope sick" usually get better within a week.  Beasley stated that Bull told him he had repeatedly messaged jail staff, saying he needed a doctor.  Beasley reported that Bull was taken to the infirmary 2-3 days prior to his death, but he did not know what Bull was treated for.  Beasley observed Bull with a cut to his head the morning of June 28, and Bull told him that he fell out of bed.  Beasley gave Bull a tissue to stop the bleeding and helped Bull submit a sick slip.

F.   *Medical Examiner's Report*

The medical examiner's report reflects that pathologist Dr. Kamal Sabharwal completed an autopsy of Mark Bull on June 30, 2022, finding the cause of death to be perforated duodenal ulcer with peritonitis.  Dr. Sabharwal noted the cut above Bull's eye, as observed by other detainees after Bull's fall, but Dr. Sabharwal observed no fractures or other signs of exterior trauma that may have contributed to his death.

## ILLINOIS STATE LAW AND ANALYSIS

Under Illinois law, the standard for an officer's use of force is codified in the Criminal Code.  *People v. Mandarino*, 2013 IL App (1st) 111772, ¶48.  A police officer is justified in the use of any force which he reasonably believes, based on the totality of the circumstances, to be necessary to effect an arrest and of any force which he reasonably believes, based on the totality of the circumstances, to

4

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D   6592
Page   6  Of  9

be necessary to defend himself or another from bodily harm while making the arrest. 720 ILCS 5/7-5(a) (eff. 12-17-21).  Whether by way of initial arrest or continued detention, the decision by a peace officer to use force shall be evaluated carefully and thoroughly, in a manner that reflects the gravity of that authority and the serious consequences of the use of force by peace officers, in order to ensure that officers use force consistent with law and agency policies.  720 ILCS 5/7-5(e).

Under the meaning of Section 5/7-5, it does not appear that any police use of force occurred in this incident.  The witness statements and surveillance video demonstrate that Madison County Sheriff's Deputies did not apply any physical force to the person of Mark Bull that contributed to his death.  On the contrary, Deputies transported Bull to the infirmary by wheelchair at his own request and at the request of medical staff.

Under Illinois law, an officer is also expected to perform certain duties mandated by law. *See* 720 ILCS 5/33-3.  Specifically, the offense of Official Misconduct is defined, in relevant part, as follows:

> (a) A public officer or employee or special government agent commits misconduct when, in his official capacity or capacity as a special government agent, he or she commits any of the following acts:
> (1) Intentionally or recklessly fails to perform any mandatory duty as required by law; or
> (2) Knowingly performs an act which he knows he is forbidden by law to perform[.]

720 ILCS 5/33-3(a)(1)-(2).  Under this statute, the State may not seek to impose criminal liability upon a public officer for an amorphous "breach of fiduciary duty." *People v. Grever*, 222 Ill. 2d 321, 338 (Ill. 2006).  Rather, the State must allege and prove that a public officer has violated an identifiable statute, rule, regulation, or tenet of a professional code.  *Id.* It is not sufficient to simply allege that a public officer has violated a common law duty applicable only to civil claims. *Id.*

In the context of detainee medical treatment, moreover, federal and state courts have long held that corrections officers can, and perhaps should, delegate medical decision-making to medical professionals. *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009).  Corrections officers act properly when they refer medical complaints to medical providers, who could be expected to address those specific concerns.  *Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005).  Corrections officers may rightfully rely on the judgment of medical professionals in treating a detainee, and are not expected to second-guess that exercise of medical judgement. *Rasho v. Elyea*, 856 F.3d 469, 478 (7th Cir. 2017).  As such, where corrections officers have reported a detainee medical issue and that issue is being addressed by medical staff, corrections officers cannot be said to have a legal duty under any

5

Approved By
**Irwin, Travis   #6344**

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000209

22-39766900034
LOWERY, MICHAEL
D   6592
Page   7   Of   9

identifiable statute, rule, regulation or professional code to provide such medical care themselves, or to demand a different form of treatment.

Here, the witness statements and medical records make clear that Mark Bull's non-emergent health issues during the period from June 23-28, 2022 were submitted to medical staff and addressed by the appropriate medical professionals. Admittedly, it is not clear from the record presented whether Bull was suffering from opiate withdrawal on June 28, 2022. Apparently, neither Bull nor his fellow detainees believed opiate withdrawal be the cause of his ongoing gastrointestinal issues. According to the detainee witnesses, Bull believed he was suffering from some other ailment. But, the precise medical diagnosis and treatment regimen are not issues within the knowledge and control of Madison County Sheriff's Deputies. It is not official misconduct to allow medical staff to make medical decisions concerning detainee treatment.

By all accounts, including the medical records and witness statements from other detainees, Bull had visited with medical staff, was prescribed medication, and was under a doctor's care. Bull submitted a request for a sick call on June 23, 2022, which was referred to medical staff, and addressed by medical staff. There is no evidence on this record that, during the period from June 23-28, 2022, any Sheriff's Deputy prevented Bull from accessing medical care, or ignored his requests directed to medical staff. *See Burks*, 555 F.3d at 596. Furthermore, on June 28, 2022, when Deputies learned that Bull was having a health emergency, he was immediately delivered to the infirmary, EMTs were summoned and, within minutes, Bull was delivered to the nearest hospital. It is not within any cognizable legal duty of Sheriff's Deputies to implement an alternative course of medical treatment and there is no probable cause to believe that any Deputy committed official misconduct in this course of events.

## CONCLUSION

There is no probable cause to believe that any Madison County Sheriff's Deputy exceeded the permissible use of force as provided under 720 ILCS 5/7-5; nor does the record reveal probable cause of official misconduct under 720 ILCS 5/33-3.

I believe no further action or investigation is necessary at this time and my office will consider this review closed. Please feel free to contact me should you have any questions or if you wish to discuss this further.

6

| Approved By |
| --- |
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
LOWERY, MICHAEL
D  6592
Page  8  Of  9

Respectfully,

Ryan A. Kemper
Assistant State's Attorney – Chief Warrant Officer
Madison County State's Attorney's Office
157 North Main Street, Suite 402 | Edwardsville, IL 62025
Phone: (618) 296-5357

7

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000211

22-39766900034
LOWERY, MICHAEL
D   6592
Page   9  Of  9

# INDIVIDUAL

| Last Name | First Name | Middle Name |
|---|---|---|
| BULL | MARK | TRAVIS |

| AKA/Maiden |
|---|
| |

| Sex | Race | | DOB | SSN |
|---|---|---|---|---|
| MALE | WHITE - W | | 07/25/1983 | |

| Drivers License Number | Home Telephone | Cell Telephone |
|---|---|---|
| | | |

| Street |
|---|
| 92 BONDS STREET |

| City | State | Zip Code | How Long | Personal History |
|---|---|---|---|---|
| EAST ALTON | IL | 62024 | | ☐ |

| Approved By |
|---|
| Irwin, Travis   #6344 |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000212

22-39766900034
HENTZE, MICHAEL
D  6404
Page   1  Of  2

## ILLINOIS STATE POLICE
## INVESTIGATIVE REPORT

| Case Number | Case Title | | | Report Type | |
|---|---|---|---|---|---|
| **22-39766900034** | **BULL, MARK T.** | | | ☑ Individual ☐ Location ☐ Vehicle | |
| Report Purpose **AUTOPSY OF MARK T. BULL** | | | | Report Date **06/30/2022** | Activity Date **06/30/2022** |
| Lead Number | Drug Buys | ArrestWarrants | Search Warrants | Overhear Admin | Overhear Warrant |
| Reporting Agent **HENTZE, MICHAEL** | | | | ID Number **6404** | Zone/Office **ISPZ6CL** |
| Case Agent **LOWERY, MICHAEL** | | | | Case Agent ID Number **6592** | Case Agent Zone/Office **ISPZ6CL** |
| ALPR Used ☐ Yes | APLR Location | | | | |

## NARRATIVE

The purpose of this report is to document my attendance at the autopsy of:

**Mark T. Bull**
Male/White, DOB: 07/25/1983
92 Bonds Street,
East Alton, IL 62025

The autopsy was conducted at the Madison County (IL) Morgue, 101 East Edwardsville Road, Wood River, IL 62095. The autopsy commenced on 06/30/2022, at approximately 8:00 a.m. The following individuals were in attendance:

- Dr. Kamal Sabharwal, Forensic Pathologist
- Autopsy Assistant Allyson Hoxsey
- Madison County Deputy Coroner Diondra Horner
- CSI Skylar Marlow #6710
- ISP Special Agent Michael Hentze #6404

Dr. Kamal Sabharwal's preliminary cause of death finding was a perforated duodenal ulcer with peritonitis.

For comprehensive autopsy findings, see the final autopsy report completed by Dr. Kamal Sabharwal. A copy of the final autopsy report will be maintained in the case file upon its completion.

No field notes were taken at the autopsy.

## INDIVIDUAL

| Last Name | First Name | Middle Name |
|---|---|---|
| **BULL** | **MARK** | **TRAVIS** |
| AKA/Maiden | | |

| Approved By |
|---|
| **Irwin, Travis   #6344** |

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois State Police.  It and its contents are not to be disseminated outside of your agency.

22-39766900034
HENTZE, MICHAEL

D   6404

Page    2  Of  2

| Sex **MALE** | Race **WHITE - W** | | DOB **07/25/1983** | SSN |  |
|---|---|---|---|---|---|
| Drivers License Number | | Home Telephone | | Cell Telephone | |
| Street **92 BONDS STREET** | | | | | |
| City **EAST ALTON** | | State **IL** | Zip Code **62024** | How Long | Personal History ☐ |

| Approved By **Irwin, Travis   #6344** |
|---|

Disclaimer: This document contains nei her recommendations nor conclusions of the Illinois
State Police.  It and its contents are not to be disseminated outside of your agency.

GTL-Bull,Mark-GeneralProduction-000214